## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Karen Wells and Andre Lock as co-
trustees for the next of kin of Amir
Rahkare Locke, deceased,

Plaintiffs,

vs.

Mark Hanneman, in his individual
capacity as a Minneapolis police
officer, and the City of Minneapolis,

Defendants.

Case No. 23-cv-00273-WMW-DLM

**DEFENDANTS' MEMORANDUM
IN SUPPORT OF MOTION FOR
JUDGMENT ON THE PLEADINGS**

## INTRODUCTION

Defendants respectfully submit this memorandum in support of their motion for judgment on the pleadings. The Complaint, search warrant affidavit, and bodyworn camera footage indisputably establish that Defendant Officer Mark Hanneman's conduct in firing his weapon at Amir Locke was objectively reasonable because, under the circumstances, Hanneman could have reasonably believed Locke could kill or seriously injure him or another person. Consequently, Hanneman is not liable for Locke's death under any legal theory and the Complaint must be dismissed.

Plaintiffs' Complaint fails because it is indisputable that the Minneapolis Police Department (MPD) was told that a judge issued no-knock, nighttime search

warrants related to a murder investigation.



The bodyworn camera recordings establish that once the officers entered apartment 701 announcing they were police conducting a search warrant, an unidentified person, later identified as Locke, looked over the couch at the officers and began to move around under a blanket. He continued to move under the blanket as officers continued entering and gave additional commands to show hands and get on the ground. When Locke partially emerged from the blanket, he was holding a handgun that was pointed in Hanneman's direction, and there were multiple officers in the apartment near Locke. At that time, Hanneman fired his handgun at Locke. Sadly, Locke passed away from his injuries.

Under those circumstances, as a matter of law, Hanneman had probable cause to believe that Locke posed a threat of serious physical harm to Hanneman

or others, and therefore Hanneman's use of deadly force was objectively reasonable or at the very least he is entitled to qualified and official immunity. In addition, the remaining allegations against the Defendants fail to state a claim. Accordingly, Defendants ask this Court to grant them judgment on the pleadings.

## FACTUAL BACKGROUND

## I.   INFORMATION FROM THE SEARCH WARRANT APPLICATION AND COMPLAINT.

The St. Paul Police Department (SPPD) provided the following facts in support of its application for search warrants.[1] It is not repeated as proof of the matters asserted, but instead to describe the information that the Minneapolis Police Department received before the search warrants were executed, and Hanneman's state of mind at the time of his use of force against Locke.

### A. The Murder of



---

[1] While courts generally may not consider materials outside the pleadings in deciding whether to grant a motion for judgment on the pleadings, courts may properly consider, among other things, public records, including the SPPD's application for search warrants here. *Noble Sys. Corp. v. Alorica Cent.*, LLC, 543 F.3d 978, 982 (8th Cir. 2008).



Plaintiffs allege that SPPD requested that MPD assist in executing the warrants. Complaint at ¶ 83. Plaintiffs allege that MPD supervisors refused to assist with the warrants unless SPPD obtained no-knock search warrants. Complaint at ¶ 84. SPPD applied for and was granted no-knock warrants to search the apartments at Bolero Flats. Complaint at ¶ 86.

## II.     FACTS FROM BODYWORN CAMERA RECORDINGS.[2]

The following is a description of what is audible and visible on bodyworn camera recordings from the MPD officers that executed the warrant on apartment 701.[3] At 6:48:02 a.m., MPD officers unlocked the door to apartment 701. (Exh. 3, Hanneman BWC at 6:48:02-04). Officers shouted, "Police search warrant" and stepped into the apartment. *Id.* (Exh. 3, Hanneman BWC at 6:48:05). Officers loudly repeated "police search warrant" as they entered further into the apartment. (Exh. 3, Hanneman BWC at 6:48:06-08). As MPD Sgt. Sysaath moved into the living room, Locke was visible on the couch lifting his head with his face turned toward Hanneman, who was in front of Sysaath. (Exh. 1, Sysaath BWC at 06:48:12-14). As MPD Sgt. Carlson moved into the apartment, the top of Locke's head was visible over the back of the couch, and Locke's face turned toward Carlson; Locke's face was illuminated by Carlson's flashlight, which was shining directly into Locke's face. (Exh. 2, Carlson BWC at 06:47:28). An officer shouted,

---

[2] Courts from this district routinely conclude that bodyworn camera videos are "embraced by the pleadings" and proper to consider on a motion to dismiss. A court deciding a motion to dismiss—or motion for judgment on the pleadings—may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint. *See, e.g., Vernio v. Higgins*, No. CV 19-3024 (DWF/LIB), 2020 WL 3542757, at *2 (D. Minn. June 30, 2020), citing *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

[3] These recordings were filed conventionally as exhibits to Defendants' Answer. See Doc. 16 (flash drive with exhibits 1-10 to Answer).

