# EXHIBIT E

# Investigation of the City of Minneapolis and the Minneapolis Police Department



United States Department of Justice
Civil Rights Division
and
United States Attorney's Office
District of Minnesota
Civil Division

June 16, 2023

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ........................................................................... 1

**BACKGROUND** ..................................................................................... 3

    A.    Minneapolis Government and MPD ............................................ 4

    B.    Recent Events ........................................................................... 5

**INVESTIGATION** .................................................................................. 7

**FINDINGS** ............................................................................................ 9

    A.    MPD Uses Excessive Force in Violation of the Fourth Amendment ......... 9

        1.    MPD Uses Unreasonable Deadly Force ........................................... 11

        2.    MPD Uses Tasers in an Unreasonable and Unsafe Manner ........... 16

        3.    MPD Uses Unreasonable Takedowns, Strikes, and Other Bodily Force, Including Against Compliant or Restrained Individuals ........ 18

        4.    MPD Encounters with Youth Result in Unnecessary, Unreasonable, and Harmful Uses of Force ................................................................ 22

        5.    MPD Fails to Render Medical Aid to People in Custody and Disregards Their Safety ....................................................................... 24

        6.    MPD Fails to Intervene During Unreasonable Uses of Force .......... 26

        7.    MPD's Inadequate Force Review System Contributes to Its Use of Excessive Force ...................................................................................... 28

    B.    MPD Unlawfully Discriminates Against Black and Native American People When Enforcing the Law............................................................ 31

        1.    MPD Unlawfully Discriminates Against Black and Native American People During Stops .............................................................................. 32

        2.    After George Floyd's Murder, Many Officers Stopped Reporting Race ...................................................................................................... 41

        3.    MPD Has Failed to Sufficiently Address Known Racial Disparities, Missing Race Data, and Allegations of Bias, Damaging Community Trust ...................................................................................................... 42

    C.    MPD Violates People's First Amendment Rights ...................................... 48

        1.    MPD Violates Protesters' First Amendment Rights........................... 48

        2.    MPD Retaliates Against Journalists and Unlawfully Restricts Their Access During Protests....................................................................... 51

    3.   MPD Unlawfully Retaliates Against People During Stops and Calls for Service ................................................................................ 52

    4.   MPD Unlawfully Retaliates Against People Who Observe and Record Their Activities ............................................................................. 53

    5.   MPD Inadequately Protects First Amendment Rights ...................... 54

D.   The City and MPD Violate the Americans with Disabilities Act in Their Response to People with Behavioral Health Disabilities .......................... 57

    1.   Behavioral Health Calls Continue to Receive an Unnecessary and Potentially Harmful Law Enforcement Response ............................. 58

    2.   MECC Contributes to Unnecessary Police Responses to Calls Involving Behavioral Health Issues .................................................. 63

    3.   Training on Behavioral Health Issues Does Not Equip Officers to Respond Appropriately .................................................................... 64

    4.   The City and MPD Can Make Reasonable Modifications to Avoid Discrimination Against People with Behavioral Health Disabilities... 65

CONTRIBUTING CAUSES OF VIOLATIONS ................................................................ 67

A.   MPD's Accountability System Contributes to Legal Violations ................. 67

    1.   The Complexity of MPD's Accountability System Discourages Complaints and Prompts Their Dismissals ...................................... 69

    2.   MPD Fails to Conduct Thorough, Timely, and Fair Misconduct Investigations ................................................................................. 74

    3.   MPD Fails to Adequately Discipline Police Misconduct ................... 77

B.   MPD's Training Does Not Ensure Effective, Constitutional Policing ........ 79

C.   MPD Does Not Adequately Supervise Officers ........................................ 80

    1.   MPD Does Not Prepare Officers to Be Effective Supervisors .......... 81

    2.   MPD Does Not Provide Supervisors with the Tools and Data to Prevent, Detect, and Correct Problematic Officer Behavior ............. 81

    3.   MPD's Staffing Practices Further Undermine Supervision ............... 82

D.   MPD Wellness Programs Insufficiently Support Officers ......................... 83

RECOMMENDED REMEDIAL MEASURES ................................................................. 85

CONCLUSION ......................................................................................................... 89

# EXECUTIVE SUMMARY

On April 21, 2021, the Department of Justice opened a pattern or practice investigation of the Minneapolis Police Department (MPD) and the City of Minneapolis. By then, Derek Chauvin had been convicted in state court for the tragic murder of George Floyd in 2020. In the years before, shootings by other MPD officers had generated public outcry, culminating in weeks of civil unrest after George Floyd was killed.

Our federal investigation focused on the police department as a whole, not the acts of any one officer. To be sure, many MPD officers do their difficult work with professionalism, courage, and respect. Nevertheless, our investigation found that the systemic problems in MPD made what happened to George Floyd possible.

## FINDINGS

**The Department of Justice has reasonable cause to believe that the City of Minneapolis and the Minneapolis Police Department engage in a pattern or practice of conduct that deprives people of their rights under the Constitution and federal law:**

- **MPD uses excessive force, including unjustified deadly force and other types of force.**
- **MPD unlawfully discriminates against Black and Native American people in its enforcement activities.**
- **MPD violates the rights of people engaged in protected speech.**
- **MPD and the City discriminate against people with behavioral health disabilities when responding to calls for assistance.**

We also found persistent deficiencies in MPD's accountability systems, training, supervision, and officer wellness programs, which contribute to the violations of the Constitution and federal law.

The frustrations with MPD that boiled over during the 2020 protests were not new. "[T]hese systemic issues didn't just occur on May 25, 2020," a city leader told us. "There were instances . . . being reported by this community long before that."

For years, MPD used dangerous techniques and weapons against people who committed at most a petty offense and sometimes no offense at all. MPD used force to punish people who made officers angry or criticized the police. MPD patrolled

**1**

neighborhoods differently based on their racial composition and discriminated based on race when searching, handcuffing, or using force against people during stops. The City sent MPD officers to behavioral health-related 911 calls, even when a law enforcement response was not appropriate or necessary, sometimes with tragic results. These actions put MPD officers and the Minneapolis community at risk.

We reached these findings based on our review of thousands of documents, incident files, body-worn camera videos, and the City and MPD's data. Our findings are also based on ride-alongs and conversations with MPD officers, City employees, mental health providers, and community members.

We acknowledge the considerable daily challenges that come with being an MPD officer. Police officers must often make split-second decisions and risk their lives to keep their communities safe. MPD officers work hard to provide vital services, and many spoke with us about their deep connection to the City and their desire to see MPD do better. Still, since the spring of 2020, hundreds of MPD officers have left the force, and the morale of the remaining officers is low. Policing, by its nature, can take a toll on the psychological and emotional health of officers, and the challenges of the last few years have only exacerbated that toll for some MPD officers.

To their credit, the City and MPD have pressed ahead with reform. MPD policy now prohibits neck restraints, and officers cannot use certain crowd control weapons without approval of the MPD chief. Following the 2022 death of Amir Locke during a "no-knock" warrant execution, MPD banned their use. The City has launched a promising behavioral health response program so that trained mental health professionals will respond to calls for service that do not need a police response.

The Department of Justice expects to work collaboratively with the City and MPD on the reforms necessary to remedy the unlawful conduct outlined in this report. We especially appreciate the cooperation and candor of City and MPD officials during our investigation. The leaders of the City and MPD know they have a problem. Mayor Jacob Frey told us, "We need help changing and reforming this department," and the reforms "need to permeate the department itself." Despite the initial steps the City and MPD have taken toward reform, Mayor Frey was realistic about the challenges ahead. "Clearly," he said, "we still have a long way to go."

# BACKGROUND

Minneapolis is a diverse, prosperous city marked by stark racial inequality. The largest city in Minnesota, Minneapolis has a population of approximately 425,000 people.[1] Minneapolis' population is 63% non-Hispanic white, 18% Black, 10% Hispanic, 6% Asian, and 1.3% Native American. Minnesota is the state with the most people who report Somali ancestry and Hmong ancestry, many of whom settled in Minneapolis.[2]

**MPD Precincts and Black Population in Minneapolis**



This map shows MPD's five police precincts and the percentage of the population within each census block group that is Black.

Minneapolis is part of a regional economic hub, home to multiple Fortune 500 companies and over two dozen colleges and universities. Minneapolis has a higher-than-average proportion of residents with a four-year college education, with over 50% of residents holding a bachelor's degree or higher (compared to roughly 33% nationally).

Not everyone in Minneapolis shares in its prosperity. The metropolitan area that includes Minneapolis and neighboring St. Paul—known as the Twin Cities—has some of the nation's starkest racial disparities on economic measures, including income, homeownership, poverty, unemployment, and educational attainment. By nearly all of these measures, the typical white family in the Twin Cities is doing better than the national average for white families, and the typical Black family in the Twin Cities is doing worse than the national average for Black families. The median Black

---

[1] *Quick Facts: Minneapolis, Minnesota*, U.S. Census Bureau, U.S. Dep't of Commerce, https://www.census.gov/quickfacts/minneapoliscityminnesota [https://perma.cc/9Y7V-RJ7H].
[2] *Immigration & Language*, Minnesota State Demographic Center, Department of Administration, State of Minnesota, mn.gov, https://mn.gov/admin/demography/data-by-topic/immigration-language/ [https://perma.cc/MM5R-ALJJ].

family in the Twin Cities earns just 44% as much as the median white family, and the poverty rate among Black households is nearly five times higher than the rate among white households. Of the United States' 100 largest metropolitan areas, only one has a larger gap between Black and white earnings.

Minneapolis also has one of the nation's largest gaps between Black and white rates of homeownership. While the City's white families enjoy one of the nation's highest rates of homeownership (76%), only roughly one quarter of Black families in Minneapolis own their home, which is one of the lowest Black homeownership rates in United States cities.

Some researchers have traced Minneapolis' homeownership gap and other economic disparities back to the restrictive racial covenants that barred non-white people from living in many parts of Minneapolis in the first half of the 20th century. Beginning in 1910, local and federal public officials and mortgage lenders embraced racial covenants, and lenders engaged in redlining by routinely denying loans for properties in majority Black or mixed-race neighborhoods. The racially restrictive covenants, which the Supreme Court sanctioned in 1926 but later ruled unenforceable in 1948,[3] funneled the City's growing Black population into a few small areas and laid the groundwork for enduring patterns of residential segregation.

## A. Minneapolis Government and MPD

An elected mayor and 13-member city council govern Minneapolis. Mayor Jacob Frey was elected in 2017 and re-elected in 2021. In November of 2021, voters approved a city charter amendment that created a "strong mayor" model of governance, designating the mayor as the City's chief executive.

MPD is the largest police force in Minnesota. It has an authorized strength of 731 officers. Nine percent of MPD officers are Black. MPD is led by the Chief of Police, an assistant chief, three deputy chiefs, and five precinct inspectors who command each precinct. Its five precincts operate with significant latitude to employ neighborhood-specific crime prevention and community engagement practices, and inspectors manage the day-to-day operations of their precincts as they see fit.

From 2017 until 2022, Medaria Arradondo served as MPD's chief—the first Black chief in MPD's history. When Chief Arradondo retired, Mayor Frey selected Deputy Chief Amelia Huffman to serve as MPD's interim chief. In September 2022, Mayor Frey nominated Brian O'Hara to be MPD's next chief. The Minneapolis City Council

---

[3] See *Corrigan v. Buckley*, 271 U.S. 323 (1926); *Shelley v. Kraemer*, 331 U.S. 1, 20 (1948).

confirmed his appointment in November 2022. Prior to joining MPD, Chief O'Hara served as the Deputy Mayor, Public Safety Director, and Deputy Chief of Police in Newark, New Jersey. Chief O'Hara's selection marks the first time in 16 years that MPD has selected a chief from outside the department.

In 2021, in addition to adopting the "strong mayor" model of governance, Minneapolis voters approved a charter amendment to create the position of Community Safety Commissioner—a new role that oversees the City's police and fire departments, 911 call center, emergency management, and violence prevention efforts. Mayor Frey selected Dr. Cedric Alexander for the position, who previously served as the Director of Public Safety and Chief of Police in DeKalb County, Georgia, and as Chief of Police and Deputy Mayor in Rochester, New York. Dr. Alexander officially began his tenure as Commissioner in August 2022 and reports to the mayor.

## B. Recent Events

On May 25, 2020, MPD officer Derek Chauvin murdered George Floyd in broad daylight and on camera. Three other MPD officers failed to save Mr. Floyd. Widespread protest followed in Minneapolis, across the country, and throughout the world.

George Floyd was one of several people whose death at the hands of MPD officers garnered heightened public attention in recent years. For example, in 2015, MPD officers shot and killed Jamar Clark, a 24-year-old Black man, triggering 18 days of protests, including an occupation of MPD's Fourth Precinct station. In 2017, an MPD officer shot and killed Justine Ruszczyk, a 40-year-old white woman, while responding to Ruszczyk's 911 call. In 2018, MPD officers fatally shot Thurman Blevins, a 31-year-old Black man, following a foot chase. In 2019, MPD officers shot and killed Chiasher Vue, a 52-year-old Asian man, during a standoff at his home. In 2022, an MPD officer shot and killed Amir Locke, a 22-year-old Black man, during a no-knock raid on an apartment. These and other deaths have focused the community's attention on MPD.

MPD has a strained relationship with the community it serves. One officer told us that morale "is at an all-time low." Since 2020, hundreds of officers have left MPD, up and down the ranks, young and old, patrol officers and supervisors. As of May 2023, there were 585 sworn MPD officers, down from 892 in 2018. Many others are on extended medical leave.[4] Despite efforts to step up recruiting and hiring, MPD has not been able to replenish its ranks.

---

[4] *Policing & Community Safety Initiatives*, minneapolis.org, https://www.minneapolis.org/safety-updates/future-of-public-safety [https://perma.cc/S5RR-E7JY] (last updated May 15, 2023).

The four officers involved in Mr. Floyd's murder faced state and federal criminal charges. On April 20, 2021, Mr. Chauvin was convicted of murder and manslaughter in state court. The United States criminally charged all four officers for violating George Floyd's constitutional rights. On December 15, 2021, Mr. Chauvin pleaded guilty to federal criminal civil rights violations, both for the murder of Mr. Floyd and for holding a 14-year-old teen by the throat, beating him with a flashlight, then pressing his knee on the teen's neck and back for over 15 minutes in 2017. A federal jury found the three other MPD officers involved in Mr. Floyd's death, Tou Thao, J. Alexander Kueng, and Thomas Lane, guilty of federal criminal civil rights offenses. Mr. Thao and Mr. Kueng were convicted of willfully failing to intervene to stop Mr. Chauvin from killing Mr. Floyd. And Mr. Thao, Mr. Kueng, and Mr. Lane were convicted of failing to render medical aid. On May 1, 2023, Mr. Thao was also convicted of state charges of aiding and abetting manslaughter; Mr. Keung and Mr. Lane had previously pled guilty to those charges.

Eight days after Mr. Floyd's murder, the Minnesota Department of Human Rights (MDHR) filed a state civil rights charge against MPD to determine if MPD had engaged in systemic discriminatory practices towards people of color. On April 27, 2022, MDHR released findings concluding that MPD had engaged in a pattern or practice of discrimination, in violation of the Minnesota Human Rights Act. On March 31, 2023, MDHR and the City of Minneapolis filed a proposed Settlement Agreement and Order to address the findings, which is under review by the state court.[5]

---

[5] *See* Proposed Settlement Agreement and Order, *State of Minnesota v. Minneapolis Police Department*, No. 27-CV-23-4177, Index #6 (Dist. Ct. Minn., 4th Judicial Dist., Mar. 31, 2023), *available at* https://publicaccess.courts.state.mn.us/CaseSearch (search by case number).

## INVESTIGATION

The Department of Justice opened our federal investigation of MPD and the City on April 21, 2021. Unlike criminal investigations that may focus on an individual officer or a single incident, the goal of our civil investigation was to determine whether MPD and the City engage in a pattern or practice of violations that are repeated, routine, or of a generalized nature. Where we conclude we have reasonable cause to believe that MPD or the City engages in a prohibited pattern or practice, we are authorized to bring a lawsuit seeking court-ordered changes.[6]

During our investigation, we heard from over two thousand community members and local organizations, including many family members of people killed by MPD officers. We also interviewed dozens of MPD officers, sergeants, lieutenants, field training officers, training academy leaders, union leaders, all five precinct inspectors, and many members of MPD's command staff, including several current and former MPD chiefs. We also spoke with numerous current and former City employees, including the mayor, the Community Safety Commissioner, and former Minneapolis City Council members, as well as members of the Police Civilian Oversight Commission. We talked with local leaders and advocates, faith leaders, and researchers, and we participated in live and virtual community meetings and town halls. We also participated in over fifty ride-alongs with MPD officers, covering every precinct and every shift so we could directly observe the work officers do and the challenges they face. Alongside mental health clinicians, we also participated in ride-alongs with behavioral crisis responders.

We also reviewed information we obtained from the City and from outside sources. We reviewed hundreds of incident files, including viewing body-worn camera footage when available, and reviewed thousands of documents, including policies and training materials, police reports, and internal affairs files. We conducted numerous statistical analyses of the data the City and MPD collected between 2016 and 2022 on calls for service, stops, uses of force, and other officer activities. Based on this evidence, we identified patterns of conduct that violate the law, as well as practices that fuel those violations. This report both identifies those violations and offers examples to illustrate how they operate in practice.

Our investigative team consists of career civil staff from the Civil Rights Division of the Department of Justice and the U.S. Attorney's Office for the District of Minnesota. More

---

[6] We conducted this civil investigation pursuant to 34 U.S.C. § 12601, which prohibits law enforcement agencies from engaging in a "pattern or practice" of conduct that deprives people of rights protected by the U.S. Constitution or federal laws. The investigation was also conducted pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

than a dozen experts assisted us, including law enforcement experts, mental health clinicians, and statisticians.

We thank the City, MPD officials, the Police Officers Federation of Minneapolis, and the officers who have cooperated with this investigation and provided us with insights into the operation of MPD. We are also grateful to the many members of the Minneapolis community who met with us during this investigation to share their experiences.

# FINDINGS

We have reasonable cause to believe that MPD and the City engage in a pattern or practice of conduct that violates the Constitution and federal law. First, MPD uses excessive force, including unjustified deadly force and excessive less-lethal force. Second, MPD unlawfully discriminates against Black and Native American people when enforcing the law. Third, MPD violates individuals' First Amendment rights. Finally, MPD and the City discriminate when responding to people with behavioral health issues.

## A. MPD Uses Excessive Force in Violation of the Fourth Amendment

The use of excessive force by a law enforcement officer violates the Fourth Amendment. The constitutionality of an officer's use of force is assessed under an objective reasonableness standard: "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."[7] To determine objective reasonableness, one must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[8]

The most significant use of force is the use of deadly force because it can result in the taking of human life. "The intrusiveness of a seizure by means of deadly force is unmatched," as the use of deadly force frustrates not only the individual's fundamental interest in their own life, but also the social interests in ensuring a judicial determination of guilt and punishment.[9] Deadly force is permissible only when an officer has probable cause to believe that a suspect poses an immediate threat of serious physical harm to the officer or another person.[10]

We evaluated MPD's use of force practices with the understanding that officers often face challenging and quickly evolving circumstances that threaten their safety or the safety of others.[11] Encounters may therefore require officers to use force to protect themselves and others from an immediate threat. These principles guided our review; our conclusions are not based on hindsight, but rather the contemporaneous perspective of a reasonable officer on the scene.

---

[7] *Graham v. Connor*, 490 U.S. 386, 397 (1989).
[8] *Id*.
[9] *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).
[10] *Id*.
[11] *See Aipperspach v. McInerney*, 766 F.3d 803, 806 (8th Cir. 2014).

The following chart shows MPD's reported uses of force from January 1, 2016, through August 16, 2022.[12]



**Reported Uses of Force: January 1, 2016, to August 16, 2022**

Our review of the data depicted above showed that roughly three quarters of MPD's reported uses of force did not involve an associated violent offense or a weapons offense.

To evaluate MPD's use of deadly force, we reviewed incident files for all MPD police shootings and one in-custody death from January 1, 2016, to August 16, 2022. For less-lethal force, we reviewed hundreds of incidents covering January 1, 2016, to September 30, 2021. Our evaluation of a stratified random sample of MPD's reported less-lethal force incidents included incidents from every force control option available to MPD officers, except for incidents where the only force reported was handcuffing or escort holds. We reviewed hundreds of body-worn camera videos, as well as related police reports, incident reports, 911 call center information, and supervisory reviews.

Our investigation showed that MPD officers routinely use excessive force, often when no force is necessary. We found that MPD officers often use unreasonable force

---

[12] This chart summarizes MPD's reported data on encounters with individuals involving a specific type of force. We count each encounter where MPD used a specific type of force against a person (whether MPD used that type of force once or multiple times against that person during that encounter). We count this way because MPD's data did not reliably count the number of applications of a specific type of force during an encounter. In this chart, if MPD used force against multiple people during a single encounter, each person is counted separately. If MPD used force against the same person across multiple encounters, each encounter where force was used is counted separately. Finally, if MPD used multiple kinds of force against a single person during an encounter, like a taser and a neck restraint, that encounter would appear in each relevant column.

(including deadly force) to obtain immediate compliance with orders, often forgoing meaningful de-escalation tactics and instead using force to subdue people. MPD's pattern or practice of using excessive force violates the law.

### 1. MPD Uses Unreasonable Deadly Force

"Deadly force" is any type of force that risks serious injury or death. Shooting a firearm is deadly force, and we found that MPD officers discharged firearms in situations where there was no immediate threat.

Neck restraints are deadly force. Compressing the side or front of a person's neck in a way that inhibits air or blood flow is inherently dangerous and poses a significant risk that the person could be seriously injured or die.[13] Medical experts have concluded that "there is no amount of training or method of application of neck restraints that can mitigate the risk of death or permanent profound neurologic damage with this maneuver."[14] Until 2020, MPD did not consider neck restraints to be deadly force, instead classifying them as "less-lethal" force. MPD officers frequently used neck restraints in situations where deadly force was not justified.

