## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Karen Wells and Andre Locke as
co-trustees for the next of kin of
Amir Rahkare Locke, deceased,

Case No. 23-cv-273 (WMW/DLM)

Plaintiffs,

**First Amended** Complaint

v.

Mark Hanneman, in his individual
capacity as a Minneapolis police officer,
and the City of Minneapolis,

*Jury Trial Demanded*

Defendants.

For their First Amended Complaint, Plaintiffs Karen Wells and Andre Locke

("Plaintiffs"), as co-trustees for the next of kin of Amir Rahkare Locke ("Amir"), hereby

state and allege upon knowledge, information, and belief as follows:

### Introduction

1.      On February 2, 2022, Amir was gunned down in cold blood just seconds

after he was peacefully asleep on his cousin's couch.  Despite public overtures by City of

Minneapolis ("Minneapolis" or "City") officials that no-knock warrants had been banned

in Minneapolis, the Minneapolis Special Weapons and Tactical Team ("SWAT") used a

no-knock warrant to storm into the apartment where Amir slept.  The SWAT officers

failed to identify themselves prior to crossing the threshold into the apartment and

shouted confusing commands in the early-morning hours.  SWAT officers woke the

sleeping Amir by kicking the couch where Amir slept.

2.      Minneapolis Police Officer, Defendant Mark Hanneman ("Hanneman") shot and killed Amir less than ten seconds after SWAT entered the apartment. Hanneman, who refused to provide an interview to investigators, will likely claim that he shot Amir because Amir was armed.  Rob Doar ("Doar"), Senior VP, Government Affairs for the Minnesota Gun Caucus perhaps said it best, "Mr. Locke did what many of us might do in the same confusing circumstances, he reached for a legal means of self-defense while he sought to understand what was happening."

3.      Amir, like many Americans, had a handgun within his reach while he slept. Even half-asleep, while Amir reached for the handgun, he demonstrated proper and responsible handling by keeping the handgun pointed away from the officers and keeping his finger off the trigger.  Amir never raised the weapon in the direction of any officer or placed his finger on the trigger.  Any reasonable officer would have understood that Amir needed an opportunity to realize who and what was surrounding him, and then provide Amir with an opportunity to disarm himself.  Hanneman failed to give Amir any such opportunity even though Amir never pointed the handgun at Hanneman or put his finger on the trigger.  Instead, Hanneman fired three shots while Amir was still covered in a blanket on the couch where Amir had been resting peacefully only ten seconds before the SWAT entry.

4.      In the four months leading up to this raid, Minneapolis executed no-knock warrants only in homes of color, predominantly in Black homes, and not once in the homes of non-Hispanic Whites.  The application for and execution of the no-knock

warrant that resulted in Amir's death is consistent with Minneapolis's custom, pattern, and practice of racial discrimination in policing.

5.     Plaintiffs now bring this cause of action for money damages pursuant to 42 U.S.C. § 1983 to redress the deprivation of Amir's clearly established rights secured by the Fourth and Fourteenth Amendment.  Plaintiffs allege a violation of these rights against Hanneman in his individual capacity while Hanneman acted under color of state law.  Plaintiffs further allege Section 1983 claims directly against Minneapolis for its unconstitutional customs, patterns, and practices under *Monell* and its progeny.  Plaintiffs also allege state law wrongful death claims against Hanneman and Minneapolis.

## Jurisdiction and Venue

6.     This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. §§ 1983.

7.     This Court has supplemental jurisdiction over the state law wrongful death claim pursuant to 28 U.S.C. § 1367.

8.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because all incidents, events, and occurrences giving rise to this action occurred in the District of Minnesota.

9.     To the extent necessary, Defendants had actual notice of sufficient facts to reasonably put them on notice of a possible claim within a year of Amir's death.

## Parties

10.    Plaintiff Karen Wells resides in Nebraska.

11.    Plaintiff Andre Locke resides in Minnesota.

3

12.     Plaintiffs were appointed as co-trustees for Amir's next of kin on March 24, 2022, by the Hennepin County District Court, 27-cv-22-3406.

13.     At all relevant times, Defendant Hanneman was acting in his individual capacity under color of state law as a Minneapolis police officer.

14.     The Minneapolis Police Department ("MPD") is the Minneapolis agency through which Minneapolis fulfills its policing functions.

15.     All MPD officers, including but not limited to Hanneman, were acting within the course and scope of their employment with Minneapolis, and Minneapolis is therefore vicariously liable for its officers' violations of state law under the doctrine of *respondeat superior*.

**Facts**

**A.     Minneapolis's notice of MPD's history of excessive force, particularly against Black victims and other victims of color.**

16.     Although Black community members make up 19% of the Minneapolis population, MPD's use of force files show that between 2010 and 2020, 63% of all use of force incidents that MPD officers reported were against Black individuals.[1]

17.     The City had notice of a 2013 incident wherein MPD officers used excessive and unjustified force against Catrina Johnson ("Johnson"), who was disabled and used a cane. MPD officers threw her against her living room wall and onto the floor while using racial slurs. While Ms. Johnson was pinned to the ground face down, an

---

[1] *See* Dkt. No. 1-1 at 12, Exhibit A, Minnesota Department of Human Rights, *Investigation into the City of Minneapolis and the Minneapolis Police Department: Findings from the Minnesota Department of Human Rights* ("MDHR Findings") at 11.

MPD officer put his knee on the back of her head and applied direct pressure, thereby causing injury. The City entered into a monetary settlement with Ms. Johnson to settle her claims. Ms. Johnson is a Black woman. *Johnson v. City of Minneapolis*, No. 15-cv-02861-JRT-SER (D. Minn. 2015).

18.     The City had notice of a 2014 incident wherein MPD officers used excessive force against Alfred Flowers ("Flowers") after he had been fully secured in handcuffs and not physically resisting. Mr. Flowers filed suit against the City and alleged that an MPD officer suddenly grabbed him by his throat, choked him, and threw him to the ground and handcuffed him. After handcuffing Mr. Flowers, an MPD officer punched him in the head, following which several other officers entered the room and proceeded to kick and stomp on Mr. Flowers while he was handcuffed and lying on the ground. The City entered into a monetary settlement with Mr. Flowers to settle his claims. Mr. Flowers is a Black man. *Flowers v. City of Minneapolis,* No. 15-cv-03015-RHK-HB (D. Minn. 2016).

19.     The City had notice of a 2014 incident wherein MPD officers used excessive force against Lamar Allen Ferguson ("Ferguson") after he had been fully secured in handcuffs and not physically resisting. Mr. Ferguson filed suit against the City in April 2017 and alleged that two MPD officers threw him to the ground after he had been handcuffed and began punching him. An MPD officer then lifted Mr. Ferguson's head off of the ground and kicked him directly in his mouth. The City entered into a monetary settlement with Mr. Ferguson to settle his claims. Mr. Ferguson is a Black man. *Ferguson v. City of Minneapolis*, No. 17-cv-01110-PJS-TNL (D. Minn. 2017).

