# JOINT REPORT OF THE HENNEPIN COUNTY ATTORNEY'S OFFICE AND MINNESOTA ATTORNEY GENERAL'S OFFICE REGARDING THE DEATH OF AMIR LOCKE

# APRIL 6, 2022





Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

## **Introduction**

The State of Minnesota, represented by the Hennepin County Attorney's Office and the Minnesota Attorney General's Office in partnership, has reviewed the incident resulting in the death of Amir Locke at the hands of Minneapolis Police Officers for the consideration of criminal charges.

The investigation of this incident was completed by the Minnesota Bureau of Criminal Apprehension (BCA), which falls under the umbrella of the Minnesota Department of Public Safety. The BCA completed the investigation, including follow-up investigative tasks requested by the Hennepin County Attorney's Office and Minnesota Attorney General's Office, and submitted the investigative file to the prosecuting authorities for review. As in any criminal case, it is only after receiving all or part of the investigative file that the prosecuting authority can begin reviewing an incident for criminal charges. The BCA submitted its reports and evidence obtained to our offices on a rolling basis. The final report was submitted on March 14, 2022.

A consideration of criminal charges involves a thorough review of all available evidence to determine whether there is sufficient, admissible evidence to prove beyond a reasonable doubt, that any crimes were committed and whether there is a legal defense for the commission of those crimes. We are limited to consideration of whether the State could prove beyond a reasonable doubt that a crime occurred by assessing whether any violations of Minnesota's criminal code occurred and, if so, whether there is any legal defense for those violations under Minnesota's criminal code. *See* Minn. Stat. § 388.051.

This memorandum includes a statement of the facts of the incident learned through the investigation, a brief overview of the principles of criminal law and procedure that govern when and how the State may file criminal charges, and a legal analysis of whether the State could prove beyond a reasonable doubt that any provisions of Minnesota criminal code were violated and disprove beyond a reasonable doubt any statutory defenses.

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

### Statement of Relevant Facts

*Background[1]*

On January 10, 2022, around 9:33 p.m., St. Paul Police Officers responded to a report of a male being shot. (Application for Search Warrant, 1117 S. Marquette Avenue, apartment 701, dated Feb. 1, 2022, at 3). This male ultimately died from a gunshot wound caused by a .223 caliber round.[2] (Application for Search Warrant, 1117 S. Marquette Avenue, apartment 701, dated Feb. 1, 2022, at 3). St. Paul Police Investigators began an extensive investigation into the homicide, the details of which are beyond the scope of this report but are detailed in the search warrant application. Ultimately, St. Paul Police investigators identified multiple suspects who were linked to the Bolero Flats Apartments, 1117 S. Marquette Avenue, in Minneapolis, Hennepin County, Minnesota. (Application for Search Warrant, 1117 S. Marquette Avenue, apartment 701, dated Feb. 1, 2022, at 5). Further investigation and examination of the St. Paul homicide suspects' social media accounts revealed that the suspects were frequently depicted in photographs displaying several firearms and cash. (Application for Search Warrant, 1117 S. Marquette Avenue, apartment 701, dated Feb. 1, 2022, at 7).

St. Paul investigators determined that the suspects were associated with apartment units 701, 1402, and 1403 of the Bolero Flats Apartments. (Application for Search Warrant, 1117 S. Marquette Avenue, apartment 701, dated Feb. 1, 2022, at 5-7). One of the primary suspects, Mekhi Camden Speed, was specifically determined to use apartment unit 1402 as a home address and was listed on the lease as living there. (Application for Search Warrant, 1117 S. Marquette Avenue, apartment 701, dated Feb. 1, 2022, at 7). Investigators also learned that Mekhi Speed's brother and his brother's girlfriend lived in apartment unit 701 of the same building. (Application for Search Warrant, 1117 S. Marquette Avenue, apartment 701, dated Feb. 1, 2022, at 7). Based on this information, on January 31, 2022, St. Paul Police investigators applied for and obtained search warrant, signed by a Hennepin County District Court Judge, for apartment units 701, 1402, and 1403 at the Bolero Flats Apartments. (Search Warrant, 1117 S. Marquette Avenue, apartment 701, dated Jan. 31, 2022). These signed warrants obtained on January 31, 2022, were daytime, knock-and-announce search warrants. (Search Warrant, 1117 S. Marquette Avenue, apartment 701, dated Jan. 31, 2022, at 3).

After obtaining these signed search warrants, St. Paul Police investigators contacted Minneapolis Police Sergeant John Sysaath and requested Minneapolis Police SWAT assistance in executing the search warrants. (Statement of Sgt. John Sysaath, at 1). St. Paul Police provided Sergeant Sysaath with copies of the warrants. (Statement of Sgt. Sysaath, at 1). The warrants listed the details of the St. Paul homicide and informed Sergeant Sysaath that the underlying homicide involved the suspected use of a .223 caliber rifle, that the suspects had a history of assault and weapons possession charges, and that the suspects had recently posted a video depicting multiple firearms including some with extended magazines. (Statement of Sgt. Sysaath, at 1). Sergeant Sysaath forwarded this information to Minneapolis SWAT Lieutenant Thomas Campbell on January 31, 2022. (Statement of Sgt. Sysaath, at 2; Statement of Lt. Thomas Campbell, at 1). Sergeant Sysaath's email to Lieutenant Campbell suggested that MPD should not agree to execute the

---

[1] Facts related to the St. Paul homicide and subsequent St. Paul investigation will be pulled exclusively from the search warrant application, and not from any St. Paul Police Reports, to avoid the release and sharing of any material that remains confidential investigative data related to that offense.

[2] The type of bullet used in the St. Paul homicide is notable, as a .223 caliber round is capable of piercing body armor.

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

warrants unless they were "no knock" warrants. (Statement of Lt. Campbell, at 1). Lieutenant Campbell reviewed the search warrants and agreed with Sergeant Sysaath that the search warrants for apartment units 701, 1402, and 1403 of 1117 S. Marquette Avenue should be rewritten as "no-knock" warrants based on the risk factors noted above – specifically, that the apartment was associated with a homicide suspect, that the firearm used in the homicide had not been recovered, that the suspect was seen on social media possessing several firearms, that the vehicle used in the homicide was associated with other armed robberies, and that the apartment units in question may be occupied by other suspects or associates. (Statement of Lt. Campbell, at 1-2).

Sergeant Sysaath contacted St. Paul Police and informed the investigators that Minneapolis Police SWAT Teams would not assist with knock-and-announce warrants but would assist with "no-knock" warrants. (Statement of Sgt. Sysaath, at 2; *see also* Statement of Lt. Campbell, at 1). After some cross-agency communication, on February 1, 2022, St. Paul Police obtained "no knock" search warrants for the apartment units, signed by the same Hennepin County District Court Judge. (Search Warrant, 1117 S. Marquette Avenue, apartment 701, dated Feb. 1, 2022; *see also* Statement of Sgt. Sysaath, at 2; Statement of Lt. Campbell, at 1-2). While waiting for the updated "no knock" warrants, Minneapolis Police SWAT officers conducted reconnaissance of the apartment building to allow for tactical operation planning. (Statement of Sgt. Sysaath, at 2; Statement of Lt. Campbell, at 2).

### *Pre-Warrant Briefing and Planning*

On February 2, 2022, around 6:00 a.m., Minneapolis Police SWAT Teams 1280 and 1281 met with one of the St. Paul Police investigators for a pre-warrant-execution briefing at the Minneapolis Police Department Special Operations Center. (Statement of Sgt. Sysaath, at 2; Statement of Lt. Campbell, at 2).[3] Also in attendance at the meeting were paramedics from Hennepin County Medical Center, who would be standing by during the search warrant execution as a precautionary measure, per standard procedure. (Statement of Sgt. Sysaath, at 2; Statement of Sgt. Troy Carlson, at 1).

The St. Paul Police investigator provided an oral and written briefing on their case, including that there had been a homicide in St. Paul a few weeks earlier and that the warrants were connected to that case. (Statement of Sgt. Carlson, at 1). The SWAT teams were informed that the St. Paul Police investigators believed that the primary suspect in the homicide lived in apartment 1402 and spent a significant amount of time in apartment 701 where his brother lived; that apartment 1403 was a "flop" apartment where the suspect and his associates often convened; that the primary suspect and two other suspects had recently made social media posts in which they were seen with multiple firearms; that the suspects were associated with multiple armed robberies and carjackings; and that the .223 caliber rifle used in the homicide had not yet been recovered. (Statement of Sgt. Carlson, at 1; St. Paul Police Department. Special Investigations Unit, SIU Operations Plan, at 1, 6).[4]

---

[3] Other officers also described attending the briefing at the Special Operations Center.

[4] Other officers' statements provided a similar account of what information was learned at the briefing, though most include less detail than Sergeant Carlson's. *See also* Statement of Officer Kristopher Dauble, at 1; Statement of Officer Zach Seraphine, at 1; Statement of Officer Nathan Sundberg, at 1; Statement of Officer Ryan Carrero, at 1; Statement of Sgt. John Biederman, at 1; Statement of Sgt. Jason Andersen, at 1.

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

After the briefing on the background of the case, the Minneapolis Officers were split into separate operational teams, with the following duties:

Minneapolis Police Department SWAT Team 1280:

Sergeant John Biederman – Team Leader
Sergeant John Sysaath – Point Officer
Sergeant Troy Carlson – Cover Officer
Officers Mark Hanneman and Dominic Manelli – Ram Team
Officer Aaron Pearson – Breach, provided with keys to Apartments 1403 and 701
Officer Conan Hickey – Breaching Tool Officer
Officer Nathan Sundberg – Cuffs and Fire Extinguisher
Officer Ryan Carerro – Van Driver

Minneapolis Police Department SWAT Team 1281:

Lieutenant Thomas Campbell – Team Leader
Officer Kristopher Dauble – Point Officer
Officer Carl Blad – Cover Officer
Officers Zach Seraphine and William Martin – Ram Team
Sergeant Jason Andersen – Breach, provided with key to apartment 1402
Officer T. Ricci – Breaching Tool Officer
Officer Nicholas Washe and Sergio Villegas – Cuffs and Cover
Officer Kyle Mader – Van Driver

(Statement of Sgt. Sysaath, at 2-3; Statement of Lt. Campbell, at 3; Minneapolis Police Department Search Warrant and Risk Assessment Form, at 2). The operational plan called for SWAT Team 1281 to conduct the search warrant on apartment 1402. (Statement of Lt. Campbell, at 3; Statement of Sgt. Carlson, at 1). While SWAT Team 1281 was conducting the search warrant on apartment 1402, SWAT Team 1280 would simultaneously conduct the search warrant on apartment 1403. (Statement of Lt. Campbell, at 3; Statement of Sgt. Carlson, at 1). Once SWAT Team 1280 cleared apartment 1403, that team would take the elevator down to the 7th floor to conduct the search warrant for apartment 701. (Statement of Lt. Campbell, at 3; Statement of Sgt. Carlson, at 1). After SWAT Team 1281 finished with apartment 1402, it would head to the 7th floor elevator lobby as standby and assistance for SWAT Team 1280. (Statement of Lt. Campbell, at 3; Statement of Sgt. Carlson, at 1).

<u>Search Warrant: 14th Floor Apartments[5]</u>

Around 6:37 a.m., SWAT Team 1280 arrived at 117 S. Marquette Avenue and parked its van on the south side of the apartment complex. (Statement of Sgt. Sysaath, at 3). Around 6:42 a.m., SWAT Team 1280 executed the search warrant on apartment 1403. (Statement of Sgt. Sysaath, at 3). Sergeant Sysaath checked the door and, after determining the door was locked, Officer Pearson used a key that had been provided by building management to unlock the door. (Statement of Sgt. Sysaath, at 3). Sergeant Sysaath was the first SWAT Team member to enter apartment 1403, and

---

[5] Regarding law enforcement action on the 14th floor, this report contains only a summary of SWAT Team 1280's actions. It does not include any level of detail regarding SWAT Team 1281's execution of the search warrant on apartment unit 1402, which was completed without notable incident.

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

announced, "police, search warrant" as he entered the apartment. (Statement of Sgt. Sysaath, at 3). The other members of SWAT Team 1280 continued entering apartment 1403, encountering one male inside the apartment, who was later identified and determined not to be one of the suspects. (Statement of Sgt. Sysaath, at 3). None of the primary suspects from the St. Paul homicide or subsequent suspected crimes were located inside apartment 1403. (Statement of Sgt. Sysaath, at 3). The apartment was ultimately cleared ("Code 4") and turned over to St. Paul Police investigators. (Statement of Sgt. Sysaath, at 3). These statements regarding law enforcement action on the 14th floor are all corroborated and confirmed by the body-worn camera videos of the officers assigned to SWAT Team 1280.

### *Search Warrant: Apartment 701 & Officer-Involved Shooting*

After clearing apartment 1403 and turning it over to the St. Paul investigators, SWAT Team 1280 went to the elevators and took the elevator down to the 7th floor. (Statement of Sgt. Sysaath, at 3; Statement of Officer Pearson, at 1). Once there, SWAT Team 1280 staged outside of apartment 701. (Statement of Sgt. Sysaath, at 3; Statement of Officer Pearson, at 1). Officer Pearson used a key that had been provided by building management to unlock the door to apartment 701 and officers entered the apartment. (Statement of Sgt. Sysaath, at 3; Statement of Officer Pearson, at 1). The paragraphs below will detail the officers' statements and compare those statements with what is depicted in each officers' body-worn camera in the order of their entry into apartment 701. Each officer who submitted a written statement included a caveat that, pursuant to Minneapolis Police Department policy, they had not been afforded the opportunity to review their body-worn camera videos before completing their written statements.[6]

1) Sergeant John Sysaath

Sergeant Sysaath was the first SWAT Team member to enter apartment 701, announcing "police, search warrant" as he crossed the apartment threshold. (Statement of Sgt. Sysaath, at 3; Statement of Sgt. Carlson, at 2; BWC of Sgt. Sysaath, at 06:48:05). Sergeant Sysaath moved to the right, into the kitchen area, immediately after entering apartment 701. (Statement of Sgt. Sysaath, at 3; Statement of Sgt. Carlson, at 2; BWC of Sgt. Sysaath, at 06:48:07).

Sergeant Sysaath submitted a written statement in which he reports the following.

Sergeant Sysaath notes that, through the kitchen's pass-through, he could see directly into the living room and saw a male (later identified as Amir Locke) raise his head from the couch and look in the direction of the SWAT Team's entry. (Statement of Sgt. Sysaath, at 3). Sergeant Sysaath also notes that, while he was in the kitchen, he lost sight of Mr. Locke, as Mr. Locke "quickly ducked" behind the couch. (Statement of Sgt. Sysaath, at 3). Sergeant Sysaath writes that as he continued through the kitchen, towards the living room, he was able to see Mr. Locke again coming out from under the blanket with his body and head oriented towards the sergeant's general direction. (Statement of Sgt. Sysaath, at 3). As Mr. Locke came up, Sergeant Sysaath states that he saw a tan-colored firearm in Mr. Locke's hand and that Mr. Locke was holding the firearm's "grip," raising the firearm. (Statement of Sgt. Sysaath, at 3-4). Sergeant Sysaath further described that the barrel of the firearm was pointed in Officer Hanneman's direction and that Officer

---

[6] The one exception to this is Sergeant Carlson, who noted that he had viewed the clip of body-worn camera video that had been publicly released by the City of Minneapolis and Minneapolis Police Department the day after the incident. (Statement of Sgt. Carlson, at 4). The self-reported effect that this had on Sergeant Carlson's recollection of the events will be noted below.

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

Hanneman was positioned approximately three to four feet in front of the firearm. (Statement of Sgt. Sysaath, at 4). Sergeant Sysaath writes that based on his observations and perception of Mr. Locke "acknowledging [their] presence, evasive movements upon [their] entry, not complying with verbal commands, controlling the firearm by the 'grip' and appearing as if he was attempting to get in a position to use the firearm," he believed that Mr. Locke intended to use the firearm to harm Officer Hanneman or the SWAT Team. (Statement of Sgt. Sysaath, at 4). Sergeant Sysaath then writes that he saw Officer Hanneman fire his duty firearm at Mr. Locke, and that Mr. Locke ended up on the living room floor. (Statement of Sgt. Sysaath, at 4). Sergeant Sysaath then directed another officer to call for paramedics, and escorted Officer Hanneman out of apartment 701 where he was passed off to Sergeant Andersen, who assumed escort duties for Officer Hanneman. (Statement of Sgt. Sysaath, at 4).