"Let me see your hands!" (Exh. 2, Carlson BWC at 6:47:28). Locke's hands moved up and then down back under the blanket. (Exh. 2, Carlson BWC at 6:47:29-30). Locke moved around on the couch going up and down and side to side, and the blanket went back over his head. (Exh. 2, Carlson BWC at 6:47:28-6:47:32). *Id*. An officer yelled, "Hands! Hands!" *Id*. An officer yelled, "Police search warrant." (Exh. 5, Pearson BWC 6:48:07; Exh. 2, Carlson BWC 6:47:32; Exh. 3, Hanneman 6:48:09-10)[4]. Hanneman shouted, "Hands. Hands. Hands." (Exh. 3, Hanneman BWC 6:48:9-10). An officer yelled, "Get on the fucking ground." *Id*.

The back of the couch was illuminated by what appears to be a handgun-mounted flashlight. (Exh. 5, Pearson BWC at 06:48:09). Locke continued to move around under the blanket in what appears to be a crouched position. (Exh. 5, Pearson BWC 6:48:09). Locke's hair and part of the side of his face were visible from Pearson's position. (Exh. 5, Pearson BWC at 06:48:09-:10). Hanneman was at the couch and Locke can be seen on the couch leaning forward onto the ottoman holding a handgun. (Exh. 5, Pearson BWC 6:48:09-:10). *Id*.

As the officers continued to approach, a handgun was visible from under Locke's blanket, pointing to Officer Aaron Pearson's right. (Exh. 5, Pearson BWC at 06:48:10). Locke was holding the firearm in his right hand. (Exh. 5, Pearson BWC

---

[4] The bodyworn camera videos have slightly different timestamps. The City uses Hanneman's camera's timestamp when referencing the time.

at 06:48:10). The firearm was pointed in Hanneman's direction. (Exh. 5, Pearson BWC 06:48:10). Hanneman ordered, "Show me your hands." (Exh. 3, Hanneman BWC at 6:48:12-13). Locke's gun began to rise. (Exh. 5, Pearson BWC 6:48:09-6:48:10). At this moment, Hanneman fired his handgun at Locke. (Exh. 5, Pearson BWC at 06:48:11; Exh. 1, Sysaath BWC at 6:48:13). After he was shot, Locke dropped the gun; he then crawled toward where the gun had landed and attempted to get up. (Exh. 5, Pearson BWC at 6:48:12-6:48:15). Hanneman laid his body down on top of Locke. (Exh. 5, Pearson BWC at 6:48:15). An officer asked Hanneman if the gun was his, and Hanneman stated, "No. That's his. He had that and pointed it at me." (Exh. 5, Pearson BWC at 6:48:27-33). Another officer responded: "Yep. I saw it. I saw it. I saw it." (Exh. 5, Pearson BWC at 6:48:27-33).

## STANDARD OF REVIEW

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is appropriate only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law." *Ashley Cty, Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009) (quotations and citations omitted). A motion for judgment on the pleadings under Rule 12(c) is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009). The distinction between a Rule 12(c)

7

motion and a Rule 12(b)(6) motion is "purely formal." *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). "A Rule 12(c) motion may assert the defense of failure to state a claim upon which relief can be granted." *Id.* In reviewing a motion for judgment on the pleadings, the Court considers all facts alleged in the complaint as true to determine if the complaint states a claim for "relief that is plausible on its face." *Branden v. Wal-Mart Store, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court construes the complaint in the light most favorable to the non-movant, drawing all inferences in his favor. *Saterdalen v. Spencer*, 725 F.3d 838, 841 (8th Cir. 2013). "While courts generally may not consider materials outside the pleadings in deciding whether to grant a motion for judgment on the pleadings, courts may consider 'some public records, materials that do not contradict the complaint, or materials that are necessarily embraced by the pleadings.'" *Saterdalen*, 725 F.3d at 841 (quoting *Noble Sys. Corp. v. Alorica Cent.*, LLC, 543 F.3d 978, 982 (8th Cir. 2008)).

The non-moving party's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotations and citations omitted). "A claim has facial plausibility when the [party] pleads factual content that allows the court to draw the reasonable inference that the [alleged party] is liable for the misconduct

alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556–67). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664.

## ARGUMENT

## I.   PLAINTIFFS' EXCESSIVE FORCE CLAIM AGAINST HANNEMAN FAILS AS A MATTER OF LAW.

Plaintiffs' Section 1983 excessive force claim against Hanneman fails as a matter of law because Hanneman's use of deadly force on Locke was objectively reasonable under the circumstances. In addition, at the very least, the law had not clearly established that Hanneman could not act as he did given the circumstances, and therefore he is entitled to qualified immunity.