### a. MPD Officers Discharge Firearms When There Is No Immediate Threat

We reviewed all of the 19 police shootings that occurred from January 1, 2016, to August 16, 2022. Although this number is relatively small, a significant portion of them were unconstitutional uses of deadly force. At times, officers shot at people without first determining whether there was an immediate threat of harm to the officers or others. Federal law requires officers to warn when feasible that they are about to use deadly force,[15] but MPD officers routinely fail to provide such warnings. MPD officers also use deadly force against people who are a threat only to themselves. Despite these unreasonable uses of deadly force, MPD has failed to respond with effective, systemic

---

[13] *National Consensus Policy and Discussion Paper on Use of Force*,15 (July 2020), https://www.theiacp.org/sites/default/files/2020-07/National_Consensus_Policy_On_Use_Of_Force%2007102020%20v3.pdf [https://perma.cc/V7XE-BU56]; *see also AAN Position Statement on the Use of Neck Restraints in Law Enforcement*, American Academy of Neurology (June 9, 2021), https://www.aan.com/advocacy/use-of-neck-restraints-position-statement [https://perma.cc/7R48-3D7L] ("Because of the inherently dangerous nature of these techniques, the AAN strongly encourages federal, state, and local law enforcement and policymakers in all jurisdictions to classify neck restraints, at a minimum, as a form of deadly force.").

[14] *See AAN Position Statement on the Use of Neck Restraints in Law Enforcement*, *supra* note 13.

[15] *Est. of Morgan v. Cook*, 686 F.3d 494, 497 (8th Cir. 2012) ("[W]here it is feasible, a police officer should give a warning that deadly force is going to be used.").

reforms (such as revised policies and additional training) designed to prevent unlawful shootings.

MPD officers discharge firearms at people without assessing whether the person presents any threat, let alone a threat that would justify deadly force. For example, in 2017, an MPD officer shot and killed an unarmed white woman who reportedly "spooked" him when she approached his squad car. The woman had called 911 to report a possible sexual assault in a nearby alley, and two officers responded. When the woman walked up to their squad car, one officer fired his gun past his partner through the open window, striking the woman. The officer was tried and convicted of third-degree murder and manslaughter (although a court overturned the murder conviction), and the City settled with her family for $20 million.

We reviewed incidents in which MPD officers fired guns without regard to people in their line of fire. In one example, an off-duty officer fired his gun at a car containing six people within three seconds of getting out of his squad car. The off-duty officer had responded to a "shots fired" call. Meanwhile, other officers had already responded and instructed a car full of passengers to leave the area by reversing down a one-way street. The off-duty officer turned onto the same street, and the car backed into his squad car. The officer got out of his squad car and, almost immediately, fired a round at the vehicle that hit near the left rear window. Body-worn camera video shows the officer asking the driver one question: "You didn't see me coming here with my lights and stuff?" The City settled with the six occupants for $150,000. While the officer was acquitted of criminal charges (which require a higher standard of proof than civil violations), using deadly force without assessing whether a threat exists is unreasonable.

We also reviewed a case where officers shot a man who was a threat only to himself. The man was a suspect in a shooting. Officers took him into custody, brought him to an interview room, and left him in the interview room unrestrained. When an officer returned, the man was stabbing himself in the neck with a knife in the back corner of the room. The officer shut the door and talked to the man through the door, ordering him to put the knife down. When officers opened the door, the man was still in the back corner of the room, with blood dripping from his neck. One officer immediately fired his taser, but may have missed. The man raised his hands, still holding the knife, and took a few slow steps towards the door, his path blocked by two office chairs. Though the man had a knife in his hand, he did not point it at the officers or wield it in a threatening manner. Rather than closing the door again, two officers fired four shots at the man, striking him

twice. Shooting a man who is hurting himself and has not threatened anyone else is unreasonable.[16]

Another example of MPD officers using firearms unreasonably involves the dangerous practice of shooting at a moving car. Two officers chased a speeding car. When the car stopped, the officers approached it from opposite sides with their guns drawn, ordering the driver to put the car in park. Instead, the driver revved the engine and drove forward. Instead of stepping out of the path of the car—which he had time and space to do—the officer fired four shots while his partner was in the line of fire, striking the back and side of the fleeing car. The officer's partner said he did not shoot because of the crossfire danger. Firing at a moving car is inherently dangerous and almost always counterproductive. In addition to the risk of killing the occupants, shooting at a vehicle is unlikely to disable it and instead can result in a runaway vehicle that endangers officers and bystanders. The officer's use of deadly force was reckless and unreasonable.

In another case, an officer created unnecessary danger when he shot two dogs in the back yard of a home in a residential neighborhood. At least two people were inside the home at the time, and the home was flanked on both sides by neighboring homes and other structures. The dogs did not present an imminent threat.[17] Discharging a firearm in the absence of a threat violates the Fourth Amendment. Although no person was injured or killed in this incident, any unnecessary discharge of a firearm in a residential area poses a grave risk to bystanders.

### b. MPD Used Neck Restraints, Often Without Warning, On People Suspected of Committing Low-Level Offenses and People Who Posed No Threat

Prior to June 9, 2020, MPD defined neck restraints as "compressing one or both sides of a person's neck with an arm or leg, without applying direct pressure to the trachea or airway (front of the neck)." MPD policy further divided neck restraints into two categories, depending on the officer's intended outcome. "Conscious neck restraints" were those in which an officer did not intend to render the person unconscious; the officer would apply "light to moderate pressure." "Unconscious neck restraints" were those in which the officer intended to render the person unconscious; the officer would

---

[16] *See Cole v. Hutchins*, 959 F.3d 1127, 1134 (8th Cir. 2020) (quoting *Partridge v. City of Benton*, 929 F.3d 562, 566 (8th Cir. 2019)) (concluding that a jury could find that an officer's use of deadly force was not justified because the decedent was not wielding his gun in a threatening manner).

[17] *See LeMay v. Mays*, 18 F.4th 283, 287 (8th Cir. 2021) (quoting *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210 (3d Cir. 2001)) (applying the unreasonable seizure standard under the Fourth Amendment to a case where an officer shot a dog).

apply "adequate pressure."[18] We reviewed numerous incidents involving both kinds, including many incidents with both a conscious and an unconscious neck restraint. We also reviewed the force that resulted in George Floyd's death.

MPD officers often used neck restraints in situations that did not end in an arrest. MPD officers used neck restraints during at least 198 encounters from January 1, 2016, to August 16, 2022.[19] Officers did not make an arrest in 44 of those encounters.

**Number of Encounters Involving Neck Restraints by Year: 2016–2021**



We reviewed dozens of incidents where MPD officers used neck restraints. Most of these restraints were unreasonable. We found that officers misused this deadly tactic in a variety of ways. De-escalation, if it occurred at all, was poor; officers shouted commands, gave multiple conflicting orders, demanded immediate compliance, or threatened force. Officers made tactical decisions that endangered community members and officers alike. Officers often used neck restraints on people who were accused of low-level offenses, were passively resisting arrest, or had merely angered the officer. And, most troublingly, officers used neck restraints on people who were not a threat to the officer or anyone else.

MPD officers frequently used neck restraints without warning, in one case sneaking up behind an unarmed Latino man and choking him until he blacked out. The officer was responding to a call about the man kicking his car and saying, "I'm going to kill somebody." The man initially spoke calmly to the officer, but the man became agitated, yelling that he was "the creator," and threatening to "fuck [the officer] up." The officer radioed for backup and pointed his taser at the man. Meanwhile, a second officer arrived. As the man stood talking to the officer with his arms outstretched, one hand

---

[18] MPD Policy & Procedure Manual, § 5-311, Use of Neck Restraints and Choke Holds (effective April 16, 2012).
[19] MPD reported 197 neck restraints. We identified one unreported 2021 neck restraint.

holding a beer and the other hand empty, the second officer crept up behind him. The second officer wrapped one arm around the man's neck until he was unconscious, and the officers handcuffed him after he slumped to the ground. Squeezing the man's neck until he lost consciousness was dangerous and unjustified. It also violated the neck restraint policy in effect at the time, which did not authorize using an "unconscious neck restraint" to overcome passive resistance.

Our review revealed several instances where MPD officers applied pressure to the necks of youth who did not pose a threat. For example, an officer and his partner responded to a call from a mother who wanted them to remove her teenage children from the home and claimed they had assaulted her. The officers confronted a Black 14-year-old, who was lying on a bedroom floor playing with his phone. The officers moved to arrest the teen, but he pulled away. One officer—Derek Chauvin—struck the teen in the head with a flashlight multiple times and pinned him to the wall by his throat. He then knelt on the teen's back or neck. The mother pleaded, "Please do not kill my son . . . He's only fourteen! . . . . You've already got him in the handcuffs. Please take your knee off my son." Mr. Chauvin kept his knee on the teen's neck or back for over 15 minutes.

These uses of deadly force—head strikes and kneeling on the teen's neck—created a grave risk to the teen. Mr. Chauvin used this deadly force even though the teen did not pose a threat, was following orders, and was crying from pain. Due to poor supervision and a failed force investigation, MPD command did not learn what had happened to the teen until three years later, after Mr. Chauvin killed George Floyd. The City recently agreed to settle the teen's lawsuit for $7.5 million.

On June 9, 2020, MPD changed its use of force policy to ban the use of all neck restraints and chokeholds.[20] This positive step met considerable resistance. We spoke to officers and supervisors who called the ban an overcorrection, "knee jerk" and "politically driven." Some officers continued to see neck restraints as an efficient and reliable tactic. Officers warned that the ban would lead to an increase in force overall, because, as one officer put it, "if you can't touch the head or neck, the result is you punch 'em." These views took hold as MPD did not train officers in alternative tactics until the year after the ban.

MPD officers have used neck restraints since the ban. In August 2020, two months after the ban, an officer used a neck restraint on a Black man to keep the man from running

---

[20] *See* Stipulation and Order, *State of Minnesota v. Minneapolis Police Department,* No. 27-CV-20-8182, Index #9 at 4–5, 2020 WL 8288787 (Dist. Ct. Minn., 4th Judicial Dist., June 8, 2020), *available at* https://publicaccess.courts.state.mn.us/CaseSearch (search by case number).

away with shoes he stole from a sneaker store. In a separate incident in 2021, an officer admitted to using a neck restraint on a protestor. MPD officers had ordered people to leave the protest, and many refused. A fight between protestors and officers ensued, and officers arrested some of the protestors. One officer explained, "He swung at me and then, you know, I had him in a neck restraint." MPD must ensure that its ban on neck restraints is fully honored.

### 2.  MPD Uses Tasers in an Unreasonable and Unsafe Manner

MPD officers carry two types of "conducted energy weapons," commonly called "tasers." A taser can be activated in two modes—probe and drive stun.[21] In probe mode, an officer fires two barbs into a person's body, piercing the skin to send incapacitating jolts of electricity. In drive-stun mode, an officer presses the taser "strongly, with forceful pressure" against a person's skin, pulling the trigger to deliver a burning electrical charge. In either mode, tasers can cause excruciating pain. Tasers can also display a warning "arc," which involves an audible, visible electric current arcing out of the taser, without firing the probes.[22]



**Taser Probes**

Figure 1 Comparison of the TASER® X26™ and X2™ probes

Officers do not appear to use tasers consistent with MPD policy. MPD provides that tasers should generally be used in the probe mode. But we often saw officers use it inappropriately in drive-stun mode. Drive-stun mode is problematic because it does not incapacitate the person, and it often escalates encounters or incites a person to fight back. In several instances, we saw officers deploy multiple, successive activations. Instead, officers should re-assess the need for further activations after each taser cycle because exposure to repeated applications of a taser totaling longer than 15 seconds may increase the risk of serious injury or death.

---

[21] *Bachtel v. TASER Int'l, Inc.*, 747 F.3d 965, 967–68 (8th Cir. 2014) ("Electronic control devices known as tasers entered the market in 1994 and are commonly used by law enforcement agencies across the United States. The specific model used by [the officer]—the model X26 ECD—had been introduced by TASER International, Inc. in 2003. When fired, the X26 ECD deploys two probes which attach to the body and deliver electrical current into the subject through thin insulated wires. Pulling and releasing the trigger of the X26 ECD results in a 5 second electrical discharge cycle, although an officer may extend the cycle by holding the trigger down. The device produces 19 electrical pulses per second, each pulse lasting about 100 microseconds and delivering a mean current of 580 volts. The electrical current forces the subject's muscles to contract, temporarily limiting muscle control and allowing police officers time to subdue the individual.").

[22] Source for Illustration: Ben Weston, *Taser Barb Removal*, Milwaukee County (Apr. 2023), https://county.milwaukee.gov/files/county/emergency-management/EMS-/Standards-of-Care/PSTaserBarbRemoval [https://perma.cc/28JE-7BCC].

MPD officers use tasers frequently and improperly. From January 1, 2016, to August 16, 2022, MPD officers used their tasers 564 times and pointed or unholstered them 1,039 times. We reviewed a sample of these incidents. Many of those encounters involved people known to have behavioral health issues. In a significant number of encounters, the associated offense was non-violent or did not involve a weapons-related offense. Sometimes, the only charge was obstruction of process. The unreasonable uses of tasers include: (1) using a taser multiple times without justification; (2) using a taser on people who do not comply with commands but are unarmed and pose no threat; and (3) using a taser after people submit or are already restrained. These taser practices are dangerous and unlawful.[23]

For example, an officer unreasonably used a taser eight times on a white man suspected of a minor offense—breaking a fence on a public sidewalk—who had initially complied with their orders. Upon arriving, the officers approached the man. One held her gun behind her back and the other pointed his taser at the man. They did not try to talk to the man or otherwise investigate whether he was committing a crime. The man obeyed the commands to stop, turn around, and show his hands. As the officer moved to handcuff the man, he tried to turn around to ask if they were police officers. The officer then lost control of the man's cuffed wrist, but quickly overpowered him, taking him to the ground. The officer continued to shout at the man to "put his hands behind his back." The officer then punched the man several times in the face before grabbing his neck. The man repeatedly pleaded for the officer to stop as the two rolled around in a struggle. The other officer drive stunned him with a taser eight times, for a total of 13.87 seconds, pausing between the seventh and eighth cycle to punch the man in the face. The officer's taser use during this encounter was unreasonable. Deploying successive taser cycles in drive-stun mode without giving the man a chance to comply is unreasonable.

Similarly, MPD officers often use tasers without providing a warning, even when warnings are feasible, and at times intentionally target vulnerable parts of the body. For example, an MPD sergeant pulled over an unarmed Black woman for an illegal U-turn. The woman approached the squad car distraught and yelling. The sergeant told her three times to go back to her car, but an apparent language barrier impeded the communication. The sergeant then pulled a taser and reversed the initial command from seconds earlier, telling the woman twice to "get over here." Without warning, the sergeant fired taser probes into the woman's chest and jolted her for five seconds. The sergeant then pushed the woman to the ground and fired the taser again without

---

[23] See Shekleton v. Eichenberger, 677 F.3d 361, 366 (8th Cir. 2012) (finding facts establishing a Fourth Amendment violation where an officer used a taser against an unarmed person who was suspected of a minor violation, did not resist arrest, did not threaten the officer, and did not attempt to flee).

warning, this time into the woman's neck, for seven seconds as the woman cried "Don't kill me! Don't kill me!" The woman was not an immediate threat, and the sergeant's use of force was unreasonable. The force left the woman bleeding and shaken, and she spent time in jail for an obstruction charge. Meanwhile, MPD towed her car to an impound lot that sold it. The Office of Police Conduct Review (OPCR) dismissed her complaint because it "did not appear to involve [MPD] officers."

Officers also unreasonably use tasers in circumstances that create a risk of serious harm. In one example, officers fired their tasers seven times into a white man having a behavioral health crisis. The man stood on a sixteenth-floor apartment balcony holding two knives but did not approach or threaten the officers. Nevertheless, the officers tased the man despite the risk that he could fall from the balcony. When a taser incapacitates a person who has the potential to fall from an elevated position, like a balcony, the risk of harm is so great that MPD policy prohibits taser use in that situation unless deadly force would otherwise be permitted.

In addition to the taser incidents we reviewed as part of our sample, we also reviewed an incident that occurred during one of our ride-alongs with MPD officers. During the incident, an MPD officer used a taser on an unarmed Black man who was yelling and filming an accident scene. When the man did not follow the officer's commands to leave the scene, the officer pointed his taser and threatened to fire it. The man raised his hands and began walking backward away from the accident scene as he continued to film and yell at the officers. The officer advanced on the man and shot him with the taser, causing the man to fall to the ground. The man was following commands to leave and was away from the scene, so there was no apparent need for the officer to use a taser.

### 3. MPD Uses Unreasonable Takedowns, Strikes, and Other Bodily Force, Including Against Compliant or Restrained Individuals

From January 1, 2016, to August 16, 2022, MPD used bodily force during 7,690 encounters. We reviewed numerous incidents involving takedowns, strikes, and other bodily force. We found that officers consistently used bodily force when they faced no threat or resistance.

MPD officers used bodily force in ways that are unreasonable. MPD officers aggressively confront people suspected of a low-level offense—or no offense at all—and use force if the person does not obey immediately. Officers sometimes used force against people who were already compliant or handcuffed. In many instances, MPD officers shoved adults and teens—including bystanders—for no legitimate reason. Such uses of bodily force are retaliatory and violate the Fourth Amendment.

### a. MPD Uses Force Against Restrained Individuals

In reviewing our sample of less-lethal incidents, we saw that MPD officers frequently use "gratuitous force." Gratuitous force is force used on individuals who have already been restrained, subdued, and handcuffed. It is a "completely unnecessary act of violence," and it violates the Fourth Amendment.[24]

We found MPD officers often use force on people who are not resisting. In one incident, an officer threw a handcuffed Black man to the ground face-first, claiming he had "tensed up" during a search while other officers had him bent over the hood of a squad car. For several minutes before the takedown, the man had been compliant, submitting to being cuffed and searched. He occasionally lifted his head or torso up from the hood of the squad car, and officers quickly pressed him down and held him by the neck, chest, or arms. One of the officers who was pinning him to the squad car said, "You are going to get thrown on the ground in a minute if you keep this up." Less than two seconds later, a different officer hooked the front of the handcuffed man's neck with his arm and took him to the ground. The man's head struck the pavement, and the officer rolled the man onto his stomach and held him down by putting his knee on the man's neck. Body-worn camera footage from this incident shows that the man was compliant with the search and was not resisting. In fact, after the officers pushed him on the hood, they took their hands off him while the search continued. There was no reason for the officer to forcibly take the man to the ground by the neck.

Using force against a handcuffed person creates a risk of serious injury. In one incident, an MPD officer used force against an unarmed, handcuffed white man reported to have been trespassing inside a vacant house. When the man attempted to go back inside the house, the officer grabbed the handcuffed man by the neck, dragged him down several steps, and threw him on his back. The officer pressed his body weight and palm against the man's chest and face, and the man screamed that the officer was "gouging my eye." The officer then pressed his knee against the man's neck, and the man said, "Get your fucking knee off my head, it hurts." The officer responded, "No. This is how we operate." The supervisor concluded the use of force "follow[ed] policy."

In another incident, an officer expressed no remorse after using excessive force against a restrained person. A white man experiencing a behavioral health crisis was handcuffed to a stretcher. The man spat on an officer, who slapped and punched him in the face. After the man had been transported to a hospital, the officer said on body-worn

---

[24] *Henderson v. Munn*, 439 F.3d 497, 503 (8th Cir. 2006) (quoting *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001) (an officer's use of pepper spray on an individual who was subdued and handcuffed was a "[g]ratuitous and completely unnecessary act[] of violence.").

camera: "I'm really proud of myself; I only hit him twice." The supervisor did not refer the officer for a misconduct investigation.

### b. MPD Uses Unnecessary Force, Including for Failure to Comply with Orders Immediately

During our review of our sample of less-lethal force incidents, we observed a pattern of officers using unnecessary force, sometimes because the person failed to comply with an order immediately. There were many such instances, with officers using force within seconds of giving a lawful or even an unlawful order. We also saw MPD officers handcuff people even when officers knew the person was neither a threat nor a flight risk, which can be humiliating. Below, we describe only a few of the examples we found.

We determined that MPD officers are quick to use force on unarmed people, even without reasonable suspicion that they are involved in a crime or are a threat. In one such incident, an officer stopped a driver after seeing him strike a parked car. While the officer spoke with the driver, the Black passenger leaned against a car looking at his phone for four minutes. A backup officer arrived and asked the passenger to stand on the sidewalk, and the passenger complied, still looking at his phone. The backup officer then told the passenger to put his hands on his head and simultaneously grabbed the passenger's left arm from behind. The passenger asked why and pulled away, and the backup officer took him to the ground. The backup officer wrote in his report that he told the man to put his hands on his head because he could not see the man's left hand, but the body-worn camera shows the man's left hand is visible and empty. The force was unreasonable because the backup officer had no reason to believe the passenger was a threat or had committed a crime.

In another incident, officers used unreasonable force to make a man do something he had a right to refuse. Two officers were responding to a fight-in-progress call and confronted a white man who was seated on a bench. One officer asked to examine the man's nose because it was bleeding. "Do not touch me," the man responded. The officer grabbed the man by the wrist, twisted it behind the man's back and pinned his face to the bench. Meanwhile, the other officer grabbed and pulled the man's ear and pushed him down. After they handcuffed the man, he asked, "Why are you doing this to me?" One officer responded, "We didn't want to go this way, we wanted to go a different way, but you didn't want to cooperate." Because the man posed no threat, using force to inspect his nose over his objection was unlawful.

We saw many examples of officers unnecessarily handcuffing unarmed people. Casual use of handcuffing without justification violates the Fourth Amendment. It also violates current MPD policy, which only authorizes handcuffing during a detention in limited

circumstances (for example, when the person is uncooperative, is dangerous, or may flee). In one instance, officers handcuffed a Black driver whom they knew was unarmed and not a threat. Officers carefully searched the shirtless, compliant driver for weapons and found none. An officer then said, "OK, we're going to hook you up just for safety, OK?" and handcuffed the driver. The driver objected, but was forced to stand handcuffed by the side of the road for five minutes before being released. Handcuffing a person absent an objective safety risk is an unreasonable seizure and violates the Fourth Amendment.

### c. MPD's Use of Chemical Irritants Like Pepper Spray Is Unreasonable

Our review of incidents involving chemical irritants (such as pepper spray) revealed that MPD officers often use chemical irritants without justification. From January 1, 2016, to August 16, 2022, MPD officers reported using chemical irritants 1,660 times. We reviewed a sample of incidents. Because MPD officers sometimes spray groups of people to disperse them and need not summon a supervisor unless someone is injured, the actual number of people sprayed is higher.