5

20.     The City had notice of a 2016 incident wherein MPD officers used excessive and unjustified force against Abdi Hussen Wagad ("Wagad").  MPD officers approached Mr. Wagad and violently threw him against a brick wall and dislocated his shoulder despite the absence of physical resistance from Mr. Wagad.  The City entered into a monetary settlement with Mr. Wagad to settle his claims.  Mr. Wagad is a Black man. *Wagad v. City of Minneapolis*, No. 17-cv-05239-MJD-TNL (D. Minn. 2017).

21.     The City had notice of a 2018 incident wherein multiple MPD officers used excessive and entirely unjustified force against Jeremiah Jermaine Thomas ("Thomas") when an officer drop-kicked Mr. Thomas in the chest area then three other MPD officers joined in and immediately started punching, kneeing, and kicking him.  Mr. Thomas suffered a punctured lung, internal bleeding, fractured ribs, and various scratches and bruises as a result of MPD's use of excessive force.  The City thereafter entered into a monetary settlement to resolve his claims.  *Thomas v. City of Minneapolis*, No. 19-cv-00954-WMW-DTS (D. Minn. 2019).

22.     The City had notice of another 2018 incident wherein multiple MPD officers used excessive and entirely unjustified force against Rico McKinnies ("McKinnies") during the course of a traffic stop, after he was handcuffed and not resisting arrest.  The City entered into a monetary settlement with Mr. McKinnies to resolve his claims.  Mr. McKinnies is a Black man and is the grandson of Minneapolis's first Black female officer.  *McKinnies v. City of Minneapolis*, No. 18-cv-02738-NEB-BRT (D. Minn. 2018).

23.     The City had notice that in 2020, only five days after George Floyd was murdered, Jaleel Stallings took to the streets to exercise his First Amendment rights and to protest against police brutality and racism.  In response to these protests, MPD SWAT officers were "targeting Black civilians with force and accusing Black civilians of engaging in felonious conduct without evidentiary support.  Mr. Stallings was a Black man who was improperly targeted and attacked due to officers' racial bias."  *Stallings v. Bittell*, No. 21-cv-2395-ADM-TNL (D. Minn. 2021).

24.     MPD SWAT targeted Mr. Stallings and unlawfully hit him in the chest with marking rounds.  "Fearing for his life, Mr. Stallings fired toward, but not directly at, the van while he went into cover."  Mr. Stallings discarded his weapon and surrendered, only to be subsequently beaten by MPD SWAT officers so badly that his eye socket fractured.

25.     Stallings was acquitted by a jury after he was wrongfully charged with attempted murder and assault.  Minneapolis then paid Stallings One Million Five Hundred Thousand Dollars ($1.5 Million) to resolve Stallings' civil suit.  Only after Stallings was forced to endure a wrongful and high-stakes jury trial was MPD SWAT officer Justin Stetson criminally charged for his unlawful assault of Stallings.  Mr. Stallings is a Black man.

26.     Each of the above-referenced incidents involved more than one officer at the scene and in each of those incidents, the non-participating MPD officers failed to intervene in the unconstitutional use of force against non-resisting citizens.

27.     The City of Minneapolis has also been forced to pay significant sums of money for the unlawful deaths caused by its officers.

28.     Since 2010, of the 14 people MPD officers have killed, 13 people were people of color or Indigenous individuals.  Despite being only 42% of Minneapolis's population, people of color and Indigenous individuals make up 93% of all MPD officer involved deaths between January 1, 2010 and February 2, 2022.[2]

29.     In 2013, Minneapolis resolved the litigation resulting from two MPD officers killing David Smith ("Smith") by using a prone restraint.  Minneapolis settled the litigation for over Three Million Dollars ($3 Million) and agreed to provide each MPD officer with training on positional asphyxia.  Neither officer involved in Mr. Smith's death was disciplined, even though the risks of prone restraint were well known within the MPD and the broader law enforcement community.  Mr. Smith was a Black man.

30.     In 2019, the City of Minneapolis also approved a significant settlement with the family of Jamar Clark ("Clark") who was shot and killed by an MPD officer. Mr. Clark was a Black man.

31.     In 2020, the City of Minneapolis approved a significant settlement with the family of Terrance Franklin ("Franklin"), who was shot and killed by an MPD officer. Mr. Franklin was a Black man.

32.     On May 25, 2020, the world stood still after four MPD officers asphyxiated, tortured, and murdered George P. Floyd Jr. ("Floyd"), through prone restraint.  This occurred ten years after two MPD officers killed David Smith by using a similar prone restraint.  Even though Derek Chauvin was an MPD officer when MPD was

---

[2] Dkt. No. 1-1 at 11, Ex. A, MDHR Findings at 10.

| Deleted: Exhibit |
| --- |

supposed to train on positional asphyxia because of MPD's killing of Mr. Smith, Chauvin

still murdered Mr. Floyd by prone restraint.  Minneapolis ultimately paid Twenty-Seven

Million Dollars ($27 Million) to resolve the litigation with Mr. Floyd's family.  Mr.

Floyd was a Black man.

**B.    Minneapolis's notice of MPD's history of excessive force when executing no-knock warrants, particularly against Black victims and other victims of color.**

33.    The Fourth Amendment generally requires officers to knock and announce

their identity and presence prior to attempting forcible entry into a dwelling.

34.    No-knock warrants generally dispense with the requirement that officers

knock and announce their presence prior to entry.

35.    No-knock warrants are supposed to be the exception to the rule and

therefore only arise in exceptional circumstances.

36.    No-knock warrants came to prominence during America's "War on Drugs,"

which has widely been criticized for its racist underpinnings.  *See, e.g.,* Andre D. P.

Cummings and Stephen A. Ramirez, *The Racist Roots of the War on Drugs & the Myth of

Equal Protection for People of Color*, 44 U. Ark. Little Rock L. Rev. 453 (2022).

37.    For decades preceding Amir's death, "[a] legion of tragic incidents

resulting from execution of 'no-knock' warrants [have] demonstrate[d] the potential

dangers inherent in serving such warrants on innocent victims."  John W. Whitehead and

Steven H. Aden, *Forfeiting "Enduring Freedom" for "Homeland Security": A

Constitutional Analysis of the USA Patriot Act & the Justice Department's Anti-*

*Terrorism Initiatives*, 51 Am. U. L. Rev. 1081, 1111 n.185 (2002) (compiling tragic incidents related to no-knock warrants from 1993 through 2001).

38.     The murder of George Floyd spurred a national and global reckoning with issues related to race and policing, particularly in Minneapolis.

39.     The March 13, 2020 killing of Breonna Taylor ("Taylor"), an innocent Black woman shot and killed by Louisville, Kentucky police officers during execution of a no-knock warrant, also brought increased attention to the perils of no-knock warrants.

40.     Prior to the death of Ms. Taylor, Minneapolis had already known executing no-knock warrants increased the risk of harm to the public because MPD had been responsible for causing severe injury to innocent people during several botched no-knock raids.