Sergeant Sysaath was equipped with a body-worn camera that was on and running during the entry to apartment 701. It should be noted that Sergeant Sysaath's body-worn camera appears, from the video, to be on his chest or torso. Sergeant Sysaath's body-worn camera video depicts the following:

Officer Pearson uses a key to unlock the door of apartment 701 and turns the handle to open the door. (BWC of Sgt. Sysaath, at 06:48:00-04). Officer Pearson then pushes the door open and steps back. (BWC of Sgt. Sysaath, at 06:48:05). Sergeant Sysaath steps forward and turns into the apartment, raising his rifle and yelling, "police, search warrant" as he does so. (BWC of Sgt. Sysaath, at 06:48:05-06). Sergeant Sysaath yells, a second time, "police, search warrant," then lowers his rifle and announces that he is moving as he steps into the kitchen to his right. (BWC of Sgt. Sysaath, at 06:48:06-08). Sergeant Sysaath then continues through the kitchen and says, "get on the ground. Dude, get on the fucking ground," as he walks through the kitchen towards the living room. (BWC of Sgt. Sysaath, at 06:48:10-13). Sergeant Sysaath raises his rifle again as he moves through the kitchen. (BWC of Sgt. Sysaath, at 06:48:10-12). As Sergeant Sysaath is saying "Get on the ground. Dude, get on the fucking ground," the living room is not visible from the body-worn camera, but Sergeant Sysaath still appears to be speaking to someone. As Sergeant Sysaath comes around the pass-through, closer to the living room, Mr. Locke is visible on or near the couch with his hair sticking out of the blanket and his face towards Officer Hanneman, who is in front of Sergeant Sysaath. (BWC of Sgt. Sysaath, at 06:48:12-14). Officer Pearson is behind the couch, to Sergeant Sysaath's left, with Sergeant Carlson further to the left with his back to the couch. (BWC of Sgt. Sysaath, at 06:48:13). One gunshot is heard at 06:48:13, followed by two more gunshots a fraction of a second later, at 06:48:14. (BWC of Sgt. Sysaath, at 06:48:13-14). Sergeant Sysaath's rifle is pointed down when the first gunshot is fired, raises momentarily, then is again pointed down after the second two gunshots. (BWC of Sgt. Sysaath, at 06:48:13-14). A moment later, an officer says, "gun." (BWC of Sgt. Sysaath, at 06:48:15). Officer Hanneman moves towards Mr. Locke, who is now on the ground, and Sergeant Sysaath follows, stating "shots fired" at 06:48:17. (BWC of Sgt. Sysaath, at 06:48:15-18). Sergeant Sysaath then moves forward slightly quicker and yells, "drop the gun." (BWC of Sgt. Sysaath at 06:48:18-23). Sergeant Sysaath turns around and jumps over the couch, then tells other officers to keep clearing the apartment. (BWC of Sgt. Sysaath, at 06:48:24-32). He makes his way to the apartment entrance and tells other officers, "shot fired, get medics up here now." (BWC of Sgt. Sysaath, at 06:48:33-36). Sergeant Sysaath stands by while officers start and coordinate medical care. (BWC of Sgt. Sysaath, at 06:48:36-06:49:37). He then asks, "who shot?" grabs Officer Hanneman and, holding him by the sleeve, escorts him out of the apartment unit and passes him off to Sergeant Andersen in the

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

hallway. (BWC of Sgt. Sysaath, at 06:49:38 -06:50:10). Sergeant Andersen states that he will be the escort, and Sergeant Sysaath leaves Officer Hanneman with Sergeant Andersen and turns back towards apartment 701. (BWC of Sgt. Sysaath, at 06:50:08-06:50:12).

2) <u>Officer Troy Carlson</u>

Sergeant Carlson was the second SWAT Team member to enter apartment 701. He moved forward through the main hallway, towards the living room. (Statement of Sgt. Carlson, at 2; BWC of Sgt. Carlson, at 06:47:26-33 There was a sectional couch in the living room, with the back of one side of the couch at the end of the hallway. (BWC of Sgt. Carlson, at 06:47:27-33; Photograph of Apartment 701 living room; *see also* Statement of Sgt. Carlson, at 2).

Sergeant Carlson submitted a written statement in which he reports the following.

Sergeant Carlson states that, as he moved forward, he saw that "hands appeared on the back of the couch and a person later identified as Locke pulled himself up from the couch to view over it." (Statement of Sgt. Carlson, at 2). Sergeant Carlson also writes that he looked directly at Mr. Locke and Mr. Locke looked directly back at him. (Statement of Sgt. Carlson, at 2). Sergeant Carlson states that he shouted at Mr. Locke to put his hands up and show his hands, and that he moved forward towards Mr. Locke since other officers were coming around through the kitchen and others were behind him. (Statement of Sgt. Carlson, at 2). Sergeant Carlson writes that after he yelled at Mr. Locke to show his hands, Mr. Locke "immediately retreated under the blanket while staying on the couch and began to vigorously move around." (Statement of Sgt. Carlson, at 2). Sergeant Carlson states that he continued to yell at Mr. Locke to show his hands, but that Mr. Locke did not do so, and the sergeant feared that the movement under the blanket may be Mr. Locke reaching for a weapon. (Statement of Sgt. Carlson, at 2). Sergeant Carlson notes that there was a sharp corner at the end of the entrance hallway and, as he got to the end of the entrance hallway, he quickly scanned for threats to the left, then turned back towards the couch where he saw Mr. Locke still under the blanket and continuing to move. (Statement of Sgt. Carlson, at 2). Sergeant Carlson repeats that he still believed that Mr. Locke was looking for a weapon. (Statement of Sgt. Carlson, at 2). Sergeant Carlson writes that he then kicked the back of the couch with his right leg, hoping that he would cause Mr. Locke to fall off the couch, rendering him less of a threat, and that the kick may dislodge any weapons from Mr. Locke's hand so that other officers could detain him. (Statement of Sgt. Carlson, at 2-3). After kicking the couch, Sergeant Carlson turned to the left to cover the closed door on that side of the room while other officers entered to engage with Mr. Locke. (Statement of Sgt. Carlson, at 3). Sergeant Carlson states that he heard a physical struggle behind his back, that he heard the word gun, and that he heard a gunshot, followed by another physical struggle. (Statement of Sgt. Carlson, at 3). Sergeant Carlson did not turn back around to face Mr. Locke and the other officers and proceeded into the room behind the closed door where he found another male and a female. (Statement of Sgt. Carlson, at 3). When Sergeant Carlson came back out of that room, he saw Mr. Locke laying on the living room floor with officers surrounding him, which is when he learned that Mr. Locke had been shot. (Statement of Sgt. Carlson, at 3).

Sergeant Carlson notes in his statement that before writing the statement he had viewed the portion of the body-worn camera video that was publicly released by the City of Minneapolis and Minneapolis Police Department and that it altered his perception of how the events occurred. (Statement of Sgt. Carlson, at 4). Specifically, Sergeant Carlson notes that he previously believed that he heard a physical struggle between the officers and Mr. Locke before hearing a gunshot and

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

that, after seeing the publicly released body-worn camera video, he saw that there was not a physical struggle before the gunshots. (Statement of Sgt. Carlson, at 4). Sergeant Carlson states that the sounds he heard might instead be attributed to "overall commotion and possibly the sound of [Mr.] Locke falling off the couch to the ground prior to being shot." (Statement of Sgt. Carlson, at 4).

Sergeant Carlson was equipped with a body-worn camera that was on and running during the entry to apartment 701. It should be noted that Sergeant Carlson's body-worn camera appears, from the video, to be on his chest or torso. Sergeant Carlson's body-worn camera video depicts the following:

Sergeant Carlson is initially standing behind Sergeant Sysaath, to the side of apartment 701's door, in the hallway of the apartment unit. (BWC of Sgt. Carlson, at 06:47:21).[7] Officer Pearson unlocks the apartment door, turns the handle, and pushes the door open. (BWC of Sgt. Carlson, at 06:47:24-25). Sergeant Sysaath then enters the apartment yelling, "police, search warrant." (BWC of Sgt. Carlson, at 06:47:25-26). Sergeant Carlson follows Sergeant Sysaath into the apartment and also yells, "police, search warrant," as he enters. (BWC of Sgt. Carlson, at 06:47:26-27). Sergeant Carlson has a rifle in his hands, which he raises. (BWC of Sgt. Carlson, at 06:47:27-28). A flashlight, which appears to be mounted onto Sergeant Carlson's rifle, is pointed into the living room at the end of the entry hallway, and the back of a couch is illuminated. (BWC of Sgt. Carlson, at 06:47:28). The body-worn camera video shows that the living room is dark, with all of the blinds drawn, and the only source of light appears to be coming from the officers' flashlights. (BWC of Sgt. Carlson, at 06:47:28).

As Sergeant Carlson advances down the apartment unit's entry hallway, the top of a person's head is visible over the back of the couch, and Mr. Locke's face appears to turn towards Sergeant Carlson; Mr. Locke's face is illuminated by the sergeant's flashlight, which is shining directly into Mr. Locke's face. (BWC of Sgt. Carlson, at 06:47:28). Then, a tan blanket starts to rise from the couch and is visible over the back of the couch; there appears to be a limb, possibly an arm or an elbow, under the blanket, that rises first. (BWC of Sgt. Carlson, at 06:47:29). Sergeant Carlson begins yelling, "Let me see your hands, hands, hands." (BWC of Sgt. Carlson, at 06:47:29-30). During this time, Mr. Locke is moving, with the blanket coming slightly off at one point and what appears to be arms and/or hands stick out on the right-hand side of the blanket for a fraction of a second. (BWC of Sgt. Carlson, at 06:47:29-30). Mr. Locke then appears to move away from the officers, off the couch and possibly onto the floor, with the blanket appearing to come over his head. (BWC of Sgt. Carlson, at 06:47:30-31). Sergeant Carlson continues moving forward and a thump is heard, which could be the sergeant kicking the couch. (BWC of Sgt. Carlson, at 06:47:31-33). Sergeant Carlson then turns to the left to face a closed door. (BWC of Sgt. Carlson, at 06:47:31-33). While Sergeant Carlson is facing that door, a single gunshot is heard, followed a fraction of a second later by two more gunshots in rapid succession. (BWC of Sgt. Carlson, at 06:47:34-35). Sergeant Carlson turns around and, as he does so, an officer or two can be heard saying, "Gun." (BWC of Sgt. Carlson, at 06:47:35-36). Sergeant Carlson turns back to the closed door, as another officer says, "Shots fired." (BWC of Sgt. Carlson, at 06:47:37).

---

[7] The time stamps on the body-worn camera videos as received are not identical, likely due to some internal settings on the body-worn cameras. The videos provide a visual depiction of the events and comparison of relevant time frames was able to be completed by other means, such as syncing videos based on identical audio statements.

Sergeant Carlson then opens the closed door and he and an officer next to him enter the next room. (BWC of Sgt. Carlson, at 06:47:38-40). As Sergeant Carlson enters the room, he shines his flashlight into the far corner, where a male is sitting up with his hands stretched into the air. (BWC of Sgt. Carlson, at 06:47:40). Sergeant Carlson approaches that corner, yelling "Hands, let me see your hands." (BWC of Sgt. Carlson, at 06:47:40-43). A female can be heard under another blanket saying, "I can't" and "okay, okay, okay," and the male who was sitting up says, "Please don't shoot," as Sergeant Carlson approaches and pulls the blanket off the female. (BWC of Sgt. Carlson, at 06:47:43-49). Sergeant Carlson then leaves the male and female with another officer, quickly looks into the bathroom, and turns back to the door that leads to the living room. (BWC of Sgt. Carlson, at 06:47:50-57).

3) Officer Mark Hanneman[8]

Officer Hanneman submitted a written statement in which he reports the following.

SWAT Team 1280 lined up outside apartment 701 after completing the search warrant on apartment 1403. (Statement of Officer Hanneman, at 2). Another team member opened the apartment door with a key, after which SWAT Team members began entering the apartment yelling "Police department! Search warrant!" (Statement of Officer Hanneman, at 2). Officer Hanneman followed the other officers inside and was the third officer to enter. (Statement of Officer Hanneman, at 2). Once inside the apartment, Officer Hanneman began to walk forward towards the living room, which had a couch in it. (Statement of Officer Hanneman, at 2). The back of the couch faced the entrance and Officer Hanneman was not able to clearly see the seating area but could see things that rose over the back of the couch. (Statement of Officer Hanneman, at 2). Officer Hanneman saw Sergeant Carlson move forward and give verbal commands to show hands. (Statement of Officer Hanneman, at 2). Officer Hanneman writes that he then saw a blanket rising above and falling below the back of the couch, making it clear to him that someone was on the couch. (Statement of Officer Hanneman, at 2). Officer Hanneman also writes that it became clear to him that the person, later identified as Mr. Locke, was "not listening to Sergeant Carlson's command to show their hands." (Statement of Officer Hanneman, at 2). Officer Hanneman moved towards the couch and went to the right, entering the living room, and he was able to walk to the right around the couch so he could see the seating area. (Officer Hanneman, at 2). Officer Hanneman also states that he checked around the corner at the end of the hallway to ensure no one else was there, then returned his attention to the couch. (Officer Hanneman, at 2).

Officer Hanneman writes that Sergeant Carlson kicked the couch and Mr. Locke "proceeded off the couch and onto the floor near an ottoman." (Statement of Officer Hanneman, at 2). Officer Hanneman then saw "the end of the blanket rise" and saw Mr. Locke underneath it, who Officer Hanneman describes as "crouched and beginning to rise from behind the ottoman." (Statement of Officer Hanneman, at 2). Officer Hanneman writes that as Mr. Locke rose he "had a handgun in [his] hand and was brandishing it, and pointed it at me." (Statement of Officer Hanneman, at 2). Officer Hanneman states:

---

[8] While other officers' written statements included an express disclaimer that they had not viewed their body-worn camera videos before writing their statements, Officer Hanneman's written statement did not include such a disclaimer. Accordingly, it is unclear whether Officer Hanneman had viewed his or other body-worn camera video before completing his written statement.

> In this moment, I feared for my life and the lives of my teammates. I was convinced that the individual was going to fire their handgun and that I would suffer great bodily harm or death. I felt in this moment that if I did not use deadly force myself, I would likely be killed. There was no opportunity for me to reposition myself or retreat. There was no way for me to de-escalate this situation. The threat to my life and the lives of my teammates was imminent and terrifying.

(Statement of Officer Hanneman, at 2). Officer Hanneman writes that he pointed his handgun out in front of him and as he saw Mr. Locke rise with the handgun and "recognized" a threat to his life, he "pulled the trigger three times" then "watched as the individual quickly moved to his left and away from the couch and ottoman." (Statement of Officer Hanneman, at 2). Officer Hanneman states that he saw Mr. Locke continue moving on the floor and that he jumped on Mr. Locke's back, tackling him to the floor so that Mr. Locke was on his stomach. (Statement of Officer Hanneman, at 2). While on the ground, Officer Hanneman saw the handgun on the floor and held Mr. Locke down until other officers moved the handgun away, after which he sat up and helped secure Mr. Locke's hands behind his back. (Statement of Officer Hanneman, at 2). Officer Hanneman then asked to leave the room, and went with an escort officer – first, Sergeant Andersen, then Sergeant Lepinski. (Statement of Officer Hanneman, at 3). Officer Hanneman notes that at some point his body-worn camera deactivated, and that he believed that happened during the struggle. (Statement of Officer Hanneman, at 3).

Officer Hanneman was equipped with a body-worn camera that was on and running during the entry to apartment 701. It should be noted that Officer Hanneman's body-worn camera appears, from the video, to be on his chest or torso. Officer Hanneman's body-worn camera video depicts the following:

Officer Hanneman is standing in the hallway outside apartment 701 behind another officer, and the sound of keys being turned is audible. (BWC of Officer Hanneman, at 06:48:03). The apartment door opens, and officers begin entering the apartment, yelling "police, search warrant." (BWC of Officer Hanneman, at 06:48:05-07). Officer Hanneman is the third officer to enter and moves into the apartment's entry hallway. (BWC of Officer Hanneman, at 06:48:07-08). An officer can be heard yelling "hands, hands." (BWC of Officer Hanneman, at 06:48:08). Officer Hanneman then begins yelling "hands," while raising his duty firearm in his right hand. (BWC of Officer Hanneman, at 06:48:09). Officer Hanneman continues saying "hands, hands" as his left hand also rises to support his right hand and duty firearm. (BWC of Officer Hanneman, at 06:48:09-10). During this, Officer Hanneman continues moving forward into the living room and, at the end of the entry hallway, moves to the right. (BWC of Officer Hanneman, at 06:48:09-11). As he does so, the blanket that Mr. Locke is under can be seen in the corner of the video rising and then falling back behind the couch. (BWC of Officer Hanneman, at 06:48:09-11). Officer Hanneman then walks forward, during which time some, but not all, of Mr. Locke's movements under the blanket can still be seen in the corner of the video frame. (BWC of Officer Hanneman, 06:48:11-12). Officer Hanneman turns his body slightly and points his duty firearm more directly at Mr. Locke, who was still under the blanket. (BWC of Officer Hanneman, at 06:48:12). Another officer can be heard yelling "get on the fucking ground" as Officer Hanneman walks forward and turns towards Mr. Locke. (BWC of Officer Hanneman, at 06:48:11-12). Officer Hanneman turns

towards his left, keeping his duty firearm aimed at Mr. Locke. (BWC of Officer Hanneman, at 06:48:12-13).

As Officer Hanneman turns, Mr. Locke's hair is visibly protruding from under the blanket, but any other view of him is obscured by Officer Hanneman's firearm. (BWC of Officer Hanneman, at 06:48:13). Officer Hanneman quickly states, "Show me your hands," as he brings his left hand back to support his firearm. (BWC of Officer Hanneman, at 06:48:13). Within the same second, a single gunshot is heard, presumably fired by Officer Hanneman. (BWC of Officer Hanneman, at 06:48:13). Two more gunshots follow in quick succession and Officer Hanneman's firearm is seen recoiling from each shot. (BWC of Officer Hanneman, at 06:48:13-14). Officer Hanneman then says, "He's got a gun." (BWC of Officer Hanneman, at 06:48:14-15). Officer Hanneman walks forward and leans down, and underneath him Mr. Locke's hair can be seen on the video. (BWC of Officer Hanneman, at 06:48:15-17). Officer Hanneman then appears to lay down on or have his torso fully up against Mr. Locke. The video goes to nothing but a dark screen after Officer Hanneman leans down further. (BWC of Officer Hanneman, at 06:48:17-18). Audible commands of "drop the fucking gun, drop the gun" can be heard, but it is unclear which officers are giving those commands. (BWC of Officer Hanneman, at 06:48:18-20). Officer Hanneman's body-worn camera video then cuts out at 06:48:21.