### A.   Hanneman's Use of Force was Objectively Reasonable.

Section 1983 prohibits a person acting under color of state law from depriving another person of their "rights, privileges, or immunities secured by the Constitution and laws...." 42 U.S.C. § 1983. Plaintiffs contend that Hanneman's actions violated Locke's Fourth Amendment right to be free from unreasonable seizures. To establish a Fourth Amendment seizure claim, a plaintiff must prove that the amount of force used was objectively unreasonable under the particular circumstances. *Henderson v. Munn*, 439 F.3d 497, 501 (8th Cir. 2006). The reasonableness of the officer's conduct is judged under the totality of the

circumstances confronting the officer. *Graham v. Connor*, 490 U.S. 386, 396, (1989).

The U.S. Supreme Court has explained:

> Because police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective. We set out a test that cautioned against the '20/20 vision hindsight' in favor of deference to the judgment of reasonable officers on the scene.

*Saucier v. Katz*, 533 U.S. 194, 205 (2001).

"The use of deadly force is reasonable where an officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012), citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). The Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead on whether the seizure actually effectuated falls within a range of conduct which is objectively "reasonable" under the Fourth Amendment. *Schulz v. Long*, 44 F.3d 643, 649 (8th Cir. 1995).

Here, the force used by Hanneman was reasonable under the totality of the circumstances because Hanneman had probable cause to believe that Locke posed a threat of serious physical harm to Hanneman or others. The information from the search warrant application is not asserted for the truth of the matter but rather to show the information MPD and Hanneman was given and reasonably relied

upon from SPPD. Officers are allowed to reasonably rely on information provided to them by other officers. *Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005) (*citing United States v. Hensley*, 469 U.S. 221, 232 (1985)). The search warrant was issued by the court in connection with a murder

Officers entered apartment 701 and announced "police, search warrant" repeatedly. Locke was moving around under a blanket. Officers yelled out additional commands, such as "let me see your hands," "hands," and "get on the ground." Locke moved to the ground, and partially emerged from the blanket, holding a firearm in his right hand, which was pointed in Hanneman's direction and near several other police officers in the apartment. Locke's hair and face were also partially visible at that time. Under those circumstances, a well-trained officer would have probable cause to believe that Locke posed a threat of serious physical harm to Hanneman or the other officers in the apartment. The firearm was visible, pointed in Hanneman's direction, and combined with Locke's movement and lack

of compliance with police commands, it was objectively reasonable for Hanneman to believe that Locke intended to use the firearm against the officers.

It is settled law that an officer facing an armed suspect may use deadly force where the officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others. *See, e.g., Aipperspach v. McInerney*, 766 F.3d 803, 807 (8th Cir. 2014) (deadly force objectively reasonable where decedent refused repeated demands to drop the gun he was holding and waved the gun in the direction of many officers after losing his balance); *Sinclair v. City of Des Moines*, 268 F.3d 594, 596 (8th Cir. 2001) ("no constitutional or statutory right exists that would prohibit a police officer from using deadly force when faced with an apparently loaded weapon"); *Loch v. City of Litchfield*, 689 F.3d 965, 966-67 (8th Cir. 2012) (deadly force was objectively reasonable when the officer reasonably believed the suspect had a gun, even though in fact the suspect had discarded his weapon before walking toward the officer, and a witness had allegedly informed the officer of this fact); *Thompson v. Hubbard*, 257 F.3d 896, 898–900 (8th Cir. 2001) (affirming summary judgment in favor of an officer who shot and killed an unarmed fleeing suspect based on the officer's credible testimony that the suspect "looked over his shoulder ... and moved his arms as though reaching for a weapon").

Based on this settled law, Hanneman's use of deadly force was objectively reasonable. Officers are not required to wait to be shot before they may use deadly force. "Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self protection." *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996).

The Complaint alleges the use of deadly force was unreasonable because officers should not have used a no-knock warrant and should have given Locke more time to realize what was happening. Compl. at ¶1-4. Both arguments should be rejected.

With respect to the fact that the warrant that brought Hanneman into apartment 701 was a no-knock warrant, the events leading up to the decision to use deadly force are irrelevant to a Fourth Amendment seizure analysis. *Yang v. City of Minneapolis*, 607 F.Supp.3d 880, 893 (D. Minn. 2022). Instead, the Court's analysis must focus on the reasonableness of the seizure itself, that is, the shooting, and not on the events leading up to it. *Yang*, 607 F.Supp.3d at 893 (citing *Schulz v. Long*, 44 F.3d 643, 648 (8th Cir. 1995)) *see also Gardner*, 82 F.3d at 252. As the Eighth Circuit has explained:

> The Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general. Consequently, we scrutinize only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment.

*Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) (citations omitted). Moreover,

> The Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within a range of conduct which is objectively "reasonable" under the Fourth Amendment. Alternative measures which 20/20 hindsight reveal to be less intrusive (or more prudent)… are simply not relevant to the reasonableness inquiry. For clarity, the reasonableness inquiry in cases such as this where deadly force is used is simply whether "the officer [using the force] has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."

*Schultz*, 44 F.3d at 649.

In determining the reasonableness of a seizure, the Court must focus on the seizure itself and not on the events leading up to it. *Gardner v. Bueger,* 82 F.3d 248, 252 (1996). "A 'seizure' occurs only when a citizen is physically touched by law enforcement officers or when he otherwise submits to a show of authority by the officers." *California v. Hodari D.*, 499 U.S. 621, 626 (1991). An assertion of authority by a law enforcement officer without a corresponding submission by the citizen does not constitute a seizure within the meaning of the Fourth Amendment. *Hodari*, 499 U.S. at 626. Here, the seizure occurred when Locke was shot. Thus, the use of deadly force analysis starts there, not at the decision to use a no-knock warrant.

Further, there is nothing in the Complaint alleging that it was Hanneman's decision to request a no-knock warrant. Compl. at ¶84. In *Schulz v. Long*, deputies engaged with a barricaded mentally ill man. 44. F.3d 643, 645 (8th Cir. 1995). When the man advanced on them with a double-bladed ax, deputies shot and killed him. *Id.* at 645. The plaintiff argued the force was unreasonable because the officers, by their actions, created the need to use force and they instead should have waited for a supervisor or a SWAT team. *Id.* at 648. The Eighth Circuit determined those arguments were irrelevant to the issue as to whether the officers' use of deadly force was reasonable in effectuating the seizure. *Id.* at 648-49. This ruling is consistent with other circuits as well.[5]

Hanneman shot only when he was feet away from a man who pointed a gun in his direction, ignored repeated orders to show his hands, inside an apartment ███████████████████████████████████████████████████████████ ████████████████████████████████████████████ The gun was

---

[5]   *See, e.g., Bella v. Chamberlain*, 24 F.3d 1251, 1255 (10th Cir. [1994]) (quoting *Cole* in stating that "'we scrutinize only the seizure itself, not the events leading to the seizure'"); *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992) ("pre-seizure conduct is not subject to Fourth Amendment scrutiny"); *Fraire v. City of Arlington*, 957 F.2d 1268, 1275–76 (5th Cir. [1992]) (rejecting as irrelevant evidence that police officer manufactured the circumstances which gave rise to the seizure), *cert. denied*, 506 U.S. 973 (1992); *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991) ("the officer's liability [is to] be determined exclusively upon an examination and weighing of the information [the officers] possessed immediately prior to and at the very moment [they] fired the fatal shot[s]").

pointed in Hanneman's direction despite repeated orders for Locke to show his hands. As stated above, Hanneman did not need to wait to see if Locke shot him before he shot at the man pointing a gun in his direction. Arguments that he should have waited longer in this situation are not required under the Fourth Amendment.

The Complaint alleges that Locke was startled and behaved innocently when he grabbed the gun to assess the threat and did not put his finger on the trigger. Compl. at 111-12, 114. These allegations are insufficient for several reasons. First, these allegations cannot be known by the Plaintiffs. They are speculation and argument not warranting consideration. But even if true, they do not render the use of deadly force unreasonable. In *Partlow v. Stadler*, 774 F.3d 497, 499 (8th Cir. 2014), a suicidal man left his apartment building with a shot gun. An officer yelled, "Gun! He's got a gun." *Partlow*, 774 F.3d at 500. Others yelled "drop the gun" or put down the gun!" *Id*. The plaintiff did not know the officers were there. *Id*. at 502. The officers shot the plaintiff. *Id*. at 500. The plaintiff claimed that although his gun moved it was innocent movements, claiming he was turning to put the gun down. *Id*. At 500. The Eighth Circuit held that even if the plaintiff intended no harm as he moved his gun, the officers' use of deadly force was reasonable because they had no way of knowing what the plaintiff planned to do. *Id*. at 502-03.

The Complaint makes assertions as to Locke's state of mind, which cannot be known, but the applicable inquiry here must instead focus on how a reasonable officer would have perceived Locke's actions. *Id*. at 502. Whether Locke was surprised or assessing the situation with no intent to shoot is not relevant. A reasonable officer would perceive Locke's actions of coming up from the couch and blanket with a gun, hand on the grip, and pointing in Hanneman's direction, as a threat of death or serious physical harm.  Deadly force was objectively reasonable.