MPD officers use chemical irritants on people in an unreasonable and retaliatory manner that violates the Fourth and First Amendments. The use of chemical irritants constitutes "significant force" that can cause prolonged pain.[25] Officers violate the Fourth Amendment's prohibition on unreasonable force when they spray people who are not acting violently and who pose no threat to officers or others. Spraying such irritants on people engaged in protected activity, such as criticizing police, also violates the First Amendment's prohibition on retaliatory force. *See* pages 48–56.

MPD officers spray chemical irritants into people's faces even when those people pose little to no threat to anyone's safety. In one instance, an MPD officer responded to a call that an unhoused Black man was trying to light a fire in a parking garage. The officer was familiar with the man, who had "been doing this for the last couple of days," and seemed annoyed that he was responding to the same issue. By the time the officer found the man, he was standing in a surface lot across the street from the garage. The officer shook his pepper spray cannister as he approached the man, saying, "Hands where I can see them. Sit on the ground. I'm gonna mace ya." The man raised his hand with the lit lighter at the same time the officer began spraying him in the eyes. The man turned his face away in response to the chemicals, and the officer immediately took him to the ground. The man did not resist the arrest, and EMS transported him to the

---

[25] *Tatum v. Robinson*, 858 F.3d 544, 548–50 (8th Cir. 2017).

hospital "for further treatment." Because the man was not fleeing and posed no immediate threat of harm, the use of pepper spray was unreasonable.

We also identified incidents where MPD officers indiscriminately fired pepper spray into groups of people to break up fights without first issuing warnings, providing opportunities to disperse, attempting lesser uses of force, or attempting to minimize injury to bystanders. This practice violates the Fourth Amendment's prohibition on unreasonable force by using chemical irritants against people not engaging in violence or posing a threat to others.

Of particular concern are incidents where MPD officers pepper sprayed people in apparent retaliation for observing, questioning, or criticizing police activity, in violation of the First Amendment right to free speech. For example, an officer pepper sprayed two bystanders to a potential suicide call after they questioned what officers were doing. The two bystanders, who were friends of the person in crisis, remained a distance away from the officers and the person, and were not interfering with the police activity. Nevertheless, an officer walked over to them and sprayed them in their faces in response to their questions.

### 4. MPD Encounters with Youth Result in Unnecessary, Unreasonable, and Harmful Uses of Force

We identified many violations of the Fourth Amendment in incidents involving youth. In several incidents, officers did not use age-appropriate de-escalation—or any de-escalation—to avoid the use of force. These officers used force against youth that was unnecessary and harmful to their physical and emotional well-being.

Adolescence is a key stage of development in which young people tend to be more impulsive and have more difficulty exercising judgment than adults, especially in emotionally heightened situations.[26] These normal characteristics of adolescence increase the chances that encounters with police will involve conflict because, in the stress of a police encounter, youth may have difficulty thinking through the consequences of their actions and controlling their responses. Without adequate guidance about child and adolescent development and how to approach encounters with young people, officers may be more likely to misinterpret behaviors of youth and potentially escalate the encounter.[27]

---

[26] Laurence Steinberg, *Adolescent Development and Juvenile Justice*, 5 ANN. REV. CLINICAL PSYCH. 459, 466–68 (2009).

[27] Denise C. Herz, Improving Police Encounters with Juveniles: Does Training Make a Difference?, 3 JUST. RES. & POL'Y 57, 59 (2001).

Within MPD, much of the force officers use against young people results from officers' failure to de-escalate. MPD policies generally do not emphasize the particular importance of de-escalation in incidents involving youth, considering their key stage of development. The use of force policy also fails to meaningfully account for a child's age, size, and development with respect to specific use of force tools or tactics. For example, MPD has no minimum age for handcuffing or guidance on how an officer might exercise discretion in handcuffing a young person considering the severity of the underlying offense, the child's compliance with officer commands, or the risk of physical or psychological harm to the child or others. Likewise, MPD's policies provide insufficient youth-specific limitations on using certain kinds of force, such as bodily force, tasers, or pepper spray.[28] Youth-specific policies are needed to ensure that officers not only correctly interpret adolescent behavior they encounter, but also that officers know how to react appropriately using the tools and discretion at their disposal.

In one incident, officers executing a traffic stop for a broken taillight sought to remove a Black teen from the backseat of the car because he had not been wearing his seatbelt. The teen requested over 20 times that officers call a supervisor to the scene, and the driver asked twice. Instead, an officer threatened the teen with a taser to try to get him out of the vehicle. After the officer arced his taser, the teen repeatedly said, "I'm scared! I'm scared!" Instead of engaging in an appropriate, de-escalating manner with the teen, officers forcibly removed him, pinned him to the ground, and handcuffed him. This use of force was unreasonable.[29]

A taser poses a serious risk of physical and emotional trauma to a young person, including cardiac and respiratory injury, burns, musculoskeletal complications, falls, injury to tissue from taser barbs, triggering of epileptic seizures, and death.[30] MPD's taser policy states that a "heightened justification" is required for using a taser on "young children"[31]—but the policy does not define the term or otherwise describe the circumstances when taser use would be justified.

---

[28] *See* MPD Policy & Procedure Manual, § 5-302, Use of Force Control Options, Section III.B–L (effective Aug. 21, 2020), https://www.minneapolismn.gov/media/-www-content-assets/documents/MPD-Policy-and-Procedure-Manual.pdf [https://perma.cc/868T-5W6J].

[29] *See* MPD Policy & Procedure, § 5-304(A), Use of Force Control Options (effective July 28, 2016) ("The threatened use of force shall only occur in situations that an officer reasonably believes may result in the authorized use of force.").

[30] *See Statement on the Medical Implications of Use of the Taser X26 and M26 Less-Lethal Systems on Children and Vulnerable Adults*, United Kingdom Defence Scientific Advisory Council Sub-Committee on the Medical Implications of Less-Lethal Weapons (DOMILL), 4, (Jan. 27, 2012), https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/443842/DOMILL14_20120127_TASER06.2.pdf [https://perma.cc/K2GN-C4T6].

[31] MPD Policy & Procedure Manual, *supra* note 28, § 5-302, Use of Force Control Options, Section III.H.2(e)(i) (effective Aug. 21, 2020).

23

MPD officers also use unnecessarily aggressive tactics in dealing with young people. In one incident, officers responded to reports of an assault and aggravated robbery in progress. When officers arrived, people were across the street and walking in different directions. Within 10 seconds of exiting his squad car, an officer pointed his gun at two unarmed Black teens. The officer told them to sit on the curb in the snow, and they complied. He pointed his gun at them a second time when one of the teens stood up. The officer continued to point his gun directly at them from a short distance, even once they had again sat down on the curb. Officers had no reasonable suspicion that the two teens were armed or posed an immediate threat. Pointing a gun in the faces of two unarmed teens was unreasonable. When we spoke to one of the teens about what happened, he told us he experienced sleeplessness, tension, and persistent paranoia afterward. He told us, "I thought it was going to be my last night."

Another incident illustrates the consequences of needlessly harsh treatment of youth. An MPD officer drew his gun and arrested an unarmed Black teen for allegedly taking a $5 burrito without paying. The officer, who was wearing street clothes, reported that he followed the teen out of the restaurant, unholstered his gun, and pinned the teen to the hood of a car. Several witnesses called 911 to report the teen was being accosted by a "wacko who has a gun." Other MPD officers then detained the teen in a squad car on charges of theft and obstructing legal process. Unholstering a gun was an unreasonable use of force in the absence of a threat. When we spoke to the teen's mother, she reported that after the incident her son experienced a sense of "helpless rage," as well as feelings of "frustration" and "powerlessness." The incident illustrates the need for youth-specific policies and training.

### 5. MPD Fails to Render Medical Aid to People in Custody and Disregards Their Safety

MPD officers routinely disregard the safety of people in their custody or people against whom they have used force, sometimes in violation of the Fourth and Eighth Amendments and MPD policy. Arrestees have a right to be free from deliberately indifferent denials of emergency medical care. Such denials are particularly egregious when the officer "actually knew" that the arrestee had "an objectively serious medical need" and disregarded the risk to the arrestee's health.[32] As for injuries that stem from an officer's use of force, courts will look to the extent of an individual's in-custody injury that results from an officer's use of force "as evidence of the amount and type of force used."[33]

---

[32] *Bailey v. Feltmann*, 810 F.3d 589, 593 (8th Cir. 2016).
[33] *Karels v. Storz*, 906 F.3d 740, 746 n.2 (8th Cir. 2018).

Three of the officers prosecuted for their role in George Floyd's death were convicted of depriving Mr. Floyd of his constitutional right to be free from a police officer's deliberate indifference to his serious medical needs. But that was not the only example of deliberate indifference that we found; we saw incidents where officers minimized complaints or denied aid, including for people who needed potentially life-saving aid. After MPD officers shot a Black man in 2018, body-worn camera video shows that no officer provided medical aid for at least 11 minutes after the shooting, when the video ended.

> **Case Study: "I Need Help"**
>
> **MPD officers arrested a woman (whom they knew from prior contacts) and transported her to jail. On the way, the woman said she was a Type One diabetic and that she could not see straight. She asked to see a doctor twice. The officers did not call for one.**
>
> **When they arrived at the jail over ten minutes later, the handcuffed woman was limp in the squad car. The officers pulled her from the car and laid her on the concrete. As she lay on the pavement moaning, the woman said, "I need help." She again told the officers that she was diabetic and that she could not see. In response, an officer bent down over her and said, "Just so we're clear, since you're playing games, I'm gonna add another charge for obstruct, okay? So you're gonna spend more time in the clink. Okay?" As a nurse from the jail approached to examine her, the officer and his partner repeatedly undermined the woman's claims that she needed assistance, claiming, "She does this every time." One of the MPD officers also told the nurse that he didn't know if the woman was diabetic, but joked, "She's got tons of needles, I know that!"**
>
> **After the nurse gave a brief examination, the woman laid back down on the concrete, barely moving. The officers then used a "Wrap" (a full-body restraint typically used to control combative people) to carry the woman into the jail.**

MPD officers also fail to render medical aid to people in their custody or against whom they used force because they are skeptical of the person's claims of distress. "[W]hether an objectively serious medical need exists [is] based on the attendant circumstances, irrespective of what the officer believes the cause to be."[34] We found numerous incidents in which officers responded to a person's statement that they could not

---

[34] *Barton v. Taber*, 820 F.3d 958, 965 (8th Cir. 2016).

breathe with a version of, "You can breathe; you're talking right now." In another incident, after pepper spraying a group of people who were fighting, MPD officers ignored pleas to call an ambulance for one woman who needed help because she had asthma. Disregarding the serious medical distress of a person who is in custody or after a use of force is unlawful.

Officers also disregard the safety of people in their custody and thereby fail to protect them from harm. We saw several situations indicating that an officer disregarded an arrestee's safety, including incidents where officers pushed people who were handcuffed and restrained with leg ties (called "hobbles") into their squad cars, then slammed a car door on their legs or head. Officers did not seatbelt some handcuffed arrestees, leaving them to slide around in the back seat during transport. We also reviewed a 2018 incident where officers "hog-tied"[35] a compliant Black man, even though MPD policy has prohibited hog-tying since 2015. Treating a restrained detainee roughly, in evident disregard of their safety, including during a transport, can amount to excessive force in violation of the Fourth Amendment.[36]

### 6. MPD Fails to Intervene During Unreasonable Uses of Force

We observed a pattern of MPD officers failing to intervene to prevent unreasonable force. Police officers have a duty to "intervene to prevent the excessive use of force." When an officer is "aware of the abuse and duration" of unreasonable force and does not try to stop it, this "permits an inference of tacit collaboration," and the officer can be held liable for an unreasonable seizure under the Fourth Amendment.[37]

Throughout our review period, MPD has had a duty-to-intervene policy, and officers have been trained on it. In recent years, MPD has expanded its training on the duty to intervene. However, we saw numerous incidents in which MPD officers could have intervened to stop unconstitutional uses of force, but did not.

Indeed, years before Derek Chauvin murdered George Floyd, multiple other MPD officers stood by as Mr. Chauvin used excessive force on other occasions and did not stop him. In June 2017, an MPD officer failed to intervene when Mr. Chauvin slammed a handcuffed woman on the ground and held her down with his knee on her back and neck. The officer helped hold the woman down, then at Mr. Chauvin's request, helped to put her in an ankle restraint. In September 2017, an MPD officer did not stop Mr. Chauvin when he beat a 14-year-old teen with a flashlight and then kneeled on his

---

[35] "Hog-tying" is tying a person's feet directly to their handcuffed hands behind the back.
[36] *Chambers v. Pennycook*, 641 F.3d 898, 908 (8th Cir. 2011).
[37] *Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009).

neck or back for more than 15 minutes. At least two other officers responded to the scene and found Mr. Chauvin kneeling on the teen. They did not intervene either. Neither Mr. Chauvin nor his partner reported that Mr. Chauvin had knelt on the teen's neck. And in May 2020, two officers failed to intervene to prevent Mr. Chauvin from killing Mr. Floyd.[38]

We saw other examples as well, which are described elsewhere in our report:

- An officer stood by and told a teenager to "shut up" while another officer held him in an unreasonable neck restraint. *See* page 53.

- Multiple MPD officers failed to step in as other officers repeatedly used unreasonable force against unarmed protesters. *See* pages 49–50.

- Multiple officers forcibly removed a teen from a car, pinned him to the ground, and handcuffed him—each with the opportunity to intervene to stop the unreasonable force. *See* page 23.

- Multiple officers fired tasers and a 40 mm launcher repeatedly at a white man who was experiencing a mental health crisis, even though he did not approach or threaten the officers, yet no officer intervened to prevent this unreasonable force. *See* pages 18 and 28–29.

- An officer failed to intervene during transport to prevent a hog-tied man from sliding and falling from the seat. *See* page 26.

These failures yielded little accountability. Despite MPD's policy requiring officers to intervene, between 2016 and the present, the only officers who were disciplined for violating the failure-to-intervene policy during that time period were the officers who failed to stop Derek Chauvin from murdering George Floyd. During that entire period, no other officer was disciplined for standing by while their colleagues violated someone's constitutional rights.

Beginning in the fall of 2021, MPD began to train officers about the duty to intervene using "Active Bystandership for Law Enforcement" (ABLE) training. ABLE training is meant to guide law enforcement agencies "in the strategies and tactics of police peer intervention."[39] In our interviews with Training Division staff, they confirmed that the duty

---

[38] Former Officers Tou Thao, J. Alexander Kueng, and Thomas Lane were convicted of federal criminal civil rights violations. Mr. Thao and Mr. Kueng were found to have deprived Mr. Floyd of his right to be free from unreasonable force by willfully failing to intervene to stop Mr. Chauvin. *See* Department of Justice Office of Public Affairs, *Three Former Minneapolis Police Officers Convicted of Federal Civil Rights Violations for Death of George Floyd* (Feb. 24, 2022), https://www.justice.gov/opa/pr/three-former-minneapolis-police-officers-convicted-federal-civil-rights-violations-death [https://perma.cc/G892-YLG5].

[39] *See About ABLE*, Active Bystandership for Law Enforcement (ABLE) Project, Georgetown Law Center for Innovations in Community Safety, www.law.georgetown.edu/cics/able [https://perma.cc/NZ2J-UCJ7].

to intervene is a significant part of training. We encourage MPD to continue
emphasizing these essential skills to keep officers and community members safe.

### 7. MPD's Inadequate Force Review System Contributes to Its Use of Excessive Force

Under MPD policy, supervisors only review a subset of force incidents, leaving several
types of force incidents without a meaningful review. Officers must describe force more
serious than an escort hold or taser/firearm display in a police report. MPD requires
supervisor notification only following injuries or certain types of force (even absent an
injury), including tasers and firearm discharges. When notified, supervisors must
respond to the scene, investigate the use of force, and document their findings. Their
assessment should include whether the force appears to have been objectively
reasonable, given the totality of the circumstances. If the force appears unreasonable or
violates policy, the supervisor must refer the incident to internal affairs.

MPD supervisors often do not perform adequate reviews of officers' uses of force.
Supervisors frequently fill out a yes/no checklist of tasks but then do not assess the
reasonableness of the force at all. When supervisors fulfill some obligations (such as
interviewing the person who was subjected to force), they accept the officers' version of
events without obtaining or considering—and sometimes outright dismissing—other
evidence. Supervisors miss serious policy violations and do not identify officer
misstatements. The lack of proper force review is dangerous. Where officers are not
held accountable for misconduct, MPD loses the opportunity to correct officers'
problematic tactics. Officers who use unreasonable force can go undetected, putting
community members at risk.

In the incident involving the man whom an officer tased eight times without pausing,
described above on page 17, the supervisor reasoned that the fact that the officers used
force meant the man must have been resisting. The supervisor found no policy
violations and did not mention the excessive use of drive stun, stating only that the
officer "attempt[ed] drive stuns." When the supervisor interviewed the man after the
force, the man insisted he "did exactly what [the officers] said." The supervisor
responded, "[I]f you weren't resisting, they wouldn't have had to strike you."

Supervisors do not conduct meaningful force reviews even in situations involving life-
threatening force. In the example described above where officers fired a taser and a 40
mm projectile launcher at a man who was experiencing a mental health crisis, the
officers created a grave risk to the man when they cornered him on an exterior sixteenth
floor balcony. *See* page 18. The responding sergeant deliberately turned off her body-
worn camera to have a "professional conversation" with the involved officers. The

sergeant did not determine whether the force was reasonable or complied with policy, and the file contains no documentation of further review of the dangerous and unreasonable force.

Supervisors often take an officer's word for what occurred even when the video shows something different. In the incident involving the limp woman, described in the case study on page 25, officers used a "Wrap" to move her instead of rendering medical aid. The woman was limp and not combative. Nevertheless, the officers told their supervisor that they were using the Wrap because the woman was "uncooperative" (which would suggest to a supervisor that the woman was actively resisting) and "refused to comply with their orders." The supervisor accepted the officers' account notwithstanding video showing that the woman was not combative and that using a Wrap was inappropriate. The supervisor also should have noted from the video that the woman had told the officers she was diabetic, could not see, and wanted a doctor, but they instead threatened to criminally charge her and mocked her. Indeed, the supervisor in this incident committed his own policy violation by failing to conduct a proper on-scene investigation. He did not interview the jail staff witnesses because "they had already returned to their work assignments," and he did not interview the woman because "she had already been processed and booked into jail."

The inadequacies in supervisors' force reviews may be due in part to insufficient training. MPD does not provide adequate specialized training to supervisors in conducting force reviews. Instead, MPD provides supervisors with an overview of policy requirements, including a sample force review. The sample itself does not evaluate whether the force was reasonable and within policy.

MPD recently adopted an additional process called "Secondary Force Review." In a secondary review, another supervisor duplicates the work of the original supervisor, including review of "the information available . . . including BWC recordings made during the on-scene Supervisor Force Review." The secondary supervisor then "perform[s] an additional, separate review of whether the use of force was consistent with MPD policy."

Although MPD is to be commended for recognizing that supervisor force reviews have been inadequate, the secondary review process is unlikely to be a sufficient improvement. Without clear policies and effective training, the second supervisor is unlikely to do a better force review than the first. An MPD commander told us that force review requires "much more attention than a supervisor just signing off on it." It requires a full-time, dedicated investigative unit staffed with people who have experience and skill in evaluating force.

29

*      *      *

Unreasonable uses of force undermine trust in MPD and take an immeasurable toll on the Minneapolis community. We heard from people who lost loved ones in encounters with MPD. Even beyond the use of force itself, some spoke of other indignities they endured. One father told us MPD did not call to tell him an MPD officer had killed his adult child; instead, he learned his child had died when the coroner called to ask for their dental records. A surviving parent going through unimaginable pain described the attitude of MPD officers as, "You don't matter, I matter." Another father who lost a child told us MPD made his child "seem like a savage." For him, three words expressed his views: "Enough is enough."

## B. MPD Unlawfully Discriminates Against Black and Native American People When Enforcing the Law

We have reasonable cause to believe that MPD engages in racial discrimination in violation of Title VI of the Civil Rights Act of 1964 and the Safe Streets Act.[40] These statutes prohibit law enforcement practices that have an unjustified disparate impact based upon race. Police practices that disproportionately affect people based on their race are unlawful unless there is a substantial, legitimate, non-discriminatory justification.[41]

Our conclusion is based on the following:

- MPD disproportionately stops Black and Native American people and patrols differently based on the racial composition of the neighborhood, without a legitimate, related safety rationale.

- MPD discriminates during stops when deciding who to search, conducting more searches during stops involving Black and Native American people than during stops involving white people who are engaged in similar behavior.

- MPD disproportionately uses force against Black and Native American people. MPD discriminates during stops by using force more frequently during stops involving Black and Native American people than stops involving white people engaged in similar behavior.

- The percentage of stops for which MPD officers documented race sharply declined following George Floyd's death, and MPD failed to take appropriate action to address these policy violations.

- Though MPD has long been on notice about racial disparities and officers' failure to document data on race during stops, and was made aware of expressions of racial bias by some MPD officers and supervisors, MPD has insufficiently addressed these issues.

These practices undermine community trust and violate federal law.

---

[40] 42 U.S.C. § 2000d (Title VI); 28 C.F.R. § 42.104(b)(2) (Title VI); 28 C.F.R. § 42.203 (Safe Streets Act).
[41] *See N.Y. Urb. League, Inc. v. New York*, 71 F.3d 1031, 1036 (2d Cir. 1995); *Georgia State Conf. of Branches of NAACP v. Georgia*, 775 F.2d 1403, 1417 (11th Cir. 1985); *see also Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 524 (2015).

1.  **MPD Unlawfully Discriminates Against Black and Native American People During Stops**

Though common, stops are not a small matter. Even low-level stops can be degrading to people and diminish their trust in law enforcement. Stops can result in uses of force, lasting physical and psychological effects, and legal consequences.[42] The harms of stops are particularly acute for people who experience repeated interactions with police and understand they are being stopped because of their race.

Our review showed that MPD disproportionately stops Black and Native American people and employs different enforcement strategies in neighborhoods with different racial compositions. During stops involving Black and Native American people, MPD conducts searches and uses force more often than it does during stops involving white people engaged in similar behavior.

a.  **MPD Stops Black and Native American People at Disproportionate Rates**

We reviewed over five years of MPD data covering roughly 187,000 traffic and pedestrian stops from November 1, 2016, to August 9, 2022, to determine whether there were racial disparities.[43] We estimate these stops involved about 334,000 people.[44] We excluded highway stops from our analysis, as the race of people stopped on highways is less likely to reflect the racial composition of the neighborhood.