41.     The City had notice that in 2007, MPD SWAT officers conducted a no-knock raid on the home of Yee Moua ("Moua"), Vang Khang ("Khang"), and their six children.  Believing his home was being burglarized, Mr. Khang fired a warning shot from his hunting shotgun.  He then fired twice through the bedroom wall at the intruders. MPD responded by firing 22 shots in the home.  Miraculously, no one was killed.  The MPD Chief later explained that MPD SWAT had obtained a tip from an informant that Black gang members were at the address, so MPD secured the no-knock warrant to break in and search for weapons.  After the botched no-knock raid, the officers were not only cleared of any wrongdoing, but ultimately received medals for their bravery during the botched raid.  The Khang family is Hmong.  Minneapolis eventually paid a large settlement amount and was required to appoint a police liaison to the Hmong community

10

and increase efforts to recruit Hmong officers. *Khang v. City of Minneapolis*, No. 27-cv-08-30118 (Henn. Dist. Ct. Dec. 4, 2008).

42.     The City had notice that in February 2010, MPD officers conducted a no-knock raid on a home where Rickia Russell ("Russell") was innocently residing. The officers were supposed to execute the search warrant in a knock-and-announce manner, but instead performed the search as a no-knock warrant. One of the MPD officers threw a flashbang grenade during the no-knock entry, which resulted in severe third-degree burns to Ms. Russell's calves. Minneapolis paid One Million Dollars ($1 Million) for its officers' conduct towards Ms. Russell. No MPD officer was disciplined for their conduct towards Ms. Russell. Ms. Russell is a Black woman. *Russell v. Taylor*, No. 10-cv-04978-SRN-AJB (D. Minn. 2010).

43.     The City had notice of a 2016 incident wherein MPD SWAT officers obtained a no-knock warrant for Tomas Garcia-Orihuela's home based on information provided by a confidential informant. Upon entry, the officers immediately shot and killed Mr. Garcia-Orihuela's pet dog, even though the dog did not attempt to attack them. Mr. Garcia-Orihuela filed suit against the City and alleged that after he was handcuffed on the ground, "several police officers began to kick and hit him" and continued to do so for several minutes while he remained handcuffed and laying on the ground. No drugs or paraphernalia were found. *Garcia-Orihuela v. City of Minneapolis*, No. 17-cv-00292-RHK-KMM (D. Minn. 2017).

44.     The City had notice of an incident in 2017 wherein MPD executed a no-knock raid in which MPD officers shot and killed Sarah Ellingworth and Charleton

11

Hawks' pet dog, even though the dog did not charge or attack the officers.  Minneapolis

paid a settlement amount for its officers' conduct.  *Ellingworth v. City of Minneapolis*,

No. 20-cv-02232-JRT-ECW (D. Minn. 2020).

45.     The Mayor and City Council receive notice of each lawsuit filed against the

City.

46.     All monetary settlements made by the City must be approved by the Mayor

and City Council.

**C.     Minneapolis's notice that Hanneman was likely to commit misconduct and violate constitutional rights.**

47.     Hanneman began his career as a police officer in Hutchinson, Minnesota.

48.     Two federal civil rights lawsuits were filed against Hanneman for conduct

during his time as a Hutchinson police officer, including one that resulted in a judgment

against Hanneman.  *Coon v. McCleod County*, No. 14-cv-4417-RHK-SER (D. Minn.

2014).

49.     As an MPD officer, Hanneman had four citizen complaints brought against

him.

50.     In July 2021, criminal charges were ultimately dismissed against an

individual because Officer Hanneman violated that individual's constitutional right to be

free from search and seizure.  *See State v. Christian*, No. 27-cr-20-23738, Findings of

Fact, Conclusions of Law and Order (Henn. Dist. Ct. July 16, 2021) (suppression order

that preceded dismissal).

51.     That illegal search and seizure occurred during an MPD SWAT team warrant execution and was executed by Hanneman on someone who, like Amir, was not the subject of the search warrant.

52.     The opinion dismissing the case reflects that Hanneman did not understand written MPD policy or the Fourth Amendment.

53.     The opinion also reflects that MPD SWAT had a custom and practice of engaging in unconstitutionally excessive searches and seizures of non-subjects of warrants when conducting SWAT team raids.

54.     Despite Hanneman's superior officers knowing about his conduct which led to the dismissal of the criminal case, Hanneman was not disciplined for his conduct.

55.     Despite the *Christian* Order, neither Hanneman nor MPD SWAT received any training to ensure they understood MPD policy or the constitutional rights of people to be free from unconstitutional searches and seizures, including the right to be free from unreasonable, excessive, and deadly force and from discriminatory policing.

**D.      Minneapolis's supposed ban on no-knock warrants.**

56.     After having served as Minneapolis Mayor since January 2018, including when Floyd and Taylor were killed, Jacob Frey ran for reelection in 2021.

57.     Days before that election, Mayor Frey trumpeted on his website that one of his administration's tops achievements included: "Banning the use of-no-knock warrants in the city of Minneapolis."  *See* www.jacobfrey.org/priorities (Oct. 23, 2021), as preserved by The WayBackMachine at https://web.archive.org/web/20211023060421/ https://jacobfrey.org/priorities (last accessed Jan. 22, 2023).

58.     Mayor Frey advertised the alleged ban on no-knock warrants in his printed

advertising materials as well:



59.     While the MPD did issue a revised policy for "9-307 Unannounced Entry

Search Warrants" on November 30, 2020 ("MPD Policy 9-307"),[3] Minneapolis did not,

in fact, ban no-knock warrants.

60.     Instead, between November 30, 2020 and October 23, 2021, while Mayor

Frey was still promoting Minneapolis's supposed ban on no-knock warrants, he was also

publicly apologizing for a botched no-knock raid lead by MPD Sergeant David

---

[3] Dkt. No. 1-1 at 74-79, Exhibit B, MPD Policy & Procedure Manual Vol. 9 (Nov. 30,
2020).

Swierzewski ("Sgt. Swierzewski") on February 11, 2021.  *See* A.J. Lagoe and Steve Eckert, *Kare 11 Investigates: Innocent MN family held at gunpoint in SWAT no-knock warrant raid*, Kare 11 (Apr. 29, 2021, 10:47 PM), https://www.kare11.com/article/news/ investigations/innocent-mn-family-held-at-gunpoint-in-swat-no-knock-warrant-raid/89-5732a3df-5863-43d5-a546-2567d43a0f2f (last accessed Jan. 25, 2023); *see also* A.J. Lagoe and Steve Eckert, *Kare 11 Investigates: Mayor Frey apologizes for no-knock raid, asks for investigation*, Kare 11 (Apr. 30, 2021, 10:27 PM), https://www kare11.com/ article/news/investigations/kare-11-investigates-mayor-frey-apologizes-for-no-knock-raid-asks-for-investigation/89-a7e12d63-221d-4869-92cc-87272c87a051 (last accessed Jan. 25, 2023).