4) <u>Officer Aaron Pearson</u>

Officer Pearson unlocked apartment 701, pushed the door open, and backed away to allow other officers to enter the apartment first. (Statement of Officer Pearson, at 1). In his written statement, Officer Pearson notes that he yelled "police, search warrant" two times after pushing the apartment door open. (Statement of Officer Pearson, at 1). He was the fourth member of SWAT Team 1280 to enter apartment 701, entering behind Officer Hanneman. (BWC of Officer Pearson, at BWC of Officer Pearson, at 06:48:05-07).

Officer Pearson submitted a written statement in which he reports the following.

Officer Pearson states that, as he walked through the doorway, he could see a couch in the living room and a lighter-colored blanket "aggressively flailing up and down as if someone was underneath it moving around." (Statement of Officer Pearson, at 1). Officer Pearson heard other officers yelling commands of "hands, hands" as he approached the couch but did not see any hands being shown by the male, who was later identified as Mr. Locke. (Statement of Officer Pearson, at 1). Officer Pearson then writes that as he got to the back of the couch, he saw Mr. Locke's head "popping out of one end of the blanket," but that the rest of his body remained covered by the blanket. (Statement of Officer Pearson, at 1). Mr. Locke's head was turned such that it was looking to Officer Pearson's right, in the direction of other officers. (Statement of Officer Pearson, at 1). At the same time, Officer Pearson saw a handgun that Mr. Locke had in his hand start to be raised, "aiming" towards the officers to Officer Pearson's right. (Statement of Officer Pearson, at 1). Officer Pearson writes that he "perceived this as a threat that would cause death or great bodily harm" and that he "was, at this point, in fear for" his and his partner's lives. (Statement of Officer Pearson, at 1). Officer Pearson further writes that as he "was processing this, [he] began aiming more directly at [Mr. Locke] and was about to" shoot his duty firearm, when he heard a gunshot. (Statement of Officer Pearson, at 1). Officer Pearson states that he heard several shots and decided not to shoot because, after reassessing, he saw Mr. Locke go to the ground and that he perceived that "the rounds that were fired were effective in stopping the threat." (Statement of Officer Pearson, at 1). Officer Pearson saw that Mr. Locke was still mostly under the blanket and Officer

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

Pearson recalls saying "something about a gun," though he could not recall his exact words. (Statement of Officer Pearson, at 1).

Officer Pearson kept his gun aimed at Mr. Locke until other officers could get to him, then moved around the couch to assist. (Statement of Officer Pearson, at 1-2). As he got closer, Officer Pearson saw a handgun near Mr. Locke's head. (Statement of Officer Pearson, at 2). Officer Pearson pushed that handgun away and confirmed that a second handgun that he could see belonged to another officer, before holstering his own firearm. (Statement of Officer Pearson, at 2). Officer Pearson stated that he told another officer to release Mr. Locke, then uncovered the blanket to get Mr. Locke's arms out, which he placed in flex-cuffs. (Statement of Officer Pearson, at 2). Officer Pearson then called for a medic and began looking for injuries to Mr. Locke. (Statement of Officer Pearson, at 2).

Officer Pearson was equipped with a body-worn camera that was on and running during the entry to apartment 701. It should be noted that Officer Pearson's body-worn camera appears, from the video, to be on his chest or torso. Officer Pearson's body-worn camera video depicts the following:

Officer Pearson puts a key into the deadbolt lock on apartment 701's door and turns the key, unlocking the door. (BWC of Officer Pearson, at 06:47:57-06:48:00). Officer Pearson takes a step back and, with an outstretched arm, turns the apartment door's handle and pushes the door open. (BWC of Officer Pearson, at 06:47:00-02). Officer Pearson then steps back, as Sergeant Sysaath enters the apartment unit, followed by Sergeant Carlson, then Officer Hanneman. (BWC of Officer Pearson, at 06:47:02-05). As the other officers are entering, there are yells of "police, search warrant," but from Officer Pearson's body-worn camera, it is difficult to tell who specifically is yelling. (BWC of Officer Pearson, at 06:47:02-05). Officer Pearson puts his hand on the apartment door to keep it open and enters the apartment. (BWC of Officer Pearson, at 06:48:05-06). As he does so, he is behind Officer Hanneman walking into the apartment's entry hallway, and Sergeant Sysaath can be seen in the kitchen on the body-worn camera video. (BWC of Officer Pearson, at 06:48:06-07). Officer Pearson continues down the entry hallway, pushing Officer Hanneman forward and to the right as he approaches the couch in the living room. (BWC of Officer Pearson, at 06:48:07-08). Officer Pearson raises his duty firearm in his left hand around 06:48:08.

Officer Pearson continues forward, towards the couch, and as he approaches the back of the couch, a tan blanket can be seen over the top of the couch. (BWC of Officer Pearson, at 06:48:08-09). Officer Hanneman is to the right of Officer Pearson during the approach. (BWC of Officer Pearson, at 06:48:09). The blanket is moving. (BWC of Officer Pearson, at 06:48:08-09). Mr. Locke appears to rise slightly and move towards the windows – away from the back of the couch – while still under the blanket. (BWC of Officer Pearson, at 06:48:09). Mr. Locke's hair and part of the side of his face appear to be visible from Officer Pearson's position. (BWC of Officer Pearson, at 06:48:09). Officer Hanneman is still to Officer Pearson's right, continuing to move around to the front of the couch. (BWC of Officer Person, at 06:48:09). As Officer Pearson approaches the couch, various officers can be heard yelling assorted commands, such as "get on the fucking ground," "hands, hands, hands," and "get on the ground," among others. (BWC of Officer Pearson, at 06:48:06-10). It is worth noting, that the back of the couch is illuminated by what appears to be the flashlight mounted to Officer Hanneman's duty firearm, during the approach. (BWC of Officer Pearson, at 06:48:09). As Officer Hanneman moves around the couch, the light travels with him and appears to shine towards the opening of the blanket from which Mr. Locke's hair can be seen protruding. (BWC of Officer Pearson, at 06:48:09-10).

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

As the officers continue to approach, a firearm becomes visible from under Mr. Locke's blanket, pointing to Officer Pearson's right. (BWC of Officer Pearson, at 06:48:10). Mr. Locke appears to be holding the firearm in his right hand, with his right index finger along the slide. (BWC of Officer Pearson, at 06:48:10). The firearm is pointed in Officer Hanneman's general direction, but Officer Hanneman is not yet all the way around the couch and it is unclear whether he is directly in front of the firearm. (BWC of Officer Pearson, at 06:48:10). Officer Hanneman is holding his duty firearm in his right hand with the muzzle and light pointed at Mr. Locke, illuminating Mr. Locke's firearm, and Officer Hanneman's left hand appears to be on the top of the couch as Officer Hanneman rounds the corner of the couch. (BWC of Officer Pearson, at 06:48:10). As Officer Hanneman continues around the couch and gets closer to Mr. Locke, within the same second, Mr. Locke's firearm appears to move downwards, angling slightly towards the ground from its previous position of pointing straight out to the side, roughly parallel to the ground. (BWC of Officer Pearson, at 06:48:10). The officers get closer and, still within the same second, Mr. Locke's firearm continues to angle further downwards, now appearing to be around 45-degrees lower from where it initially was and around 45-degrees above the ground. (BWC of Officer Pearson, at 06:48:10). At this point, a light is seen shining on Mr. Locke's face area and his face is not visible, but Mr. Locke's hair and firearm are visible, and Mr. Locke's right index finger is visible along the slide of the firearm from Officer Pearson's body-worn camera video.[9] (BWC of Officer Pearson, at 06:48:10). A moment later, again within the same second, the light that was shining on Mr. Locke turns off.[10] (BWC of Officer Pearson, at 06:48:10). Without the light, it is more difficult to see details, but Mr. Locke's hair and face appear to be visible – though not clear – and part of the firearm can still be seen, though the angle is not clearly visible. (BWC of Officer Pearson, at 06:48:10). An officer is heard saying "show me your hands," though it is unclear from this video which officer says this command. (BWC of Officer Pearson, at 06:48:10).

Officer Pearson's duty firearm continues tracking Mr. Locke as Mr. Locke moves further off the couch, falling between the couch and an ottoman. (BWC of Officer Pearson, at 06:48:10-11). Officer Hanneman's firearm and part of Officer Hanneman's leg can be seen at the edge of Officer Pearson's video, but the rest of Officer Hanneman is not visible. From the position of Mr. Locke's firearm and Officer Hanneman's leg, it appears that Officer Hanneman is now past the end of the couch and in front of Mr. Locke. (BWC of Officer Pearson, at 06:48:11). Mr. Locke's hair and face still appear to be visible – though not clear in the dark – and the slide of the firearm can still be seen. (BWC of Officer Pearson, at 06:48:11). Though the angle of the firearm is not entirely clear, from the outline of Mr. Locke's finger it appears to have moved slightly back up, higher than 45-degrees and closer to parallel, and is pointed in the general direction of what appears to be Officer Hanneman's knee. (BWC of Officer Pearson, at 06:48:11). Officer Pearson begins moving his firearm forward and slightly to the right, and a gunshot is heard. (BWC of Officer Pearson, at 06:48:11).

At the time of the first gunshot, Officer Pearson is still holding the firearm in only his left hand and his right hand appears to have started moving upwards simultaneous to the gunshot. (BWC of Officer Pearson, at 06:48:11). Immediately after the first gunshot, Officer Pearson's right hand quickly snaps up to support his left hand and his duty firearm. (BWC of Officer Pearson, at

---

[9] Mr. Locke's left hand is not visible at any point before Officer Hanneman shoots him.
[10] Through additional investigation and review, it was determined that the flashlight mounted to Officer Hanneman's duty firearm was on a setting that required continuous pressure to stay lit. Thus, it appears that the moment the light turned off is when Officer Hanneman moved his finger from the flashlight to the trigger of his duty firearm.

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

06:48:11). Two more gunshots follow in quick succession, and Mr. Locke falls to the ground between the couch and the ottoman, with the blanket still over him. (BWC of Officer Pearson, at 06:48:11-12). At some point during this, another light comes in to shine on Mr. Locke. (BWC of Officer Pearson, at 06:48:11). Shortly after the gunshots, at least one officer says, "He's got a gun." (BWC of Officer Pearson, at 06:48:12-13).

Mr. Locke then appears to roll slightly over and rises slightly, perhaps on his hands and knees, with the top of his head visible from the top of the blanket. (BWC of Officer Pearson, at 06:48:13-15). Officer Hanneman moves forward and gets on top of Mr. Locke, as another officer says, "Shots fired." (BWC of Officer Pearson, at 06:48:14-15). A second officer approaches behind Officer Hanneman, slightly obscuring the view from this angle, and an officer can be heard saying, "Drop the fucking gun." (BWC of Officer Pearson, at 06:48:15-17). Officer Pearson's firearm is still in both hands, and he is pointing it towards the area where Officer Hanneman and Mr. Locke are. (BWC of Officer Pearson, at 06:48:17). An officer is heard saying, "he's got another one," and two more officers move towards Officer Hanneman and Mr. Locke. (BWC of Officer Pearson, at 06:48:17-18). Officer Pearson moves around the couch, towards the group and where Mr. Locke is on the ground and leans down. (BWC of Officer Pearson, at 06:48:18-25). Officer Pearson asks, "Is this yours?" to Officer Hanneman, presumably pointing at a firearm that is seen on the floor. (BWC of Officer Pearson, at 06:48:25-28). Officer Hanneman says, "No, that's his. He had that and he pointed it at me," to which Officer Pearson responds, "Yup, I saw it, I saw it, I saw it." (BWC of Officer Pearson, at 06:48:28-33). Officer Pearson tells another officer to release and directs officers to get Mr. Locke's arm out. (BWC of Officer Pearson, at 06:48:35-41). The officers pull off the blanket and place Mr. Locke's hands behind his back. (BWC of Officer Pearson, at 06:48:41-55). Officer Pearson then asks for cuffs. (BWC of Officer Pearson, at 06:48:55-57). Another officer hands Officer Pearson a set of flex cuffs, and Officer Pearson says, "Hanne, good job, bud." (BWC of Officer Pearson, at 06:48:57-06:49:00). Officer Pearson and other officers then secure Mr. Locke's hands in flex cuffs, while another officer is heard in the background saying they will "get started on medical stuff right now." (BWC of Officer Pearson, at 06:49:00-18). Officer Pearson says to start medical and turns back to tell other officers to get Officer Seraphine up here. (BWC of Officer Pearson, at 06:49:18-24). The officers then move Mr. Locke's t-shirt, and Officer Pearson requests a chest seal. (BWC of Officer Pearson, at 06:49:24-36). Officer Pearson then stands up and walks away from Mr. Locke. (BWC of Officer Pearson, at 06:49:36-38). Officer Pearson confirms with the other officers that the apartment is clear, and things are handled, and exits apartment 701. (BWC of Officer Pearson, at 06:49:38-06:50:00).

5) Officer Dominic Manelli

Officer Manelli entered apartment 701 behind Officer Pearson. (Statement of Officer Manelli, at 1; BWC of Officer Manelli, at 06:46:06-07; BWC of Officer Hickey, at 06:48:08).

Officer Manelli submitted a written statement in which he reports the following.

Officer Manelli writes that he yelled, "police, search warrant" as he entered the apartment and that he repeated those statements once inside. (Statement of Officer Manelli, at 1). Officer Manelli states that when he entered the apartment, he saw a person on the couch, later identified as Mr. Locke, who was moving under a tan blanket, but that his view of Mr. Locke was blocked by the back of the couch. (Statement of Officer Manelli, at 1). Officer Manelli then turned to search a closet on the left side of the entrance and, while he was searching inside the closet, he heard an officer yell "gun," so he turned away from the closet and walked towards the couch. (Statement of

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

Officer Manelli, at 1). Officer Manelli further states that as he began walking towards the couch, he heard gunshots and saw muzzle flashes. (Statement of Officer Manelli, at 1). Officer Manelli was then redirected by a supervisor to continue searching the apartment and entered a bathroom and bedroom, where he assisted Officer Hickey by providing cover while Officer Hickey detained the male and female found in the bedroom. (Statement of Officer Manelli, at 1).

Officer Manelli was equipped with a body-worn camera that was on and running during the entry to apartment 701. It should be noted that Officer Manelli's body-worn camera appears, from the video, to be on his chest or torso. Officer Manelli's body-worn camera video depicts the following:

Officer Manelli enters apartment 701 behind Officer Pearson, and yells, "police, search warrant" twice as he enters. (BWC of Officer Manelli, at 06:48:06-08). Officer Manelli opens the door to, and looks inside of, a closet on the left side of the entry hallway immediately after entering the apartment unit. (BWC of Officer Manelli, at 06:48:09-10). From Officer Manelli's body-worn camera video, some audible shouts of "get on the ground" and "hands" can be heard, but it is unclear who is saying what, or why. (BWC of Officer Manelli, at 06:48:08-11). Then, one gunshot is heard, followed by two more in rapid succession. (BWC of Officer Manelli, at 06:48:11-13). Officer Manelli turns and walks back down the entry hallway, during which an officer is heard saying, "Gun." (BWC of Officer Manelli, at 06:48:13). Shortly after, an officer says, "shots fired," and officers are converging in the living room near the windows. (BWC of Officer Manelli, at 06:48:13-17). An officer is heard yelling, "Drop the fucking gun." (BWC of Officer Manelli, at 06:48:17-18). Officer Manelli turns to look inside of another closet. (BWC of Officer Manelli, at 06:48:18-20). Officer Manelli then walks back up the entry hallway and other officers are visible on the video amassed in the living room, with someone yelling "drop the gun" and another yelling "hands." (BWC of Officer Manelli, at 06:48:20-22). Officer Manelli enters the bedroom on the left side of the living room, where he finds another officer standing near two people who are seated on the ground. (BWC of Officer Manelli, at 06:48:22-25). Another officer directs Officer Manelli to watch a door, and Officer Manelli turns and opens a bathroom on his left side. (BWC of Officer Manelli, at 06:48:25-27). Officer Manelli yells, "police, search warrant," as he looks inside of the bathroom. (BWC of Officer Manelli, at 06:48:27-28). Officer Manelli then enters the bathroom, looks around and in the shower, then backs out of the bathroom. (BWC of Officer Manelli, at 06:48:28-40). Officer Manelli then walks over to another officer who says he will be cuffing the people in the room, and Officer Manelli stands by. (BWC of Officer Manelli, at 06:48:40-47).

6) Officer Conan Hickey

Officer Hickey submitted a written statement in which he reports the following.