Similarly, even if the barrel of Locke's gun was pointed down, the force was reasonable. When an officer reasonably believes that there is an imminent threat of serious harm, the officer may be justified in using deadly force even before the person actually points a weapon at him.  *Liggins v. Cohen*, 971 F.3d 798 (8th Cir. 2020) (citing *Malone v. Hinman*, 847 F.3d 949, 954-55 (8th Cir. 2017); *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001)). In Liggins, officers were investigating the report of a stolen gun by the plaintiff's brother, as well as a carjacking.  971, F.3d at 799. Officers knew the apartment complex had a history of "violent activity." *Id*. When officers arrived, the plaintiff had a gun. *Id*. at 800. The plaintiff stated he was holding the gun by the barrel pointed down. *Id*. He stated the gun was moving slightly because he was running. *Id*. When the officer saw the plaintiff had a gun in his hand, the officer took cover behind his vehicle and two seconds

later he shot at the plaintiff four times with no warning. *Id*. The Eighth Circuit

concluded that:

> With only a second or two to react as he rounded the parked truck,
> Cohen had reasonable grounds to believe that the fleeing subject who
> was running toward the back of the property could raise the gun and
> shoot. It would take only an instant to do so if the person were ready
> to fire. …This was a split-second decision for the officer. It was not
> practical in that moment for Cohen to discern whether B.C. was
> carrying the gun in an unusual manner or to shout a warning and
> wait for him to react. There was simply no time. "When the hesitation
> involved in giving a warning could readily cause such a warning to
> be the officer's last, then a warning is not feasible."

*Id*. at 801.

Here, the Complaint alleges that Locke grabbed the gun to assess the threat.

Compl. at ¶112, 114. Plaintiffs do not allege that Locke made any effort to drop the

gun, nor can they given the undisputed bodyworn camera footage, which shows

Locke pointing the gun in Hanneman's direction. As in *Partlow*, Locke's subjective

state of mind is irrelevant. His actions show wild movements under the blanket,

poking his head and his gun out from under the blanket, and pointing his gun in

Hanneman's direction, who was only feet away. Doc. 13, Ex. 2. A reasonable officer

would reasonably perceive a deadly threat.

### B.    Hanneman is Entitled to Qualified Immunity.

Even if the shooting of Locke could be found constitutionally unreasonable,

the excessive force claim still fails because there was no clearly established law

that would have put a reasonable officer on notice that using deadly force in these circumstances was unlawful.

The qualified immunity doctrine analyzes two questions: first, taken in the light most favorable to the person alleging injury, do the facts alleged show that the officer's conduct violated a constitutional right? *Saucier*, 533 U.S. at 201. If no constitutional right has been violated, there is no necessity for further inquiry concerning qualified immunity. *Id*. Second, was the constitutional right allegedly implicated clearly established at the time of the events in question? *Id*. [6]

For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

---

[6] *Saucier* was overruled in part by *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that *Saucier's* two-step sequence is not mandatory). "Under the rule established in *Pearson*, we have the discretion to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Fields v. Abbott*, 652 F.3d 886, 890 (8th Cir. 2011) (quoting *Pearson*, 555 U.S. at 236).

A court may deny a request for qualified immunity only if it is obvious that no reasonably competent officer would have concluded that the conduct was legal. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). If rational officers could possibly disagree on the legality of the actions, qualified immunity applies. *Id.* "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004). An officer does not lose qualified immunity because of a mistaken, yet reasonable belief as to the legality of his actions. *Saucier*, 533 U.S. at 205-06.

In February 2022, there was no clearly established law prohibiting deadly force when officers were faced with a person ███████████████████████████ ███████████████████████████████████████, who points a handgun in the direction of an officer mere feet away—an officer in close confines with nowhere to retreat or take cover—and who refuses to show his hands, drop the weapon, or show any indication of submitting to the lawful authority. To the contrary, a reasonable officer would have correctly believed that deadly force was authorized under established caselaw, as set forth above. Accordingly, Hanneman is entitled to qualified immunity.

## II.   PLAINTIFFS' *MONELL* CLAIM AGAINST THE CITY FAILS.

Count II of Plaintiffs' Complaint is a *Monell* claim against the City for practice and custom of unreasonable force, including racist policing and excessive

force for seeking and utilizing no-knock warrants against people of color, and failure to discipline officers who engage in unconstitutional or "other misconduct." Compl. at ¶151.