MPD stops Black and Native American people disproportionately compared to their shares of the population. MPD reported roughly 64,000 stops of Black people and 4,800 stops of Native American people, which we estimate involved 112,000 and 10,000 people, respectively. We estimate that MPD stops Black people at 6.5 times the rate at which it stops white people, given their shares of the population. Similarly, we estimate MPD stops Native American people at 7.9 times the rate at which it stops white people, given population shares.

---

[42] *See Utah v. Strieff*, 579 U.S. 232, 252–55 (2016) (Sotomayor, J., dissenting) (citing Gabriel "Jack" Chin, *The New Civil Death: Rethinking Punishment in the Era of Mass Conviction*, 160 U. PA. L. REV. 1789, 1805 (2012); James B. Jacobs, *The Eternal Criminal Record* 33-51 (2015); Kathryne M. Young & Joan Petersilia, *Keeping Track: Surveillance, Control, and the Expansion of the Carceral State*, 129 HARV. L. REV. 1318, 1341–57 (2016)).

[43] MPD did not track data on ethnicity in a way we could analyze across our review period. As a result, we could not assess whether MPD's enforcement activities disparately impact Latino people.

[44] MPD's data collection structure created some challenges for our analysis. For example, MPD's data does not always clearly identify how many people were involved in a stop, so we estimated the number of people stopped per capita with help from statistics experts. Similarly, MPD's data does not always link specific searches to specific people. We still found significant racial disparities, as described in this report.

MPD's stops identified as "traffic law enforcement" and "suspicious vehicle" stops have similarly skewed per capita rates. We estimate MPD stopped 97 people during vehicle stops per 1,000 Minneapolis residents. But Black and Native American people were more likely to be stopped. Our estimates show MPD stopped 30 white people per 1,000 white residents during vehicle stops, but stopped 192 Black people per 1,000 Black residents and 126 Native American people per 1,000 Native American residents.

**Per Capita Rates of Stops: Stops of White People Compared to Stops of Black and Native American People, Adjusted for Population Shares**
November 1, 2016, to August 9, 2022

|  | White | Black | Native American |
|---|---|---|---|
| All Stops | 👤 | 👤👤👤👤👤👤 | 👤👤👤👤👤👤 |
| Traffic Stops* | 👤 | 👤👤👤👤👤 | 👤👤👤👤 |

*Includes traffic law enforcement and suspicious vehicle stops.

### b. MPD Employs Different Enforcement Strategies Based on the Racial Composition of the Neighborhood

We further analyzed MPD traffic stops, taking into account the racial composition of the neighborhood and the offenses officers reported following stops.[45] Within each neighborhood, we examined the proportion of traffic stops that were for only minor reasons, based on the offenses reported (like excess sound, parking violations, or failure to signal), and the proportion of traffic stops where the offense could only have been discovered by MPD or could have only taken place after the traffic stop had already been initiated (like no proof of insurance or providing false information to an officer). For the purposes of this analysis, we refer to these collectively as "minor" violations or stops.

From November 1, 2016, to August 9, 2022, MPD initiated a significantly larger proportion of its traffic enforcement stops that resulted in minor violations in neighborhoods with fewer white people. When comparing the types of stops across neighborhoods, as the percentage of the white population in a neighborhood increased, the percentage of stops MPD conducted for minor reasons decreased almost

---

[45] For the purposes of this analysis, "neighborhood" means a census block group. There are 403 census block groups in Minneapolis. As before, we excluded stops and crashes on highways, as drivers on highways are less likely to reflect neighborhood demographics.

proportionally. Predominantly white neighborhoods saw far fewer minor traffic stops than neighborhoods with fewer white people. Stops in predominantly white neighborhoods targeted more serious activity.

**Traffic Stops: Minor or Post-Stop Offenses Compared to the Racial Composition of the Neighborhood***



Percentage of White Residents in the Neighborhood

Number of Stops in the Neighborhood    •  0    •  1000    ●  2000    ●  3000

*Excluding stops on highways.

These racial disparities were not a result of traffic safety needs. Though we might expect to see MPD conduct more traffic enforcement in places with more accidents or fatalities, when we compared minor stops in neighborhoods with comparable traffic accident rates, we found that traffic safety did not explain the disparity. Even when traffic accident rates were the same in different neighborhoods, MPD initiated a larger portion of its stops for minor reasons in neighborhoods with fewer white people.

MPD has often used a strategy known as "pretext" stops to address crime. When police use this strategy, they stop cars and pedestrians—typically for minor violations—then

**34**

use the stop as an opportunity to look for evidence of some other crime, like possession of an illegal weapon.

Pretext stops are highly discretionary. To conduct a stop, an officer only needs reasonable suspicion to believe a person has violated a law. Even low-level ordinances that prohibit things like obstructing the sidewalk or being out after curfew can legally justify a stop. Pretext stops do not necessarily violate the Fourth Amendment.[46] But because so much everyday conduct can amount to a minor legal violation, officers are constantly exercising their discretion to decide who gets stopped, and that discretion creates opportunities for biased enforcement. Some officers told us they were given insufficient guidance about how to carry out MPD's enforcement priorities. While some supervisors said they were worried about micromanaging, officers would benefit from clear guidance and additional support. Further, MPD leaders told us no one at the City or MPD is responsible for regularly assessing MPD's data to ensure MPD is not pursuing enforcement strategies that result in unwarranted racial disparities.

MPD's focus on minor and/or pretextual stops has also led to inefficient use of limited resources. MPD leadership has persistently encouraged using traffic enforcement and stops of "suspicious" people and vehicles as a way to reduce violent crime and get guns off the street. One MPD presentation we reviewed described traffic law enforcement stops as the "top tactic used by MPD for illegal gun recovery." But only a small percentage of MPD's traffic stops resulted in recovering guns. For example, in 2018, MPD conducted roughly 32,000 vehicle stops, but recovered only 97 guns—meaning just 0.3% of traffic stops resulted in MPD recovering a gun.

Moreover, from November 1, 2016, to August 9, 2022, MPD data showed no record of a citation or arrest of any kind for 71.7% of traffic stops. The burden of these stops fell most heavily on Black and Native American people. MPD stopped but did not cite or arrest Black people at 5.7 times the rate at which it stopped but did not cite or arrest white people, given their shares of the population. And Native Americans were stopped but not cited or arrested at 5.9 times the rate.

These kinds of stops consume officer time. We conservatively estimated that from 2017 to 2019, when MPD relied heavily on low-level stops, officers spent thousands of hours per year on stops that did not result in a citation or arrest. Thus, while MPD's use of stops created stark racial disparities that violate the law, it also yielded few gains to public safety.

---

[46] *See Whren v. United States*, 517 U.S. 806, 813 (1996).

In 2018, the Hennepin County public defender raised concerns that Black drivers were stopped more than drivers of any other race, disproportionately to the racial demographics of Minneapolis. MPD limited some low-level stops starting in January 2020, when it changed its policy and directed officers to stop ticketing drivers for specific equipment violations related to inoperable headlights, turn signals, rear lights, rear license plate lights, or parking lights. Instead of ticketing people, officers were to give drivers vouchers for repairs. But officers were still allowed to make traffic stops for those equipment violations, and could use those violations as a pretext to stop drivers for other reasons. In October 2021, MPD further modified the policy to prohibit officers from conducting stops for inoperable license plate lights, expired tabs, or an item dangling from the rearview mirror (unless it posed a safety risk). Today, MPD can still stop people for pretextual reasons for other low-level offenses, including other equipment violations that were not specifically enumerated in the policy. In 2021 and 2022, MPD conducted a dramatically smaller number of stops, and the percentage of traffic stops for minor offenses was more comparable across neighborhoods with different racial compositions. However, while there were smaller disparities in traffic stops, these policy changes did not reduce racial disparities in MPD's stops overall. From 2020 to 2022, we estimate MPD stopped Black pedestrians and drivers at 7.8 times the rate at which they stopped white people, given their shares of the population.[47] And for Native American pedestrians and drivers, the rate was 10 times higher.

### c.  MPD Unlawfully Discriminates When Searching Black and Native American People During Stops

When MPD conducts traffic and pedestrian stops, MPD searches Black and Native American people far more often than white people, compared to their shares of the population. MPD searches people during stops involving Black people at 12.8 times the per capita rate at which it searches people during stops involving white people. MPD searches people during stops involving Native Americans at 19.7 times the rate for white people. Similarly, MPD conducts vehicles searches during stops involving Black people at 16.5 times the per capita rate at which it conducts vehicle searches during stops involving white people. And MPD conducts vehicle searches during stops involving Native American people at 14.4 times the per capita rate.

To account for possible race-neutral explanations for these disproportionate searches, like possible differences based on how people of different races behave when stopped by police, we compared MPD's reported stops involving Black or Native American

---

[47] Excluding highway stops.

people with similar stops involving white people.[48] To do this, we used statistical models to estimate differences in stop outcomes across different racial groups, adjusting for numerous factors. We compared stops that occurred from November 1, 2016, to August 9, 2022, during the same year, month, and time of day (using a four-hour window), and that were identified by MPD as the same type of stop (like "suspicious person" or "curfew violation" stops) and offense category (like drugs or alcohol, traffic, or disorderly conduct). We also controlled for whether MPD reported certain behaviors as an offense (like assaulting an officer, violent or disorderly behavior, fleeing police, or possessing a weapon). In addition to looking at stops across the whole time period, we also looked separately at stops that occurred within our time period before and after May 25, 2020, to isolate MPD's more recent practices and determine whether there have been any changes.

When controlling for all these factors, we found striking racial disparities in MPD's searches, suggesting that MPD applies a different, lower standard when searching Black and Native American people.

During our review period, MPD officers conducted person searches during roughly 20,400 stops, including roughly 13,300 searches during stops involving Black people and 1,500 during stops involving Native American people.[49] We found racial disparities in search rates during our entire review period. From May 25, 2020, to August 9, 2022, for example, MPD searched people 22% more often during stops involving Black people than during stops involving white people at similar times, for similar reasons, and who were behaving similarly—at roughly 1.22 times the rate. Similarly, MPD searched people 23% more often during stops involving Native Americans than during stops involving white people in similar circumstances—at roughly 1.23 times the rate.

**Compared to white people behaving similarly, Black people stopped by MPD are subjected to:**

- **22% more searches**
- **37% more vehicle searches**
- **24% more uses of force**

**Compared to white people behaving similarly, Native American people stopped by MPD are subjected to:**

- **23% more searches**
- **20% more uses of force**

---

[48] For stops involving two or more people, MPD's data does not clearly identify which specific individual was the subject of a specific post-stop outcome. Therefore, the analyses of post-stop outcomes in this report measure whether there is discrimination in outcomes of stops *involving* a person of a specific race.
[49] The totals presented here and in the next paragraph exclude searches during highway stops.

MPD also conducted approximately 12,900 vehicle searches during our review period, including roughly 8,500 vehicle searches during stops involving Black people. Even when controlling for similar types of stops, at similar times, involving similar behavior, we found MPD disproportionately searched people's vehicles during stops involving Black people. For example, from May 25, 2020, to August 9, 2022, MPD searched vehicles during stops involving Black people 37% more often than during stops involving white people—at roughly 1.37 times the rate. We estimate that in that period alone, over 1,000 vehicle searches during stops involving Black people would not have otherwise occurred if the stop involved white people instead. MPD's discriminatory searches violate the law.

### d. MPD Unlawfully Discriminates Against Black and Native American People When Using Force During Stops

MPD reported using force (excluding handcuffs and escort holds)[50] at significantly higher rates against Black and Native American people than white people, compared to their shares of the population.

MPD used force during over 15,000 encounters with individuals, including stops and other encounters. However, MPD used force against Black people at 9 times the rate that it used force against white people, given their shares of the population. MPD used force against Native American people at 13.9 times the rate. For almost every type of force, Black and Native American people experienced it at higher per capita rates than white people. Some of these disparities were extreme. For example, MPD reported using neck restraints during 197 encounters from January 1, 2016, to August 16, 2022. As we describe above, many of the neck restraints we reviewed were unjustified, regardless of race. However, MPD used this dangerous tactic on Black and Native American people at per capita rates that were 9.6 and 12.2 times the rate for white people, respectively.

We also found that MPD used force in over 1,000 encounters involving people under the age of 18. MPD used force against Black youth at a rate 12 times the per capita rate for white youth. And for Native American youth, the rate was 14 times higher. The use of force rates are different in another way, as well: while MPD used force on Black and Native American youth at lower rates per capita than they did on Black and Native American adults, they used force against Black and Native American youth at significantly higher rates than against white adults. We found striking disparities when

---

[50] MPD started documenting handcuffs and escort holds as uses of force in late 2020, following the death of George Floyd, and did so through 2022. Because they were not tracked for the whole period, we analyzed handcuffs and escort holds separately.

looking at specific types of force used against youth. For instance, MPD used bodily force against Black and Native American youth at rates 11.4 and 10.5 times higher per capita than they did against white youth, and at rates 1.8 and 1.7 times higher than they did against white adults. And MPD officers unholstered or pointed guns at Black and Native American youth at rates 13.5 and 19.6 times higher per capita than white youth, and at rates 4.7 and 6.8 times higher than white adults.

Given these racial disparities in MPD's reported use of force data, we next considered whether MPD discriminates when deciding to use force against Black and Native American people in similar situations, or whether instead there were possible race-neutral explanations for the racial disparities. Because MPD requires officers to report the race of people who are stopped, which allows us to compare similar encounters, we focused on MPD's use of force during stops. Stops in which MPD used force account for roughly 14% of all incidents where MPD used force. To control for possible factors that might result in the need for force, we compared stops involving white people with similar stops involving Black or Native American people, where the people involved reportedly behaved similarly, to see whether MPD discriminated when deciding whether to use force. We compared

**Per Capita Rates of Force: Force Used Against White People Compared to Black and Native American People, Adjusted for Population Shares**
January 1, 2016, to August 16, 2022

| | White | Black | Native American |
|---|---|---|---|
| All Types* | 1 | 9 | 13 |
| Neck Restraints | 1 | 10 | 6 |
| Chemical Irritants | 1 | 16 | 4 |
| Tasers | 1 | 5 | 7 |
| Canines | 1 | 11 | 14 |
| Unholstering or Pointing Firearm | 1 | 8 | 15 |
| Bodily Force | 1 | 8 | 11 |

*Excludes handcuffs or escort holds.

stops reported by officers that occurred from November 1, 2016, to August 9, 2022, during the same year, month, and time of day, and that were identified by MPD as involving the same type of stop, offense category, and civilian behaviors, like assaulting an officer, violent or disorderly behavior, fleeing police, or possessing a weapon. We also looked at how MPD used force during stops that occurred from May 25, 2020, to August 9, 2022, to isolate MPD's more recent practices.

After controlling for all these factors, we found MPD discriminates when using force during stops. For example, between May 25, 2020, and August 9, 2022, MPD used force during stops involving Black individuals 24% more often (at roughly 1.24 times the rate), than it did during stops involving white people at similar times and who reportedly engaged in similar behavior.[51] During stops involving Native American individuals, MPD used force 20% more often (at roughly 1.2 times the rate).

Our analyses found even starker discrimination in certain parts of Minneapolis. For example, from May 25, 2020, to August 9, 2022, in the Third Precinct—where many Native Americans live and where supervisors told us the "cowboys" want to work—MPD used force 49% more often during stops involving Black people and 69% more often during stops involving Native American people than they did during similar stops involving white people. And during that same period, officers in the predominantly white Fifth Precinct used force against Black people 44% more often than against white people during similar stops. Our analysis shows that these precinct-level disparities are not explained by differences in people's behavior, the reason MPD documented for the stop, the offenses, the demographic makeup of the precinct, or even possible differences in policing strategies in different precincts. Indeed, Black and Native American people in Minneapolis face a higher risk of having force used against them during stops throughout the City.

The racial disparities we found are unlikely to be based on race-neutral factors. MPD unlawfully discriminates against the Black and Native American people it stops by using force disproportionately.

---

[51] We did the same kind of analysis for handcuffs and escort holds and found similar disparities. From May 25, 2020, to August 9, 2022, for both Black and Native American people, MPD reported using handcuffs and escort holds 21% more often (at roughly 1.21 times the rate) than it did during stops involving white people at similar times and who reportedly engaged in similar behavior.

### 2. After George Floyd's Murder, Many Officers Stopped Reporting Race

Starting in late May 2020, officers suddenly stopped reporting race and gender in a large number of stops, despite MPD policy requiring officers to collect the data. We estimate the percentage of daily stops with known race data recorded dropped from about 71% just before May 25, 2020, to about 35% afterwards, a drop of roughly 36 percentage points. This sudden decrease in MPD officers recording racial data continued throughout the next two years.

**Completeness of Data on Race in MPD Stops Over Time**



Each dot represents the percent of recorded MPD stops with data on civilian race on a specific day.

We are not aware of MPD taking any action to address this widespread policy violation—a policy violation that can make it more difficult to detect and counter discrimination.

Still, our analyses of the reported racial data on or after May 25, 2020, showed significant racial disparities in searches and use of force, as described above.

### 3. MPD Has Failed to Sufficiently Address Known Racial Disparities, Missing Race Data, and Allegations of Bias, Damaging Community Trust

MPD and City leadership have been on notice about the kinds of racial disparities and missing race data we identify above for years. They have also been on notice about other complaints of discrimination, including expressions of bias by supervisors. The community, oversight officials, public defenders, government entities, researchers, and the press have been vocal about these issues, filing complaints and sharing detailed reports, qualitative analyses, and historical reviews. Nevertheless, MPD has not adequately addressed the issue of biased policing.

This report is not the first to identify racial disparities in MPD's law enforcement activities. Over the last decade, multiple reports have identified racial disparities in MPD's data on stops, searches, and uses of force similar to those we identify in this report—including, for example, the 2018 Hennepin County Public Defender report described above on stops and searches (see page 36), a 2021 presentation by a Hennepin County public defender on 2020 stops and searches (showing that Black drivers were more likely to be searched, but also more likely to be let go following a search because nothing was found), and a 2015 ACLU report analyzing data from 2012 to 2014 on low level arrests (showing Black and Native American people were more likely than white people to be arrested for low-level offenses).[52] Several reports contained recommendations for MPD to better track, assess, and reduce disparities.

City and MPD leaders admit they have known about MPD's shortcomings in this area. Mayor Frey told us after reviewing MDHR's 2022 report that "[w]e knew, and continue to know, there is disparate treatment" of communities of color. Despite this knowledge, however, MPD has not sufficiently addressed the racial disparities in MPD's enforcement practices, as discussed above. Perhaps more troubling, neither the City

---

[52] *See, e.g.,* Jay Wong, *A Look at Racial Disparities in MPD Traffic Stops and Searches in 2020* (Apr. 22, 2021), https://lims.minneapolismn.gov/download/Agenda/1960/PCOC%20Traffic%20Stop%20Presentation.pdf/55573/2396/PCOC%20Traffic%20Stop%20Presentation; *Picking Up the Pieces: A Minneapolis Case Study*, American Civil Liberties Union (2015), https://www.aclu.org/issues/racial-justice/race-and-criminal-justice/picking-pieces [https://perma.cc/D5T8-HD74]; *see also* Libor Jany, *Hennepin County Report Finds Stark Racial Disparities In Traffic Stops*, STAR TRIBUNE (Oct. 5, 2018), https://www.startribune.com/hennepin-county-report-finds-stark-racial-disparities-in-traffic-stops/495324581 [https://perma.cc/N5XF-P3WV]; Andy Mannix, *Black Drivers Make Up Majority of Minneapolis Police Searches During Routine Traffic Stops,* STAR TRIBUNE (Aug. 7, 2020), https://www.startribune.com/black-drivers-make-up-majority-of-minneapolis-police-searches-during-routine-traffic-stops/572029702/ [https://perma.cc/3P23-Y7AR]; Brandon Stahl, A.J. Lagoe, Steve Eckert, *KARE 11 Investigates: New Data Shows MPD Searches Black Drivers at 29 Times the Rate of Whites After Minor Stops,* KARE11.COM (May 6, 2021), https://www.kare11.com/article/news/investigations/new-data-shows-mpd-searches-black-drivers-at-29-times-the-rate-of-whites-after-minor-stops/89-7d1498a6-5fe3-4a9b-b1f9-a9dc72600829 [https://perma.cc/DAV5-MV3H].

nor MPD has tasked anyone with regularly and systematically assessing MPD's enforcement data to identify and take action to avoid unwarranted disparities.

MPD has also known about problems with MPD's data collection regarding race. MPD was put on notice of this issue at least eight years ago when the Police Conduct Oversight Commission (PCOC) reported that MPD recorded race for only 11% of 2014 suspicious person stops that did not lead to booking, and recommended MPD improve its collection of demographic information.[53] Other reports over the years made similar recommendations. However, as described above, MPD did not identify a person's race for roughly 30% of stops occurring from 2017 until just before George Floyd's death in 2020, and did not identify a person's race for 65% of stops just after Mr. Floyd's death. This was even after a change to a new records management system in 2018. These are not isolated omissions. Supervisors should have caught and addressed this issue long ago. MPD leadership also should have done more to address this issue, especially in light of 2021 reports by investigative journalists finding that the share of stops for which MPD reported race as "unknown" had risen significantly since 2016.[54] MPD has long failed to sufficiently improve data collection on race.

MPD and City leadership have also been on notice about disturbing incidents involving expressions of bias by officers. For years, community members have filed complaints alleging bias, filmed and shared videos documenting officer misconduct, and published detailed reports, including those summarizing MPD's history and explaining how Black and Native American people's negative experiences with MPD have resulted in distrust in MPD.[55]

During our investigation, we found evidence that some MPD officers, including supervisors, field training officers, trainers, and even a former member of MPD's command staff, have made discriminatory statements and committed discriminatory acts. As one officer told us, there is a lot of overtly racist conduct by MPD members.

---

[53] *Investigatory Stop Detention Review*, Police Conduct Oversight Commission (Apr. 17, 2015) at 9–11, https://www2.minneapolismn.gov/media/content-assets/www2-documents/departments/Investigative-Stops-Documentation-Review.pdf.