61.     The warrant Sgt. Swierzewski obtained was a no-knock warrant for a Black subject who had not resided at the residence for nearly a year prior to the raid.

62.     Sgt. Swierzewski then sought the assistance of other departments to execute this no-knock raid without conducting reasonable due diligence regarding who resided at the address.

63.     An innocent family—who had no connection to the target of the raid—was held at gunpoint as a result of the botched no-knock raid.

64.     Sgt. Swierzewski was not disciplined for his failure to conduct basic diligence prior to leading this botched no-knock raid.

65.      In his April 2021 apology for the raid, Mayor Frey doubled down on characterizing the new MPD "Unannounced Entry Search Warrants" as a ban on no-

15

knock warrants while deflecting blame onto Anoka County SWAT even though it was

MPD Sgt. Swierzewski who sought the no-knock warrant:

> *Our new policy requires MPD officers to announce their presence and purpose prior to entry, effectively ending 'no-knock' warrants, outside of exigent circumstances in the City of Minneapolis.  That policy does not govern how the Anoka SWAT team conducts itself.*
>
> *Minneapolis' more restrictive policy ends at our borders and other jurisdictions do not have to comply with our standards when executing warrants, as approved by the courts in Minnesota. This case highlights the need for consistency across local governments – especially amid sensitive multi-jurisdictional operations – when it comes to how and when to execute these warrants.*

*See* Paragraph 60, *supra*.

66.     In October 2021, Mayor Frey's office was also responding to media

requests regarding the new no-knock policy, and the City's internal communications

reflect that MPD's SWAT unit was still conducting no-knock raids at a pace that **far**

outpaced knock-and-announce entries:[4]

SWAT SPECIFIC:

|      | Warrants | Knock | No Knock | Exigent Circ. |
|------|----------|-------|----------|---------------|
| 2015 | 151      | 1     | 150      |               |
| 2016 | 126      | 5     | 121      |               |
| 2017 | 178      | 10    | 168      |               |
| 2018 | 159      | 6     | 153      |               |
| 2019 | 207      | 13    | 194      |               |
| 2020 | 181      | 10    | 171      |               |
|      |          |       |          |               |

67.     In that email chain, MPD Officer Garrett Parten ("Parten") intimated that

the Mayor's office was being misleading with respect to the purported November 2020

---

[4] Dkt. No. 1-1 at 80-85, Exhibit C, Minneapolis Email Correspondence (Oct. 11-12, 2021) (coloring/highlights in original).

policy change (i.e., the ban that was not a ban), and that the policy change had zero impact on business as usual: "The phrase 'restricting the use of no-knock' in your question may be misleading.  The policy update formally incorporated into policy the best practices that were already in place and had been for some time."[5]

68.    Officer Parten further informed the Mayor's Office that the "MPD SWAT Team has executed 87 unannounced entry warrants <u>since November 2020 (date of the Policy Change/update)</u>.  This number does not include any sought by outside agencies or warrants that were requested but not executed."[6]

**E.    MPD insisted on executing a no-knock search warrant that resulted in Amir's execution.**

69.    The perils of no-knock warrants in a country that has the staunch right to keep and bear arms under the Second Amendment are obvious and well documented:

> In addition, the Second Amendment protects the right of individuals to keep guns in the home for the purpose of immediate self-defense.  Approximately forty percent of Americans either currently own a gun or live with someone who does, and nearly two-thirds of gun owners cite personal protection as a major reason for owning a gun.  The conflict between no-knock warrants, the castle doctrine, and the rate of gun ownership is a dangerous cocktail that creates an inherent risk of harm any time police force entry into a private residence without first knocking and announcing their authority and purpose. The principles underlying the castle doctrine, like those underlying the knock-and-announce rule, are based upon the sanctity of the home as a place where individuals should be free from unlawful intrusion.  Because the knock-and-announce rule and the castle doctrine are based on similar legal and historical principles, the most harmonious way to resolve the tension between them and

---

[5] *Id.* at 2.
[6] *Id.*

reduce the risk of violence created by no-knock warrants is
for states to eliminate the use of no-knock warrants and
require strict adherence to the knock-and-announce
requirement.

Brian Dolan, *To Knock or Not to Knock?  No-Knock Warrants and Confrontational
Policing*, 93 St. John's L. Rev. 201, 217-18 (2019) (citations omitted).

70.     On January 31, 2022, St. Paul Police Sergeant Daniel Zebro ("Sgt. Zebro") | Deleted: 2021

applied for and obtained four **daytime, knock-and-announce** search warrants related to

a St. Paul homicide Investigation ("St. Paul Investigation").

71.     Three of the knock-and-announce search warrants were to be executed at

the Bolero Flats located at 1117 South Marquette Avenue in Minneapolis ("Bolero

Flats").

72.     While there was no arrest warrant issued, Sgt. Zebro considered Mehki

Speed ("Mehki") to be a suspect in the St. Paul Investigation.

73.     Sgt. Zebro knew Mehki listed his address as Apartment 1402 in the Bolero

Flats and that a female renter of Apartment 1402 listed Mehki as a child who lives at

Apartment 1402.

74.     One of the knock-and-announce search warrants Sgt. Zebro obtained was

for Apartment 701.

75.     No one residing in Apartment 701 was a suspect in the St. Paul

Investigation.

18

76.     Sgt. Zebro knew that no homicide suspect resided in Apartment 701 but stated in his affidavit for the no-knock warrant that Mehki was "associated with apartment 701."

77.     The affidavit submitted by Sgt. Zebro with the Application for Search Warrant did not provide probable cause to execute a no-knock warrant on Apartment 701.

78.     Apartment 701 was rented by Tatyana Henderson ("Henderson") and Marlon Speed Jr. ("Marlon").

79.     Marlon is Mehki's brother.

80.     Amir was Marlon and Mehki's cousin.

81.     Neither Henderson, Marlon, nor Amir were suspects in the St. Paul Investigation.

82.     Amir, Marlon, Henderson, and Mehki are all Black.

83.     Sgt. Zebro sought the MPD's assistance with executing the knock-and-announce search warrants.

84.     MPD supervisors, including Sergeant John Sysaath ("Sgt. Sysaath") and Lieutenant John Campbell ("Lt. Campbell"), refused to assist the Saint Paul Police Department ("SPPD") unless the SPPD obtained warrants that were re-written as no-knock warrants, including the search warrant for Apartment 701.

85.     Sgt. Sysaath and Lt. Campbell knew that the individuals residing in apartment 701 were Black.

86.     Due to the MPD's refusal to assist the SPPD with the search warrants unless they were no-knock warrants, on February 1, 2022, Sgt. Zebro sought and

obtained no-knock warrants for the four addresses, including Apartment 701 (the "701 No-Knock Warrant").

87. The 701 No-Knock Warrant permitted entry "without announcement of authority and purpose between the hours of 7 a m. and 8 p m., **and a nighttime search** outside those hours . . . ." (Emphasis added).