Officer Hickey was assigned to carry a prying tool to assist in opening the apartment unit doors, but another officer was able to unlock the door to apartment 701. (Statement of Officer Hickey, at 1). Officer Hickey writes that, once the door was opened, he announced several times that they were police executing a search warrant. (Statement of Officer Hickey, at 1). Officer Hickey entered apartment 701 behind Officer Manelli. (BWC of Officer Hickey, at 06:48:08). Officer Hickey writes that as he approached the living room, he could see other officers approaching a couch and heard the other officers addressing someone on the couch. (Statement of Officer Hickey, at 1). Officer Hickey then scanned the room to see where he would have to go next and, as he did so, heard several loud bangs from near the couch, after which he heard someone yell "gun" several times. (Statement of Officer Hickey, at 1). Officer Hickey turned to the closed bedroom door to

the left of the couch, and entered that room with Sergeant Carlson, where he helped detain the female and male found inside that room. (Statement of Officer Hickey, at 1).

Officer Hickey was equipped with a body-worn camera that was on and running during the entry to apartment 701. It should be noted that Officer Hickey's body-worn camera appears, from the video, to be on his chest or torso. Officer Hickey's body-worn camera video depicts the following:

Officer Hickey is standing in the hallway outside apartment 701 holding a pry bar. (BWC of Officer Hickey, at 06:48:03-04). The apartment unit door is heard opening, followed by yells of, "police, search warrant." (BWC of Officer Hickey, at 06:48:04-05). Officer Hickey sets down the pry bar and begins walking towards the apartment unit. (BWC of Officer Hickey, at 06:48:05-06). As other officers enter the apartment unit, repeated yells of "police, search warrant," can be heard. (BWC of Officer Hickey, at 06:48:04-08). Officer Hickey enters the apartment unit behind Officer Manelli. (BWC of Officer Hickey, at 06:48:08-09). As Officer Hickey enters, additional statements by officers, such as "hands, hands," and "get on the ground" can be heard. (BWC of Officer Hickey, at 06:48:09-11). These shouts of "hands" and "get on the ground" or "get on the fucking ground" continue as Officer Hickey makes his way down the entry hallway. (BWC of Officer Hickey, 06:48:11-12).

From Officer Hickey's body-worn camera video, Mr. Locke is not visible, but Sergeant Carlson can be seen on the far left of the frame, Officer Pearson at the back of the couch, Officer Hanneman next to or just in front of the couch with his firearm pointed using both hands, and Sergeant Sysaath to the right, having just come out of the kitchen holding a rifle. (BW of Officer Hickey, at 06:48:11-12).

Officer Hickey continues moving forward, and Officer Hanneman fires one shot, followed by two more in rapid succession while backing up towards the back of the couch. (BWC of Officer Hickey, at 06:48:13-14). As Officer Hickey approaches the couch, the ottoman in front of the couch is seen sliding to the right and the top of Mr. Locke's head comes into view over the top of the couch. (BWC of Officer Hickey, at 06:48:14). Mr. Locke is on the ground and appears to be starting to get up and moving towards the window while Officer Hanneman moves forward after him. (BWC of Officer Hickey, at 06:48:14-16). Officer Hanneman grabs Mr. Locke and goes down to his knee, as another officer yells "shots fired." (BWC of Officer Hickey, at 06:48:16-17). Officer Hickey then stands next to Sergeant Carlson by a door on the left side of the living room, and says "I'm with you," as the door is opened. (BWC of Officer Hickey, at 06:48:18). In the background, another officer can be heard yelling "Drop the fucking gun." (BWC of Officer Hickey, at 06:48:18-19). Officer Hickey enters the bedroom behind Sergeant Carlson and proceeds to the corner of the room where a man is sitting on the floor with his hands up, and Sergeant Carlson pulls a blanket off a woman who also has her hands up. (BWC of Officer Hickey, at 06:48:18-28). Officer Hickey orders the man and woman onto their stomachs and to put their hands behind their backs. (BWC of Officer Hickey, at 06:48:28-34). Officer Hickey then stands over them, tells them not to move, and to keep their hands behind their backs, before ultimately handcuffing them. (BWC of Officer Hickey, at 06:48:24-57).

7) Other SWAT Team 1280 Officers

Officer Nathan Sundberg, Officer Ryan Carrero, and Sergeant John Biederman were other members of SWAT Team 1280 who entered apartment 701. However, these officers reported entering simultaneous to or after the gunshots and did not describe seeing anything in the moments

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

preceding the gunshots. Their body-worn camera videos also do not depict any of the critical moments of the events that occurred before or during the gunshots. Thus, a detailed summary of their statements and body-worn camera video is not being included, as they are not central to the legal analysis for the issues under consideration by the State.

8) <u>Civilian Accounts</u>

During the investigation, the BCA interviewed the two civilians, Tatyana Henderson and Marlon Speed, who were found and detained in the bedroom of apartment 701 during the execution of the search warrant. The following is a summary of their statements:

    *a.  Tatyana Henderson*

On February 2, 2022, Ms. Henderson was living in apartment 701. She stated that she was inside the apartment bedroom with Marlon Speed, and that Mr. Speed's cousin, Mr. Locke, was sleeping on the couch in the living room. (Henderson Interview Tr., at 2, 4). Mr. Locke had been staying with Ms. Henderson and Mr. Speed at the apartment for a few nights. (Henderson Interview Tr., at 3). Ms. Henderson stated that she did not really know what was going on and that "they just came in my house . . . they shot somebody and then they like came in the room and then we were already on the ground. Cuz I just heard like yelling and stuff." (Henderson Interview Tr., at 2). To her, "it sounded like somebody was breaking in," which caused her and Mr. Speed to wake up. (Henderson Interview Tr., at 5). She "heard . . . people . . . walking in. And . . . I don't know what they said. But I like heard something." (Henderson Interview Tr., at 5). Ms. Henderson recalled hearing yelling and "just thought somebody like ran into my apartment or something," and then she heard multiple gunshots. (Henderson Interview Tr., at 4, 5). She and Mr. Speed got on the ground and the next thing she saw was officers running into her bedroom. (Henderson Interview Tr., at 4, 5). Ms. Henderson stated more than once that she was "literally just asleep and then we just heard people like just bust in," and that it seemed random which is why she thought people were breaking into their apartment. (Henderson Interview Tr., at 5, 9).

    *b.  Marlon Speed*

Mr. Speed was staying at apartment 701 on February 2, 2022. (Speed Interview Tr., at 2). On the morning of February 2, 2022, when the Minneapolis Police executed the search warrant, Mr. Speed stated that he "was asleep . . . knocked the fuck out" in the bedroom. (Speed Interview Tr., at 2). Mr. Locke was asleep on the couch in the living room. (Speed Interview Tr., at 2). Mr. Speed heard a noise in his sleep and "sat up a little bit," then "next thing" he knew there was a gunshot. (Speed Interview Tr., at 2). He stated that he thought he was hearing things; he heard the door open but knew he was asleep, so he thought he was just hearing things, but he woke up and then heard the gunshots. (Speed Interview Tr., at 2). Mr. Speed recalled hearing a boom, then gunshots, then announcement of "police," in that order. (Speed Interview Tr., at 2-3, 5). From what Mr. Speed heard, the police "just walked in, shoot their fuckin guns," and announced that they were police afterwards. (Speed Interview Tr., at 5, 7).

<u>*Medical Response and Assessment*</u>

1. <u>On-Scene and First Responder Medical Care</u>

After placing Mr. Locke in flex cuffs, Officer Pearson called for the SWAT Team medics and Sergeant Biederman radioed out a similar request. (Statement of Officer Pearson, at 2; Statement

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

of Sergeant John Biederman, at 1). Officers also lifted Mr. Locke's t-shirt to look for injuries and saw gunshot wounds on Mr. Locke's side and chest. (Statement of Officer Pearson, at 2; Statement of Officer Sundberg, at 1; Statement of Officer Ryan Carrero, at 1). Officer Pearson informed the other officers that they may need a chest seal. (Statement of Officer Pearson, at 2). Officers Seraphine and Martin, the team medics, entered apartment 701 and approached Mr. Locke to begin medical care. (Statement of Officer Zachary Seraphine, at 1; Statement of Officer William Martin, at 1; Statement of Sergeant Jason Andersen, at 1). Officer Seraphine found a gunshot wound on the right side of Mr. Locke's chest and applied a chest seal over the wound. (Statement of Officer Seraphine, at 1; Statement of Officer Martin, at 1-2). Officer Seraphine was unable to find an exit wound for this injury. (Statement of Officer Seraphine, at 1). While Officer Seraphine was working on the chest seal, Officer Martin checked Mr. Locke for a pulse and found a "faint" pulse. (Statement of Officer Martin, at 2). Officer Seraphine also checked for a pulse on Mr. Locke's carotid artery but did not find one. (Statement of Officer Seraphine, at 1). Officer Martin also re-checked Mr. Locke for a pulse and could no longer feel one. (Statement of Officer Martin, at 2). Officer Martin then began chest compressions and CPR. (Statement of Officer Martin, at 2)

Shortly after SWAT Team 1280 had moved to the 7th floor, and as Officers Seraphine and Martin were called to apartment 701, the paramedics also received a call that there had been shots fired.[11] (Beager Interview Tr., at 2; Christian Interview Tr., at 2; *see also* Statement of Sgt. Biederman, at 1). The paramedics responded by grabbing a stretcher and a first aid bag and entering the apartment lobby. (Beager Interview Tr., at 2; Christian Interview Tr., at 2). An issue with the lobby elevators prevented paramedics from getting up to the 7th floor, so the police officers brought Mr. Locke down to the main floor lobby where the paramedics were waiting. (Beager Interview Tr., at 2-3; Christian Interview Tr., at 2). The officers used a "litter" (a fabric stretcher) to transport Mr. Locke down to the main floor lobby. (Statement of Officer Sundberg, at 2; Statement of Sergeant Carlson, at 3; Statement of Officer Dauble, at 1). Medical attempts, including CPR, continued while in the elevator, and officers also found another gunshot wound near Mr. Locke's left collar bone. (Statement of Officer Seraphine, at 1; Statement of Officer Martin, at 2).

Once the officers arrived on the main floor with Mr. Locke, the paramedics moved Mr. Locke onto the stretcher and brought him to the ambulance. (Beager Interview Tr., at 2). During this time, Minneapolis Police Officers continued CPR on Mr. Locke until was placed into the ambulance. (Beager Interview Tr., at 2; Christian Interview Tr., at 2; Statement of Officer Martin, at 2).

Once Mr. Locke was in the ambulance, Minneapolis Firefighters took over CPR, continued chest compressions, and provided oxygen until they got to Hennepin County Medical Center. (Fairall Interview Tr., at 2; Brunette Interview Tr., at 2). The paramedics reported that it took about two or three minutes to get to Hennepin County Medical Center. (Brunette Interview Tr., at 3; Christian Interview Tr., at 3). As the first responders brought Mr. Locke into the hospital, a doctor asked the first responders to pause CPR to check for a pulse, at which time the paramedics confirmed that Mr. Locke did not have a pulse and had not been breathing since the paramedics initially assessed

---

[11] As noted above, Hennepin Emergency Medical Services Paramedics attended the operational briefing before the SWAT team executed the search warrants and, while the search warrants were being executed, were positioned outside of the apartment complex in case of injury. (Statement of Sgt. Sysaath, at 2; Statement of Sgt. Troy Carlson, at 1; Beager Interview Tr., at 2; Christian Interview Tr., at 2). Also as noted, this is a common practice for "high-risk warrant situation[s]." (Statement of Sgt. Sysaath, at 2; Statement of Sgt. Troy Carlson, at 1; Beager Interview Tr., at 2). The paramedics had Minneapolis Police Department radio to hear whether they needed to respond. (Beager Interview Tr., at 2).

him. (Fairall Interview Tr., at 2; Brunette Interview Tr., at 2). After learning this, the stabilization room doctor ordered that CPR be halted and pronounced Mr. Locke dead at 7:01 a.m. (Fairall Interview Tr., at 2; Brunette Interview Tr., at 2; Hennepin County Medical Examiner's Office, case 22-00941, Autopsy Report, at 1).

The body-worn camera video of several officers was consistent with and confirmed the information about medical efforts that was noted in the officers' written statements and the other first responder interviews. (*See* BWC of Officer Pearson; BWC of Officer Seraphine; BWC of Officer Martin; BWC of Sgt. Biederman).

    2.  Autopsy

Dr. Andrew Baker of the Hennepin County Medical Examiner's Office conducted the autopsy of Mr. Locke, and Dr. Owen Middleton reviewed and co-signed the report. (Autopsy Report, at 1, 3). Dr. Baker identified multiple gunshot wounds to Mr. Locke, including:

1) a gunshot wound to the face from a bullet entering through the upper lip and passing through mandibular teeth before exiting on the underside of the chin and resulting in a mandibular fracture;

2) a gunshot wound from a bullet entering the right upper chest and exiting on the left anterolateral neck base, causing a right clavicle fracture and extensive soft tissue hemorrhaging;

3) a gunshot wound from a bullet entering on the anterior left shoulder and passing through the left humeral head, resulting in a fracture, before stopping just under the skin surface of the posterolateral left shoulder;

4) a gunshot wound to the chest from a bullet entering the right chest and passing through the soft tissue of the right chest wall, a rib (causing a fracture), the upper lobe of the right lung, the pericardium and right atrium of the heart, aortic and pulmonary roots, the upper lobe of the left lung, and other soft tissue; and

5) 5) a graze gunshot wound to the anterior right wrist. (Autopsy Report, at 1-3; *see also* Autopsy Report, at 6-8).[12]

Dr. Baker concluded that the immediate cause of Mr. Locke's death was "[m]ultiple gunshot wounds," and ruled the manner of death as a homicide. (Hennepin County Medical Examiner's Office, case 22-00941, Cause of Death Hierarchy, at 1).

<u>*Factual Summary Based on the Evidence*</u>

The St. Paul Police Department was investigating a homicide from early January 2022, which involved the use of a firearm and a high-powered rifle round. Through its investigation, the St. Paul Police Department identified a set of suspects who had been seen on social media with assorted firearms and were suspected of being involved in other violent criminal behavior. The St. Paul Police Department had linked the suspects for that homicide to the Bolero Flats Apartments in Minneapolis, Minnesota. Amir Locke was not among the persons identified as suspects nor is

---

[12] Officer Hanneman fired three bullets into Mr. Locke's body and the medical examiner identified five gunshot wounds. This suggests that some of the bullets may have passed through Mr. Locke's body in one spot and re-entered at another.

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

there any evidence to suggest that he was a person of interest or that he had been identified by law enforcement during this investigation.

The St. Paul Police Department applied for and obtained standard "knock-and-announce" search warrants for three units to be searched in the Bolero Flats apartment complex, which were signed by a Hennepin County District Court judge. Because the apartment complex is in Minneapolis, the St. Paul Police Department requested the Minneapolis Police Department's assistance in executing the search warrants. Minneapolis Police Department SWAT Team leadership informed the St. Paul Police Department that they were willing to assist but only if the St. Paul Police Department obtained "unannounced entry" or "no-knock" search warrants. Investigators from the St. Paul Police Department then obtained approval from their command staff and applied for and obtained "no-knock" search warrants for the three apartment units to be searched in the Bolero Flats apartment complex.

On February 2, 2022, around 6:00 a.m., the Minneapolis Police Department SWAT Teams assigned to execute the search warrants at the apartment complex attended a briefing. Officers on the team were provided some background information and a briefing document by a St. Paul Police investigator, and Minneapolis SWAT Team leaders led a briefing on the operational and tactical plan. The officers were informed that they would be executing what was deemed a "high-risk" search warrant in an attempt to recover evidence related to the St. Paul homicide, including firearms, and that the suspects, who had been seen with firearms on social media and who were suspected to be associated with other violent crime, were known to stay at and associate with the apartment units and might be able to be arrested there. The officers also learned that they would be broken into two teams – 1280 and 1281 – to conduct the search warrants. Team 1280 would conduct the search warrant on apartment 1403 while Team 1281 conducted the search warrant on apartment 1402. After finishing with apartment 1403, Team 1280 would then move to apartment 701 to conduct the third and final search warrant. Team 1281 would join Team 1280 at apartment 701 after finishing with apartment 1402. After the briefing, the SWAT Teams went to the apartment complex to conduct the search warrants.

The SWAT Teams arrived at the apartment complex around 6:37 a.m. and at approximately 6:42 a.m., they conducted the search warrants on apartments 1402 and 1403, without incident. None of the homicide suspects were located in those apartments. SWAT Team 1280 then took the elevators to the 7th Floor to conduct the search warrant on apartment 701. Officer Aaron Pearson unlocked the door to apartment 701 and pushed the door open, then backed away. SWAT Team 1280 then entered the apartment in the following order: Sergeant John Sysaath, Sergeant Troy Carlson, Officer Mark Hanneman, Officer Aaron Pearson, Officer Dominic Manelli, Officer Conan Hickey, Officer Nathan Sundberg, Officer Ryan Carrero, and Sergeant John Biederman. Each officer announced, "police, search warrant" as they entered the apartment unit.

Sergeant Sysaath moved to the right, into the kitchen, almost immediately upon entering the apartment. The rest of the officers entered and moved straight forward, down an entry hallway into the living room. As the officers entered and moved into the living room, a person who was at least partially under a blanket – later identified as Amir Locke – looked up over the back of the couch at the officers before beginning to move around under the blanket. Lights were shining directly in Mr. Locke's face as he was looking in the officers' direction. The officers continued to yell commands such as "get on the ground," "let me see your hands," "hands, hands, hands," and "police, search warrant." These shouts were, at times, simultaneous and overlapping. The other

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

civilians present in the apartment described hearing the entry and stating that it sounded like someone was breaking into the apartment.