Under Section 1983, a municipality cannot be held liable for its employees' allegedly unconstitutional acts under a theory of respondeat superior. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Rather, a municipality may be liable only if the plaintiff can show that an official policy of the government is "the moving force of the [alleged] constitutional violation." *Monell*, 436 U.S. at 694. It is only when the "execution of a government's policy or custom . . . inflicts the injury" that the municipality may be held liable under Section 1983. *Id.* at 694. Plaintiffs' claim against the City fails and must be dismissed.

> **A.      Plaintiffs' *Monell* claim fails because Hanneman's use of force was objectively reasonable.**

Plaintiffs' *Monell* claim against the City fails because Plaintiffs' underlying Section 1983 claim against Hanneman fails, as discussed above. "[F]or municipal liability to attach, individual liability must first be found on an underlying substantive claim." *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007); *Sanders v. City of Minneapolis, Minn.*, 474 F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* …municipal liability.") Because that claim fails as a matter of law, the *Monell* claim likewise must be dismissed.

**B.     The Complaint fails to plausibly allege an unconstitutional custom.**

To establish the existence of a municipal "custom," a plaintiff must show:

(1)  The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2)  Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3)  The plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

*Ware v. Jackson County,* 150 F.3d 873, 880 (8th Cir. 1998). The Complaint alleges that prior to February 2, 2022, Minneapolis knew of and was deliberately indifferent in failing to correct "a number of unconstitutional practices and customs that were the moving force behind Locke's death." Compl. at ¶150. Listed as unconstitutional customs of misconduct are: engaging in racist policing; applying for no-knock warrants against people of color; executing no-knock warrants without regard for the rights of innocent third parties; and failing to discipline officers who engage in unconstitutional conduct. Plaintiff's Complaint fails to plausibly plead a claim satisfying these elements. The Complaint lists bare statistical evidence, and allegations of the applications of different types of force in different types of situations. There is not a single factual allegation of any previous misconduct in the same vein as the conduct at issue here.

### a. Plaintiffs fail to properly allege a pattern of unconstitutional misconduct.

Plaintiffs allege a widespread custom of excessive force. But the Complaint provides no factual allegations demonstrating a widespread pattern of unconstitutional misconduct by MPD officers similar to the allegations here. The only incidents specifically alleged in the Complaint are too dissimilar to this incident to constitute a pattern of unconstitutional acts, or to have provided notice of such a pattern. *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (dismissing custom claim because incidents plaintiff asserted identified a custom did not "bear any factual similarity to the January 22, 1994, confrontation with her son"); *Jane Doe A by and through Jane Doe B v. Special Sch. Dist. Of St. Louis Cty.*, 901 F.2d 642, 646 n.4 (8th Cir. 1990) (holding that notice of an employee's sexual misconduct with adults did not provide notice of sexual misconduct with children); *see also Livers v. Schenck*, 700 F.3d 340, 356 (8th Cir. 2012) ("misconduct must be very similar to the conduct giving rise to liability."); *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (two prior instances of misconduct a "persistent and widespread" pattern of misconduct that amounts to a city custom or policy of overlooking police misconduct"); *Kruse v. City of Elk River*, No. CV 21-01262 (JRT/BRT), 2022 WL 4387994, at *6 (D. Minn. Sept. 22, 2022) (granting motion to dismiss *Monell* claim because "allegations do not rise above genericism by alleging specific facts or constitutional violations…on multiple occasions, under

23

circumstances similar to those alleged [in the complaint]"); *Clardy v. City of St. Paul*, No. CIV. 01-CV-1275, 2003 WL 21805203, at *7 (D. Minn. Aug. 4, 2003) ("Clardy, does not point to specific facts indicating that the prior complaints against the City of St. Paul police officers were for constitutional violations akin to those he asserts against the City of St. Paul police officers, or were in other ways factually similar to the case at hand.").

Here, Paragraphs 17-21 of the Complaint assert a hodgepodge of allegations of excessive force in the context of arrests claiming officers used kicks, punches, and one shove against a wall. Paragraphs 23-25 allege a man was shot with less-lethal marking rounds and then beaten in the face. Paragraph 22 provides no details as to what type of force and situation allegedly occurred. Paragraphs 23-25 involve the use of non-lethal rounds during the unrest following George Floyd's murder. Paragraphs 29 and 32 involve deaths while the decedents were in the prone-restraint position. Paragraphs 30 and 31 state the cause of death but no factual allegations regarding the context of the shooting deaths. None of the claimed excessive force conduct alleged is similar to the alleged conduct here: shooting an armed person who begins to train his gun in the direction of the officer during the course of officers carrying out an unannounced search warrant. Equally important, the allegations have nothing to do with excessive force in connection with carrying out any kind of search warrant. **Plaintiffs cannot prevail "unless**

there is a municipal policy or custom of failing to act on earlier *similar* complaints of unconstitutional conduct." *Ratliff v. City of Columbia*, 1999 WL 1143752, at *1 (8th Cir. 1999) (emphasis added) (eight earlier unrelated complaints of misconduct were "insufficient as a matter of law to show a persistent pattern of unconstitutional misconduct"); *Mettler v. Whitledge*, 165 F.3d 1197, 1205-05 (8th Cir. 1999) (the mere existence of fifteen previous citizens' complaints does not suffice to show a municipal custom of permitting or encouraging excessive force).