[54] *See, e.g.,* Stahl et al., *supra* note 52; Brandon Stahl, A.J. Lagoe, Steve Eckert, *KARE 11 Investigates: Race Increasingly Listed as 'Unknown' in MPD Use of Force Reports*, KARE11.COM (July 8, 2021), https://www.kare11.com/article/news/investigations/kare-11-investigates-race-increasingly-listed-as-unknown-in-mpd-use-of-force-reports/89-2439f86f-0d19-4a0c-8bfa-e9be7b099979 [https://perma.cc/TGL6-75YZ].

[55] *See, e.g.,* Michelle Phelps, Amber Joy Powell, Christopher Robertson, *Over-Policed and Under-Protected: Public Safety in North Minneapolis,* Center for Urban & Regional Affairs, University of Minnesota (Nov. 17, 2020), https://www.cura.umn.edu/research/over-policed-and-under-protected-public-safety-north-minneapolis [https://perma.cc/V7YE-2E9M].

For example, during a May 2020 protest following the murder of George Floyd, a lieutenant was caught on camera expressing racist assumptions about Black people: "I'd love to scatter 'em but it's time to fuckin' put people in jail and just prove the mayor wrong about his white supremacists from out of state. Although, this group probably is predominantly white, 'cuz there's not looting and fires." Another officer agreed. The lieutenant oversaw MPD's use of force training—a position where he had enormous influence.

One officer told us that MPD officers make degrading comments to Black detainees about their intelligence or their family, or by invoking racially charged stereotypes with statements like "we'll get you Popeyes in a minute." Similarly, when an officer in plainclothes held a Black teen at gunpoint for allegedly stealing a $5 burrito (as described on page 24), in response to questions about whether he was a police officer, the officer responded on camera, "Really? How many white people in the city of Minneapolis have you run up against with a gun?" He also reportedly said of the teen words to this effect: "If he doesn't steal today, he will steal tomorrow." Statements like these undermine the community's faith in MPD, which in turn undermines public safety.

Some officers we spoke with aired fears and grievances about being perceived as racist, even as they made comments to us that themselves suggested bias and contempt for the people they are supposed to serve. For instance, one officer we rode with said of a young Black man standing on the side of the road, apparently waiting for a ride, "He's so guilty."

We heard from several MPD employees that some officers also express bias directly to other officers. One Black officer told us about statements by officers condoning disrespectful racial stereotypes and tropes, such as calling Black people "ghetto," and saying, "Black people don't work," and "you don't have to worry about Black people during the day 'cuz they haven't woken up—crime starts at night." This officer told us that they try not to appear offended and refrain from reporting comments like this for fear of retaliation. The officer recalled not receiving backup on dangerous calls after reporting misconduct, impacting public and officer safety and MPD's effectiveness. When a permissive culture—furthered by expressions of bias by supervisors and other MPD leaders—results in some officers being afraid to serve their community because they cannot rely on their peers, the breakdown in supervision becomes mission critical.

It would not be challenging for MPD to identify expressions of bias like these. In fact, in the incidents we heard about, officers made little effort to hide them. Some officers act as though they are unconcerned about being held accountable for even egregious discriminatory misconduct. For example, in late 2020, a woman called MPD to ask about a man she believed was putting flyers threatening Black Lives Matter supporters

onto vehicles. She told us that the officer who answered said Black Lives Matter was a "terrorist" organization and stated: "We are going to make sure you and all of the Black Lives supporters are wiped off the face of the Earth." He said, "I think you should file a complaint, and I want you to do it well, so let me spell my first and my last name so you get it right. Then I'll give you my badge number." The woman asked to speak to a supervisor, but the officer refused to transfer her or take her contact information.

The woman filed a complaint the next day but was not interviewed for seven months. Though she described the officer's threat to us as a "discriminatory comment, mostly against Blacks or people of color," MPD did not investigate for bias. Instead, the investigation was for failure to engage in "professional policing." The investigation concluded in February 2022 with a finding of "no merit" and no discipline or coaching. The officer had been the subject of at least nine previous complaints since 2017 (including at least one about racial profiling that was dismissed for unclear reasons). The woman told us the officer "sure felt like he was above any repercussions," and he was. He still works for MPD.

That was not the only racial bias complaint that was treated as something else. As discussed later in this report, in 2020 MPD failed to investigate a Black woman's explicit complaint of discrimination and unlawful arrest after she called 911 for help for her white partner, instead investigating only potential failures to adhere to MPD's body camera policy and engage in "professional policing." *See* page 72.

In incidents where we found MPD did hold officers accountable for biased conduct, it was often only after public outrage, and even then, MPD failed to communicate a clear message to officers, supervisors, and the public. For example, in 2015, MPD officers stopped a car carrying four Somali-American teens. According to an arbitrator assigned to review discipline, an officer approached the car with his gun drawn and ordered a teen to get out, threatening: "If you fuck with me, I'm gonna break your leg before you even get a chance to run." When the teen asked why he was being arrested, the officer replied, "Because I feel like arresting you." Later, when one of the teens told the officer, "[Y]ou're a racist, bro," the officer responded: "Yep, and I'm proud of it." He added, "Do you remember what happened in Black Hawk Down when we killed a bunch of you folk? I'm proud of that . . . . We didn't finish the job over there . . . if we had . . . you guys wouldn't be over here right now." None of the other officers present intervened or reported their colleague, according to news reports. It was not until weeks later, when cellphone footage went viral, that MPD opened an investigation, eventually firing the officer. Afterward, the City did not release evidence of the most troubling comments until required to by a public records lawsuit, nearly five years later. MPD thus missed the opportunity to send a strong message to officers, the Somali community, and the broader public that MPD does not tolerate or condone this behavior.

**45**

**Fourth Precinct Christmas Tree**



In another example, in 2019, two MPD officers put racist decorations on a Christmas tree in the lobby at the Fourth Precinct station, including a pack of Newport cigarettes, malt liquor cans, Funyuns, police tape, and a Popeyes cup: "Trash, literally," as Mayor Frey described it to us. "Super racist stuff." The officers were fired and the inspector of the precinct was demoted after the community found out about the tree. The inspector of the precinct was seen on video walking by, laughing at it, and failing to take action, showing a failure of supervision and suggesting there would have been no discipline if the community had not seen the tree.

The tree sent a clear message to the community. In the aftermath of the incident, one protestor explained, "[I]n essence, they're calling us trash . . . This incident is a direct reflection of how officers that work in the Fourth Precinct view and feel about the community." Even here, where City and MPD leadership took decisive action, any message that MPD takes these issues seriously was lost on some uninvolved supervisors, who described the incident to us as a "joke" and told us the reaction was overblown. If MPD meant to convey that biased behavior is at odds with MPD's core values, and that supervisors needed to help push that message down through the ranks, the message was apparently not received. These examples illustrate supervision failures and apparent efforts to appease the public when they happen to learn of misconduct, rather than a holistic effort to reform MPD's culture.

MPD and City leaders have acknowledged that MPD has contributed to "historical and present day trauma." One leader put it succinctly: "We haven't done right by people."

When policing strategies produce racial disparities, cities should consider alternative approaches to public safety that do not generate unequal and harmful impacts on people of color. To its credit, in recent years, Minneapolis has pursued approaches to addressing crime other than through policing. For example, the City has been working with teams of violence interrupters—trained community members who use informal mediation and non-physical conflict resolution to prevent violence. In January 2023, the

City created a Neighborhood Safety Department to prevent and address violence from a public health perspective. Among other strategies, the Neighborhood Safety Department manages violence interrupters, provides hospital-based support for victims of violent assaults, and operates a Violence Prevention Fund to invest in community-proposed solutions to issues related to violent crime.

Both Mayor Frey and Chief O'Hara expressed a desire to engage with community-based responses to violence like violence interrupters and hospital-based interventions. However, as Chief O'Hara acknowledged, law enforcement officers can be resistant to these approaches. At times, we saw MPD officers express open resentment for violence interrupters. For example, at a protest in October 2020, a sergeant who was preparing to make a mass arrest learned that violence interrupters were present. He responded, "Oh good. They'll get arrested too."

*      *      *

MPD engages in unlawful racial discrimination that has taken a toll on its relationship with the community. The result is diminished public safety and a breakdown of community trust in MPD, not just of those who have directly experienced discrimination, but also of those who learn MPD is not protecting and serving all Minneapolis residents equally.

## C. MPD Violates People's First Amendment Rights

The First Amendment reflects a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide-open."[56] Police retaliation against speech is antithetical to this commitment: "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."[57]

To assess MPD's conduct at protests, we reviewed hundreds of body-worn camera videos from 22 different protest events that occurred between 2016 and the present. We reviewed thousands of documents, including MPD's protest planning materials, as well as its internal policies and trainings related to protests and crowd-control tactics. We spoke to scores of individuals who had information about MPD's protest response, including protesters, journalists, community advocates, attorneys in relevant litigation, and MPD supervisors and line officers. We also reviewed publicly available evidence, including evidence submitted during relevant litigation and videos and accounts from citizens and journalists.

We found that MPD violates the First Amendment in four ways. First, MPD officers retaliate against protesters. Second, MPD officers retaliate against journalists and unlawfully restrict their actions during protests. Third, MPD officers penalize people who challenge or question them during stops and calls for service. Fourth, MPD officers unlawfully interfere with individuals' right to observe and record police activity.

### 1. MPD Violates Protesters' First Amendment Rights

Police cannot deliberately interfere with free expression or punish protesters for their protected speech.[58] Nevertheless, MPD officers regularly retaliate against people for their speech or presence at protests—particularly when they criticize police.

This retaliation frequently manifests as force. For example, at a June 2021 protest of a police shooting, an MPD officer pushed a protester so hard that she fell backward, hit the pavement, and lay unconscious for three minutes. Other officers had told the protester to move back, and she did; she was walking backwards when one of them pushed her on the shoulder. When she responded, "Don't fucking push me, asshole," the officer pushed her again, this time so hard that he knocked her to the pavement. The woman needed 12 staples in her head, spent two days in the hospital, and suffered

---

[56] *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).
[57] *City of Houston v. Hill*, 482 U.S. 451, 463 (1988).
[58] *Nieves v. Barlett*, 139 S. Ct. 1715, 1722 (2019).

a traumatic brain injury. That protester was not the only one shoved that day. At the same protest, another MPD officer ran up behind a protester who was walking away and shoved him forcefully in the back. Another officer shoved a man who was standing on the sidewalk recording the police.

Crowds of peaceful protesters sometimes include people who are breaking the law. When this happens, the proper response is to address "those who actually engage in such conduct," and not "suppress legitimate First Amendment conduct as a prophylactic measure."[59] However, MPD officers frequently use indiscriminate force, failing to distinguish between peaceful protesters and those committing crimes. For example, MPD officers regularly use 40 mm launchers—firearms that shoot impact projectiles, like rubber bullets—against protesters who are committing no crime or who are dispersing. In one incident, an MPD officer shot several times toward a distant crowd, even though he had no clear target, limited visibility, and was—according to MPD training—too far away to ensure accuracy. Around the same time, a nearby journalist was hit by a rubber bullet and lost her eye.

In other protests we reviewed, we saw MPD officers throw blast balls—rubber grenades that cause a loud, bright explosion and can contain tear gas or pepper spray—and other gas munitions into crowds of protesters who were not committing any crime. At times, officers celebrated this behavior. During the George Floyd protests, one officer encouraged another to throw a flash bang grenade into a crowd of protesters: "Think you can get it right in that crowd, bro?" The officer responded, "You mean throw one? I'll just fucking throw it. They'll scatter real quick." Shortly afterward, the officers congratulated one another for hitting fleeing protesters with rubber bullets: "You hit him! Nice!" These indiscriminate uses of force suggest that officers' true purpose is not to prevent criminal activity, but to retaliate against protesters for their constitutionally protected speech.[60]

At times, if protesters break the law or do not comply with officers' lawful commands, officers may have a basis to use force. But in those situations, MPD officers frequently respond with more force than is reasonable and continue using force after any resistance or threat has passed.

For example, in March 2021, a group of protesters threw snowballs, tore down caution tape, and blocked the street with their bikes to prevent police from assisting in clearing

---

[59] *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996).

[60] *See, e.g.*, *Black Lives Matter Seattle-King Cnty. v. City of Seattle*, 466 F. Supp. 3d 1206, 1214 (W.D. Wash. 2020) (finding that "the use of indiscriminate weapons against all protesters—not just the violent ones—support[ed] the inference that" police had a retaliatory motive); *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1155–56 (D. Or. 2020) (same).

an encampment for unhoused people. They also verbally taunted the police. When officers arrested them, some protesters physically resisted. But even after protesters were restrained, officers beat, kicked, and shoved them. One officer repeatedly punched a protester in the abdomen while he was restrained. Another officer, using his full body weight, kneed a passive, restrained protester in the neck as he lay face down—an act that amounted to deadly force.

Retaliation need not rise to the level of physical force to offend the First Amendment. Any action—including a threat of harm—that would discourage the average person from exercising her right to speak or protest can constitute a violation.[61] But MPD officers routinely threaten to use unjustified force against peaceful protesters because of their protected speech. In one 2021 case, an officer pointed his 40 mm projectile launcher at a protester after the protester cursed at another officer. In response, another protester shouted: "Don't aim at him! He can use words!" The protester was right, and this sort of police intimidation strikes at the heart of the First Amendment.

**40 mm Launcher**



---

[61] *Black Lives Matter Seattle-King Cnty.*, 466 F. Supp. 3d at 1213.

### 2. MPD Retaliates Against Journalists and Unlawfully Restricts Their Access During Protests

The press has a distinct and essential role in maintaining our democracy. When reporting on government conduct, the press serves as "surrogates for the public,"[62] and their work gathering and sharing information "enable[s] speech."[63] Accordingly, reporting is a constitutionally protected activity, and the First Amendment prohibits retaliation against individuals for gathering the news.[64]

Regardless, MPD officers regularly retaliate against members of the press—particularly by using force. For example, in October 2020, an MPD sergeant repeatedly pushed a journalist who was actively filming, verbally identified himself as press, and had a press credential around his neck. In the police report, the sergeant falsely claimed that the journalist was leaning against a business owner's truck and that the sergeant had simply "moved the media member off the vehicle." Body-worn camera footage clearly shows that the journalist was standing at least a foot away from it.

**Pepper Spraying of Journalist**



---

[62] *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980).
[63] *Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 838–839 (8th Cir. 2021).
[64] *Id.* (citing *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)).

In another case, on May 30, 2020, officers encountered journalists who were sheltering at a gas station. An officer, pointing a 40 mm launcher, approached a journalist who was filming, holding up his press credential, and shouting, "I'm press!" The officer forcefully pushed the journalist's head to the pavement. As he lay on the ground, the journalist held up his press credential. In response, an MPD sergeant pepper sprayed him directly in his face, then walked away.

MPD officers also interfere with newsgathering by unlawfully limiting journalists' access to public spaces where protests take place, and thus their ability to report on police activity. The First Amendment requires that any restrictions on when, where, and how reporters gather information "leave open ample alternative channels" for gathering the news.[65] Blanket enforcement of dispersal orders and curfews against press violates this principle because they foreclose the press from reporting about what happens after the dispersal or curfew is issued, including how police enforce those orders.

However, MPD regularly enforces general orders to disperse against members of the press. For example, at a 2021 protest, two officers approached a journalist who was standing on a sidewalk recording police and repeating, "I'm media! I'm media." Both officers told him that he had to leave. One of the officers then said, "Time to go!" and forcefully shoved the man down the sidewalk.

During the George Floyd protests in May 2020, Governor Tim Walz imposed an 8 p.m. curfew with an explicit carve-out for press. MPD officers enforced the curfew against the press anyway. In one case, officers approached a group of journalists who identified themselves as press and carried cameras and microphones. An MPD sergeant screamed at the journalists to "fucking go!" As the journalists packed to leave and tried to open a large gate to exit, two officers pepper sprayed them at close range.

### 3. MPD Unlawfully Retaliates Against People During Stops and Calls for Service

MPD's retaliatory conduct is not limited to protests. During stops and calls for service, officers retaliate against people who question or criticize them. This violates the law: "Criticism of officers, even with profanity, is protected speech."[66] Nevertheless, MPD officers routinely respond to protected speech with arrests and with force.

---

[65] *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

[66] *Laney v. City of St. Louis*, No. 4:18-cv-1575, 2021 WL 4439252 (E.D. Mo. Sept. 28, 2021) (citing *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 985 (8th Cir. 2019)); *see also City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (yelling obscenities and threats at a police officer is still protected under the First Amendment).

For example, in 2017, MPD officers responded to a disturbance call about a college party. A 19-year-old yelled, "Fuck the police!" as he walked past two officers. One of the officers grabbed him and asked him whether he had said, "Fuck the police."" The teen responded (correctly) that he had the right to say it. "No," the officer replied, "You can't." Another officer put the teen in a neck restraint, and the teen screamed, "I can't breathe!" The officer then pulled the teen, still in a neck restraint, backwards towards the patrol car. Once the teen was in the back seat, another officer approached the car to weigh in: "Hopefully you can tell your friends when you say, 'Fuck the police,' now you understand that's actually not legal unless you're in a riot or a display of protest."

That officer was wrong. The First Amendment protects criticism, including profanity, directed to police officers. Nevertheless, we saw MPD officers repeatedly retaliate against people who criticized them. In one case, after a man said he planned to file a complaint against police officers, an officer shoved him so hard that he fell and struck his head on the sidewalk. In another case, during a trespassing call, an officer followed a man for two blocks and repeatedly shoved him after he had already left the property because the man had verbally antagonized him. This conduct violates the First Amendment.

### 4. MPD Unlawfully Retaliates Against People Who Observe and Record Their Activities

MPD officers also retaliate against people who watch or question them. This violates the law. So long as it does not actively interfere with police conduct, people have the right to observe police officers' conduct and express views about it, even if it causes an officer a momentary distraction.[67]

But MPD officers regularly arrest and use force against people who exercise these core First Amendment rights. For instance, in one case discussed on page 22, two bystanders attempted to observe an interaction between MPD officers and a man who was having a mental health crisis. When they verbally objected to the officers' actions, one officer pepper sprayed both of them in the face.

Just as people have a right to observe public police interactions, people have a right to record officers' activities as well.[68] However, both during protests and in everyday interactions, MPD officers interfere with individuals' right to record police activity by

---

[67] *Copeland v. Locke*, 613 F.3d 875, 880 (8th Cir. 2010) (holding that if an officer arrested a person "solely for distracting him from [a] stop through the use of his protected expression, then the arrest was unlawful"); *see also Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020); *Walker v. City of Pine Bluff*, 414 F.3d 989, 992–93 (8th Cir. 2005).
[68] *Chestnut*, 947 F.3d at 1090.

arresting them, destroying their recording equipment, and retaliating with force. For example, during a May 2020 protest, officers approached a man who was standing on the side of a roadway on a bridge, recording police. One officer tried to grab his phone and screamed at him to move. Another officer pepper sprayed the man's face. When the man refused to leave, an officer grabbed his phone and threw it off the bridge.

MPD officers also retaliate against people who record them outside of the protest context, during regular stops and calls for service. In one 2019 case, two officers responded to a call about a domestic disturbance. As the officers were removing a man from the home, a bystander tried to record the police activity. In response, one of the officers pepper sprayed him.

MPD policy makes clear that people have a right to record police activities. Officers seem to know this: They frequently tell people they are free to record. In practice, however, they often use force against or arrest people who record. For instance, in January 2017, a man told two officers that he intended to record them. One officer told him that he could record all he wanted, but that he had to move across the street. When the man began to move away, the other officer followed him, told him he was under arrest, and threw him onto the ground. As that officer held the man's face down on the pavement, the first officer confiscated his phone.

### 5.  MPD Inadequately Protects First Amendment Rights

MPD officers' First Amendment violations are the predictable consequence of MPD's broader failure to protect speech and guard against unlawful retaliation.

To start, MPD's policies and training on First Amendment issues have been seriously deficient. When widespread protests began in May 2020, MPD's only policy on the issue was its civil disturbance policy, which was four sentences long and had not been updated since 2007. After the protests, MPD made a series of positive changes to their policies, including adding limitations on the use of less-lethal projectiles and chemical agents and additional requirements for reporting and reviewing uses of force during protests. Nevertheless, MPD's policies still fail to clarify basic First Amendment requirements, including details about the scope of First Amendment protections and how to handle media at protests. Likewise, MPD's trainings on police response to protests refer broadly to First Amendment rights without sufficiently explaining what those rights include.

MPD also fails to hold officers accountable for violating First Amendment rights. Despite the repeated police misconduct that we observed at protests between 2016 and the present, MPD has only disciplined officers for their conduct at protests in connection

with five incidents over that seven-year period. Notably, although the reviews in those cases considered issues like the use and reporting of force, they ignored the question of whether officers violated protesters' First Amendment rights.

Moreover, even when officers have seriously injured protesters, supervisors often accept their accounts with little scrutiny, and associated complaints linger for years without resolution. For example, the officer who pushed a peaceful protester and caused a traumatic brain injury falsely claimed that he gave the woman a "slight push" because she "walked towards [him] with her right hand up and clinched." Other officers who were present echoed this false account, claiming the woman had refused to comply with commands and advanced on officers. The body-worn camera footage shows this is not true. Both times the officer pushed her, the woman was walking backward, away from the police line, and both times, he gave her a forceful shove. Regardless, the supervisor who reviewed the incident claimed that the officers' accounts "appear[ed] to match" the footage. Nearly two years later, the complaint against the officer remains unresolved. He is still on the force.

We also observed repeated expressions of contempt for First Amendment rights by line officers, supervisors, and members of the SWAT team. For example:

- During protests in May 2020, an officer saw a sergeant indicate a group of protesters yelling at police from behind a fence. The sergeant told an officer, "I'll give you a pack of beer if you hit them with a 40 mm round."

- At a protest in October 2020, a sergeant encouraged officers to hit protesters with their 40 mm rounds "in the junk."

- In 2021, an MPD SWAT team officer assisting at a protest in the neighboring city of Brooklyn Center aimed his 40 mm launcher at protesters from his rooftop position. He joked, "What if I can get 'em?" He then repeatedly pointed his weapon at the peaceful protesters below, apparently for his own entertainment.

These remarks—and the many others like them we identified—show disrespect for First Amendment rights, not mere confusion about what those rights protect. And when supervisors regularly express this attitude, they send a message throughout MPD that protesters are adversaries, and First Amendment rights need not be protected.

\*　　\*　　\*

The First Amendment protects the public's right to expose truths and express their views—even when the focus of protected speech is the police themselves.