88. The 701 No-Knock Warrant was a search warrant and not an arrest warrant.

89. Amir was not a suspect in the St. Paul Investigation and was not mentioned or considered in any way in the 701 No-Knock Warrant.

90. The MPD's raid of the Bolero Flats began at approximately 6:40 a.m. on February 2, 2022 (the "Raid").

91. Between the time the 701 No-Knock Warrant was issued and the Raid, the MPD conducted no reasonable surveillance, if any, of Apartment 701 to determine what innocent persons might be put at risk by executing the 701 No-Knock Warrant in the early morning.

92. At 6:40 a m. on February 2, 2022, Marlon and Henderson were sleeping in the bedroom of Apartment 701 and Amir was sleeping on the couch in the living room.

93. Upon entering Apartment 701 there is a short entryway with the kitchen to the immediate right of the door.

94. The living room is straight ahead after entering the door to the apartment, the couch Amir slept on faced away from the door, and his face was obscured by a blanket.

95. A handgun was near the couch where Amir slept.

20

96.     As reflected by the Government Affairs for the Minnesota Gun Caucus's Senior VP Doar's statement above, it is also foreseeable in the United States that a person asleep in a dwelling would have access to and reach for a firearm to use in self-defense.

97.     In fact, a 2001 study of law enforcement officers reflected that over half of law enforcement gun owners disfavored gun locks, citing an inability to access the weapon quickly if they are sleeping.  *See* T. Coyne-Beasley & Renee Johnson, *Law Enforcement officers' opinions about gun locks: anchors on life jackets?*, 7 Injury Prev. 200-04 (2001).

98.     Members of MPD SWAT Team 1280 ("Team 1280") stacked to enter Apartment 701 at approximately 6:48 a m.

99.     Team 1280 consisted of Sgt. Sysaath, Sergeant Troy Carlson ("Sgt. Carlson"), MPD Officers Defendant Hanneman, Aaron Pearson ("Pearson"), Dominic Manelli ("Manelli"), Conan Hickey ("Hickey"), Nathan Sundberg ("Sundberg"), and Ryan Carerro ("Carerro"), and Sergeant John Biederman ("Sgt. Biederman").

100.    While MPD Policy 9-307 was not the ban on no-knock warrants it was advertised to be, it did place requirements on how MPD officers execute no-knock warrants.

101.    For example, even "[d]uring unannounced entry search warrants, MPD officers **shall** announce themselves as "Police" and announce their purpose as "Search Warrant" **prior to** crossing the threshold of the door into the residence or building." MPD Policy 9-307(A)(2)(b) (emphasis added).

102. At approximately 6:48 a.m., Officer Pearson used a key obtained from Bolero Flats management to open the door to Apartment 701.

103. After Officer Pearson pushed the door open, Sgt. Sysaath was the first to enter Apartment 701.

104. Sgt. Sysaath did not announce "Police – Search Warrant" prior to entering Apartment 701.

105. Sgt. Sysaath only announced the police presence and purpose after crossing the threshold into the residence.

106. No member of Team 1280, including Hanneman, had reasonable suspicion that a "knock and announce" approach to executing the warrant at Apartment 701 would be dangerous, futile or inhibit the effective investigation of a crime.

107. Team 1280 barreled into Apartment 701 over the next few seconds, in the order stated in Paragraph 99 above.

| | |
|---|---|
| | Deleted: several |

108. Amir remained asleep on the couch covered in a blanket when Team 1280 entered the apartment, with the officers yelling overlapping, incoherent commands.

| | |
|---|---|
| | Deleted: unclear |

109. Approximately six seconds after Team 1280 crossed the threshold into Apartment 701, Sgt. Carlson encountered Amir on the couch.

| | |
|---|---|
| | Deleted: asleep |

110. Sgt. Carlson kicked the couch as Sgt. Sysaath yelled, "Get on the ground."

| | |
|---|---|
| | Deleted: to wake Amir ¶ |

111. Sgt. Carlson's kick startled Amir and Amir fell off the couch and onto the ground.

| | |
|---|---|
| | Deleted: the sleeping |

112. A reasonable officer would have recognized that Amir had been startled awake and was still draped in the blanket he was sleeping under, which was obscuring his

| | |
|---|---|
| | Deleted: Startled |
| | Deleted: ; |

view, when Amir began to stand and grabbed the handgun to assess the threat that jarred

him awake.

113.   Amir held the handgun momentarily in his right hand.

114.   Despite being presented with these terrifying circumstances, Amir kept his

finger off the trigger, kept the handgun pointed down, and never raised the handgun in a

threatening manner in the direction of any officer or other person.

115.   At all times, Amir exercised proper firearm and trigger discipline as he

assessed circumstances that any person would have perceived as confusing and terrifying.

116.   As Hanneman approached Amir, Hanneman yelled "Show me your hands."

117.   Amir began to comply with Hanneman's order to "Show [Hanneman his

hands."

118.   Amir lowered gun's barrel and muzzle further toward the ground.

119.   Amir raised his left hand in the air to the side of his head.

120.   Before Amir could fully comply with Hanneman's command to "Show me

your hands," Hanneman fired three shots at Amir.

121.   Hanneman shot Amir only eight seconds after Team 1280 entered the

threshold of Apartment 701 and two seconds after Sgt. Carlson kicked the couch on

which Amir had been sleeping.

122.   Despite having the opportunity, neither Hanneman nor any member of

Team 1280 issued Amir a warning to drop the handgun.

123.   Despite having the opportunity, neither Hanneman nor any member of

Team 1280 issued Amir a warning that he would be shot if he did not drop the handgun.

23

124.    Despite having the opportunity, Hanneman did not attempt to retreat or find cover in the apartment's kitchen.

125.    Hanneman shot Amir three times without providing Amir with any warning.

126.    Hanneman then yelled, "He's got a gun."

127.    Amir's body was thrown to the ground and he tried to move away from Hanneman.

128.    Amir was not suspected of a crime.

129.    Amir never refused to comply with the officers' commands.

130.    Amir never resisted arrest or attempted to evade arrest by flight.

131.    Amir was shot as he began to comply with the officers' commands, including Hanneman's command.

132.    Alternatively, Amir was shot before he was given an opportunity to comply with the officers' commands, including Hanneman's command.

133.    All movements of the handgun were made in an effort to comply with the officers' commands, including Hanneman's command.

134.    Amir never placed his finger on the handgun's trigger.

135.    Amir never pointed the handgun's muzzle at any officer or other person.

136.    Amir never pointed or moved the handgun's muzzle in the direction of any officer or other person.

137.    Amir never pointed the handgun's muzzle in a menacing way.

138.    Amir never took any menacing action.

139.   Amir never moved the handgun in such a way that Hanneman or any other officer would believe Amir was aiming the handgun's muzzle at any officer or other person.

140.   Amir never discharged the handgun.

141.   Amir merely possessed the handgun.

142.   Even though multiple members of Team 1280 had their weapons pointed at Amir and had a view of Amir's firearm, only Hanneman shot Amir.