As the officers continued to enter the apartment, Mr. Locke moved around while under the blanket. The specific nature of his movements underneath the blanket is unknown. The officers stated that they interpreted this movement as noncompliance and as possibly reaching for a weapon. Sergeant Carlson moved quickly to the couch and kicked the back of it, after which Mr. Locke moved from the couch and stumbled or fell towards the windows at the far end of the living room, landing between the couch and an ottoman. Sergeant Carlson then turned to face a bedroom door on the left side of the living room. Officers Hanneman and Pearson continued entry into the living room, with Officer Hanneman moving to the right to get around the couch and Officer Pearson approaching from behind the couch. As those two officers got closer, Mr. Locke was on the ground, still covered by the blanket. While Officer Hanneman was moving around the couch, and Officer Pearson was standing behind it, Mr. Locke's hair and face can be seen from under the blanket, as can his right hand, which is holding a firearm pointed off to the right side of the room, in the general direction that Officer Hanneman had been moving towards.

When the firearm first became visible from Officer Pearson's position behind the couch, Mr. Locke's right index finger was visible along the slide of the gun and not on the trigger or trigger guard. In the next one second or less, Officer Pearson was standing behind the couch and Officer Hanneman continued moving around to the front-right side of the couch, directly in front of Mr. Locke and forward and to the right of Officer Pearson. Sergeant Sysaath was behind Officer Hanneman, coming out of the kitchen. Initially, the firearm in Mr. Locke's hand was parallel to the ground, then it appeared to drop down to about a 45-degree angle, before rising again slowly. This all happens within the timeframe of one second or less, as Officer Hanneman continued moving to the front of the couch. While the firearm appeared to move to angle down and then slightly back up within one second or less, Mr. Locke's right index finger does not appear to move off of the slide and his left hand is not visible. Also, during this one-second timeframe, a light from one of the officer's flashlights which had been shining in Mr. Locke's face went off. Officer Hanneman said, "show me your hands," and a split second later fired his duty firearm one time, followed by two more shots in rapid succession. The time elapsed between the firearm in Mr. Locke's hand becoming visible and Officer Hanneman firing the first shot at Mr. Locke was less than two seconds, with all three shots being made within three seconds from when the firearm first comes into view. After the shots are fired, an officer announced "gun" or "he's got a gun."

After being shot, Mr. Locke rolled slightly over and moved towards the windows. Officer Hanneman followed him and got on top of him, yelling to drop the gun, and other officers assisted Officer Hanneman. Ultimately, the officers detained Mr. Locke in flex cuffs, then cut the flex cuffs off to provide medical care. Two SWAT Team medics applied a chest seal and begin CPR but noted that Mr. Locke did not have a pulse by the time CPR began. When emergency medical services first responders are unable to get upstairs due to elevator issues, the officers transported Mr. Locke down to the ambulance, continuing CPR and other medical aid on the way down. Mr. Locke was then moved into the ambulance where paramedics and firefighters continue CPR and medical aid while Mr. Locke was transported to Hennepin County Medical Center. Upon Mr. Locke arriving at Hennepin County Medical Center, the doctor in the emergency room pronounced Mr. Locke dead. After conducting an autopsy, the Hennepin County Medical Examiner concluded that Mr. Locke's death was caused by multiple gunshot wounds and ruled the manner of death a homicide.

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

## Relevant Minneapolis Police Department Policies[13]

It must be noted at the outset that a local law enforcement agency's standards and policies do not equate to standards for determining whether a crime occurred. *See State v. Post*, 512 N.W.2d 99, 103 (Minn. 1994). And, as noted above, the Hennepin County Attorney's Office and the Minnesota Attorney General's Office, acting in partnership, are responsible for the limited task of assessing whether a crime occurred and can be charged and not for assessing whether any local law enforcement agency policies were violated. *See* Minn. Stat. § 388.051. Nevertheless, the agency's policy may be considered as circumstantial evidence of what knowledge was imparted upon officers in that local agency, and therefore is relevant to the limited extent of establishing what information reasonable officers in the local agency would know. As such, the review of this matter included a review of the Minneapolis Police Department's policies with relevant portions identified in this section.

### *Policy Chapter 9-300: Warrants*

Minneapolis Police Department Policy notes that, unless the court authorizes a nighttime search, search warrants may only be executed between 7:00 a.m. and 8:00 p.m. (Minneapolis Police Department, Policy 9-301). The policies also distinguish between types of announcements required for different types of search warrants. (Minneapolis Police Department, Policy 9-307). Under the policy in effect on February 2, 2022, "high-risk warrants" could involve judicially signed warrants authorizing immediate or "unannounced" entries, also known as "no-knock" entries, which allow officers "to enter the specified premises without first knocking and announcing their presence or purpose prior to entering." (Minneapolis Police Department, Policy 9-307). These types of warrants must include an explicit indication by the judge issuing the warrant that such an entry is permitted, based on the case details. (Minneapolis Police Department, Policy 9-307).

During the execution of an "unannounced" entry, officers are still required to identify themselves as "Police" and announce that they are there on a "search warrant" before crossing the threshold of the door into the premises. (Minneapolis Police Department, Policy 9-307). Officers must repeat these announcements "periodically throughout the search and at least one time when the officer has moved to an area where the previous announcement may not have been heard." (Minneapolis Police Department, Policy 9-307). The policy creates an exception, allowing a supervisor to authorize entry without any announcements "[i]n exceptional circumstances when giving announcements would create an imminent threat of physical harm to victims, officers, or the public." (Minneapolis Police Department, Policy 9-307).

SWAT teams are to be used for executing high-risk warrants and when an entry into a building or dwelling "is necessary to arrest a suspect(s) who is believed to be armed and/or dangerous." (Minneapolis Police Department, Policy 9-303). SWAT teams may also be used to assist outside agencies to serve search or arrest warrants. (Minneapolis Police Department, Policy 9-303). SWAT team supervisors will conduct a briefing with the officers on the team, and "[t]actical considerations for entering a dwelling and securing occupants is the responsibility of SWAT." (Minneapolis Police Department, Policy 9-303). Minneapolis Police Department's policies also guide officers executing warrants, including "unannounced" or "no-knock" entries, to "be mindful of any known or reasonably believed barriers or obstacles to cooperation such as perception

---

[13] Since this incident, the City of Minneapolis has announced changes to several of the policies discussed below. The policies as listed here are those that were in effect on February 2, 2022.

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

barriers, mental or emotional capacity, physical and language barriers, including whether the individual is known or believed to be deaf or hard of hearing." (Minneapolis Police Department, Policy 9-307).

### *Policy Chapter 5-300: Use of Force*

Officers are guided to appreciate that "[s]anctity of life and the protection of the public are the cornerstones of the MPD's use of force policy." (Minneapolis Police Department, Policy 5-301). The policy goes on to define various terms used throughout the policy, including "objectively reasonable force" which the policy defines as "[t]he amount and type of force that would be considered rational and logical to an 'objective' officer on the scene, supported by facts and circumstances known to an officer at the time force was used." (Minneapolis Police Department, Policy 5-301).

The policy also defines various types of behavior that persons may exhibit, including "passive resistance," which is defined as a lack of compliance but where the subject "is taking only minimal physical action to prevent an officer from placing the subject in custody and taking control," and "active resistance," which is defined as actions "intended to prevent an officer from placing the subject in custody and taking control but are not directed at harming the officer." (Minnesota Police Department, Policy 5-301). Officers are also given guidance on when a subject's actions may display intent to harm an officer, such as taking a fighting stance, striking, or "taking other actions which present an imminent threat of physical harm to the officer or another." (Minneapolis Police Department, Policy 5-301). The policy defines situations that include use of weapons as "aggravated aggressive resistance or aggravated assaults." (Minneapolis Police Department, Policy 5-301). The policies also define use of force generally and use of deadly force. (Minneapolis Police Department, Policy 5-301).

The Minneapolis Police Department's use-of-force policy further guides officers to comply with the federal and state constitutions and with Minnesota state statutes. (Minneapolis Police Department, Policy 5-302). The policy extends beyond constitutional and statutory guidance, and states that "the principle of Do No Harm provides a guiding light from which all decisions shall flow," recognizing that officers are "granted the extraordinary authority to use force when necessary to accomplish lawful ends." (Minneapolis Police Department, Policy 5-302). Officers are instructed to "only use the amount of force that is objectively reasonable." (Minneapolis Police Department, Policy 5-302). Beyond that, the policy states that officers "should use the lowest level of force necessary for safety and control" and may only use force that is consistent with department training. (Minneapolis Police Department, Policy 5-302). This policy also directs officers to "exercise special care when interacting with individuals with known physical, mental health, developmental, or intellectual disabilities as an individual's disability may affect the individual's ability to understand or comply with commands from officers." (Minneapolis Police Department, Policy 5-302).

Regarding the use of deadly force, Minneapolis Police Department's policy states verbatim the language of Minn. Stat. § 609.066. (Minneapolis Police Department, Policy 5-302). The policy also incorporates by reference Minn. Stat. § 626.8452, subd. 1a(3), and states that even in circumstances under which Minn. Stat. § 609.066 authorizes the use of deadly force, "officers shall first consider all reasonable alternatives including less lethal measures, before using deadly force." (Minneapolis Police Department, Policy 5-302). Additionally, "[w]here feasible, officers shall

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

identify themselves as law enforcement officers and warn of their intent to use deadly force." (Minneapolis Police Department, Policy 5-302).

The department policy also discusses how "[a] lack of reasonable or sound tactics can limit options available to officers, and unnecessarily place officers and the public at risk." (Minneapolis Police Department, Policy 5-302). As such, officers must "use reasonableness, sound tactics and available options during encounters to maximize the likelihood that they can safely control the situation." (Minneapolis Police Department, Policy 5-302). "Officers should consider their positioning and attempt to place themselves in the best tactical position possible, in order to maximize their ability to safely resolve a dangerous threat. The sanctity of life should be the guiding principle for officers during those situations and they should attempt to reduce the likelihood of a deadly force encounter as much as possible." (Minneapolis Police Department, Policy 5-302).

The policy also discusses "de-escalation," which it defines as attempts "to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources can be called upon to resolve the situation without the use of force or with a reduction in the force necessary." (Minneapolis Police Department, Policy 5-301). Such tactics include "[p]lacing barriers between an uncooperative subject and an officer" and "[m]inimizing risk from a potential threat using distance, cover or concealment." (Minneapolis Police Department, Policy 5-302). Under the policy, "[w]hen all of the reasonably known circumstances indicate that it is safe and feasible to do so, officers shall: attempt to slow down or stabilize the situation so that more time, options and resources may become available;" and "[c]onsider . . . whether a subject's lack of compliance is a deliberate attempt to resist or an inability to comply based on factors including, but not limited to, the subjects emotions and behavior." (Minneapolis Police Department, Policy 5-302). De-escalation techniques and alternatives to higher levels of force shall be used "whenever feasible and appropriate before resorting to force and to reduce the need for force." (Minneapolis Police Department, Policy 5-302). To minimize a need for force, officers should "[g]ive commands to be followed and afford the person a reasonable opportunity to comply" and [w]henever possible and when such delay will not compromise the safety of another or the officer . . . an officer shall allow an individual time and opportunity to comply with verbal commands before force is used." (Minneapolis Police Department, Policy 5-302).

## Criminal Law and Procedure: General Overview

In the criminal justice system, the prosecutor's primary role is to decide when a crime should be charged, who to charge with a crime, and what crime to charge them with. 8 Minn. Prac., Criminal Law & Procedure § 10:1 (4th ed.). One of the primary questions for a prosecutor to assess is whether a crime was committed and, if so, what crime. *Id.*

"A crime is generally defined as an act committed, or omitted, in violation of a public law forbidding or commanding it." 21 Am. Jur. 2d Criminal Law § 1. An act is considered a crime when it is classified as a crime by statute or common law. 21 Am. Jur. 2d Criminal Law § 3. In other words, when there is a statute or common law rule prohibiting a specific act and a person commits that act, that person has committed a crime. For the State to charge a person with a crime, "it must be shown that the [person] has committed some unlawful act or engaged in some prohibited course of conduct, together with a wrongful intent or mens rea." 21 Am. Jur. 2d Criminal Law § 4.

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

"A 'defense' is any set of identifiable conditions or circumstances that may prevent conviction for an offense." 21 Am. Jur. 2d Criminal Law § 176. A defense is typically used to negate, or raise reasonable doubt about, an element of the offense. *Id.* In contrast, a "legal excuse" exists when the person committed all of the elements of the crime, but "acted under extenuating circumstances that the law recognizes as excusing the wrongful conduct or requiring that conviction and punishment be withheld." *Id.* A legal justification is a "specific doctrine that negates . . . the wrongfulness of the act," while a legal excuse is a "specific doctrine that negates . . . the culpability of the actor." 2 Wharton's Criminal Law § 20:1 (16th ed.). "Legal excuses" or "legal justifications" are affirmative defenses to crimes. 21 Am. Jur. 2d Criminal Law § 177. "[A]n affirmative defense goes beyond the elements of the offense to prove facts which somehow remove the defendant from the statutory threat of criminal liability." *Id.* But, "[i]n general, justification as a defense focuses on the reasonableness of the actor's beliefs and the necessity of his acts. Deadly force is justifiable only if the actor 'reasonably believes that the other is about to inflict unlawful death or serious bodily harm upon him (and also that it is necessary to use deadly force to prevent it.'" *State v. Edwards*, 717 N.W.2d 405, 412 (Minn. 2006) (quoting 2 Wayne R. LaFave, *Substantive Criminal Law* § 10.4(b) (2d ed. 2003)). "If the actor's belief is reasonable, 'he may be mistaken in his belief and still have the defense.'" *Id.*

An affirmative defense must be recognized by the law for it to be presented or raised. 21 Am. Jur. 2d Criminal Law § 177. Here in Minnesota, the legislature has enacted Minn. Stat. § 609.066 provides peace officers with the authority to use deadly force under certain circumstances, which may exceed circumstances in which the general public would be so authorized.

"[F]orce which the actor uses with the purpose of causing, or which the actor should reasonably know creates a substantial risk of causing, death or great bodily harm" is considered deadly force. Minn. Stat. § 609.066, subd. 1. "The intentional discharge of a firearm . . . in the direction of another person" also constitutes deadly force. *Id.* Because, as will be explained below, Officer Hanneman intentionally shot his duty firearm directly at Mr. Locke, Officer Hanneman's conduct was a use of deadly force. Therefore, in the sections below we will also assess his conduct under the statutory defense provided in Minn. Stat. § 609.066.

The State must disprove at least one element of an affirmative defense beyond a reasonable doubt to convict the accused of a crime. *State v. Basting*, 572 N.W.2d 281, 286 (Minn. 1997); 21 Am. Jur. 2d Criminal Law § 177. As such, if any criminal charge is filed in this case, in addition to proving every element of the crime itself, the State would bear the burden of disproving beyond a reasonable doubt at least one element of the affirmative defense in Minn. Stat. § 609.066.

As an overarching principle and ethical obligation, "[a] prosecutor should not institute criminal charges not supported by probable cause, or in the absence of sufficient admissible evidence to support a conviction." 8 Minn. Prac., Criminal Law & Procedure § 10:4(P) (4th ed.); Minn. R. Prof. Conduct 3.8(a); ABA Criminal Justice Standards for the Prosecution Function 4-3.3(a).. Circumstances where the prosecutor should not file criminal charges include 1) when there is insufficient admissible evidence to prove every element of the offense beyond a reasonable doubt; and 2) when there is insufficient admissible evidence to disprove any element of an affirmative defense. It is with these principles in mind that the Hennepin County Attorney's Office and Minnesota Attorney General's Office have reviewed this matter.

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

## Legal Analysis

In reviewing this case, the prosecution team has assessed every type of possible homicide charge available under Minnesota law. The offenses and affirmative defenses analyzed below include those that could conceivably be applicable under Minnesota law and are addressed starting with the most applicable.

### *Second-Degree Murder*

1. Second-Degree Intentional Murder

A person commits a second-degree intentional murder when the person "causes the death of a human being with intent to effect the death of that person or another, but without premeditation." Minn. Stat. § 609.19, subd. 1(1).

The elements that the State must prove to establish a second-degree murder under this provision are: 1) the death of a person; 2) that the defendant caused the death of that person; 3) that the defendant acted with intent to kill or effect the death of that person; and 4) that the defendant's act occurred in Hennepin County. 10 Minn. Prac., Jury Instr. Guides—Criminal CRIMJIG 11.25 (6th ed.). The State would also be required, as an additional element of proving a crime, to disprove beyond a reasonable doubt at least one element of any affirmative defense to prevail at trial.