When the Complaint does allege police encounters involving the execution of warrants, none describe a situation where an officer was in close proximity to an armed man during the execution of a warrant searching for evidence in an investigation of a shooting-related murder, and the armed person begins pointing his gun in the direction of the officer. Instead, Paragraph 41 centers around a warrant obtained through faulty information and officers shooting through a wall. Paragraph 42 alleges a flashbang going off near a woman causing injury. Paragraph 43 alleges officers killed a dog for no reason and kicked and hit a man while he was handcuffed. Paragraph 44 alleges officers killed a dog for no reason. These matters do not have the similarity required under case law to demonstrate a widespread custom of shooting an armed human being in close proximity.

### b. Plaintiffs fail to properly allege deliberate indifference to an unconstitutional pattern of misconduct.

Much of the Complaint chronicles allegations from previous lawsuits and notes that the City settled the matter. Compl. at ¶ 17-27, 29-31 and 45-46. In addition to those lawsuits being factually dissimilar, these cannot be the basis for *Monell* liability here because the existence of lawsuits and settlements do not provide notice of an unconstitutional custom. *Mann v. Shevich*, 2010 WL 653867 (D. Minn. Feb. 23, 2010) (citing, *Mettler*, 165 F.3d at 1205). For example, in *Mann*, the Court explained:

> [T]he mere fact that a number of [excessive force] lawsuits have been filed, without any information as to whether the suits are meritorious or spurious, or alternatively, any evidence that the municipality ignored such complaints such that it constituted deliberate indifference to any potential problem of excessive force, does not assist a fact-finder in determining whether the [municipality] actually has a historical problem of its police officers using unconstitutionally excessive force in the performance of their duties.

*Mann*, 2010 WL 65367 at *6 (quoting, *Ostroski v. Town of Southfold*, 443 F.Supp.2d 325, 346–47 (E.D.N.Y.2006) (collecting numerous cases holding the same).

Here, the allegations are nothing more than recitations of allegations in other lawsuits with no claim of admissions of liability. Additionally, although settlements with the City, including the dollar amounts of settlements, are publicly available, most simply say "the City entered into a monetary settlement." Plaintiffs attempt to use the settlements to demonstrate the City had notice, under

*Monell*, of an unconstitutional custom, but allowing such evidence would gut the public policy of settling disputes and clearing up court dockets by disincentivizing such compromises for fear that the settlements would later be used against the municipality. *See Weems v. Tyson Foods*, 665 F.3d 966-67 (8th Cir. 2011) ("concerns underlying Rule 408 are strongly implicated where an offer of compromise is used to prove an element of the claim the compromise offer was meant to settle"). Since Plaintiffs fail to adequately plead the deliberate indifference element necessary to a *Monell* claim, the claim should be dismissed. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556–67).

### c. Plaintiffs fail to properly plead that an allegedly unconstitutional custom was the moving force behind the constitutional violation.

*Monell* liability requires the alleged custom to be the moving force behind the particular unconstitutional force in the present matter and not merely the "but for" cause. *Harris v. Pagedale,* 821 F.2d 499, 507 (8th Cir. 1987)(citing *Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986)). Plaintiffs must establish a direct causal link between the custom and the constitutional violation here. *City of Canton v. Harris*, 489 U.S. 378,385 (1989). The Supreme Court has held that it is a "rigorous standard[ ] of causation" in order to prevent opening the flood gates to liability to every actions in which something could have been done to prevent it from occurring. *Brown*, 520 U.S. at 404-05, 117 S.Ct. 1382; *see also Connick v. Thompson*,

563 U.S. 51, 75, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011); *Oklahoma City v. Tuttle,* 471 U.S., at 823, 105 S.Ct. at 2436. As the Supreme Court has explained, to establish *Monell* liability, Plaintiffs must demonstrate that:

> through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bd. Cnty Com'rs of Brian Co., v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

Here, the Complaint does not plausibly plead a causal link between any allegedly unconstitutional practice or custom and Locke's death. To the contrary, Locke's death was caused by his raising and pointing of a gun in the direction of officers during the execution of a high-risk search warrant related to a murder investigation. Because there is no causal link, Plaintiff's *Monell* claims fail for this independent reason also.