Safeguarding speech is essential so that "falsehoods may be exposed."[69] In Minneapolis, this principle has special resonance. The day after George Floyd was murdered, MPD issued a press release about it. The press release, entitled "Man Dies After Medical Incident During Police Interaction," stated that officers had handcuffed the man and "noted he appeared to be suffering medical distress." Because a 17-year-old girl filmed that day, the nation learned what really happened.

---

[69] *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940).

## D. The City and MPD Violate the Americans with Disabilities Act in Their Response to People with Behavioral Health Disabilities

Our investigation showed that the City and MPD violate the Americans with Disabilities Act (ADA) by discriminating against people with behavioral health disabilities when providing emergency response services. The ADA prohibits discrimination against people with disabilities, including by excluding them from participation in or denying them the benefits of city services, programs, and activities.[70] People with behavioral health disabilities must be able "to participate in or benefit from" the City's services, programs, and activities to an extent "equal to that afforded others" and that is equally "effective in affording equal opportunity to obtain the same result."[71] The City must make "reasonable modifications" to policies, practices, or procedures, if necessary to avoid discrimination against people with disabilities.[72] Many behavioral health-related calls for service do not require a police response, but MPD responds to the majority of those calls, and that response is often harmful and ineffective. This deprives people with behavioral health disabilities an equal opportunity to benefit from the City's emergency response services.

In December 2021, the City launched a mobile crisis response pilot that provides a behavioral health response in addition to, or instead of, a police response. The program has been a positive development. But it lacks the capacity to promptly respond to calls throughout the City and, as a result, MPD continues to be the primary response to behavioral health calls. The City itself has unanswered questions about whether the program is on track. While a recent report reflected a promising start, Mayor Frey acknowledged the lack of important information about the program's performance.[73]

---

[70] 42 U.S.C. § 12132; *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998).

[71] 28 C.F.R. § 35.130(b)(1)(ii), (iii).

[72] 28 C.F.R. § 35.130(b)(7); *see also* Title II Technical Assistance Manual § II-3.6100.

[73] In assessing the City's and MPD's compliance with the ADA, we analyzed a variety of forms of evidence the City provided. Aided by experts in forensic and clinical psychiatry, behavioral health services, crisis response, co-response models, and dispatch, we analyzed thousands of records from MPD's computer-aided dispatch and records management systems from 2016 to 2022, as well as reviewed body-worn camera and squad car footage. In addition, we joined ride-alongs with MPD and mobile crisis responders, observed trainings, and reviewed training materials and policies. We interviewed dozens of MPD officers; county emergency medical services (EMS) responders; Minneapolis Emergency Communications Center (MECC) call takers, dispatchers, and supervisors; Behavioral Crisis Response (BCR) responders and supervisors; City and MPD officials and leadership; and people with behavioral health issues who had experienced an MPD response, along with their family members, community members, activists, and others.

1. **Behavioral Health Calls Continue to Receive an Unnecessary and Potentially Harmful Law Enforcement Response**

Many behavioral health-related calls for service in Minneapolis do not require a law enforcement response. These calls often involve no violence, weapon, or immediate threat of harm. For example, MPD responded to a call from a man who wanted to tell officers stories about his life and had to be advised by officers that "911 was for emergencies," a call about a woman with schizophrenia who believed people were stealing her identity, and a call from a grandmother about her grandson who had depression and was upset due to a family issue. Such calls could be safely resolved with a behavioral health response, such as a mobile crisis team.[74] Other calls may present public safety concerns that may require a joint response involving police and behavioral health responders.

MPD responded to well over one million emergency and non-emergency 911 calls between January 2016 and August 9, 2022. Almost 10% of these calls directly related to a behavioral health issue. For the vast majority, MPD was the primary, if not the sole, responder, mostly due to the unavailability of a behavioral health response. We analyzed a randomly selected sample of certain behavioral health-related 911 calls to which MPD responded. For the vast majority of these calls, the person in need of behavioral health attention was not reported to have a weapon or pose an immediate threat to themselves or others. Only 0.45% of over 100,000 mental health calls resulted in an arrest at the scene, underscoring that the current reliance on police-only responses is unwarranted.

The treatment of people with behavioral health needs stands in stark contrast to the experience of people in need of medical assistance. A person in medical need receives a response from trained Emergency Medical Services (EMS) professionals; due to insufficient mobile crisis team capacity, the person with behavioral health needs typically receives a response from an armed police officer with often inaccurate and ineffective training in behavioral health. We include here just a few examples showing the harmful, and even fatal, results when officers lead the responses to situations involving behavioral health issues.

In one example, MPD responded to check the welfare of an unarmed white man. Notes

---

[74] A mobile crisis team includes trained behavioral health staff who respond to individuals in need of urgent behavioral health assistance wherever the person is located. The team can resolve the immediate need and connect the person with ongoing behavioral health services as appropriate.

of the call advised that the man was "talking to himself and . . . crawling on sidewalk."[75] A responding officer encountered the man with his pants partially undone, appearing "agitated," and "moving around at a fast pace." As officers spoke to him, the man grew increasingly agitated and tried to move away. There was no indication that he was a threat to officers or others. Nevertheless, an officer told him he was going to "get cuffed up." The officer reported that "to prevent him from leaving," the officer grabbed his arm, put him in a neck restraint, and pinned him to the ground. Officers restrained him face-down in the snow with a knee on his back for several minutes as they waited for EMS, resulting in the man having a bloody nose. EMS sedated him and took him to a hospital. Dispatching a mobile crisis team, instead of MPD, would have been appropriate and could have addressed the man's apparent behavioral health needs while avoiding the use of force.

When MPD officers respond to behavioral health calls, they often fail to use appropriate de-escalation techniques, such as giving the individual extra space and time, speaking slowly and calmly, and actively listening.[76] We identified numerous examples of MPD officers unnecessarily escalating situations and in many cases using avoidable force against people with behavioral health disabilities.

One officer responded to a report in 2016 of a naked Latino man walking down a quiet residential street using a long branch as a walking stick. The officer drove next to the man in his squad car, asking him where he was going. The man ignored the officer but appeared disoriented and calm. The officer exited his squad car, grabbed the man's wrist, pulled him towards the vehicle, and subdued him with a neck restraint. Another officer arrived, and they pinned the man to the pavement for over 13 minutes. EMS sedated him, and he later had to be intubated.

In a 2017 incident, officers used a taser on an unarmed white man experiencing behavioral health issues. The man was shirtless, shoeless, and wearing pajama pants in his front yard. Neighbors told officers that he was having a mental health episode, had bipolar disorder, and was unmedicated. Although agitated, at times pacing around his yard and yelling, the man was compliant with officer orders to sit on his front steps. At a quiet moment during the encounter—the man was seated, unarmed, and not

---

[75] Some MPD sources use all uppercase letters. For readability, we use lowercase letters when quoting these sources.

[76] The ADA requires that a public entity must "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). When an individual is experiencing a behavioral health issue and officers do not use well-known tactics for communicating with that individual, the law enforcement agency may not have taken appropriate steps to ensure that communications with individuals with disabilities "are as effective as communications with others."

posing a threat to anyone—an officer fired his taser without warning. After the man stood up in pain, he fell to the ground, officers handcuffed him, and EMS eventually sedated him. The unnecessary police-led response escalated the situation, and a behavioral health-led response may have avoided the use of force entirely.

A behavioral health-informed response is uniquely important when responding to children. In a 2020 encounter, MECC dispatched MPD and EMS to a call that an 11-year-old Black girl had taken an unknown kind and quantity of pills. The child's brother told responders that the girl "possibly took like 6 or 7 pills, Tylenol, aspirin, ibuprofen, that type of combination." The girl ignored responders when they tried to engage her and continued lying quietly on her bed. After the girl kicked and hit responders when they physically tried to move her, EMS personnel sedated her and MPD officers handcuffed her arms behind her back. An officer suggested, "If we're going to carry her out, might as well handcuff the legs, too." Responders handcuffed her ankles and wrists, carrying her face-down out of the home. A behavioral health-led response may have avoided handcuffing of the child's wrists and ankles, minimizing the trauma suffered and assisting EMS to better manage this child's behavioral health and medical issues. Also noteworthy is that the child received services from qualified medical personnel for her medical need, but from police for her behavioral health issue.

Even if a police presence is appropriate, missed opportunities to bring in an alternative response can have deadly consequences. In one 2018 incident, MPD was dispatched without any behavioral health responders after a man's girlfriend called the non-emergency response line. The man reportedly told his girlfriend that he would kill himself and had sought to buy a gun "a few months ago." Without mentioning that timeframe, dispatchers relayed to MPD that he "was looking to buy a gun." A supervisor directed the officers not to force entry given that the man was alone and not a threat to others, and suggested the officers call the man's girlfriend to try and convince him to voluntarily leave the home. Officers were standing close to the home, however, looking in windows and calling to the man to come out. The man, agitated, then opened the front door holding a knife, yelling, "OK then, let's do this!" He initially advanced on the officers quickly and did not comply with multiple demands to drop the knife. An officer shot and killed the man. A well-coordinated joint response with behavioral health professionals and law enforcement would have been warranted here. Responders could have taken more time to understand and de-escalate the situation, such as by allowing the man to stay inside the home, engaging in dialogue, attempting to gather other information from the girlfriend or other sources, and having officers on standby. Such strategies may have avoided the use of force that ended the man's life.

Not only is a police response unnecessary in many behavioral health-related situations—and harmful for that reason alone[77]—it can increase the stigma associated with behavioral health issues, contribute to distrust of public services, and cause trauma for some individuals.[78] Communities of color in Minneapolis are particularly impacted by unnecessary police encounters. People with serious mental illness in these communities are already less likely than their white counterparts to use mental health services, and they are more likely to report stigma as a reason for not doing so.[79]

One recent survey of Minneapolis residents found that a majority of respondents of color believed that a police response was unhelpful in situations involving a mental health crisis. We reviewed incidents that demonstrated this dynamic. A mother called 911 to report that her adult daughter, a Black woman who had a bipolar disorder, was attempting to hurt herself by lying in the road. Two MPD officers responded. One ran up to the daughter, who was by then calmly walking through a park. The officer exited the squad car and immediately grabbed her arm. The daughter became agitated, saying, "I didn't do nothing illegal, I'm walking through the park like y'all walking through the park," and began yelling. The second officer also grabbed her. She pulled away, and officers put her in a neck restraint. Watching the incident unfold, her mother said, "Don't choke her like that!"

---

[77] When dispatched to behavioral and physical health calls, EMS personnel frequently wait outside until MPD arrives on scene to declare the situation "Code 4," meaning under control and safe, before EMS personnel enter the scene and begin to administer services. According to community members and City employees interviewed, this practice is particularly pronounced in North Minneapolis' Fourth Precinct, and we observed this dynamic during our investigation. This practice absorbs MPD resources and places officers at scenes where a police response is not needed and may even be harmful, creating opportunities for the negative outcomes discussed in this section.

[78] *National Guidelines for Behavioral Health Crisis Care: Best Practice Toolkit Executive Summary*, Substance Abuse and Mental Health Services Administration (SAMHSA), 8–10, https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-services-executive-summary-02242020.pdf [ https://perma.cc/4QNM-565A].

[79] *Racial/Ethnic Differences in Mental Health Service Use Among Adults and Adolescents (2015-2019)*, Center for Behavioral Health Statistics and Quality, SAMHSA, Tables 5.2, 5.7, pages 36, 41, https://www.samhsa.gov/data/sites/default/files/reports/rpt35324/2021NSDUHMHChartbook102221B.pdf [https://perma.cc/J89N-WY2D].

In December 2021, the City launched the mobile Behavioral Crisis Response (BCR) pilot. Mayor Frey described it as "a huge day for the City of Minneapolis, and a move toward safety beyond policing, recognizing that not every 911 call requires response from an officer with a gun." BCR is a 911 first-responder entity, like MPD, EMS, and Fire. MECC call takers dispatch BCR units when available. Mental health practitioners staff two mobile units dispatched to calls involving certain behavioral health issues during set hours. Several months into the pilot, the BCR team expanded its hours, but significant coverage gaps persist. After BCR's first year of service, the City reported it was either the primary or secondary response to thousands of incidents, but its limited capacity still leaves MPD as the primary responder to behavioral health calls. While the service is designed to be City-wide, launched with only two vans, BCR has been unable to provide timely City-wide responses. The two vans BCR has had access to have also experienced frequent mechanical problems, significantly lengthening response times across the City. While the City has had plans for some time to add vehicles to the fleet, BCR currently remains unable to respond to large numbers of calls for which it is needed. And because BCR does not track response times, improvements will be difficult to measure without improved data collection and analysis. As recently as March 2023, BCR was still not able to provide 24/7 coverage due to unfilled overnight weekend shifts. MPD continues to handle a large volume of behavioral health calls.

**Case Study: A Compassionate Alternative Response**

**During a ride-along with a BCR team in November 2022, we observed the BCR team provide timely, compassionate, and impactful services to a person in crisis. Responders were dispatched to a pharmacy to assist a patient, a Black woman experiencing hallucinations of bugs eating her ears. She had sprayed Raid insect spray into her ears, causing injuries. The BCR responders calmly and caringly engaged the woman in conversation. Recognizing the need for urgent medical care to treat her wounds, BCR responders encouraged her to allow them to transport her to the hospital. The woman resisted and expressed fear of involuntary commitment for mental health issues, but BCR responders continued to patiently engage with her, discussing the situation with her at a relaxed pace. She eventually consented to be seen at the hospital. BCR transported her in their van, offering her food on the way. BCR entered through an ambulance bay entrance and left the woman with emergency room nursing staff.**

**When it is able to respond, the BCR program can provide a compassionate alternative to a law enforcement response.**

In part due to its capacity limitations, BCR has also been unable to regularly connect community members to ongoing support services that would help prevent future crises. Likewise, coordination of BCR, MECC, or MPD with the recently launched 988 Suicide and Crisis Lifeline[80] has been minimal. These challenges have compromised BCR's ability to achieve its emergency crisis response mission and continued the City's reliance upon MPD for many first responses.

## 2. MECC Contributes to Unnecessary Police Responses to Calls Involving Behavioral Health Issues

The City's failure to provide a meaningful police alternative also stems from issues with dispatch. In 2021 alone, MECC received nearly 18,000 behavioral health calls. MECC's operations therefore have a substantial impact on how—and by whom—behavioral health calls are handled.

MECC lacks the ability to adequately assess and appropriately dispatch behavioral health-related calls for service. New training is limited, particularly around behavioral health diagnoses, and response protocols remain unclear. MECC staff themselves identified the need for clarity about the "gray areas" of call taking and dispatching in response to behavioral health calls. One dispatcher told us they are "trained to err on the side of caution and to oversend" police, and another feared personal liability for improperly dispatching BCR. And, as with MPD officers, the concept of excited delirium persists at MECC among some staff. Finally, MECC's quality assurance program does not review behavioral health calls, further undermining the City's ability to ensure appropriate response to behavioral health calls.

Even when a call is identified as requiring a behavioral health-led response, certain MECC processes result in MPD responding anyway. Dispatchers reported that many calls appropriate for BCR are diverted to MPD if BCR has not responded in as little as 10 minutes. This is true even for situations in which callers specifically said not to send police.

Some of the most frequent callers for service (such as shelters for people in the unhoused community, short-term mental health stabilization, acute and long-term care facilities, and walk-in behavioral support clinics), receive police responses for calls known at dispatch to involve behavioral health issues. That service providers designed to serve people with behavioral health disabilities are frequently calling for MPD

---

[80] The 988 Suicide and Crisis Lifeline "is a national network of local crisis centers that provides free and confidential emotional support to people in suicidal crisis or emotional distress 24 hours a day, 7 days a week." *See* 988 Suicide & Crisis Lifeline, SAMHSA, https://988lifeline.org.

assistance—a teenager living at one care facility had 11 MPD contacts in just over 3 months, for example, all for calls relating to attempted suicide or self-harm—presents an opportunity for the City to set expectations regarding the unique skillsets and roles of MPD and BCR. MECC must ensure training, call scripts, and protocols are updated to dispatch BCR where appropriate.

### 3. Training on Behavioral Health Issues Does Not Equip Officers to Respond Appropriately

Our investigation showed that a law enforcement-led response can cause real harm in the form of trauma, injury, and death to people experiencing behavioral health issues, as well as other impacts. These harms may be avoided by dispatching behavioral health responders rather than law enforcement where appropriate, and they can be mitigated by sending behavioral health responders with police where a law enforcement response is needed, as well as by appropriate training of law enforcement officers. Officers will inevitably come into contact with people experiencing behavioral health issues and, as a result, they must be prepared to interact appropriately with them. MPD's training in this area, however, is at best inadequate; at worst, it is factually inaccurate and biased. While we observed encounters in which some officers displayed compassion and kindness for people with behavioral health needs, the training may contribute to prejudice among MPD officers against people with behavioral health issues.

> **"If we don't deal with the crazy naked guy, who will? It's not the old days. Can't lasso them. Best way to deal with them is to put them on the ground and handcuff them. And police are the only ones who are justified in doing that . . . I don't know a better way."**
>
> **– MPD Officer During Ride-Along with DOJ Investigator, July 2021**

Since at least 2017, all MPD officers have received basic Crisis Intervention Team (CIT) training, but the training program suffers from serious flaws. Training materials contained concerning messaging, including inaccurate medical information. One MPD crisis intervention trainer told trainees that responding to behavioral health calls "could be dangerous because they think you're coming to rob them." Likewise, training materials provided by outside consultants on behavioral issues among youth were problematic: a slide on autism stated that a child with the condition "will power struggle with you to the death." Also unclear are what quality standards, competency requirements, or monitoring apply to the curriculum or trainers as part of MPD's CIT and other behavioral health-related trainings. Our investigation showed that current training is not sufficient to educate officers about behavioral health issues, with officers underestimating the need for training at all. One officer told us he did not need training

to know someone is "off their rocker." And despite a laudable City directive to stop training officers on excited delirium, training given to MPD officers referred to "severe agitation with confusion (delirium)" in an obvious attempt to skirt the City directive. Some officers continue to mention "excited delirium" in call comments and reports.[81] This reflects the importance of confirming the quality and accuracy of training before it is delivered and the need for proper oversight following trainings.

### 4. The City and MPD Can Make Reasonable Modifications to Avoid Discrimination Against People with Behavioral Health Disabilities

The ADA requires public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."[82] Whether a particular modification is reasonable and not a fundamental alteration includes a fact-based assessment of a particular jurisdiction.

***Expand and Improve BCR as an Alternative Response.*** BCR is an important step toward creating a meaningful alternative to police for calls involving behavioral health issues. Resources in sufficient quality and quantity are critical to its ability to provide appropriate services and prevent unnecessary police responses. Increased collaboration and coordination with other City and county programs can further enhance BCR's efficacy. Deeper connection between BCR and other first-responders and providers, particularly COPE, as well as the recently-launched 988 Suicide and Crisis Lifeline, is essential. Minneapolis' network of mental health treatment and support resources is largely untapped given the City's current siloed approach.

***Modify MECC to Dispatch an Alternative Response Where Appropriate.*** MECC must also ensure accurate identification of and responses to behavioral health calls and engage in robust quality assurance. City policies must better delineate the responsibilities of MPD, BCR, and other first responders in behavioral health calls, including joint responses involving more than one agency, so that MECC can accurately

---

[81] In light of the well-documented connection of the use of excited delirium to racial bias, the persistent presence of this concept is troubling. *See* Brooks Myrick Walsh, Isaac K. Agboola, Edouard Coupet, Jr., John S. Rozel, Ambrose H. Wong, *Revisiting "Excited Delirium:" Does the Diagnosis Reflect and Promote Racial Bias?* 24(2) WESTERN JOURNAL OF EMERGENCY MEDICINE 152–59 (Mar. 2023) (electronically published Jan. 31, 2023).

[82] 28 C.F.R. § 35.130(b)(7). The City need not provide a reasonable modification if the person requiring the modification poses a direct threat to the safety of an officer or others. *See* 28 C.F.R. § 35.139(a). A direct threat is "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services." 28 C.F.R. § 35.104.

assess calls for service and deploy the right responder(s) in accordance with the unique missions and skillsets of MPD, BCR, EMS, and Fire.

***Ensure Quality and Impact of MPD Behavioral Health Training.*** MPD can make changes to its CIT program to ensure that when calls related to behavioral health do need a police response, appropriately trained officers respond. Training related to behavioral health issues must ensure that when MPD officers respond to situations in which behavioral health issues are present, they do so appropriately. It is critically important that behavioral health-related training for MPD, including cross-training with BCR, be updated, accurate, and impactful.

*     *     *

Expanding BCR to ensure that the City can provide services tailored to residents with diverse behavioral health needs holds much promise. As Mayor Frey told us, being able "to have someone show up without a gun and with the right skillset" is critical. Coordination and continuous assessment will be essential in this next phase to make sure all people in Minneapolis receive appropriate responses when they call for help.

# CONTRIBUTING CAUSES OF VIOLATIONS

## A. MPD's Accountability System Contributes to Legal Violations

Effective police accountability requires timely, thorough, and objective investigations into alleged officer misconduct, as well as meaningful discipline. People deserve to have their misconduct complaint investigated fairly. Community trust in law enforcement suffers when officer misconduct is tolerated.

MPD's accountability system is fundamentally flawed.[83] It consistently fails at its core purpose: to find, address, and prevent officer misconduct. Instead of a clear, straightforward accountability system, MPD's system is an opaque maze, with multiple dead ends where meritorious complaints are dismissed without investigation and often for no discernable reason. Significant allegations in complaints are mischaracterized or ignored. Officers who commit serious misconduct are diverted to coaching or retraining, and sometimes, the coaching or retraining never happens. If MPD does investigate a complaint, obvious misconduct is often overlooked or excused. By the end, the investigation often has taken so long that the complaint becomes stale, leaving problematic officers to continue committing misconduct for years.