143.   After unsuccessful life-saving efforts, Amir was pronounced dead less than fifteen minutes after Team 1280 crossed the threshold into Apartment 701.

144.   Hennepin County Medical Examiner Dr. Andrew Baker ("Baker") conducted Amir's autopsy and concluded that Amir suffered a gunshot wound to his face, right upper chest, and to his left shoulder.

145.   Dr. Baker concluded that Amir's immediate cause of death was multiple gunshot wounds, and the manner of death was homicide.

F.   **The Aftermath**

146.   On February 4, 2022, Mayor Frey announced a moratorium on no-knock warrants.

147.   Following Amir's death, additional, unreasonable no-knock warrants conducted by the MPD continued to come to light, underscoring that the advertised ban on no-knock warrants was false.

148.   For example, on March 17, 2021, MPD Sgt. Swierzewski, the same sergeant who initiated the botched no-knock raid in Coon Rapids, obtained a no-knock

warrant for the recovery of a stolen puppy at a home occupied by Black residents. *See* A.J. Lagoe and Steve Eckert, *KARE 11 Investigates: MPD used no-knock warrant SWAT raid to investigate dognapping of puppy*, Kare 11 (Feb. 27, 2022, 10:13 PM), https://www.kare11.com/article/news/investigations/kare-11-investigates-minneapolis-police-department-used-no-knock-warrant-swat-raid-to-investigate-dognapping-of-puppy/89-2e6aa9e0-4511-415b-be62-366425c1d06e (last accessed Jan. 26, 2023).

149.    The available body camera footage shows MPD SWAT team members ramming and blasting through a door and unreasonably breaking windows of the home, yet an MPD SWAT officer described their conduct as "**very cordial** . . . ." *See id.* (emphasis added).

150.    The female resident of the puppy-raid-home, who was not a suspect in any alleged crime, was reportedly evicted and left homeless because of the damage MPD SWAT did to her home.

151.    In response to Kare 11's story on the puppy raid, Mayor Frey responded, "Even if officers announced their presence prior to entry, in accordance with the Nov. 2020 policy, **this kind of conduct** underscores why we are revising the no-knock warrant policy, with a full moratorium in place in the meantime." *Id.* (emphasis added).

152.    The Minneapolis Department of Civil Rights, Office of Police Conduct Review, issued a "Preliminary Report: High Risk Warrants," with data on MPD's use of high-risk warrants.[7]

---

[7] Dkt. No. 1-1 at 86-99, Exhibit D, Minneapolis Department of Civil Rights, Office of Police Conduct Review, "Preliminary Report: High Risk Warrants."

153.   The Preliminary Report indicated that "[t]he full report will be completed by April 15, 2022 and contain additional data from high-risk warrants served between January 1, 2021 and February 4, 2022."[8]  However, it appears the full report was never created.

154.   Between September 1, 2021 and January 31, 2022, MPD only executed no-knock warrants on people of color, with 80% of no-knock warrant targets being Black. MPD did not execute a single no-knock warrant on Non-Hispanic Whites, as depicted in the charts below:[9]

| 2.1 | High-Risk Warrant Targets Demographic Data | | | | |
|---|---|---|---|---|---|
| | No-Knock Warrant (NKW) | Night Capped | High-Risk Warrant (Non-NKW) | Night Capped | TOTAL |
| African American | 20 | 4 | 7 | 1 | 32 |
| Native American | 3 | 0 | 1 | 0 | 4 |
| White (Hispanic) | 1 | 0 | 0 | 0 | 1 |
| White (Non-Hispanic) | 0 | 0 | 3 | 0 | 3 |
| Asian | 1 | 0 | 0 | 0 | 1 |
| Pacific Islander | 0 | 0 | 1 | 0 | 1 |
| TOTAL | 25 | 4 | 12 | 1 | 42 |

---

[8] *Id.* at 3.
[9] *Id.* at 7, 10.





Deleted:

| 5.1 | High-Risk Warrants by Subject Demographics NOTE: A single warrant can list multiple suspects | | | | |
|---|---|---|---|---|---|
| | No-Knock Warrant (NKW) | Night Capped | High-Risk Warrant (Non-NKW) | Night Capped | TOTAL |
| African American | 23 | 4 | 17 | 1 | 40 |
| Native American | 5 | 0 | 1 | 0 | 6 |
| White (Hispanic) | 2 | 0 | 1 | 0 | 3 |
| White (Non-Hispanic) | 0 | 0 | 5 | 0 | 5 |
| Asian | 1 | 0 | 6 | 0 | 7 |
| Pacific Islander | 0 | 0 | 1 | 0 | 1 |
| TOTAL | 31 | 4 | 31 | 1 | 62 |



155.   High-risk warrants, which included no-knock warrants, disproportionately impacted Black people in Minneapolis.[10]

156.   Minneapolis knew MPD was obtaining and executing no-knock and other high-risk warrants against Black people at a disproportionate rate and that MPD had a custom and practice of intentionally seeking no-knock warrants because of race.

157.   On April 27, 2022, the Minnesota Department of Human Rights issued its Findings ("MDHR Findings") from its Investigation into Minneapolis and the MPD.[11]

---

[10] Ex. D at 4.
[11] *See generally* Ex. A.

158.    The MDHR Findings concluded that there was probable cause to believe that Minneapolis and MPD engaged in a pattern or practice of race discrimination in violation of state law.

159.    The MDHR Findings included reference to Amir's killing by MPD, stating that Minneapolis and MPD leaders provided inaccurate information regarding the incident when "MPD repeatedly referred to Mr. Locke, **who was not a suspect**, as a suspect, and released pictures to further paint Mr. Locke as a suspect."[12]

160.    The MDHR Findings also stated that the City and MPD's training practices "reinforce a culture that exacerbates a pattern of race-based policing" and "teaches a paramilitary culture to new officer hires and reinforces these concepts with veteran officers," that MPD's trainings continue to embed a "warrior mindset," and that veteran MPD officers reinforce a culture of unquestioned compliance by other officers through "positioning community members as the enemy."[13]

161.    The MDHR Findings state that "[t]he lack of collective and sustained action among [Minneapolis] and MPD leaders has, in effect, allowed this organizational culture to fester within MPD and resulted in unlawful policing practices that undermine public safety."  It further states that Minneapolis and MPD leaders were "aware of the long-standing, disproportionate impact of race-based policing on people of color and Indigenous individuals, especially Black individuals."[14]

---

[12] *Id.* at 69 (emphasis added).
[13] *Id.* at 39-40.
[14] *Id.* at 9.

30

162.    Minneapolis ultimately lifted its moratorium on no-knock warrants and revised its no-knock entry policies effective May 2, 2022.  The current policy permits no-knock entry if the officers determine there are "exigent circumstances."