    *a. Second-Degree Intentional Murder Elements*

The third element – intent – requires the State to prove that the defendant "acted with the purpose of causing death, or believed the act would have that result." *Id. See also* Minn. Stat. § 609.02, subd. 9(4) (defining "with intent to" as meaning "that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result"). Direct evidence of intent is almost never available. *State v. Bouwman*, 328 N.W.2d 703, 705 (Minn. 1982). Instead, "[i]ntent is an inference drawn . . . from the totality of circumstances." *State v. Raymond*, 440 N.W.2d 425, 426 (Minn. 1989). In reaching a conclusion as to whether a defendant acted intentionally, "the jury may infer that a person intends the natural and probable consequences of his actions." *State v. Lundstrom*, 171 N.W.2d 718, 724-25 (Minn. 1969). A jury is not bound to accept a defendant's statement regarding his intentions if his acts demonstrate contrary intent. *Id.* Instead, a person's intent to kill can be inferred from the nature of the killing, *State v. Darris*, 648 N.W.2d 232, 236 (Minn. 2002), or from the manner of shooting, *State v. Boitnott*, 443 N.W.2d 527, 531 (Minn. 1989). *See State v. Bryant*, 281 N.W.2d 712, 714 (Minn. 1979) (finding sufficient evidence of intent to kill where the defendant fired a gun pointed at the victim three times, with the last two at close range); *State v. Chuon*, 596 N.W.2d 267, 271 (Minn. Ct. App. 1999) (finding sufficient evidence of intent to kill where the defendant fired a gun at the victim from a distance of six to eight feet, hitting the victim in the shoulder blade); *see also State v. Thompson*, 544 N.W.2d 8, 12, (Minn. 1996) (recognizing that intent to kill can be shown by a single gunshot fired at close range).

The facts of this case are such that there is sufficient evidence that would be admissible at trial to conclude that Officer Hanneman's conduct meets the statutory criteria and elements of second-degree intentional murder. Officer Hanneman fired three gunshots from his duty firearm into Amir Locke. Officer Hanneman did this while standing approximately three or four feet away from Mr. Locke. All three fired bullets entered Mr. Locke's body, passing through his face, chest, and shoulder. Mr. Locke died from the injuries that he sustained from the gunshots. While there is no

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

direct evidence that Officer Hanneman intended to kill Mr. Locke, such as a statement of intent, the circumstances present here are like those in the cases listed above such that a jury could conclude that Officer Hanneman intended to kill Mr. Locke. The body-worn camera video clearly shows Officer Hanneman standing with his duty firearm out, pointed at Mr. Locke, and that Officer Hanneman pulled the trigger three times – shooting one round initially, followed by two more rounds in rapid succession. A person intends the natural and probable consequences of his actions, and it is natural and probable that shooting a person three times at close range would result in that person's death. Thus, there is sufficient evidence to conclude that Officer Hanneman's conduct meets the statutory criteria and elements of second-degree intentional murder.

### b. Authorized Use of Deadly Force Defense

Having concluded that Officer Hanneman's conduct meets the statutory criteria and elements of second-degree intentional murder, we now turn to the affirmative defense of authorized used of deadly force under Minn. Stat. § 609.066. As stated above, to file a criminal charge, in addition to proving every element of second-degree intentional murder under Minn. Stat. § 609.19, subd. 1(1), the State must also possess sufficient admissible evidence to disprove beyond a reasonable doubt at least one element of the affirmative defense authorizing police officers to use deadly force as provided in Minn. Stat. § 609.066. *See Basting*, 572 N.W.2d at 286.

Under Minn. Stat. § 609.066, a peace officer is justified in using deadly force in the line of duty

> only if an objectively reasonable officer would believe, based on the totality of the circumstances known to the officer at the time and without the benefit of hindsight, that such force is necessary: (1) to protect the peace officer or another from death or great bodily harm, . . . or (2) to effect the arrest or capture, or prevent the escape, of a person whom the peace officer knows or has reasonable grounds to believe has committed or attempted to commit a felony and the officer reasonably believes that the person will cause death or great bodily harm to another person . . . unless immediately apprehended.

Minn. Stat. § 609.066, subd. 2(a). The statute further explains that, for deadly force by a peace officer to be justified under the first provision, there must be, at minimum, a threat of death or great bodily harm which: 1) "can be articulated with specificity;" 2) "is reasonably likely to occur absent action by the law enforcement officer;" and 3) "must be addressed through the use of deadly force without unreasonable delay." *Id.*[14]

The statute requires that the evaluation of the peace officer's decision to use deadly force be made "from the perspective of a reasonable officer in the same situation, based on the totality of the circumstances known to or perceived by the officer at the time, rather than with the benefit of hindsight." Minn. Stat. § 609.066, subd. 1a(3). Under the statute, the totality of the circumstances "shall" also "account for occasions when officers may be forced to make quick judgments about using deadly force." *Id.* These are relevant factors that the statute requires be considered in determining whether, under the totality of the circumstances, a police officer's use of deadly force is justified. This language in the statute adopts, to an extent, the legal standard proscribed by the

---

[14] This language omits the "by the officer" language that has been deemed unconstitutional. *See Minn. Chiefs of Police Assoc., et al. v. Governor Timothy Walz and State of Minnesota*, Amended Findings of Fact, Conclusions of Law, and Order on Declaratory and Injunctive Relief, Ramsey County District Court File No. 62-CV-21-3582 (Dec. 22, 2021).

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989) for assessing alleged civil rights violations.[15]

The legislature has made clear that its intent is that "peace officers use deadly force only when necessary in defense of human life or to prevent great bodily harm." Minn. Stat. § 609.066, subd. 1a(2). The law also directs "that peace officers should exercise special care when interacting with individuals with known physical, mental health, developmental, or intellectual disabilities as an individual's disability may affect the individual's ability to understand or comply with commands from peace officers." Minn. Stat. § 609.066, subd. 1a(4).

In addition to the elements of second-degree intentional murder discussed above, to file a criminal charge, the State must also have sufficient admissible evidence to prove beyond a reasonable doubt that, at minimum, an objectively reasonable officer in Officer Hanneman's position would not have believed that Officer Hanneman's use of deadly force was necessary because: 1) the threat of death or great bodily harm to the officers or another was not specifically articulable; 2) death or great bodily harm was not reasonably likely to occur absent action by law enforcement; or 3) the threat did not need to be addressed by deadly force without unreasonable delay. We address these criteria in turn.

       i.      Specifically Articulable Threat of Death or Great Bodily Harm

First, the State cannot prove beyond a reasonable doubt that an objectively reasonable officer in Officer Hanneman's position would not perceive a specifically articulable threat of death or great bodily harm to the officers or another person under the circumstances. Here, SWAT Team 1280 entered apartment 701 and initially announced, "police, search warrant." The officers saw Mr. Locke, who was initially on the couch, moving around under a blanket but were unable to make out his specific movements or see much of his body. Officers yelled out additional commands, such as "let me see your hands," "hands," and "get on the ground." Seconds later, Mr. Locke was on the ground and partially emerged from the blanket, holding a firearm in his right hand. Mr. Locke's hair and face were also partially visible at that time. These facts are all visible in the body-worn camera videos of the officers entering the apartment. At least three officers, including Officer Hanneman, stated in their written statements that they saw the firearm and, combined with what they perceived to be vigorous movement and a lack of compliance with their commands, believed that Mr. Locke intended to use the firearm against the officers. Though Minn. Stat. § 609.066 does not require the officers themselves to articulate the threat, at least three officers did specifically articulate what they perceived on scene to be a threat of death or great bodily harm. Their statements are consistent with what is seen in the body-worn camera videos. Thus, the State would be unable to prove beyond a reasonable doubt that an objectively reasonable officer in Officer Hanneman's position would not have perceived a specifically articulable threat of death or great bodily harm.

       ii.     Reasonably Likely to Occur Absent Action

Second, the State cannot prove beyond a reasonable doubt that an objectively reasonable officer in Officer Hanneman's position would not conclude that death or great bodily harm was reasonably likely to occur absent action by law enforcement. This assessment must be conducted "from the

---

[15] This language was not included in the prior version of Minn. Stat. § 609.066 but was adopted in the 2020 amendment.

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

perspective of a reasonable officer in the same situation, based on the totality of the circumstances known to or perceived by the officer at the time, rather than with the benefit of hindsight." Minn. Stat. § 609.066, subd. 1a(3).

The evidence shows that the following circumstances were known to the officers when they initiated the search warrant on apartment 701: the search warrants were related to a homicide; a high-powered round capable of piercing body armor had been used in the homicide; the suspects from the homicide had been linked to other violent crimes; the suspects from the homicide were depicted with firearms, including some with extended magazines, in social media images; and the suspects remained at large and had not been found in either of the first two apartments on which the officers had conducted the search warrants. Once the officers entered apartment 701, the officers encountered the following circumstances: an unidentified person looked over the couch at the officers; after officers announced that they were police and conducting a search warrant, the person began to move around under a blanket; the person continued to move around under the blanket as officers continued to enter the apartment and gave additional commands to show hands and get on the ground; when the person partially emerged from the blanket, that person was holding a firearm that was pointed in Officer Hanneman's general direction; and there were multiple officers in the apartment near the person under the blanket. These were the circumstances that the officers, and Officer Hanneman specifically, faced while on scene.

Under these circumstances, the State would be unable to prove beyond a reasonable doubt that an objectively reasonable officer in Officer Hanneman's position would not conclude that death or great bodily harm was reasonably likely to occur absent law enforcement action. The severity of the underlying crime being investigated was a homicide. The officers encountered an unidentified person under a blanket who ultimately partially emerged holding a firearm pointed in Officer Hanneman's general direction. The person, later identified as Mr. Locke, had both the ability and opportunity to shoot the firearm and cause death or great bodily harm to Officer Hanneman. And based on the direction in which Mr. Locke's firearm was pointing, the State would be unable to prove that an objectively reasonable officer in Officer Hanneman's position would not conclude that Mr. Locke had the intention to use the firearm against him or the other officers. This is especially true given the officer's knowledge of the nature of the underlying homicide and the fact that the suspects had not yet been apprehended. The officers had already completed search warrants on the other two apartment units to which the suspects were linked and had not located the suspects, which could lead a reasonable officer to have a heightened concern that the suspect would be found in apartment 701. And while Mr. Locke was not a suspect in that homicide, his identity was unknown to the SWAT team during the encounter in apartment 701. Thus, based on the totality of the circumstances, the evidence is such that the State could not prove beyond a reasonable doubt that an objectively reasonable officer in Officer Hanneman's position would not conclude that death or great bodily harm was reasonably likely absent law enforcement action.

To assist with the review of this case, the State consulted with a police practices expert, retired Captain John "Jack" Ryan. Captain Ryan independently reviewed the evidence related to this matter and wrote a report in which he assesses Officer Hanneman's conduct in comparison to generally accepted police practices. In his report, Captain Ryan states the following:

> Based on the same split-second timing and facts known to Hanneman, an objectively reasonable and well-trained officer would conclude that they were facing an immediate physical threat of

> serious bodily harm or death. Law enforcement had entered an apartment on a court-authorized no-knock warrant but had made loud, verbal announcements upon opening the door as depicted by the BWC videos. These announcements continued as the officers moved into the apartment. A subject, concealed under a blanket is clearly depicted moving while under the blanket, and specific orders are shouted to that individual. The individual, as depicted by the video, then came partially out from under the blanket gripping a handgun and raising the gun from under the blanket. Any reasonable and well-trained officer would have concluded that the subject posed an immediate physical threat of serious bodily harm or death to the officers as well as any other person in the area.

(Report of Captain John "Jack" Ryan, OIS Review: Amir Locke Shooting, dated March 29, 2022, at 26-27). While Captain Ryan does not render an ultimate opinion as to whether the use of deadly force was authorized, his analysis based on generally accepted police practices reaches the same conclusion as this reviewing team did. This underscores the fact that the State could not prove beyond a reasonable doubt that an objectively reasonable officer in Officer Hanneman's position would not conclude that death or great bodily harm was reasonably likely absent law enforcement action.

### iii.    Need for Use of Deadly Force without Unreasonable Delay

Third, the State cannot prove beyond a reasonable doubt that an objectively reasonable officer in Officer Hanneman's position would conclude that he did not need to use deadly force without unreasonable delay. Again, this assessment must be conducted "from the perspective of a reasonable officer in the same situation, based on the totality of the circumstances known to or perceived by the officer at the time, rather than with the benefit of hindsight." Minn. Stat. § 609.066, subd. 1a(3). It must also account for the fact that law enforcement officers must, at times, "be forced to make quick judgments about using deadly force." *Id.*

Based on the circumstances known to the officers before and during their entrance into apartment 701 as noted above, the State cannot prove that a reasonable officer would conclude there was an opportunity to reasonably delay the use of deadly force. Mr. Locke's holding and pointing a firearm in Officer Hanneman's direction, with others nearby, is a circumstance under which a reasonable officer in Officer Hanneman's position could conclude that Mr. Locke had the ability, opportunity, and intention to cause death or great bodily harm to one or more of the officers. The totality of the circumstances, which include the underlying homicide being investigated, the use of ammunition capable of piercing body armor in that homicide, that the suspects were known to possess firearms, and that the suspects remained at large, must be considered under Minn. Stat. § 609.066, subd. 1a(3). It must also be considered that the officers encountered an unidentified person under a blanket who produced a firearm and pointed it in the direction of at least one officer after officers announced themselves during their entry. And Mr. Locke's holding the firearm pointed in Officer Hanneman's direction after the police announced their presence would be seen by an objectively reasonable officer in Officer Hanneman's position as the highest level of resistance under the Minneapolis Police Department's use-of-force policy. (Minneapolis Police Department, Policy 5-301). While the shouts overlapped at times, and the civilians in the next room said they could not understand the shouts, the video evidence shows that as the officers

entered, at least one officer clearly yelled "police, search warrant" before yelling any other words and that Mr. Locke was close enough in proximity, without any doors or walls between him and the officers, that a reasonable officer in Officer Hanneman's position could believe that Mr. Locke had heard and was disregarding the officers' shouts. Under the totality of these circumstances, the State would be unable to prove beyond a reasonable doubt that an objectively reasonable officer in Officer Hanneman's position would conclude there was no need to use deadly force to prevent death or great bodily harm to Officer Hanneman or another, or that an objectively reasonable officer in Officer Hanneman's position would have delayed the use of deadly force.

Captain Ryan's opinion, based on generally accepted police practices, supports this conclusion. In his report, Captain Ryan states:

> Officer Hanneman knew officers were serving a no-knock warrant for evidence and apprehension of subjects for a violent homicide involving firearms. Hanneman was suddenly confronted with a subject rising from under a blanket following multiple loud announcements of Police, Search Warrant, coupled with directives to the subject who was moving under the blanket. Hanneman additionally made visual observations that the subject was armed with a handgun and was raising the gun from under the blanket. Any reasonable and well-trained officer, based on universal law enforcement training and generally accepted practices would recognize that the use of deadly force was necessary to protect Hanneman as well as the other officers who were serving a judicially signed search warrant. Additionally, a reasonable and well-trained officer would recognize that a subject opening fire in an apartment building would also pose a threat to anyone else in adjoining rooms or bedrooms.

(Report of Captain Ryan, at 28).

While Mr. Locke did not fire a shot, and did not have his finger on the trigger, the law does not require that police officers wait for a person to actually shoot a firearm at an officer or another before the officer is authorized to use deadly force. Instead, Minn. Stat. § 609.066 authorizes peace officers to use deadly force when it is reasonably likely that the person would cause death or great bodily harm absent action by the peace officer and when delay in doing so would be unreasonable. Under the statute, so long as an objectively reasonable police officer in Officer Hanneman's position would conclude that deadly force needed to be used without unreasonable delay to prevent the reasonably likely threat of death or great bodily harm, Minn. Stat. § 609.066 authorized Officer Hanneman to use such force.

Mr. Locke's thoughts and intentions remain unknown and, sadly, can never be known. We do not know whether Mr. Locke was awake or asleep when the officers entered the apartment, nor do we know whether Mr. Locke thought the persons entering were police officers or unwelcome intruders. We are acutely aware that the nature of the officers' "no-knock" entry into the apartment, combined with the officers' various, overlapping shouts and commands and shining of bright lights at Mr. Locke likely startled and disoriented Mr. Locke. We are also cognizant that Mr. Locke's reaction to the entry was not per se unreasonable. And we emphasize that Mr. Locke was not one of the homicide suspects nor was he implicated in any of the other violent offenses with which the

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

homicide suspects were associated. But, under Minn. Stat. § 609.066, Mr. Locke's thoughts or intentions are not the crux of the legal analysis. Instead, Minn. Stat. § 609.066 requires the State to evaluate Officer Hanneman's decision to use deadly force "from the perspective of a reasonable officer in the same situation, based on the totality of the circumstances known to or perceived by the officer at the time, rather than with the benefit of hindsight." Minn. Stat. § 609.066, subd. 1a(3). Because, under this standard, the State cannot disprove any element of the statutory authorized-use-of-deadly-force defense beyond a reasonable doubt, the State cannot issue a criminal charge for second-degree intentional murder.

2. Second-Degree Unintentional Murder

A person commits a second-degree unintentional murder when the person "causes the death of a human being, without intent to effect the death of any person, while committing or attempting to commit a felony offense other than criminal sexual conduct in the first or second degree with force or violence or a drive-by shooting." Minn. Stat. § 609.19, subd. 2(1).

The elements that the state must prove to establish a second-degree unintentional murder under this provision are: 1) the death of a person; 2) that the defendant caused the death of that person; 3) that the defendant, at the time of causing the death, was committing or attempting to commit a felony offense; and 4) that the defendant's act occurred in Hennepin County. 10 Minn. Prac., Jury Instr. Guides—Criminal CRIMJIG 11.29 (6th ed.). The State would also be required, as an additional element of proving a crime, to disprove beyond a reasonable doubt at least one element of any affirmative defense to prevail at trial.