## III.  PLAINTIFFS' *CANTON* CLAIM FAILS.

Count III alleges a *City of Canton* claim of failure to train officers regarding racist policing, excessive force, high risk warrants, rights of innocent third parties, and general misconduct, and alleges that the City's alleged failure to do so was the moving force behind Hanneman's allegedly unconstitutional use of force on Locke. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (inadequacy of

28

police training may serve as basis for Section 1983 liability only where failure to train amounts to deliberate indifference to rights of persons with whom police come into contact.)  As explained above, Plaintiffs have no viable claims against Hanneman with respect to the use of deadly force on Locke, and as such, the City could not have caused any damages even if it failed to train, supervise, or discipline. *See Roach v. City of Fredericktown, Mo.*, 882 F.2d 294, 297-98 (8th Cir. 1989) (affirming the district court's denial of municipal liability where the plaintiffs alleged inadequate police training but "had not proven that specific constitutional rights were violated" by the municipal employee).

In addition, the count asserts no specific facts that the City's alleged deliberate actions were unconstitutional and were the moving force behind Locke's death. The non-moving party's "obligation to provide the grounds of  his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "A claim has facial plausibility when the [party] pleads factual content that allows the court to draw the reasonable inference that the [alleged party] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556–67). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664.  Here, the count contains only legal conclusions, and no specific

facts regarding what training is claimed to be deficient, or how any alleged deficient training caused an alleged constitutional deprivation. Accordingly, the count must be dismissed.

## IV.    PLAINTIFFS' STATE LAW WRONGFUL DEATH CLAIM FAILS.

Hanneman is entitled to official immunity for Plaintiffs' wrongful death claim. Official immunity rests on the same rationale as federal qualified immunity: courts must ensure that the threat of suit does not inhibit public officials' exercise of discretion in discharging their duties. *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991); *Holmquist v. State*, 425 N.W.2d 230, 233 n.1 (Minn. 1988). "[A] public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion. Generally, police officers are classified as discretionary officers entitled to that immunity." *Johnson v. Morris*, 453 N.W.2d 31, 41-42 (Minn. 1990). When a public official's duties require the exercise of discretion or personal judgment, personal liability for damages will attach only when the harmful action is done willfully or maliciously. *Pletan v. Gaines*, 494 N.W.2d 38, 40 (Minn. 1992). Official immunity is broadest when officers act in emergency situations and circumstances that are high-risk to the officer or bystanders. *Pletan*, 494 N.W.2d at 40. The Minnesota Supreme Court explained that in such circumstances, "questions must be resolved under emergency conditions with little time for

reflection and often on the basis of incomplete and confusing information. It is difficult to think of a situation where the exercise of significant, independent judgment and discretion would be more required." *Id.* at 41.

To overcome Hanneman's official immunity, Plaintiffs must establish that he acted with malice. To prove malice, Plaintiff must provide proof of "intentional doing of a wrongful act without legal justification or excuse." *Rico,* 472 N.W.2d at 107. The question of malice is an objective inquiry into the legal reasonableness of an official's actions. *Miskovich v. Indep. Sch. Dist.*, 226 F. Supp. 2d 990, 1021 (D. Minn. 2002). The willful or malicious wrong exception to official immunity "does not impose liability merely because an official *intentionally* commits an act that a court or jury subsequently determines is a wrong. Instead, the exception anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is prohibited." *Rico*, 472 N.W.2d at 107 (emphasis in original).

Here, Hanneman used discretion when he was presented with Locke pointing a gun in his direction, with Locke's hand on the grip, while Hanneman was in close proximity with no ability to retreat or find cover. The video evidence undisputedly demonstrates this. Accordingly, Hanneman is entitled to official immunity. This immunity extends vicariously to the City. *Schroeder v. St. Louis Cty*, 708 N.W.2d 497, 508 (Minn. 2006).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request this Court to grant their motion to for judgment on the pleadings in its entirety.

Dated: June 15, 2023

KRISTYN ANDERSON
City Attorney
By  *s/ Tracey Fussy*
TRACEY FUSSY (3117807)
MARK ENSLIN (338813)
REBEKAH MURPHY (392912)
Assistant City Attorneys
Minneapolis City Attorney's Office
350 South Fifth Street, Room 210
Minneapolis, MN 55415
(612) 673-2254
(612) 673-5132
(612) 673-2017
tracey.fussy@minneapolismn.gov
mark.enslin@minneapolismn.gov
rebekah.murphy@minneapolismn.gov

*Attorneys for Defendants*