To investigate MPD's accountability system, we conducted dozens of interviews of City leaders, union officials, Office of Police Conduct Review (OPCR) staff, MPD command, civilian police conduct review panelists, and community members. We studied a random sample of over 400 complaints that the OPCR closed after 2016. We focused on closed cases to account for the inordinate delays in processing complaints, particularly those placed into investigation. Indeed, of OPCR cases opened after 2016 and placed into investigation, 53.1% remain unresolved for at least one year, and 26.1% remain unresolved for at least two years. To ensure we could evaluate complaints from beginning to end, we assessed MPD's performance when resolving cases during our review period, regardless of when the alleged misconduct occurred. Our case review

---

[83] On December 14, 2022, the City amended provisions of the Minneapolis Code of Ordinances that relate to police conduct oversight, effective April 2023. Pursuant to these amendments, MPD and the Minneapolis Department of Civil Rights adopted a revised Police Misconduct Complaint Process Manual on April 20, 2023, that will govern how complaints of police misconduct will be allocated, investigated, and processed by the two departments. *See* Minneapolis Code of Ordinances § 172.30 (amended 12/14/2022); Ordinance No. 2022-058, https://mcclibraryfunctions.azurewebsites.us/api/ordinanceDownload/11490/1190830/pdf [https://perma.cc/53BN-HGZ9]. The revised manual identifies a transitional period to effectuate these new policies that concludes 120 days after the effective date of a settlement agreement between the City and the Minnesota Department of Human Rights. As a result, this report details our review of the City's accountability systems prior to the enactment of ordinance amendments in late 2022, and revised policies in April 2023.

included a random sample of approximately 80 OPCR complaints that were placed into investigation, as well as complaints dismissed or diverted on various grounds (for example, no basis, no jurisdiction, failing to state a claim, or referred to coaching). We also reviewed OPCR complaint files related to conduct we learned of through community outreach, news reports, interviews, and other documents.[84]

MPD officers' misconduct costs the City dearly. Between 2018 and 2022, the City paid out $61,502,925 to settle claims of police misconduct. Apart from the $47 million in settlements for the deaths of Justine Ruszczyk and George Floyd, the City paid $14,502,925 for 69 claims or lawsuits from 2018 through 2022. In April 2023, the City approved additional settlements of $7.5 million and $1.375 million for misconduct related to arrests by Derek Chauvin occurring in 2017. In May 2023, the City approved a settlement of $700,000 related to the allegedly unlawful detention of three children while their father was killed during a police shooting. Sometimes, MPD pays for the repeated misconduct of certain officers. For instance, MPD paid $344,000 to settle claims related to one officer's uses of force over a 12-year MPD career. This includes settlements of $140,000, $82,000, and $62,500 for the officer allegedly choking an 18-year-old developmentally disabled student unconscious, punching a woman in the face and knocking her unconscious, and beating a man unconscious outside of a bar.

Our review shows that MPD frequently fails to address police misconduct, which allows officers' serious violations of people's rights to go unpunished. MPD's flawed accountability system contributes to the unconstitutional and unlawful patterns or practices we found.

---

[84] As noted above, we evaluated OPCR's handling of misconduct complaints for those complaints where the resolution fell within our review period (beginning in 2016). It is not possible to fully assess how a complaint is processed and investigated until the complaint investigation is completed and the officer has exhausted appeals and other rights; as a result, our sample includes cases that were filed before 2016. Nevertheless, the older complaints suffer from the same deficiencies that we highlight regarding the more recent complaints in our sample, and these deficiencies are contributing causes of the violations of federal law.

**Case Study: "Far Outside the Norm"**

In 2014, an MPD officer responded to a report that a man had committed retail theft. The OPCR investigator noted that store surveillance video showed the officer punching the man "multiple times in the face with a closed fist while [the man] is handcuffed behind his back." The force review supervisor completed the force review without viewing the surveillance footage that would have revealed the misconduct, and MPD did not investigate further at the time.

The officer continued working and continued using unreasonable force. He had eight uses of force requiring a supervisory force review from March 31, 2016, to May 30, 2016. In one of those incidents, the officer kicked a man in the face after the man was already on his hands and knees. The man suffered a traumatic brain injury and a displaced nasal bone. MPD settled with the man for $150,000, and the officer was convicted of assault.

MPD's 2016 internal review of the officer's force showed that from February 2012 to June 2016, he had 68 force incidents, a number that OPCR noted was "far outside the norm for an MPD officer."

1. **The Complexity of MPD's Accountability System Discourages Complaints and Prompts Their Dismissals**

Minneapolis has a combined civilian and MPD internal accountability system to review and process allegations of police misconduct. This consists of MPD Internal Affairs (IA) and OPCR. OPCR handled the overwhelming majority of complaints during our review period. IA may have handled a complaint alone or jointly with OPCR.[85]

During our review period, the Commander of IA and Director of OPCR (collectively the Joint Supervisors) together processed every complaint of police misconduct within OPCR's subject matter jurisdiction.[86] The Joint Supervisors could decide to dismiss a

---

[85] For simplicity, we use "MPD" to refer collectively to actions and investigations of MPD Internal Affairs, the Joint Supervisors, and OPCR.

[86] To fall within OPCR's jurisdiction before the December 14, 2022, amendment, a complaint must have been filed within 270 days of the misconduct and allege excessive use of force; inappropriate language or attitude; harassment; discrimination in the provision of police services; theft; failure to provide adequate or timely police protection; retaliation; or criminal misconduct. Minneapolis Code of Ordinances § 172.20

complaint on the merits (referred to as "no basis"), for lack of jurisdiction, or for failure to state a claim, among other reasons. The Joint Supervisors could also refer it for coaching of the officer, or for formal investigation. After a complaint was investigated, the Joint Supervisors decided whether to dismiss it on the merits or refer it for review by a panel of MPD and civilian panelists for a merit or no-merit recommendation to the Chief of Police.

MPD's accountability system has been needlessly complex. A complaint traveled through numerous steps before the MPD Chief of Police could issue a final decision and potential discipline. We found several opportunities to dismiss or divert a complaint before it reached the MPD Chief. During our investigation, MPD produced an eight-page flow chart that illustrates the number of steps, decision points, and mandatory delays built into the accountability process.

In one case we reviewed, an MPD investigator discouraged a man from pursuing a complaint based on the complexity of the system itself. The man filed a complaint in 2013 alleging that he was in an altercation at a bar and was escorted out. He stated that he was compliant and walking away from bar security when an MPD officer "reached around his shoulder and sprayed him in the eyes with pepper spray." When we spoke to the man, he said the MPD sergeant assigned to investigate the complaint had said the process would take a lot of time, he would have to show up in court, and there would likely not be a consequence for the officer. In March 2016, OPCR dismissed the complaint as "Failure to Cooperate." The man told us he would have pursued the matter had he believed the officer would face consequences.

### a.   MPD Wrongfully Dismisses Complaints at Intake

By City ordinance, MPD must assess and review every OPCR complaint at intake. Before the recent amendments to Minneapolis law, complaints could only be dismissed during intake if the complaint failed to allege a violation on its face or for lack of jurisdiction. Although MPD could refer lower-level complaints (for example, improper attire/appearance, failure to properly inspect vehicle) for coaching, the law required that "[a]ll other qualifying complaints shall be formally investigated."

Nevertheless, over the time period of our review, MPD investigated only 13.6% of the non-duplicate complaints OPCR received.[87] At intake, MPD dismissed approximately 65.7% of misconduct complaints, which included 19.8% of the complaints on the merits

---

(repealed per 12/14/22 amendment). IA handled police misconduct complaints filed outside of the 270-day window and complaints against civilian employees.

[87] Nearly 23% of all OPCR complaints were dismissed as duplicates.

without any investigation,[88] and referred 18.3% of the complaints for coaching in lieu of a formal investigation.

A dismissal at intake can occur even when the misconduct is captured on video. For example, MPD dismissed as "no basis" a 2019 complaint involving clear policy violations captured on body-worn camera. The complainant saw officers breaking up a party at her neighbor's home. She stated in her complaint that officers used profanity and one officer repeatedly shoved a young person in the chest. Body-worn camera footage confirms her account. An officer can be seen pushing a young person down the street. Another officer stated, "Pull your pants up boy . . . it's disrespectful to show your ass . . . you know what that actually means in prison." That same officer used profanity as well, saying "[F]ucking move, get the fuck out, right fuck me, right get the fuck out of here." The dismissal does not mention the shoving or the profanity, which are both policy violations.

We learned of an instance where MPD dismissed a complaint as "no basis" and suggested to the complainant that there was an investigation when there was none. In 2018, MPD dismissed a man's complaint of unlawful detention. He alleged that officers detained him for six hours, took his money, took his motorcycle, strip-searched him "more than one time," and took DNA swabs. Finding nothing, the officers did not arrest him. The man said in his complaint that he "felt violated." The OPCR file does not reflect any investigation or provide an explanation for the dismissal. Nevertheless, MPD advised the complainant that "an appropriate investigation" took place.

Even when an officer's misconduct potentially injures someone, MPD may not investigate. When an unarmed man said he was planning to file a complaint, an MPD officer pushed him backward so hard his head struck the sidewalk. The officer searched and handcuffed the man, who remained compliant and seated as he waited for EMS to respond. MPD did not investigate whether the use of force was retaliatory or excessive. Rather, MPD referred the officer for non-disciplinary training.

MPD even declined to investigate a May 2018 case of serious force referred to it by the Minneapolis City Attorney. The referral included a video taken by a City worker that shows an MPD officer placing his knee and full body weight on an arrestee's head and

---

[88] MPD also dismissed complaints at intake for lack of jurisdiction, failure to state a claim, and failure to cooperate, as well as complaints that were deemed to be duplicates or withdrawn. Under the Complaint Process Manual in place at the time, misconduct complaints could also be dismissed any time when the focus officer stopped working for MPD, or when no MPD policy covered the alleged misconduct. OPCR & MPD, Complaint Process Manual, 2016, at Section IV, https://www2.minneapolismn.gov/media/content-assets/www2-documents/departments/OPCR-Complaint-Process-Manual-(PDF).pdf [https://perma.cc/S9A5-WDVH].

neck area. The video also depicts a concerned community member walking up to the officers and stating, "[H]ey sir, treat him with respect." MPD received the complaint and video on July 5, 2018. Either due to MPD failing to timely refer the complaint to OPCR or OPCR failing to timely log in the complaint, MPD erroneously dismissed the complaint in October 2019 for "lack of jurisdiction."

### b.    MPD Misclassifies Complaints and Ignores Explicit Misconduct Allegations

MPD frequently misclassifies complaints and fails to identify obvious misconduct that should trigger an investigation. This tends to occur when MPD identifies only a subset of a complainant's allegations for investigation or substitutes its own allegations for the complainant's, thereby distorting the complaint. The result is that the specific allegations that most troubled the complainant, often involving severe misconduct, are dismissed without the complainant's knowledge. Indeed, MPD does not document any notice to complainants of what allegations will proceed through the intake process.

In one incident, a woman alleged that two officers failed to take action against a dangerous driver, but MPD ignored her allegations. The woman called MPD about "a man with a smashed car, broken headlights, front bumper missing, hood bent blocking visibility from windshield, and smoke coming from the engine." She said that officers did not appear to conduct a sobriety test, but instead told the man to move his car out of the street. When he did so, he drove it into a parked car. The officers then let the man drive away. She wrote that the officers' actions made her "fear for my safety and the safety of others." The form that documents coaching referrals has a space for "Complainant's Description of Employee's Action," and the form identifies a violation of MPD's body-worn camera policy. The form is silent about the officers' dereliction of duty.

At times, MPD bypasses the allegations that seem most upsetting to the complainant. For example, in 2020, after a Black woman called 911 seeking help for her white partner, who was experiencing a mental health crisis, officers forced entry into the house, arrested the Black woman on suspicion of domestic abuse, and transported the white woman for a mental health examination. Officers held the Black woman overnight, even after the white woman (who had been holding a butcher knife when officers arrived), subsequently admitted to an officer on scene that she was the physical aggressor. When the Black woman later filed a complaint alleging discrimination and unlawful detention, the City and MPD did not process, let alone investigate, her allegations of discriminatory policing and unlawful detention. Instead, eight months later, it was handled as relating only to body camera usage and "professional policing," and the officers were referred for coaching.

As another example, a different Black woman alleged in 2019 that she and her fiancé experienced an unlawful search, discriminatory policing, and use of excessive force. She alleged that MPD officers came to her home to investigate domestic violence, which she denied. She claimed they beat on her door, used profanity, entered her home without consent, and drew their firearms and tasers. They then pushed her fiancé into a wall, handcuffed him, and conducted a warrantless search of her home without permission while her three-year-old child watched. Body-worn camera footage confirms her account, including an officer shouting "open the fucking door" and "I will kick this fucking door in." The woman sued, and a federal court held that the officers were not entitled to qualified immunity, granted plaintiff's motion for summary judgment, and found the officers liable for an unlawful search. The court noted that, "This was a highly charged situation, due mainly to the Officers' aggressive manner . . . . If anything, the Plaintiffs were the ones who remained as calm as possible throughout the interaction with the Officers escalating the situation."[89]

Despite the unlawful and degrading treatment of the family, MPD did not address the allegations of an unlawful search. Instead, MPD focused only on whether the officers violated MPD policy by failing to completely investigate potential domestic abuse, and whether one officer engaged in unprofessional policing. After a preliminary investigation, MPD found no violation of the MPD domestic abuse policy and referred one officer for coaching for use of profanity.

### c. MPD Diverts Complaints Involving Serious Misconduct for Coaching, and the Coaching May Never Happen

MPD has used coaching as a non-disciplinary corrective action tool to address low-level misconduct. Low-level misconduct includes infractions such as improper attire or appearance, and failure to properly inspect a vehicle. Most coaching referrals occur at intake. At that point, the officer's supervisor would investigate the alleged misconduct, decide whether the officer violated MPD policy, and provide coaching. Fewer than one in four OPCR complaints referred for coaching at intake actually resulted in coaching.

We found that MPD refers for coaching many allegations that are far from "low-level." For instance, MPD referred for coaching a 2019 complaint that alleged an officer smacked, kicked, and used a taser on a teen accused of shoplifting. The video showed egregious misconduct: The officer failed to de-escalate, used excessive force, called the teen a "motherfucker," conducted a custodial interrogation without *Miranda* warnings, and questioned him after he asked to speak with his mother. The complaint file does not indicate whether the officer's supervisor investigated the incident or coached the officer.

---

[89] *Cotten v. Miller*, No. 20-1588 (JRT/JFD), 2022 U.S. Dist. LEXIS 139360 at 5–6 (D. Minn. Aug. 5, 2022).

MPD dismissed the case one year later with the designation "Reckoning Period Expired."[90]

In another example, MPD improperly referred an officer for coaching after he detained a group of people at a Starbucks about a missing $5 bill. A customer told the MPD officer that he dropped the money and an unidentified youth picked it up. The officer then confronted a girl, who said she did not have the money and that the customer had been sexually harassing her. The officer detained eight other people (many of them minors) and arrested the girl, even though someone had offered to reimburse the customer. A man used his phone to photograph the officer's badge number, and the officer knocked the phone to the ground, breaking it. The officer released the girl after a bystander gave $5 to the customer. At intake, MPD referred the complaint for coaching.

There appears to be little follow-up to ensure that recommended coaching ever happens. In one case, an investigation revealed that an MPD sergeant used her personal cell phone to communicate with a sexual assault survivor (a policy violation) and inadvertently sent a picture of a partially unclothed man. The survivor filed a complaint, and the sergeant was referred for coaching. There is no indication that the coaching occurred, and MPD dismissed the complaint four years later with a designation of "Reckoning Period Expired."

We also found inexplicable delays in follow-through when officers are recommended for coaching. According to OPCR staff, the coaching process is expected to be completed within 45 days of the referral. However, we reviewed case files where coaching documents were not completed for up to almost two years after the OPCR complaint was filed.

## 2. MPD Fails to Conduct Thorough, Timely, and Fair Misconduct Investigations

When MPD does investigate a complaint, the investigations often skip key investigative steps and are significantly delayed. Complaints languish for no legitimate reason, sometimes for years. Under OPCR policy, investigators delay interviewing involved officers, if they interview officers at all. Open investigations are abruptly closed and dismissed with designations of "Reckoning Period Expired," "Failure to Cooperate," and "No Basis." Case files often do not contain documentation explaining the basis for these

---

[90] MPD uses the designation "Reckoning Period Expired" to dismiss complaints for dubious reasons. Reckoning periods pertain to union grievances, which have nothing to do with complaint intake and investigation. MPD told us that the term is sometimes mistakenly used to mean "lack of jurisdiction." In many cases, however, "Reckoning Period Expired" appears to be a tool to close older cases inappropriately.

dismissals, which sometimes appear to reflect the length of the delay itself rather than a decision on the merits.

Investigations of MPD officer misconduct—even serious misconduct—are inexcusably slow. We reviewed the OPCR database to determine how long complaints opened and placed into investigation remain open. We found significant delays:

- 92.2% of cases remained unresolved at least 90 days

- 87.7% of cases remained unresolved at least 120 days

- 78.5% of cases remained unresolved at least 180 days

- 53.1% of cases remained unresolved at least 1 year

- 26.1% of cases remained unresolved at least 2 years

Lengthy delays undermine efforts to hold officers accountable for misconduct. A commander told us that "discipline takes way too long. . . . That is a huge problem here." A union leader pointed out that lengthy delays in imposing discipline benefit the officer, who can argue that the misconduct couldn't have been that serious if the department waited so long to act.

We found several files in which it appears there was no investigation at all. For instance, in 2019, MPD dismissed a timely two-year-old complaint that alleged an officer used excessive force by shoving and pepper spraying a person who was retreating. The investigator never interviewed the complainant, witnesses, or the officer. Nevertheless, MPD closed it as "Reckoning Period Expired"—an improper basis for dismissing a timely complaint.

If there is an investigation, it often omits obvious and essential steps. For instance, MPD dismissed a timely complaint that an unidentified officer used excessive force at a barbecue. One witness saw an officer kick a compliant man in the back of the leg, drop him to the ground, and knee the man's spine, and saw another officer kick dirt toward the man's face. Another witness reported that officers kicked the man in the gut and shoved his face in the dirt. The investigator did not interview any of the eight officers who were at the scene. Instead, the investigator recommended dismissal because "this case has passed the reckoning period during which any potential action could be taken against any of the involved officers." MPD dismissed the complaint on the merits over two years after it was filed.

We also found investigations in which the investigator's conclusion bore little resemblance to what actually occurred. In 2017, an MPD officer threw an intoxicated woman to the sidewalk for jaywalking. Video footage shows the officer after he exited his vehicle and followed the woman down a busy sidewalk after she had crossed

**75**

against the light. The officer grabbed her arms from behind and stated, "Stop! You're under arrest." She turned toward him and said, "Huh?" The officer replied, "You play stupid games, you get stupid prizes," as he pulled her arms behind her back. She said, "What do you mean?" while turning toward him. The officer then yelled "Stop," and threw her down, slamming her face into the curb.

The investigator never interviewed the officer. Nevertheless, he concluded that the woman attempted to evade the officer by "speeding up," and resisted the officer by saying, "No." None of that is captured on the body-worn camera footage. MPD dismissed the complaint and referred the officer for non-disciplinary training. In the woman's federal lawsuit, the court denied the officer qualified immunity. The court concluded that a reasonable jury could find that the woman was not attempting to flee or resisting arrest, but confused and perhaps trying to pull away from someone she thought was attacking her from behind.[91]

Investigators also tend to draw inferences in favor of officers that the evidence does not support. As discussed on page 13, two officers responded to a home security system false alarm. While one officer went to the front door, the second officer scaled a six-foot privacy fence and shot the resident's two dogs. The dogs' owner sued, and the United States Court of Appeals for the Eighth Circuit affirmed both the district court's refusal to grant qualified immunity to the officer and the district court's denial of defendant's motion to dismiss plaintiff's unlawful seizure claim. The appellate court concluded that the video evidence was not entirely inconsistent with the complaint, which described the first dog as walking "toward [the officer] wagging his tail in a friendly manner to greet [him]" just before he was shot, and the second dog as presenting himself in a "non-threatening manner."[92]

The investigator saw things differently. Without interviewing the officers, the investigator agreed with the officer's threat assessment. The investigator wrote, "[B]oth dogs ran towards him. The first dog growled at him. Growling is an indicator a dog may bite." The body-worn camera footage had no sound when the officer shot the first dog, and there is no indication of the second dog growling. MPD referred the shooting officer for non-disciplinary training and paid $150,000 to settle the lawsuit.

---

[91] *Gaines v. City of Minneapolis*, No. 18-838, 2019 U.S. Dist. LEXIS 221596, at *8 (D. Minn. Dec. 26, 2019).
[92] *LeMay v. Mays*, 18 F.4th 283, 286 (8th Cir. 2021).

### 3.  MPD Fails to Adequately Discipline Police Misconduct

After investigation, the Joint Supervisors could dismiss complaints or approve them to be presented to a police conduct review panel, a group of civilian and sworn panelists who make recommendations to the Chief of Police on whether a complaint has merit. Between 2015 and 2020, approximately 37.3% of complaints originally referred for investigation were ultimately presented to a police conduct review panel.

Discipline for MPD officer misconduct is rare. Between 2016 and 2021, approximately 2.9% of non-duplicate OPCR complaints resulted in a letter of reprimand, suspension, demotion, or termination. When limited to non-duplicate complaints that OPCR deemed to state a claim within its jurisdiction, this figure is approximately 4.2%.

Even when officers admit policy violations, they may not be held accountable. For example, someone turned in a teenager's lost wallet at an MPD precinct front desk. When the teen's mother came to retrieve the wallet, it was gone. During an MPD investigation, the desk officer admitted that he had failed to inventory and secure the wallet. Nevertheless, MPD dismissed the complaint as "no basis," and never presented the investigation to a police conduct review panel. Even though MPD knew the name of the desk sergeant, someone crossed out the name in the investigative file and replaced it with "unknown officer."

**Official OPCR Complaint Form: "Unknown Officer"**

| BADGE/NAME | ALLEGED POLICY VIOLATIONS |
|---|---|
| unknown officer | OPCR Ord. § 172.20(8) – Violation of P&P Manual MPD P&P § 10-401 RESPONSIBILITY FOR INVENTORY OF PROPERTY AND EVIDENCE. All MPD employees taking possession of property, whether evidentiary or non-evidentiary, shall place such property in the custody of the Property and Evidence Unit and complete the inventory prior to the end of their shift. The inventory shall include all evidence seized regardless of whether an arrest has been made. This includes sworn employees working off-duty employment. |

Our review also showed inconsistent practices with respect to review panel referrals. In some instances, MPD refers only a portion of allegations in a complaint, and frequently without explanation. MPD advised at least one complainant that a review panel found no merit to her complaint, but there is no record in the case file that a panel review ever occurred.