163.    To the best of Plaintiffs' knowledge, no MPD officer was disciplined for their conduct related to Amir's death.

**G.    The Department of Justice Investigation**

164.    On April 21, 2021, the Department of Justice ("DOJ") opened a pattern or practice investigation of MPD and the City.[15]

165.    On June 16, 2023, the DOJ announced its findings that there was reasonable cause to believe that the City and MPD engage in a pattern or practice of conduct that deprives people of their rights under the Constitution and federal law.

166.    The DOJ determined that "persistent deficiencies in MPD's accountability systems, training, supervision, and officer wellness programs, which contribute to the violations of the Constitution and federal law. . . . For years, MPD used dangerous techniques and weapons against people who committed at most a petty offense and sometimes no offense at all."[16]

167.    The DOJ found, as relevant here, that "MPD uses excessive force, including unjustified deadly force and excessive less-lethal force" and that "MPD

---

[15] *See* Exhibit E, United States Dep't of Justice Civil Rights Div. & United States Attorney's Office D. Minn. Civil Div., *Investigation of the City of Minneapolis and the Minneapolis Police Department*, at 1.
[16] *Id.*

unlawfully discriminates against Black and Native American people when enforcing the law."[17]

168.   When discussing MPD's pattern or practice of violating the Fourth Amendment by using excessive force, the DOJ found that "MPD officers routinely use excessive force, often when no force is necessary."[18]

169.   The DOJ also found "that MPD officers often use unreasonable force (including deadly force) to obtain immediate compliance with orders, often forgoing meaningful de-escalation tactics and instead using force to subdue people."[19]

170.   Moreover, the DOJ found "that MPD officers discharged firearms in situations where there was no immediate threat."[20]

171.   When discussing uses of deadly force, the DOJ stated:

> Although [the number of police shootings] is relatively small, a significant portion of them were unconstitutional uses of deadly force.  At times, officers shot at people without first determining whether there was an immediate threat of harm to the officers or others.  Federal law requires officers to warn when feasible that they are about to use deadly force, but MPD officers routinely fail to provide such warnings.[21]

---

[17] *Id.* at 9.
[18] *Id.* at 10.
[19] *Id.* at 10-11.
[20] *Id.* at 11.
[21] *Id.* (citing *Est. of Morgan v. Cook*, 686 F.3d 494, 497 (8th Cir. 2012) ("[W]here it is feasible, a police officer should give a warning that deadly force is going to be used.")).

172.   The DOJ also found that "MPD officers discharge firearms at people without assessing whether the person presents any threat, let alone a threat that would justify deadly force."[22]

173.   The DOJ also found that "MPD officers aggressively confront people suspected of a low-level offense—or no offense at all—and use force if the person does not obey immediately.  Officers sometimes used force against people who were already compliant[.]"[23]

174.   The DOJ "observed a pattern of officers using unnecessary force, sometimes because the person failed to comply with an order immediately.  There were many such instances, with officers using force within seconds of giving a lawful or even an unlawful order."[24]

175.   When discussing MPD's pattern or practice of unlawful discrimination against Black and Native people when enforcing the law, the DOJ stated "MPD disproportionately uses force against Black and Native American people. . . . Though MPD has long been on notice about racial disparities and officers' failure to document data on race during stops, and was made aware of expressions of racial bias by some MPD officers and supervisors, MPD has insufficiently addressed these issues."[25]

---

[22] *Id.* at 12.
[23] *Id.* at 18.
[24] *Id.* at 20.
[25] *Id.* at 31.

176.   Mayor Frey told the DOJ that the City "'knew, and continue to know, there is disparate treatment' of communities of color.  Despite this knowledge, however, MPD has not sufficiently addressed the racial disparities in MPD's enforcement practices[.]"[26]

177.   Despite that knowledge, the DOJ determined that "neither the City nor MPD has tasked anyone with regularly and systematically assessing MPD's enforcement data to identify and take action to avoid unwarranted disparities" in policing.[27]

178.   The DOJ concluded that "MPD engages in unlawful racial discrimination that has taken a toll on its relationship with the community.  The result is diminished public safety and a breakdown of community trust in MPD, not just of those who have directly experienced discrimination, but also of those who learn MPD is not protecting and serving all Minneapolis residents equally."[28]

179.   The DOJ likewise concluded that "MPD frequently fails to address police misconduct, which allows officers' serious violations of people's rights to go unpunished. MPD's flawed accountability system contributes to the unconstitutional and unlawful patterns or practices we found."[29]

180.   When investigations into officer misconduct do occur, the DOJ found such investigations to be "inexcusably slow."[30] This is significant because "[l]engthy delays undermine efforts to hold officers accountable for misconduct."[31]

---

[26] *Id.* at 42.
[27] *Id.* at 42-43.
[28] *Id.* at 47.
[29] *Id.* at 68.
[30] *Id.* at 75
[31] *Id.*

181.    The DOJ also found that "[d]iscipline for MPD officer misconduct is rare" even when officers admit to policy violations.[32]

182.    Further, the DOJ stated that its investigation "uncovered systemic deficiencies in MPD's training programs that contribute to the pattern or practice of violations we found. We identified a wide range of problems across MPD's recruit, in-service, and field training programs, including the qualifications of instructors, poor training materials, and chronic understaffing at the Training Division."[33]

183.    The DOJ stated that its review of MPD's training "revealed an overreliance on using force during encounters. We found that MPD staff favored training on defensive tactics over training on de-escalation options."[34]

184.    Finally, the DOJ found that "[s]upervision at MPD is inadequate for several reasons" including that supervisors are inadequately trained and in turn "struggle to understand policy and effectively communicate changes to officers;" supervisors at MPD "do not perform tasks that other agencies commonly require to improve officer performance;" and the scheduling system "undermines supervisory authority."[35]

185.    Plaintiffs allege and incorporate by reference each of the DOJ's findings.

---

[32] *Id.* at 77.
[33] *Id.* at 79.
[34] *Id.*
[35] *Id.* at 80-81.

<u>**Count One**</u>
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendment Violations**
*Plaintiffs v. Hanneman*

186.    Plaintiffs reallege and incorporate by reference each preceding allegation contained in this Complaint as if fully set forth herein.

187.    Under the Fourth Amendment as incorporated by the Fourteenth Amendments to the United States Constitution, Amir had a right to be free from unconstitutional searches and seizures, including the right to be free from unreasonable, excessive, and deadly force.

188.    By the actions described above, Hanneman acted under color of state law and violated Amir's clearly established right to be free from unreasonable, excessive, and deadly force.

189.    As a direct and proximate result of Hanneman's unlawful conduct, Amir endured pain, suffering, loss of income, loss of enjoyment of life, and other compensatory and special damages available under federal common law.

190.    As a direct and proximate result of Hanneman's unlawful conduct, Amir's next of kin suffered loss, including but not limited to loss of aid, counsel, guidance, advice, assistance, protection, and support.

191.    Plaintiffs also have standing to recover funeral, burial, and medical expenses.

192.    Hanneman subjected Amir to these deprivations of his rights in such a manner to render him liable for punitive damages as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983).