A second-degree unintentional murder charge does not require that the State prove that the defendant intended to kill the other person, but the State must prove the commission or attempted commission of the underlying felony. *Id.* This statutory provision – known as the "felony murder rule" – is one that "allows one whose conduct brought about an unintended death in the commission of a felony to be found guilty of murder by imputing malice when there is no specific intent to kill." *State v. Cole*, 542 N.W.2d 43, 51 (Minn. 1996). But lack of intent is not a separate element of second-degree unintentional murder. *Id.*

As noted above, Officer Hanneman shot Mr. Locke three times at close range and Mr. Locke died from the injuries caused by the gunshots. While the circumstances present are such that a jury could conclude that Officer Hanneman intended to cause Mr. Locke's death, the State could present an alternative theory of the case that Officer Hanneman did not intend to kill Mr. Locke, but that his decision to shoot Mr. Locke constituted a felony that caused Mr. Locke's death. Such a theory would come into play if the evidence showed, and a jury believed, that Officer Hanneman tried to shoot Mr. Locke in a manner that was not likely to cause his death.

To serve as a predicate offense for second-degree unintentional felony murder, an offense must involve a special danger to human life. *State v. Anderson*, 666 N.W.2d 696, 700-01 (Minn. 2003). The special danger to human life must be established both in the specific way the offense is committed and in the abstract, based on the elements of the underlying felony. *Id.* The elements of the underlying felony need not include reference to death or bodily harm but must "demonstrate that the felony is inherently dangerous and poses a significant danger to human life." *State v. Smoot*, 737 N.W.2d 849, 851 (Minn. Ct. App. 2007). The following are felonies involving the discharge of a firearm that could be predicates for a second-degree unintentional murder charge and the elements of those felonies:

33

### a. Second-Degree Assault

"Whoever assaults another with a dangerous weapon" commits a felony second-degree assault. Minn. Stat. § 609.222, subd. 1. A firearm is, by statute, a dangerous weapon. Minn. Stat. § 609.02, subd. 6. To prove a second-degree assault, the State must prove beyond a reasonable doubt that: 1) the defendant assaulted another person; 2) the defendant used a dangerous weapon to assault that person; and 3) that the assault occurred in Hennepin County. 10 Minn. Prac., Jury Instr. Guides—Criminal CRIMJIG 13.10 (6th ed.). An assault is committed when the defendant intentionally inflicts or attempts to inflict bodily harm upon another, or when the defendant commits an act with intent to cause fear of immediate bodily harm or death in the other person. Minn. Stat. § 609.224, subd. 1; 10 Minn. Prac., Jury Inst. Guides—Criminal CRIMJIG 13.01, 13.02 (6th ed). Again, a person acts intentionally when "the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn. Stat. § 609.02, subd. 9(4). "Intent is an inference drawn . . . from the totality of circumstances," *Raymond*, 440 N.W.2d at 426, and "a person intends the natural and probable consequences of his actions," *Lundstrom*, 171 N.W.2d at 724-25.

There is sufficient evidence that would be admissible at trial to support a conclusion that Officer Hanneman's conduct meets the statutory criteria and elements of second-degree assault against Mr. Locke. Officer Hanneman pointed his duty firearm, which is, by statute, a dangerous weapon, at Mr. Locke. Officer Hanneman discharged the firearm, shooting three bullets into Mr. Locke's body, at close range. This act would have caused, at minimum, bodily harm. These circumstances lead to the conclusion that Officer Hanneman intentionally committed a second-degree assault. Officer Hanneman's actions, pointing and shooting his duty firearm at Mr. Locke, show an intent to inflict bodily harm. From Officer Hanneman's own statement, there is no claim that his discharge of the firearm was anything but intentional. (*See* Statement of Officer Hanneman, at 2). The bullets fired by Officer Hanneman hit Mr. Locke in the face, chest, and shoulder, causing not only mere bodily harm but injuries that ultimately proved fatal. Thus, there is sufficient evidence to conclude that, as an alternative to a second-degree intentional murder, Officer Hanneman's conduct meets the statutory criteria and elements of second-degree unintentional murder predicated on a felony second-degree assault.

### b. Intentional Discharge of a Firearm

Under Minn. Stat. § 609.66, subd. 1a(a)(2), whoever "intentionally discharges a firearm under circumstances that endanger the safety of another" is guilty of a felony. This crime requires the State to prove that: 1) the defendant discharged a firearm; 2) the defendant acted intentionally in discharging the firearm; 3) the discharge of the firearm was under circumstances that endangered the safety of another; and 4) the act occurred in Hennepin County. 10A Minn. Parc., Jury Instr. Guides—Criminal CRIMJIG 32.08 (6th ed.). In determining whether a defendant intentionally discharged a firearm in a way that endangered the safety of others, the relevant inquiry is "whether, under the totality of the circumstances extant at the moment the trigger was pulled—including what the defendant knew and . . . what the defendant did not know—would the discharge of the firearm place another person's safety in danger." *In re Welfare of A.A.E.*, 590 N.W.2d 773, 777 (Minn. 1999).

There is sufficient evidence that would be admissible at trial to support a conclusion that Officer Hanneman's conduct meets the statutory criteria and elements of intentionally discharging a firearm under circumstances that endangered the safety of another. Officer Hanneman

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

intentionally discharged his duty firearm three times. Again, from Officer Hanneman's own statement, there is no claim that his discharge of the firearm was anything but intentional. (*See* Statement of Officer Hanneman, at 2). Officer Hanneman discharged the firearm while pointing it at Mr. Locke, putting Mr. Locke's safety in danger. Officer Hanneman's statement confirms that, at the moment he discharged the firearm, he knew he was shooting at another person. (Statement of Officer Hanneman, at 2). Accordingly, it can be concluded that Officer Hanneman knew that his discharge of the firearm would place Mr. Locke's safety in danger. Mr. Locke was hit by the bullets from Officer Hanneman's discharge of the firearm and the injuries caused by the bullets killed Mr. Locke. Thus, there is sufficient evidence to conclude, as an alternative to a second-degree intentional murder, that Officer Hanneman's conduct meets the statutory criteria and elements of second-degree unintentional murder predicated on a felony intentional discharge of a firearm.

### c. Authorized Use of Deadly Force

Having concluded that Officer Hanneman's conduct meets the statutory criteria and elements of second-degree unintentional murder under the two predicate felonies discussed above, we now turn to the affirmative defense of authorized used of deadly force under Minn. Stat. § 609.066. In addition to the elements of second-degree unintentional murder discussed above, to file a criminal charge, the State must also have sufficient admissible evidence to prove beyond a reasonable doubt that, at minimum, an objectively reasonable officer in Officer Hanneman's position would have believed that Officer Hanneman's use of deadly force was not necessary because: 1) the threat of death or great bodily harm to the officers or another was not specifically articulable; 2) death or great bodily harm was not reasonably likely to occur absent action by law enforcement; or 3) the threat did not need to be addressed by deadly force without unreasonable delay.

The evidence shows that the following circumstances were known to the officers when they conducted the search warrant on apartment 701: the search warrants were related to a homicide; a high-powered round capable of piercing body armor had been used in the homicide; the suspects from the homicide had been linked to other violent crimes; the suspects from the homicide were depicted with firearms, including some with extended magazines, in social media images; and the suspects remained at large and had not been found in either of the first two apartments on which the officers had conducted the search warrants. Once the officers entered apartment 701, the officers encountered the following circumstances: an unidentified person looked over the couch at the officers; after officers announced that they were police and conducting a search warrant, the person began to move around under a blanket; the person continued to move around under the blanket as officers continued to enter the apartment and gave additional commands to show hands and get on the ground; when the person partially emerged from the blanket, that person was holding a firearm that was pointed in Officer Hanneman's general direction; and there were multiple officers in the apartment near the person under the blanket.

As discussed above, based on the totality of the circumstances, the State cannot prove that an objectively reasonable officer in Officer Hanneman's position would not have perceived a specifically articulable threat of death or great bodily harm that was reasonably likely to occur absent the officer's use of deadly force without unreasonable delay. The circumstances are such that an objectively reasonable officer could conclude that Mr. Locke had the ability, opportunity, and intent to use the firearm to cause death or great bodily harm to Officer Hanneman or another officer. And, as stated above, while we do not and cannot know what Mr. Locke was thinking or

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

intending, Minn. Stat. § 609.066 requires that Officer Hanneman's use of deadly force be assessed from the perspective of an objectively reasonable officer in Officer Hanneman's position, not from Mr. Locke's perspective. Because, under these circumstances, the State does not possess sufficient evidence to disprove any element of Minn. Stat. § 609.066's authorization for peace officers to use deadly force, no charges can be filed against Officer Hanneman for his use of deadly force.

### *Second-Degree Manslaughter*

"A person who causes the death of another . . . by the person's culpable negligence whereby the person creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another" is guilty of second-degree manslaughter. Minn. Stat. § 609.205(1). "A defendant can be found guilty of second-degree manslaughter even for an accidental death if the accident resulted from culpable negligence and from the defendant's consciously taking chances of causing death or great bodily harm." *State v. Frost*, 342 N.W.2d 317, 323 (Minn. 1983). The State would also be required, as an additional element of proving a crime, to disprove beyond a reasonable doubt at least one element of any affirmative defense to prevail at trial.

Culpable negligence is "intentional conduct which the actor may not intend to be harmful but which an ordinary and reasonably prudent man would recognize as involving a strong probability of injury to others." *State v. Beilke*, 267 Minn. 526, 234, 127 N.W.2d 516, 521 (1964); *see also* 10 Minn. Prac., Jury Instr. Guides—Criminal CRIMJIG 11.56 (6th ed).

The Minnesota appellate courts have attempted to explain culpable negligence by referencing other negligence mens rea. In doing so, the courts have expanded the definition as outlined below:

"Culpable negligence" goes beyond ordinary and gross negligence; instead, it is "gross negligence coupled with an element of recklessness." *State v. Beilke*, 267 Minn. 526, 234, 127 N.W.2d 516, 521 (1964). Proof of culpable negligence sufficient to establish second-degree manslaughter "requires proof of an objective element and a subjective element, the objective element being gross negligence and the subjective element being recklessness in the form of an actual conscious disregard of the risk created by the conduct." *State v. Frost*, 342 N.W.2d 317, 320 (Minn. 1983). To establish the objective element of gross negligence, the State must prove that the defendant's conduct involved "a gross deviation from the standard of conduct that a law-abiding person would observe in the [defendant]'s situation." *Id.* at 319.

> In deciding whether a defendant was grossly negligent, a jury is tasked with deciding whether and to what extent a defendant breached his duty of care. In doing so, a jury must first determine, as a matter of fact, what the defendant did. The jury must next consider whether the defendant's conduct was such that an ordinary and reasonably prudent person would recognize as involving a strong probability of injury to others. The second inquiry does not require the jury to infer the existence of any separate fact; instead, the jury must assess the defendant's conduct and determine whether the facts of that conduct amount to the level of gross negligence.

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

*State v. Doucette*, No. A20-02387, 2021 WL 856126, at *4 (Minn. Ct. App. March 8, 2021) (internal citations and quotations omitted).

To establish the subjective element of recklessness, the State must prove "an actual conscious disregard of the risk created by the conduct." *Frost*, 342 N.W.2d at 320. A person is reckless when she "is *aware* of the risk and disregards it." *Id.* (emphasis in original). This subjective element requires a finding of the defendant's state of mind, which is typically proven by circumstantial evidence and inferred from the defendant's words or actions. *Doucette*, 2021 WL 856126 at *5 (citations omitted); *State v. Johnson*, 616 N.W.2d 720, 726 (Minn. 2000).

However, the original definition of culpable negligence – which has been adopted by the pattern JIG – states: Culpable negligence is "intentional conduct which the actor may not intend to be harmful but which an ordinary and reasonably prudent man would recognize as involving a strong probability of injury to others." *Beilke*, 267 Minn. at 234, 127 N.W.2d at 521; 10 Minn. Prac., Jury Instr. Guides—Criminal CRIMJIG 11.56 (6th ed). Taking all of these statements of the law together, it appears that culpable negligence is to be read as gross negligence with a *hint* or *touch* of recklessness, but that the State is not required to prove recklessness as a separate element. Indeed, the case law states that it involves "an element of recklessness," but does not state that to establish culpable negligence the State must "prove, as an element," recklessness. Thus, the case law supports an interpretation that the awareness of the "strong probability of injury to others" is sufficient to meet this "element of recklessness" for culpable negligence. We assess whether this statutory crime applies to two separate acts: Officer Hanneman's shooting at Mr. Locke and the decision to use a no-knock search warrant.

### 1. The Shooting

The facts of this case are such that there might be sufficient evidence to conclude that Officer Hanneman's shooting at Mr. Locke meets the statutory criteria and elements of second-degree manslaughter. As noted, Officer Hanneman pointed his duty firearm directly at Mr. Locke and shot three times at close range. This is conduct that a reasonable person would recognize as involving a strong probability of death or great bodily harm to others. And in fact, as discussed above, the evidence supports a conclusion that Officer Hanneman actually intended to cause death or great bodily harm to Mr. Locke by shooting him. Whether Officer Hanneman intended to kill Mr. Locke or not, he intentionally created a risk and consciously took a chance of doing so.

However, it is also important to note that the statute requires that the actor create an "unreasonable risk." Minn. Stat. § 609.205(1). As such, the State would also have to prove at trial that the risk created by Officer Hanneman's conduct was unreasonable. Proof of this fact would dovetail with the requirement that the State disprove the affirmative defense of justified or authorized use of deadly force by a peace officer, under Minn. Stat. § 609.066. But, as discussed above, the State cannot prove beyond a reasonable doubt that Officer Hanneman's use of deadly force was not authorized by Minn. Stat. § 609.066. As such, the State cannot issue a charge for second-degree manslaughter.

### 2. The No-Knock Warrant

We would be remiss to not address the fact that numerous studies have revealed the fraught nature of unannounced or no-knock search warrants, and have shown that these types of warrants increase, rather than decrease, risk to officers and civilians. This fact has been considered and we

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

have assessed its impact on potential criminal liability. Specifically, we have considered an argument that, in requesting that the search warrants for the apartment building be no-knock warrants, the Minneapolis Police Department and involved officers created an unreasonable risk and consciously took a chance of causing death or great bodily harm to others. Following from such an analysis could stem an argument that a second-degree manslaughter charge against some or all the officers is appropriate, even without considering the reasonableness of Officer Hanneman's decision to use deadly force. But that argument would be incorrect and a second-degree manslaughter charge on this basis could not be proven beyond a reasonable doubt.

As an initial matter, the State would have to prove beyond a reasonable doubt that it was unreasonable for the SWAT Teams to have requested and executed a no-knock warrant instead of a regular, knock-and-announce warrant. Based on the Minneapolis Police Department policies outlined above and the specifically articulated risk factors involved in the decision to use a no-knock warrant – specifically, that the suspects were involved in a homicide using a firearm, the homicide involved the use of a .223 caliber round, the suspects were seen social media posts demonstrating access to firearms, and the suspects were linked to ongoing violent criminal behavior – the State would not be able to prove beyond a reasonable doubt that it was unreasonable for the Minneapolis Police Department SWAT Team leadership to request a no-knock search warrant. Moreover, the no-knock warrant was signed by a Hennepin County District Court Judge who reviewed the affidavit and found that those factors, along with the other facts stated in the warrant application, provided sufficiently articulated grounds to authorize a no-knock entry into the apartment. That this warrant was signed and authorized by a judicial officer carries significant weight in assessing whether the warrant was reasonable. *See Massachusetts v. Upton*, 466 U.S. 727, 734 (1984) (recognizing the strong preference afforded to warrants signed by a judge). Under these circumstances, the State would not be able to prove beyond a reasonable doubt that the use of a no-knock warrant in this instance was unreasonable such that it could bring criminal charges premised on the use of that type of warrant.

Even if the State could prove that the use of a no-knock search warrant was unreasonable, a charge of second-degree manslaughter premised on the use of a no-knock warrant would fail against both Officer Hanneman and the Minneapolis Police Department SWAT Team leadership for the following reasons.

a. *Officer Hanneman*

Officer Hanneman could not be charged with second-degree manslaughter solely on the basis of the no-knock warrant creating an unreasonable risk of causing death or great bodily harm because Minn. Stat. § 609.205(1) requires that "the *person* create[] an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another" to be guilty of second-degree manslaughter. For Officer Hanneman to be guilty of second-degree manslaughter solely by virtue of the risk created by the use of a no-knock warrant, *Officer Hanneman* would have to have been the person, or at minimum one of the people, who created that risk of causing death or great bodily harm by use of a no-knock warrant and consciously chose to proceed with doing so regardless of the known risks. But the factual record provides no evidence that this was the case. The decision to use a no-knock warrant was made by Sergeant Sysaath and Lieutenant Campbell, with possible input by Sergeant Biederman, and in conjunction with St. Paul Police investigators and St. Paul Police Department leadership. There is no evidence to suggest that Officer Hanneman had any role in the process by which that decision was made or finalized. Thus, there is no evidence that would

support a second-degree manslaughter charge against Officer Hanneman premised on the decision to use a no-knock warrant.