OPCR also does not ensure that panelists collectively review and follow all instructions when deliberating. For example, panelists are instructed during their training that they must consider only evidence contained in the investigative file, and may not base conclusions on information regarding the matter or the persons involved if that

information is not part of the investigative file. Nevertheless, civilian panelists told us that during deliberations, MPD sworn panelists sometimes provide character evaluations of the subject officer, describe the physical location of the event, explain MPD policies at issue, and provide insight on the law enforcement response. This structure provides sworn panelists considerable opportunity to influence a panel's merit or no-merit recommendation.

If the Chief of Police does issue discipline, the discipline may be reversed. Post-discipline arbitration often overturns discipline determinations. As discussed on page 46, in 2019, the former chief terminated two officers for racially derogatory and offensive decoration of a Christmas tree in the Fourth Precinct. In October 2020, the arbitrator vacated one officer's termination, and imposed a 320-hour unpaid suspension. The other officer settled with a medical retirement after filing his grievance.

**Case Study: Eleven-Count Indictment**

**MPD allowed an officer to remain on active-duty status for two years after it learned that he was conducting potentially illegal searches and seizures. In October 2017, the officer pulled a suspected hit-and-run driver out of her vehicle, then improperly searched the vehicle, including opening and reading letters he took from the glovebox and center console. In November 2018, MPD found the officer was "overly aggressive and very disrespectful," conducted an improper search, and failed to document the search.**

**MPD let the officer continue working, and he continued his unlawful behavior. He accumulated ten complaints over two years, including allegations of harassment, unlawful arrest, unlawful search and seizure, and excessive force. For example, in July 2019, the officer removed a man and his 5-year-old daughter from their vehicle and unlawfully searched it in a store parking lot.**

**MPD did not suspend the officer until October 2019. The lack of timely adjudication of the 2017 misconduct case permitted the officer to engage in a continuing pattern of constitutional violations resulting in the officer ultimately being charged in a November 2020 11-count federal indictment. In November 2021, the officer was convicted in federal court of abusing his position from September 2017 through October 2019 to obtain controlled substances for his own use by deception and conducting unconstitutional searches and seizures.**

\*       \*       \*

MPD's failure to investigate and address officer misconduct has taken a toll on community trust. People in Minneapolis have reason to question whether making a complaint to MPD was worth the trouble. Our investigation found that all too often it wasn't.

## B. MPD's Training Does Not Ensure Effective, Constitutional Policing

Our investigation uncovered systemic deficiencies in MPD's training programs that contribute to the pattern or practice of violations we found. We identified a wide range of problems across MPD's recruit, in-service, and field training programs, including the qualifications of instructors, poor training materials, and chronic understaffing at the Training Division. These problems have plagued MPD for several years, resulting in deficient and inadequate training. For example, officers and supervisors alike told us that they were confused after MPD changed its use of force policy.

We found numerous problems with the way MPD delivers training to officers. Instructors do not have formal training certifications, and MPD has not established criteria for selecting instructors or implemented mechanisms to evaluate how well instructors are performing. We found that many members in the Training Division lacked an understanding of best training practices and did not have strong training skills. Training materials generally failed to succinctly identify learning objectives and state what performance criteria would be used, making it difficult to assess what skills were taught and what students learned. City and MPD leaders were candid in their assessment of MPD's training programs, saying, "[W]e have had a lot of problems."

Our review of MPD's training also revealed an overreliance on using force during encounters. We found that MPD staff favored training on defensive tactics over training on de-escalation options. We also found that MPD provided insufficient opportunities for scenario-based training so officers could practice de-escalating stressful encounters and avoiding the need to use force.

We paid particular attention to MPD's field training program. A new officer's first few months in the field are where they learn agency culture. A top City official told us, "[I]f the first thing an officer hears on the street is 'forget what you just learned, I'll tell you how to be a cop,' . . . that screws up everything we just did."

When MPD recruits graduate from the Academy, they enter five months of field training where they are paired with a Field Training Officer (FTO). The FTO should regularly evaluate the new officer. And MPD should regularly evaluate the performance of the

FTO. FTOs must model MPD values and ethical conduct, and officers with poor skills or poor disciplinary histories should not serve as FTOs. Allowing unsuitable officers to serve as FTOs risks spreading bad tactics and bad attitudes throughout the agency.

MPD officers and training staff expressed a wide variety of concerns about the FTO program. An FTO told us that MPD was using inexperienced FTOs, and "somebody who only has one to two years on the job" should not be an FTO. There is a "lack of consistency between FTOs." One FTO wrote that the biggest challenge of being an FTO is "watch[ing] other FTOs, who suck at their job, train a recruit, who now will pass . . . and suck at their job."

We are aware of officers serving as FTOs even while under investigation for serious misconduct. For example, one officer served as an FTO following a 2016 incident in which he punched a handcuffed man in the face multiple times. While the incident was being investigated, he told us, he was initially suspended without pay, then brought back, first to "limited duty" then to patrol, where he served as an FTO. The officer was later fired, but the termination was overturned after appeal.

We also found incidents where FTOs violated a person's rights while training a new officer. In an October 2017 incident, an FTO and recruit were transporting a 15-year-old teen to a detention center, and the FTO told the teen to remove his shoes so the recruit could search them. The FTO then told the recruit not to return the shoes to make it more difficult for the teen to leave the detention center—an unlawful seizure with no legitimate law enforcement purpose. In a separate incident in 2020, an FTO used a taser to drive stun a man eight times in 30 seconds, not assessing the need for force between each drive stun. *See* pages 17 and 28. Ensuring that FTOs teach right from wrong is essential to ensuring that recruits abide by the policies and values of MPD.

## C. MPD Does Not Adequately Supervise Officers

Robust supervision of officers is essential to safe and effective policing. Sergeants—the first-line supervisors in a police agency—play a crucial role. Sergeants serve as mentors, respond in the field to uses of force, and ensure officers comply with the law and policy. Sergeants often set the tone at the precinct level. They brief officers daily, conveying organizational changes, enforcement priorities, and community concerns in their precincts. Supervisors at all levels have a role in enforcing policies and upholding standards among their subordinates; supervisors who fail to do so should be held accountable for misconduct and performance deficiencies.

Supervision at MPD is inadequate for several reasons. First, MPD inadequately trains its supervisors. MPD supervisors, in turn, struggle to understand policy and effectively

communicate changes to officers. Second, MPD does not empower supervisors with tools and data that could reveal problems needing prompt corrective action. Accordingly, supervisors do not perform tasks that other agencies commonly require to improve officer performance. Third, staffing practices at MPD inhibit good supervision. MPD's scheduling system prevents officers from having a consistent supervisor, and its secondary employment (or "off-duty" employment) system undermines supervisory authority.

### 1. MPD Does Not Prepare Officers to Be Effective Supervisors

MPD does not train supervisors effectively to guide and supervise officers. MPD does not provide adequate specialized police training in how to review a force incident. Several sergeants confirmed to us that they did not receive specialized supervisory training in force review. We heard from a supervisor who felt MPD's training for supervisors did not prepare them to review a force incident or a critical incident. Instead, MPD leaves sergeants to learn on the street how to assess whether force complies with policy.

MPD also does not support supervisors in preparing officers to understand changes in MPD policy. Clear policies that are consistently enforced ensure good order. But MPD policies often confuse officers. They are cumbersome and difficult to navigate. Sometimes, MPD issues new policies and delays training officers on them, leaving it to supervisors to explain the policies to officers. That process often fails in practice. As one MPD commander explained, it is insufficient "to just send an email with a 60-plus page document and expect people to understand it."

### 2. MPD Does Not Provide Supervisors with the Tools and Data to Prevent, Detect, and Correct Problematic Officer Behavior

Functional police agencies require that first-line supervisors stay informed about the activities of officers and review their reports to ensure compliance with policy and the law. Prompt, accurate reporting of officer activity facilitates effective supervision. Well-run agencies also require sergeants to review reports on stops, searches, and arrests, and to actively supervise officers to guide their enforcement efforts in the field.

However, MPD does not require officers to file a police report for all stops or searches. For many stops, instead of filling out a police report, officers use a CAD form, which lacks useful detail. And an officer need not record the fact or nature of some encounters with the public at all. MPD gives sergeants no specifically expressed role in reviewing investigatory stops or traffic stops unless there is a use of force. Without clear, complete, consistent documentation, supervisors cannot meaningfully review police

actions. The result is that supervisors cannot identify and address trends or problematic conduct, such as unlawful or improper stops, racial profiling, harassment, theft, and sexual misconduct.

MPD can and should collect and use this data consistently for organizational improvement. Data analysis can, for example, help decisionmakers assess whether enforcement strategies are reducing crime, improving public safety, or disparately impacting specific groups. MPD could use search-related data to determine how often a search leads to guns or other contraband. If certain types of searches frequently find nothing criminal, MPD could explore whether to train officers to use different indicia of probable cause to justify a search. But MPD cannot learn in this way when officers are not required to complete police reports for searches unless they result in an arrest. MPD's failure to collect and use data about meaningful police activity seriously impedes effective supervision and prevents MPD from operating as a learning organization.

MPD also underuses body-worn cameras (BWCs) to improve performance. BWCs are a vital supervisory tool. BWC footage may reveal problems that would otherwise go undetected, such as dangerous tactics, policy violations (including failure to activate the BWC), ineffective de-escalation, or mistreatment of community members. Supervisors should routinely check BWC footage of officers they supervise. But MPD does not require patrol supervisors to review BWC footage other than in connection with use of force reports. Instead, a two-person group of analysts conducts random audits of BWC footage for the entire department.[93]

MPD also lacks a functional Early Intervention System (EIS). EIS is a data-based supervision tool to identify as soon as possible those officers who may benefit from supervisory counseling. Once an officer has tripped certain objective indicators, such as a number of complaints or force incidents, an effective EIS should flag the officer so the supervisor can intervene to help the officer. In October 2021, the City received a $500,000 grant to begin developing an EIS, but work was stalled until recently.

### 3. MPD's Staffing Practices Further Undermine Supervision

Effective supervision requires "unity of command," meaning that the same sergeant consistently supervises the same officers. Unity of command enables sergeants to develop deeper relationships with the officers under their commands. That familiarity

---

[93] MPD recently began a pilot to require sergeants to check in with officers monthly and view at least three of the officer's videos. This is a positive step.

allows sergeants to more effectively supervise officers. Officers, in turn, can perform better when subject to consistent management styles and expectations.

MPD's staffing practices undermine effective supervision. MPD allows officers to select their work schedules even if it results in a disunity of command. Every four weeks, MPD officers choose the days and shifts they prefer to work. Because officer preferences can vary, officers do not have an assigned sergeant. As one high-ranking supervisor put it, this system is akin to "tak[ing] a bunch of names and throw[ing] them into the air, and whatever it lands, that's who the supervisor is and where they are working." MPD's scheduling approach inhibits sergeants from developing mentoring relationships with officers and makes it more difficult for sergeants to address officer problems.

Off-duty employment also undermines supervision at MPD. Private entities can hire off-duty MPD officers to provide security. In Minneapolis, these jobs can pay significantly more than overtime at MPD—up to $150–175 per hour, according to a commander. MPD allows officers to use its squad cars (and gas), and the officer keeps all the compensation. The City gets nothing. Some patrol officers manage these opportunities, deciding who gets the lucrative work. Because MPD allows patrol officers to control whether supervisors get off-duty employment opportunities, supervisors have ample disincentive to hold officers accountable. MPD's off-duty employment practices impede effective supervision.

## D. MPD Wellness Programs Insufficiently Support Officers

Policing, by its nature, can take a toll on the psychological and emotional health of officers. Officers encounter stressful situations, see people in their worst moments, and witness tragic events, including deaths. At times, they face long hours and uncertain conditions. And officers face public criticism about the profession and scrutiny around how they do their jobs. As one MPD sergeant told us, "If officers are sick, community members will suffer." Without appropriate support, these factors can affect behavior, influence decision-making and judgment, and lead to stress and burnout, resulting in officers having a diminished ability to serve the community in the way it deserves.[94] We heard from some officers that they felt inadequately supported.

The importance of practices and programs to support officer resilience and help officers cope with challenging situations has long been recognized. However, resources for

---

[94] Deborah L. Spence, Melissa Fox, Gilbert C. Moore, Sarah Estill, and Nazmia E.A. Comrie, Law Enforcement Mental Health and Wellness Act: Report to Congress, U.S. Department of Justice, Community Oriented Policing Services, March 2019, https://cops.usdoj.gov/RIC/Publications/cops-p370-pub.pdf [https://perma.cc/P7EW-NPR2].

officer wellness have not been sufficiently prioritized at MPD. MPD leaders almost universally recognized the need to better prioritize the health and wellness of officers, but they told us the resources currently available to MPD officers—including a peer-to-peer program and a counselor support program accessible through a mobile application—were inadequate.

Failing to provide adequate officer support has real consequences. Just before George Floyd's murder, only 2.1% of sworn employees were on continuous leave. By the end of 2020, that number had grown to 18.6%. Similarly, the City paid out huge sums for MPD workers compensation claims for post-traumatic stress disorder. For injuries claimed in 2020 alone, for example, the City paid over $27 million. Officers need support, and failing to provide it carries enormous psychological, physical, professional, and financial costs.

MPD has taken initial steps to better address this issue. As of May 2023, MPD reported that it had developed a wellness program and a partnership with an external provider of certain psychological and other wellness-related services, in addition to its "Peer Support" network, wellness app, and various debriefings after a traumatic event. It remains unclear, however, to what extent those services are helping officers and affecting the conduct we observed during our investigation. Given the considerable challenges of the last several years in the Minneapolis community—from the COVID-19 pandemic to the widespread trauma and unrest following George Floyd's tragic murder—providing officers with emotional and psychological support is important to ensure that officer stress and fatigue do not contribute to constitutional violations.

# RECOMMENDED REMEDIAL MEASURES

We commend the City and MPD for beginning the hard work ahead necessary to make improvements. The remedial measures we recommend below provide a foundation for changes that the City and MPD must make to improve public safety, build the trust of the Minneapolis community, and comply with the Constitution and federal law.

**Use of Force**

1. **Improve Use of Force Policies, Reporting, and Review Procedures to Minimize the Use of Force.** Revise force policies to emphasize avoiding force and increasing de-escalation and require officers to consider less-intrusive alternatives before employing force. Implement force reporting and review systems to ensure that officers report all uses of force and that MPD conducts timely, thorough force reviews. Ensure that supervisors' performance reviews evaluate the quality of their force reviews.

2. **Improve Use of Force Training.** Provide clear guidance to officers about when it is appropriate to use different force options, including scenario-based training and testing that reinforces these concepts. Stress the importance of the duty to intervene to prevent force and the duty to render medical aid.

3. **Enhance Force-Related Accountability Mechanisms.** Require supervisors to conduct use of force supervisory reviews and identify violations of policy or law. Ensure that supervisors promptly refer evidence indicating misconduct or criminal conduct to the appropriate investigative unit or agency. Take appropriate corrective or disciplinary action when officers violate force policies.

4. **Improve Data Collection and Assessment of Force.** Assess data to identify trends and develop policies, training, and recommendations to reduce the use of force. Ensure that supervisors and command can effectively review force data.

5. **Develop Force Policies Appropriate for Youth and People with Behavioral Health Needs.** Recognize the unique characteristics of youth and people who have behavioral health needs. Develop policies addressing those characteristics.

**Identifying and Reducing Racial Disparities**

6. **Improve Documentation of Police Activity.** Ensure public safety data collection allows for analysis of racial disparities, including for stops, searches, search warrant applications, warrant executions, citations, arrests, force, and investigative activities. Ensure data captures the basis for enforcement action, including reasonable articulable suspicion or probable cause for stops and searches, the basis for consent searches, and the results of each search. Differentiate between traffic and pedestrian stops.

7. **Analyze Data from Enforcement Activity.** Develop capacity to analyze data about racial disparities in enforcement activities overall, and to assess the impact of any specialized units, initiatives, or programs.

8. **Reduce Unjustified Disparities.** Where unjustified racial disparities exist, take steps to reduce or eliminate them within MPD.

**Protecting First Amendment Rights**

9. **Improve Policies and Training Related to Protests and Demonstrations.** Revise policies on responding to civil disturbances and disorderly conduct to improve planning for protests; emphasize First Amendment freedoms; protect the right to gather and report the news; limit the use of less-lethal weapons; and provide daily after-action reports about force, officer wellness, and effectiveness. Training should address the challenges of protecting public safety and First Amendment rights during demonstrations critical of law enforcement.

10. **Improve Accountability for First Amendment Violations.** Ensure that force reviews and reviews of misconduct complaints assess whether an officer's conduct violated the First Amendment. Develop an after-action review process following protests to evaluate the performance of officers and commanders.

**Responding to People with Behavioral Health Issues**

11. **Expand BCR's Capacity, Training, and Coordination.** BCR should become a permanent 24/7 program with appropriate capacity, clinical oversight, comprehensive training, and continuous quality improvement processes, including enhanced data-collection and reporting capabilities. BCR should develop relationships with COPE and other mental health services to better serve individuals experiencing behavioral health issues, and BCR should cross-train with MECC, MPD, EMS, and Fire.

12. **Ensure MECC is Dispatching Appropriate Responder(s).** MECC should work closely with BCR, MPD, Fire, and EMS to update protocols for calls for service involving behavioral health issues. MECC must also coordinate with first responders, as well as City and Hennepin County entities, around the recent launch of the 988 Suicide and Crisis Lifeline. Prioritize MECC staffing issues, training on calls involving behavioral health, and quality assurance processes to assess call-taking, dispatches, and responses to such calls.

13. **Develop and Implement Appropriate Policies and Training Relating to Behavioral Health and Assess Their Impact.** Provide clinically informed training including community perspectives for MPD officers and supervisors. Develop policies and trainings specific to youth experiencing behavioral health issues. Ensure trainings address coordinating responses with other key actors (EMS, BCR, and COPE), avoid topics such as "excited delirium," and ensure

86

oversight of such training material and presentations. Implement after-action reviews of calls involving behavioral health issues, including debriefings for system and officer improvement.

**Accountability**

14. **Identify, Address, and Document All Allegations Raised in Misconduct Complaints.** Ensure all allegations of misconduct are comprehensively reviewed and resolved with appropriate documentation explaining decision-making. Hold supervisors accountable for failing to report or address misconduct.

15. **Require Officers to Report Misconduct.** Where officers do not report known misconduct, ensure they are held accountable. Ensure protections against retaliation for officers who report the misconduct of other officers.

16. **Facilitate Civilians' Access to the Complaint Process.** Ensure that when any officer encounters a person who wants to make a complaint, the officer puts the person in contact with a supervisor, internal affairs, OPCR or otherwise enables them to complain through appropriate means. Provide training to all officers on the appropriate procedures and on reasons for facilitating civilian complaints.

17. **Improve Civilian Complaint Investigations.** Ensure that when people make an allegation of MPD misconduct to any member of OPCR, MPD, or a City employee, the allegation is documented and reviewed, the allegation is fully investigated consistent with the Minneapolis Code of Ordinances § 172.30 (amended 12/14/2022) and state law, and the complainant is kept up to date on the complaint status. Train OPCR and MPD internal affairs investigators on investigative practices and the particular challenges of police investigations.

18. **Fully Staff OPCR and MPD Internal Affairs Units.** Ensure that OPCR and MPD internal affairs units are fully staffed with enough qualified, well-trained investigators to complete all investigations in a timely and consistent manner. Ensure that investigations are thorough, interviews are conducted appropriately, all evidence is appropriately weighed, and sound determinations of credibility of witnesses are made where there is conflicting evidence.

19. **Improve the Review Process for OPCR and MPD Internal Affairs Investigations.** Streamline the review process for administrative investigations to facilitate their timely resolution. Establish time limits for each stage of review, set firm expectations to ensure the process moves forward expeditiously, and document all decisions.

20. **Improve Quality of Data and Civilian Oversight.** Cooperate with the Community Commission on Police Oversight to promote robust and even-handed civilian oversight. Prioritize transparency in its internal affairs practices, including reporting to the public about the nature of complaints received, misconduct

findings made, and discipline imposed. Ensure IA and OPCR cases can be easily linked with police files.

## Transparency

21. **Ensure Accuracy of Public Statements.** Ensure City and MPD leaders provide timely, accurate information about public safety, including after critical incidents.

## Supervision

22. **Require Consistent Activation, De-Activation, and Review of Body-Worn Cameras.** Require officers to consistently activate body-worn cameras to document interactions with the public. Require supervisors to review footage to monitor officer performance and ensure compliance with MPD policies.

23. **Require Review of All Stops.** Require supervisory review of the reasonable articulable suspicion for any stops and frisks, the probable cause of any searches, and the basis for any consent searches. Require periodic analysis of the efficacy of certain practices where officers have more discretion, such as pretext stops or consent searches.

24. **Revise Staffing Practices.** Ensure that staffing practices achieve unity of command and that off-duty employment policies are consistent with officer wellness and effective supervision. Train supervisors to improve force incident review and to better communicate policy changes to officers.

## Training

25. **Improve Training Department-Wide.** Use qualified instructors, best practices in adult learning, and outside experts and community-based instructors. Involve training officials in after-action evaluations of force incidents.

26. **Improve Training for Supervisors.** Train supervisors to promote effective and constitutional police practices by leading subordinates, monitoring and assessing their performance, evaluating written reports, investigating uses of force, building community partnerships, and de-escalating conflicts.

27. **Reform the Field Training Officer Program.** Improve standards for training and selection of field training officers so that they will consistently model and support MPD values and standards. Standardize the Field Training Officer program to ensure all officers and recruits are evaluated consistently and fairly.

## Wellness

28. **Ensure Effectiveness of Health and Wellness Programs.** Ensure that officers are accessing effective support services and develop a comprehensive Early Intervention System to establish support for officers who need it.

## CONCLUSION

The Department of Justice has reasonable cause to believe that MPD and the City engage in a pattern or practice of conduct that deprives people of their rights under the Constitution and federal law. MPD uses unreasonable force, infringes on First Amendment rights, and discriminates based on race and disability. MPD also lacks the systemic safeguards that can prevent or address those abuses, such as effective accountability, rigorous training, robust supervision, and appropriate officer support.

City and MPD leadership have been forthcoming about the need for reform. We recognize that they have negotiated a proposed Settlement Agreement and Order with MDHR that includes comprehensive reforms. We hope the remedial measures we propose will be the foundation for a productive conversation with the City and the Minneapolis community about the future of public safety.