36

193.    Plaintiffs are entitled to recover their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

**<u>Count Two</u>**
**42 U.S.C. § 1983 *Monell* Liability**
*Plaintiffs v. Minneapolis*

194.    Plaintiffs reallege and incorporate by reference each preceding allegation contained in this Complaint as if fully set forth herein.

195.    Prior to February 2, 2022, Minneapolis knew of and was deliberately indifferent in failing to correct a number of persistent and widespread unconstitutional practices and customs within the MPD that violated citizens' rights to Equal Protection and to be free from unreasonable force under the Fourth and Fourteenth Amendments and were the moving force behind Amir's death.

196.    These practices and customs include but are not limited to:

      a.    Engaging in racist policing and excessive force, including but not limited to the application for and execution of no-knock warrants against people of color, and use of excessive or deadly force during execution of warrants against people of color;

      b.    Executing no-knock warrants without regard for the rights of innocent third parties; and

      c.    Failing to discipline officers who engage in unconstitutional or other misconduct.

197.    As a direct and proximate result of Minneapolis's unlawful conduct, Amir endured pain, suffering, loss of income, loss of enjoyment of life, and other compensatory and special damages available under federal common law.

37

198.    As a direct and proximate result of Minneapolis's unlawful conduct, Amir's next of kin suffered loss, including but not limited to loss of aid, counsel, guidance, advice, assistance, protection, and support.

199.    Plaintiffs also have standing to recover funeral, burial, and medical expenses.

200.    Plaintiffs are entitled to recover their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

**Count Three**
**42 U.S.C. § 1983 *Canton* Liability**
*Plaintiffs v. Minneapolis*

201.    Plaintiffs reallege and incorporate by reference each preceding allegation contained in this Complaint as if fully set forth herein.

202.    Prior to February 2, 2022, Minneapolis knew that training was necessary within the MPD in numerous areas to avoid its officers violating citizens Fourth and Fourteenth Amendment rights, but with deliberate indifference failed to train its officers in a number of ways, including but not limited to training on:

a.    Not engaging in racist policing and excessive force, including but not limited to the application for and execution of no-knock warrants against people of color, and use of excessive or deadly force during execution of no-knock warrants against people of color;

b.    MPD high-risk warrant policies and procedures that are intended to avoid violating constitutional rights;

c.    Use of de-escalation tactics rather than force;

d.    Understanding the rights of innocent third parties during the execution of no-knock warrants;

38

e. Training supervisors appropriately on policies and changes to policies; and

f. Disciplining officers and holding them accountable for unconstitutional or other misconduct.

203. Minneapolis's deliberately indifferent failure to train, supervise, and discipline was the moving force behind Amir's death.

204. As a direct and proximate result of Minneapolis's unlawful conduct, Amir endured pain, suffering, loss of income, loss of enjoyment of life, and other compensatory and special damages available under federal common law.

205. As a direct and proximate result of Minneapolis's unlawful conduct, Amir's next of kin suffered loss, including but not limited to loss of aid, counsel, guidance, advice, assistance, protection, and support.

206. Plaintiffs also have standing to recover funeral, burial, and medical expenses.

207. Plaintiffs are entitled to recover their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

**Count Four**
**State Law Wrongful Death – Minn. Stat. § 573.02**
*Plaintiffs v. Hanneman and Minneapolis*

208. Plaintiffs reallege and incorporate by reference each preceding allegation contained in this Complaint as if fully set forth herein.

39

209. By the actions described above, Minneapolis officers, including but not limited to Hanneman, engaged in wrongful acts and omissions that directly and proximately caused Amir's death.

210. These wrongful acts and omissions include but are not limited to constitutional violations, negligence, battery, and full and equal enjoyment of public services.

211. These wrongful acts and omissions were malicious and/or in violation of ministerial duties.

212. Amir's next of kin have suffered pecuniary loss, including but not limited to loss of aid, counsel, guidance, advice, assistance, protection and support.

213. Plaintiffs have standing to recover funeral, burial, and medical expenses in addition to other items of compensatory, special, and punitive damages.

214. Minneapolis is vicariously liable for all damages caused by its employees as set forth in the preceding paragraphs of this Count.

215. Hanneman acted with deliberate disregard for Amir's rights, which also renders him individually liable for punitive damages.

### **Prayer for Relief**

Wherefore, Plaintiffs Karen Wells and Andre Locke pray for judgment against Defendants as follows:

1. As to Count One, a finding that Hanneman violated Amir's constitutional rights and a money judgment against Hanneman for compensatory, special, and punitive

damages in an amount to be determined by the jury, together with costs including reasonable attorneys' fees under 42 U.S.C. § 1988, and pre-and-post-judgment interest;

2.      As to Count Two, a finding that Minneapolis violated Amir's constitutional rights and a money judgment against Minneapolis for compensatory and special damages in an amount to be determined by the jury, together with costs including reasonable attorneys' fees under 42 U.S.C. § 1988, and pre-and-post-judgment interest;

3.      As to Count Three, a finding that Minneapolis violated Amir's constitutional rights and a money judgment against Minneapolis for compensatory and special damages in an amount to be determined by the jury, together with costs including reasonable attorneys' fees under 42 U.S.C. § 1988, and pre-and-post-judgment interest;

4.      As to Count Four, a finding that Hanneman and Minneapolis violated state law and a money judgment against Hanneman and Minneapolis for compensatory and special damages in an amount to be determined by the jury, together with costs and pre-and-post-judgment interest, in addition to Hanneman being separately liable for punitive damages in an amount to be determined by jury;

5.      For injunctive relief and appointment of a receiver or similar authority to ensure the City of Minneapolis eliminates the unconstitutional customs and practices at issue in this litigation and properly trains and supervises its officers; and

6.      For all such other and further relief as the Court deems just and equitable.


                        **NEWMARK STORMS DWORAK LLC**

Dated: July 7, 2023                    /s/ Jeffrey S. Storms

| Deleted: February 2 |
| --- |

Jeffrey Storms (#0387240)
Ryan O. Vettleson, #0312915
Naomi E. H. Martin, #0402332
222 South 9th Street, Suite 470
Minneapolis, MN 55402
Telephone:  (612) 455-7050
Facsimile:  (612) 455-7051
E-mail: jeff@newmarkstorms.com
          ryan@newmarkstorms.com
          naomi@newmarkstorms.com

*- and -*

**BEN CRUMP LAW**
Ben Crump (*pro hac vice pending*)
(Washington, D.C. Bar No. 1552623)
717 D Street N.W., Suite 310
Washington, D.C. 20004
E-mail: ben@bencrump.com

*- and -*

**ROMANUCCI & BLANDIN, LLC**
Antonio M. Romanucci (*pro hac vice pending*)
(Illinois ARDC No. 6190290)
Sam Harton (*pro hac vice pending*)
(Illinois ARDC No. 6342112)
321 North Clark St., Suite 900
Chicago, Illinois 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
E-mail: aromanucci@rblaw.net
          sharton@rblaw.net