### b. *SWAT Team Leadership*

A second-degree manslaughter charge would also fail against any or all of the officers in the SWAT Team leadership who made the decision to use and requested a no-knock warrant because the State would be unable to prove beyond a reasonable doubt that this decision was the proximate cause of Mr. Locke's death. As an element of second-degree manslaughter, it must be proven that the death was caused by person who created an unreasonable risk and consciously took a chance of causing death or great bodily harm. 10 Minn. Prac., Jury Instr. Guides—Criminal CRIMJIG 11.56 (6th ed.). In assessing causation, the following statement of the law applies:

> "To cause" means to be a substantial causal factor in causing the death. The defendant is criminally liable for all the consequences of his or her actions that occur in the ordinary and natural course of events, including those consequences brought about by one or more intervening causes, if such intervening causes were the natural result of the defendant's acts. The fact that other causes contribute to the death does not relieve the defendant of criminal liability. However, the defendant is not criminally liable if a "superseding cause" caused the death. A "superseding cause" is a cause that comes after the defendant's acts, alters the natural sequence of events, and produces a result that would not otherwise have occurred.

*Id. See also* 10 Minn. Prac., Jury Instr. Guides—Criminal CRIMJIG 3.31 (6th ed.); *State v. Smith*, 835 N.W.2d 1, 6 (Minn. 2013); *State v. Olson*, 435 N.W.2d 530, 534 (Minn. 1989). As such, the State would have to prove beyond a reasonable doubt that Mr. Locke's death was foreseeable as being in the "ordinary and natural course" of executing a no-knock warrant and that there was no "superseding cause." In other words, the State would have to prove beyond a reasonable doubt that no intervening acts changed the natural course of events that flow from using a no-knock warrant. To do this, the State would have to prove beyond a reasonable doubt that: 1) Mr. Locke's actions of moving around and holding a firearm, which Officer Hanneman and other officers perceived as threatening, would not have occurred but-for the search warrant being a no-knock rather than a knock-and-announce; and 2) that Officer Hanneman's use of deadly force was not a superseding cause. The State would likely be unable to prove either of these facts beyond a reasonable doubt.

First, as to Mr. Locke's movements, it is entirely possible that the movements were caused by the nature of the "no-knock" warrant entry. The apartment door burst open, and several armed men moved quickly into the apartment, yelling overlapping commands and shining bright lights, some of which were in Mr. Locke's face. We recognize this fact, and recognize that it is possible, and perhaps even probable, that Mr. Locke's response to the entry – his movements and even his holding a firearm – could have been legitimate and reasonable responses to such an entry. But the State cannot prove that these movements and actions were foreseeable in the decision to use a no-knock warrant or that they occurred solely because of the entry. This is not to say that Mr. Locke's reaction was an unreasonable response to what he was experiencing in those moments. But the

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

State cannot prove beyond a reasonable doubt that Mr. Locke's movements and pulling of a firearm were foreseeable in the decision to use a no-knock entry or that they were not a superseding cause that altered the sequence of events.

Second, the State cannot prove beyond a reasonable doubt that Officer Hanneman's decision to use deadly force was not a superseding cause of Mr. Locke's death. Officer Hanneman alone elected to use deadly force when he shot and killed Mr. Locke. It is speculatively possible that Officer Hanneman might have chosen some other action, other than shooting Mr. Locke, even when presented with the same set of circumstances as those present here. But it cannot be said that Officer Hanneman's independent decision to use of deadly force was caused by the no-knock search warrant itself. It is possible, and perhaps probable, that the use of a no-knock search warrant heightened the likelihood of causing a situation in which death or great bodily harm would result. But it cannot be proven beyond a reasonable doubt that it was the decision to use a no-knock warrant that caused Officer Hanneman to use deadly force. Instead, it appears that decision by Officer Hanneman was based on a number of factors, specifically including Mr. Locke's pointing of a firearm. The State cannot attribute Officer Hanneman's decision solely to the no-knock search warrant or entry. Thus, the evidence does not support a charge of second-degree manslaughter against the SWAT Team leadership for choosing to request and use a no-knock search warrant.

### *Analysis of Other Homicide-Related Offenses*

In our review of this case, we also reviewed and considered the applicability of every other homicide-related offense enumerated in Minnesota's criminal code. Based on the review of those laws and the facts of this case, the evidence would not support a finding that other homicide-related crimes were committed for the reasons discussed below.

1. First-Degree Murder

Under Minnesota Statute section 609.185(a)(1), a person commits first-degree murder of when the person "causes the death of a human being with premeditation and with intent to effect the death of the person or of another."

The elements that the State must prove to establish a first-degree murder under this provision are: 1) the death of a person; 2) that the defendant caused the death of that person; 3) that the defendant acted with intent to kill or effect the death of that person; 4) that the defendant acted with premeditation; and 5) that the defendant's act occurred in Hennepin County. 10 Minn. Prac., Jury Instr. Guides—Criminal CRIMJIG 11.02 (6th ed.). The third element – intent – requires the State to prove that the defendant "acted with the purpose of causing death or believed the act would have that result." *Id.* The fourth element, premeditation, requires the State to prove the defendant "considered, planned, prepared for, or determined to commit the act" before committing it. *Id.*; Minn. Stat. § 609.18.

> While premeditation requires no specific period of time for deliberation, some amount of time must pass between the formation of the intent and the carrying out of the act. A premeditated decision to kill may be reached in a short period of time. However, an

> unconsidered or rash impulse, even though it includes an intent to
> kill, is not premeditated.

10 Minn. Prac., Jury Instr. Guides—Criminal CRIMJIG 11.02 (6th ed.). In short, to prove first-degree murder, the State would have to prove that the defendant acted with a purpose to cause a death and that some time passed between deciding to act and carrying out the act, and that the action intended to cause a death was not impulsive or unconsidered. "Premeditation indicates a preexisting reflection and deliberation involving more than a mere intent to kill" which must be inferred from the totality of the circumstances. *State v. Buntrock*, 560 N.W.2d 383, 388 (Minn. 1997) (quoting *State v. Lloyd*, 345 N.W.2d 240, 245 (1984)) (quotations omitted). Premeditation does not require extensive planning and "the requisite 'plan' to commit a first-degree murder can be formulated virtually instantaneously by a killer." *Buntrock*, 560 N.W.2d at 338 (quoting *Lloyd*, 345 N.W.2d at 246). But the time that passes must be "appreciable" enough such that it allows the actor to consider, plan, prepare, or determine to commit the act before actually doing so. *State v. Moore*, 481 N.W.2d 355, 361 (Minn. 1992); Minn. Stat. § 609.18.

Here, there is no evidence which would support a conclusion that Officer Hanneman acted with premeditation. While premeditation can be formed in even a short period of time, there are no facts present that would allow a jury to conclude beyond a reasonable doubt that Officer Hanneman reflected on and planned to commit a premeditated murder. There is no evidence that Officer Hanneman's movements closer to Mr. Locke were for the specific purpose of getting into a position to shoot and kill him. The video evidence also does not support a conclusion that Officer Hanneman had decided to shoot Mr. Locke as he passed the couch. Instead, Officer Hanneman's body-worn camera video shows that Officer Hanneman said "show me your hands" to Mr. Locke a split-second before shooting him. While premeditation could be "formulated virtually instantaneously," *Buntrock*, 560 N.W.2d at 338, Officer Hanneman's verbal command suggests that he had not decided to actually shoot Mr. Locke until the moment that he pulled the trigger. While the manner in which Officer Hanneman shot Mr. Locke supports a conclusion that he intended to kill Mr. Locke, the evidence is insufficient to show that this intent was premeditated or planned. Thus, the evidence does not support a conclusion that Officer Hanneman's conduct meets the statutory criteria for first-degree murder.

2. Third-Degree Murder

Under Minnesota Statute section 609.195(a), a person commits third-degree murder when the person unintentionally "causes the death of another by perpetrating an act eminently dangerous to others and evincing a depraved mind, without regard for human life." The State must prove that the defendant: (1) caused the death of another, (2) committed an act that was eminently dangerous to others, and (3) evinced a depraved mind without regard for human life. *State v. Hall*, 931 N.W.2d 737, 741 (Minn. 2019). The "depraved mind" mental state is "equivalent to a reckless standard." *State v. Coleman*, 944 N.W.2d 469, 478 (Minn. Ct. App. 2020) (quoting *State v. Barnes*, 713 N.W.2d 325, 332 (Minn. 2006)). The "'depraved mind' element of the third-degree murder statute requires proof that the defendant was aware that his conduct created a substantial and unjustifiable risk of death to another person and consciously disregarded that risk." *Coleman*, 944 N.W.2d at 479.

The Minnesota Supreme Court reviewed *Coleman* and explained that an eminently dangerous act, committed without regard for human life, is committed when one can infer from the surrounding

circumstances that the defendant was indifferent to the loss of life that the act could cause. *State v. Coleman*, 957 N.W.2d 72, 80 (Minn. 2021).

> In other words, a defendant is guilty of third-degree murder, when based on the attending circumstances: (1) he causes the death of another without intent; (2) by committing an act eminently dangerous to others, that is, an act that is highly likely to cause death; and (3) the nature of the act supports an inference that the defendant was indifferent to the loss of life that this eminently dangerous activity *could* cause.

*Id.* The Minnesota Supreme Court has further clarified that the mental state required for a deprived-mind murder "is a generalized indifference to human life and . . . cannot exist when the defendant's conduct is directed with particularity at the person who is killed." *State v. Noor*, 964 N.W.2d 424, 438 (Minn. 2021).

As in *Noor*, Officer Hanneman's conduct was directed exclusively at Mr. Locke. As such, there is no viability of a third-degree murder charge based on the facts present here.

   3.  <u>First-Degree Manslaughter</u>

      a.  *Heat of Passion*

"Whoever . . . intentionally causes the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances" commits manslaughter in the first-degree. Minn. Stat. § 609.20(1). To prove a heat-of-passion first-degree manslaughter, the State must prove beyond a reasonable doubt that: (1) there was a death; (2) the defendant caused the death; (3) the defendant acted in the heat of passion with the intent to cause the death of the person; and (4) the act occurred in Hennepin County. 10 Minn. Prac., Jury Instr. Guides—Criminal CRIMJIG 11.44 (6th ed.).

A person acts "in the heat of passion" when they are "provoked by words or acts such as would provoke a person of ordinary self-control in like circumstances." *Id.*; *State v. Buchanan*, 431 N.W.2d 542, 549 (Minn. 1988). When a person intentionally kills another under the heat of passion, the law sets the crime as manslaughter instead of murder because "[t]he heat of passion may cloud a person's reason and weaken will-power." *Id.*; *see also State v. Brocks*, 587 N.W.2d 37, 41 (Minn. 1998). Determining whether the killing was done in the heat of passion is a subjective analysis, looking to the defendant's emotional state. *Brocks*, 587 N.W.2d at 41. The second element, whether there were preceding acts that would be sufficient to provoke a person of ordinary self-control in like circumstances, requires an objective analysis. *Id.*

"A defendant's behavior before, during, and after the crime is relevant to whether the crime was committed in the heat of passion." *State v. Carney*, 649 N.W.2d 455, 461 (Minn. 2002). "While passion may be caused by fear or terror, standing alone those emotions are insufficient to mitigate murder to manslaughter." *State v. Nystrom*, 596 N.W.2d 256, 262 (Minn. 1999). Likewise, anger alone is insufficient for heat of passion. *State v. Stewart*, 624 N.W.2d 585, 590 (Minn. 2001). Instead, "[t]here must also be evidence that the defendant's fear was caused by the victim's words or acts, and that the victim's words or acts were sufficient to provoke a person of ordinary self-control." *Nystrom*, 596 N.W.2d at 262 (quotations and citation omitted). The Minnesota Supreme Court has determined that a victim shooting a defendant in the head would be a sufficient act to

provoke a person of ordinary self-control into a heat of passion. *State v. Johnson*, 719 N.W.2d 619, 628 (Minn. 2006). In contrast, cases where the victim reached for a gun after the defendant was the initial aggressor and where the victim grabbed a knife after being smacked by the defendant did not have a sufficient basis to support a provocation of a person of ordinary self-control to act in the heat of passion. *Stiles v. State*, 664 N.W.2d 315, 322 (Minn. 2003); *State v. Hale*, 453 N.W.2d 704, 706-07 (Minn. 1990).

Based on the legal standards for first-degree manslaughter outlined above, the evidence does not support a lesser charge of first-degree manslaughter. Essentially, a first-degree manslaughter charge requires the same elements as a second-degree murder but mitigates the charge because the person doing the killing did so under a heat of passion. Here, arguably, it could be stated that while Officer Hanneman acted intentionally in shooting and killing Mr. Locke, he did so only out of fear and that Mr. Locke's holding a firearm that was pointed in Officer Hanneman's direction was conduct such that a person of ordinary self-control would experience the "heat of passion" and respond as Officer Hanneman did. Indeed, Officer Hanneman writes that he "feared for [his] life and the lives of [his] teammates" and that the perceived threat was "imminent and terrifying" as an explanation for why he shot Mr. Locke. (Statement of Officer Hanneman, at 2). But the case law indicates that in situations where the victim reaches for a weapon after some initial aggression or provocation by the person who ultimately ends up taking the fatal action, it cannot be said that there was sufficient provocation by the victim such that the person who does the killing is entitled to the mitigated offense of first-degree manslaughter.

Even assuming, without concluding, that Mr. Locke was intentionally pointing a firearm at Officer Hanneman, it is possible – and perhaps likely – that Mr. Locke was doing so in response to being startled by a group of people rushing into the apartment in which he was sleeping. Mr. Locke may have been sleeping on the living room couch when the SWAT team opened the door and rushed in, with several people yelling at the same time. As Mr. Locke looked up in the officers' direction – both when they initially entered the apartment and as they got closer to him – flashlights were illuminated and pointing directly in his face, possibly disorienting him. The officers also simultaneously shouted varying commands, such as "police, search warrant," "get on the ground," and "let me see your hands" or "hands." A reasonable person in Mr. Locke's position would likely be startled, disoriented, and confused and try to take action to protect themself from the apparent chaos. While the evidence does not definitively show Mr. Locke's intentions, it is possible – if not probable – that Mr. Locke's movements and holding of the firearm were based on a reasonable perception that he needed to protect himself. And, as noted in the case law above, where the victim raises a weapon in response to a reasonably perceived need to protect himself, the person who later kills the victim cannot claim to have been provoked by the victim to mitigate what is otherwise a second-degree murder to first-degree manslaughter. Thus, Officer Hanneman's conduct does not meet the statutory criteria for first-degree manslaughter under Minn. Stat. § 609.20(1).

### b. Under Coercion or Duress

First-degree manslaughter also occurs when a person "intentionally causes the death of another person because the actor is coerced by threats made by someone other than the actor's coconspirator and which cause the actor reasonably to believe that the act performed by the actor is the only means of preventing imminent death to the actor or another." Minn. Stat. § 609.20(3). There is no stock jury instruction for this provision. There are also very few cases arising from or referencing this provision, but it appears that this provision refers to when the actor kills another

Joint Report of the HCAO and AGO Regarding the Death of Amir Locke

while under duress from a person threatening the actor, other than the victim. *See State v. Caine*, 746 N.W.2d 339, 357 (Minn. 2008) (quoting 9 Henry W. McCarr & Jack S. Nordby, *Minnesota Practice—Criminal Law and Procedure* § 47.17 (3d ed. 2001) (defining this type of manslaughter as "an intentional killing under duress")). This provision does not apply to our facts. To the extent that Officer Hanneman's decision to shoot resulted from his perceiving Mr. Locke as a threat, that perceived threat was not the type of threat contemplated by this statutory provision.

## Conclusion

Amir Locke's death is an immense tragedy. We recognize the sadness, pain, and anger felt by Mr. Locke's family, friends, and the community over his loss. And Mr. Locke's death has, again, put a spotlight on the dangerous nature of "no-knock" search warrants. Both the Hennepin County Attorney's Office and the Minnesota Attorney General's Office strongly support the current review and rethinking of policies surrounding the use of "no-knock" search warrants being done at all levels of government.

As prosecutors, we are limited in our role to considering only whether criminal charges are warranted against any of the police officers involved in Mr. Locke's death. We cannot change the policies that started the sequence of events that led to Mr. Locke's death. To file a criminal charge against any of the police officers, and specifically against Officer Hanneman, the State must possess sufficient admissible evidence to prove every element of the criminal offense and disprove at least one element of any available affirmative defense beyond a reasonable doubt. This is a high burden, and it is one which is not met here. While the elements of at least one criminal offense could be proven beyond a reasonable doubt, the evidence cannot disprove any element of the authorized-use-of-deadly-force defense beyond a reasonable doubt.

We recognize that this decision may seem unfair, especially given the nature of the entry and the inability to know what Mr. Locke intended to do. But because Minn. Stat. § 609.066 requires the State to evaluate Officer Hanneman's decision to use deadly force "from the perspective of a reasonable officer in the same situation, based on the totality of the circumstances known to or perceived by the officer at the time, rather than the benefit of hindsight," we must analyze the use of deadly force based only on what an objectively reasonable officer in Officer Hanneman's position would have known or perceived, and not on what Mr. Locke's intentions may have been. Under this standard, the State cannot disprove any element of the statutory authorized-use-of-deadly-force defense beyond a reasonable doubt. Accordingly, the State cannot file criminal charges in this case.

Michael O. Freeman
Hennepin County Attorney

Keith Ellison
Minnesota Attorney General

44