## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Karen Wells and Andre Locke as
co-trustees for the next of kin of
Amir Rahkare Locke, deceased,

Case No. 23-cv-273 (WMW/DLM)

Plaintiffs,

v.

**Plaintiffs' Opposition to Defendants'
Motion to Stay Discovery**

Mark Hanneman, in his individual capacity
as a Minneapolis police officer, and the
City of Minneapolis,

Defendants.

## <u>Introduction</u>

Amir Locke ("Amir") was senselessly and unlawfully killed by Officer Mark

Hanneman ("Hanneman") in a manner consistent with the Minneapolis Police

Department's ("MPD") longstanding and widespread unconstitutional customs and

practices.  Defendants Hanneman and City of Minneapolis (the "City") now move this

Court for a stay of discovery from the named Defendants,[1] to prevent Plaintiffs from

conducting a thorough investigation in their search for answers and accountability for

Amir's death.  The Eighth Circuit does not require a wholesale ban on all discovery when

a qualified immunity defense is raised by one defendant to one claim in a lawsuit.

---

[1] Despite the language in Defendants' brief, the Defendants are not seeking a stay of
third-party discovery, as previously agreed to by stipulation.  *See* ECF Nos. 36-37.  The
parties have agreed that they will submit a joint letter to the Court, with permission from
Chambers, to confirm this point.

Defendants carry heavy burdens in seeking this stay and in ultimately seeking judgment on the pleadings.  The paucity of factual and legal support that Defendants have provided for their position fails to meet their burden now, just as the facts alleged by Plaintiffs do not warrant dismissal of this case on the pleadings later.  The law and practicalities of this case warrant the denial of Defendants' motion for a stay in its entirety.

## Background

### I.  The unlawful killing of Amir Locke.

In the early morning hours of February 2, 2022, Amir slept on a couch in the living room of his cousin's Minneapolis apartment.  (Doc. 40, First Am. Compl. ("FAC") ¶¶ 80, 92.)  A handgun was near the couch where Amir slept.  (*Id.* ¶ 95.)  Suddenly, MPD officers barreled into the apartment as they yelled overlapping, incoherent commands.  (*Id.* ¶¶ 107-08.)  Officers had not announced themselves prior to crossing the threshold of the apartment, as they were executing a No-Knock Warrant.  (*Id.* ¶¶ 71, 88, 92, 104-05.)

Within seconds of entering the apartment, an MPD officer kicked the couch Amir had been sleeping on.  (*Id.* ¶109.)  The kick startled Amir and Amir fell off the couch and onto the ground.  (*Id.* ¶ 111.)  A reasonable officer would have recognized that Amir had been startled awake and was still draped in the blanket he was sleeping under which was obscuring his view, when Amir began to stand and grabbed the handgun to assess the threat that jarred him awake.  (*Id.* ¶ 112.)  Amir held the handgun momentarily in his right hand.  (*Id.* ¶ 113.)  Despite being presented with these terrifying circumstances, Amir kept his finger off the trigger, kept the handgun pointed down, and never raised the handgun in a threatening manner in the direction of any officer or other person.  (*Id.*

2

¶ 114.)  At all times, Amir exercised proper firearm and trigger discipline as he assessed circumstances that any person would have perceived as confusing and terrifying.  (*Id.* ¶ 115.)

As Hanneman approached Amir, Hanneman yelled "Show me your hands."  (*Id.* ¶ 116.)  Amir began to comply with Hanneman's order to "Show [Hanneman his] hands" and lowered the gun's barrel and muzzle further toward the ground.  (*Id.* ¶¶ 117-18.)  Amir raised his left hand in the air to the side of his head, but before Amir could fully comply with Hanneman's command to "Show me your hands," Hanneman fired three shots at Amir.  (*Id.* ¶¶ 119-20.)  Hanneman shot Amir only eight seconds after the MPD officers entered the apartment and without providing Amir with any warning.  (*Id.* ¶¶ 121, 125.)  Amir died from the gunshot wounds.  (*Id.* ¶ 145.)

Despite having the opportunity, neither Hanneman nor any officer had issued Amir a warning to drop the handgun or a warning that Amir would be shot if he did not drop the handgun.  (*Id.* ¶¶ 122-23.)  Despite having the opportunity, Hanneman did not attempt to retreat or find cover in the apartment's kitchen.  (*Id.* ¶ 124.)  Even though multiple officers had their weapons pointed at Amir and had a view of Amir's firearm, only Hanneman shot Amir.  (*Id.* ¶ 142.)

Amir was not suspected of a crime, never refused to comply with the officers' commands, and never resisted arrest or attempted to evade arrest by flight.  (*Id.* ¶¶ 128-30.)  Amir was shot as he began to comply with the officers' commands, including Hanneman's command to show the officers his hands.  (*Id.* ¶ 131.)  Alternatively, Amir

was shot before he was given an opportunity to comply with the officers' commands, including Hanneman's command.  (*Id.* ¶ 132.)

All movements of the handgun were made in an effort to comply with the officers' commands, including Hanneman's command.  (*Id.* ¶ 133.)  Amir never placed his finger on the handgun's trigger, never pointed the handgun's muzzle at any officer or other person, never pointed or moved the handgun's muzzle in the direction of any officer or other person, and never pointed the handgun's muzzle in a menacing way.  (*Id.* ¶¶ 134-37.)  Amir never took any menacing action, never moved the handgun in such a way that Hanneman or any other officer would believe Amir was aiming the handgun's muzzle at any officer or other person, and never discharged the handgun.  (*Id.* ¶¶ 138-40.)  Amir merely possessed the handgun.[2]

## II.   MPD has a well-documented history of unlawful customs and practices that were the moving force behind Amir's death.

Plaintiffs' FAC also details the MPD's notorious and widespread history of excessive force, particularly against Black individuals and other people of color.  This history is highlighted by recent findings from the Minnesota Department of Human Rights ("MDHR Findings") from its investigation into the MPD.  (*Id.* at Ex. A (citing ECF No. 1-1 at 12).)  Among other things, the MDHR Findings concluded that there was probable cause to believe that the City and MPD engaged in a pattern or practice of race

---

[2] To the extent the body worn camera footage that Defendants' have attempted to incorporate in their Answer is considered, Plaintiffs' allegations are supported by the footage, especially that of Officer Aaron Pearson's body worn camera.  Plaintiffs are entitled to all reasonable inferences in interpreting that footage.

discrimination in violation of state law. (*Id.* ¶ 158.) The MDHR Findings also stated that the City and MPD's training practices "reinforce a culture that exacerbates a pattern of race-based policing" and "teaches a paramilitary culture to new officer hires and reinforces these concepts with veteran officers," that MPD's trainings continue to embed a "warrior mindset," and that veteran MPD officers reinforce a culture of unquestioned compliance by other officers through "positioning community members as the enemy." (*Id.* ¶ 160 (citing MDHR Findings at 39-40).)

Consistent with this race-based policing, a preliminary report issued by the Minneapolis Department of Civil Rights Office of Police Conduct Review found that between September 1, 2021 and January 31, 2022, the MPD only executed no-knock warrants on people of color and that 80% of the no-knock warrant targets were Black. (*Id.* ¶¶ 152-54.) The City knew that the MPD was obtaining and "executing no-knock and other high-risk warrants against Black people at a disproportionate rate and that MPD had a custom and practice of intentionally seeking no-knock warrants because of race." (*Id.* ¶ 156.) Yet, the City allowed this practice to continue despite knowing the severe dangers posed by no-knock warrants, which were being disproportionately inflicted upon people of color. (*Id.* ¶¶ 37-46.) Cognizant of the concerns about the dangers of no-knock warrants raised by Minneapolis residents, Minneapolis Mayor Jacob Frey falsely proclaimed to the general public that his administration banned no-knock warrants. (*Id.* ¶¶ 57-60.)

The MPD's unlawful customs and practices are also the recent focus of a pattern and practice investigation by the United States Department of Justice ("DOJ"). (*Id.*

¶ 164).  On June 16, 2023, the DOJ announced its findings ("DOJ Rep.") that there was reasonable cause to believe that the City and MPD engage in a pattern or practice of conduct that deprives people of their rights under the Constitution and federal law.  (*Id.* ¶ 165; Ex. E, DOJ Rep.)  The DOJ determined that "persistent deficiencies in MPD's accountability systems, training, supervision, and officer wellness programs, which contribute to the violations of the Constitution and federal law. . . . For years, MPD used dangerous techniques and weapons against people who committed at most a petty offense and sometimes no offense at all."  (*Id.* ¶ 166 (citing DOJ Rep. at 1).)

The DOJ found, as relevant here, that "MPD uses excessive force, including unjustified deadly force and excessive less-lethal force" and that "MPD unlawfully discriminates against Black and Native American people when enforcing the law."  (*Id.* ¶ 167 (citing DOJ Rep. at 9).)  When discussing MPD's pattern or practice of violating the Fourth Amendment by using excessive force, the DOJ found that "MPD officers routinely use excessive force, often when no force is necessary."  (*Id.* ¶ 168 (citing DOJ Rep. at 10).)  The DOJ also found "that MPD officers often use unreasonable force (including deadly force) to obtain immediate compliance with orders, often forgoing meaningful de-escalation tactics and instead using force to subdue people."  (*Id.*¶ 169 (citing DOJ Rep. at 169).)  Finally, the DOJ found "that MPD officers discharged firearms in situations where there was no immediate threat . . . [, without warning, and] without assessing whether the person presents any threat, let alone a threat that would justify deadly force."  (*Id.* ¶¶ 170-72 (citing DOJ Rep. at 11-12).)

## Standards of Review

### I.   This Court has broad discretion to deny Defendants' motion.

Courts have held that the power to stay discovery arises from both Federal Rule of Civil Procedure 26(c) and the court's inherent authority to control their docket. *Villalobos v. United States*, No. 21-cv-2233 (NEB/JFD), 2022 WL 2452278, at *1-2 (D. Minn. July 6, 2022) (denying stay and collecting cases); *see also Cake Love Co. v. AmeriPride Servs., LLC*, No. 22-cv-1301 (PJS/ECW), 2023 WL 3255015, at *2-3 (D. Minn. May 4, 2023) (denying stay and collecting cases).  As with other discovery matters, this Court "has broad discretion regarding decisions to stay proceedings." *Villalobos*, 2022 WL 2452278, at *1 (citing *Clinton v. Jones*, 520 U.S. 681, 706 (1997)) (additional citation omitted); *see also Pavlik v. Cargill, Inc.*, 9 F.3d 710, 714 (8th Cir. 1993) ("The trial court has broad discretion to decide discovery motions and we will not disturb such a ruling absent a gross abuse of discretion affecting the fundamental fairness of the trial.").  A district court's power to stay discovery includes the broad discretion to deny a stay of discovery pending resolution of a dispositive motion based on qualified immunity.  *See Lovelace v. Delo*, 47 F.3d 286, 287-88 (8th Cir. 1995) (affirming denial of motion to stay despite assertion of qualified immunity).

"A proponent of a stay has a **heavy burden** to establish the need of the stay." *Cake Love*, 2023 WL 3255015, at *2 (emphasis added) (citations omitted).  Courts generally require that a movant meet their burden by demonstrating that various practical factors weigh in their favor, including:

> (1) whether the movant has shown it is reasonably likely to succeed on the merits of its dispositive motion; (2) whether the movant has demonstrated it will suffer hardship or inequity if the matter is not stayed; (3) whether there will be prejudice to the non-moving party if the matter is stayed; and (4) what outcome is best for the conservation of judicial resources.

*Id.* (citing *Villalobos*, 2022 WL 2452278, at *2 (citation omitted)).

## II.   Overview of Section 1983 and qualified immunity principles.

"The essential elements of a § 1983 claim are (1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) (citation omitted). "[V]icarious liability is inapplicable to . . . § 1983 suits." *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (quotation omitted). Thus, to hold a municipality liable under Section 1983, a plaintiff must demonstrate that an unconstitutional policy or custom was the cause of the plaintiff's constitutional injury. *Berry v. Hennepin Cnty.*, No. 20-cv-2189 (WMW/JFD), 2022 WL 3579747, at *3 (D. Minn. Aug. 19, 2022) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). A plaintiff may also establish a claim directly against a municipality for a failure to train its employees if that failure was the cause of plaintiff's constitutional injury. *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

In response to a Section 1983 claim, an **individual defendant** may assert a defense of qualified immunity. *See Owen v. City of Independence, Mo.*, 445 U.S. 622, 650-57 (1980) (stating defense of qualified immunity not available to municipalities). The defense of "[q]ualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or

statutory right of which a reasonable person would have known." *Montoya v. City of Flandreau*, 669 F.3d 867, 872 (8th Cir. 2012) (reversing trial court's grant of qualified immunity on excessive force claim).  A reviewing court must ask: "(1) whether the facts alleged, construed in the light most favorable to the nonmoving party, establish a violation of a constitutional right, and (2) whether such right was clearly established so that a reasonable officer would have known her actions were unlawful." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 456 (8th Cir. 2011) (citation omitted).  This Court has discretion to address these issues in either order; however, the sequence set forth above "is often appropriate." *Shannon v. Koehler*, 616 F.3d 855, 862 (8th Cir. 2010) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)) (additional citations omitted).

Constitutional rights are clearly established when "a reasonable official would understand that what he is doing violates that right."  *Glover v. Paul*, No. 22-2640, ---F.4th---, 2023 WL 5440861, at *1 (8th Cir. Aug. 24, 2023) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Plaintiffs are not required to "identify 'a case directly on point,' but controlling authority or a robust consensus of persuasive authority must put the constitutional question 'beyond debate.'"  *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011)).  "The dispositive question is whether the violative nature of particular conduct is clearly established." *Id.* (quotations omitted).  Since there is no requirement that a plaintiff "find a case where the very action in question has previously been held unlawful," there critical inquiry is whether the defendant had "fair warning" that his conduct was unconstitutional. *Rokusek v. Jansen*, 899 F.3d 544, 548 (8th Cir. 2018) (quotations omitted).  Therefore, "officials can still be on notice that their conduct

violates established law even in novel factual circumstances." *Glover*, 2023 WL

5440861, at *5 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741(2002)).

Finally, "[t]he defendant bears the burden of proof on this affirmative defense."

*Herts v. Smith*, 345 F.3d 581, 585 (8th Cir. 2003) (citation omitted); *see also White v*

*McKinley*, 519 3d 806, 813 (8th Cir. 2008) ("The party asserting immunity always has

the burden to establish the relevant predicate facts, and at the summary judgment stage,

the nonmoving party is given the benefit of all reasonable inferences.").

## III.    Motion for judgment on the pleadings standard.

Defendants will likely argue that its 12(c) motion for judgment on the pleadings be

handled in accordance with Rule 12(b)(6) motion to dismiss standards. *Jenkins v. Univ.*

*of Minn.*, 50 F.Supp.3d 1084, 1102 n.9 (D. Minn. Sep. 25, 2014) (citing *Westcott v. City*

*of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990)).  Thus, the court must "accept as true all

facts pleaded by the non-moving party and grant all reasonable inferences from the

pleadings in favor of the non-moving party."  *Haney v. Portfolio Recovery Assocs.*, 895

F.3d 974, 980-81 (8th Cir. 2016) (quotations omitted).  A reviewing court must ask itself

if the claim is merely "plausible on its face."  *Id.* at 981 (quoting *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A court

"assesses plausibility by drawing on [its] own judicial experience and common sense."

*Id.* (quotations omitted).  A court examines "the plausibility of the plaintiff's claim as a

whole, not the plausibility of each individual allegation."  *Id.* (quotation omitted).

A district court's analysis of a 12(b)(6) motion is "not strictly limited to the four corners of complaints." *Dittmer Props., L.P. v. F.D.I.C.*, 708 F.3d 1011, 1021 (8th Cir. 2013). The Eighth Circuit holds that:

> While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; without converting the motion into one for summary judgment.

*Id.* (quotation and citation omitted).

As touched upon again below, the Defendants made a strategic decision to answer the First Amended Complaint ("FAC") and have attempted to incorporate a wide body of evidence that is not attached to or incorporated by Plaintiffs' FAC. Defendants have notified the Court and Plaintiffs of their intention to move for judgment on the pleadings, however no such motion has been filed to date. Plaintiffs anticipate disputes regarding the appropriate record on the Defendants' forthcoming motion for judgment on the pleadings. Regardless, all inferences must be made in Plaintiffs' favor on all evidence considered at this stage of the case. *See also Tolan v. Cotton*, 572 U.S. 650, 659 (2014) (criticizing the Fifth Circuit for noncompliance with the summary judgment and qualified immunity standards).

## <u>Argument</u>

I.  **Defendants have not met their burden of demonstrating that a stay based upon qualified immunity is warranted.**

    A.  **It is clearly established that the mere possession of a gun does not constitute an immediate threat justifying deadly force.**

An officer's use of force violates the Fourth Amendment when it is unreasonable. *Cole v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020) (citations omitted). In assessing objective reasonableness, courts generally weigh the *Graham* factors, i.e., (1) severity of crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is attempting to actively resist or flee. *Partridge v. City of Benton, Arkansas*, 929 F.3d 562, 565 (8th Cir. 2019) ("*Partridge I*") (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (additional citation omitted). When deadly force is involved, the focus is typically on the threat posed by the subject:

> It is reasonable for an officer to use deadly force if he has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others. . . . But where a person poses no immediate threat to the officer and no threat to others, deadly force is not justified.

*Id.* (quoting *Rogers v. King*, 885 F.3d 1118, 1121 (8th Cir. 2018); *Ellison v. Lesher*, 796 F.3d 910, 916 (8th Cir. 2015)) (quotations omitted).

Defendants do not allege in their memorandum in support of this motion for stay that Amir was a suspect, nor should they be permitted to do so under proper application of the Rule 12 standard on their forthcoming dispositive motion. Nor do Defendants argue that Amir attempted to resist or evade by flight. Nor do Defendants even expressly argue that Amir posed an imminent threat warranting application of deadly force. In fact,

Defendants—despite bearing many burdens on this motion for a stay—do not even lay out the standard of review for use of deadly force.  Ultimately, however, the thrust of Defendants argument appears to be that deadly force was warranted because Amir had a gun.

In the United States, we recognize a "fundamental" right to bear arms.  *United States v. Sitladeen*, 64 F.4th 978, 988 (8th Cir. 2023) (citation omitted).  "Generally, an individual's mere possession of a firearm is not enough for an officer to have probable cause to believe that individual poses an immediate threat of death or serious bodily injury; the suspect must also point the firearm at another individual or take similar 'menacing action.'"  *Cole*, 959 F.3d at 1132 (citations omitted).  Circuits throughout the country have made clear that mere possession of a firearm does not provide immediate justification for police to shoot an individual.  *See, e.g.*, *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016) ("[T]he mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit. . . . [T]he ultimate determination depends on the risk presented, evaluating the totality of the circumstances surrounding the weapon."); *George v. Morris*, 736 F.3d 829, 838-39 (9th Cir. 2013); *King v. Taylor*, 694 F.3d 650, 653, 662-63 (6th Cir. 2012).  "Whether a reasonable officer could conclude [a subject] posed an immediate threat depends on the circumstances at the time of the shooting."  *Partridge I*, 929 F.3d at 565.

In *Cole*, an intoxicated man, Richards, was engaged in a dispute with his uncle, Underwood.  959 F.3d at 1130.  The uncle headed into his home while Richards retrieved a long gun from his vehicle.  *Id.*  The uncle slammed the door shut.  *Id.*  Richards

emerged from his vehicle with a "gun vertically facing either the sky or the ground but 'never . . . pointed at Underwood." *Id.* Officer Hutchins arrived on the scene right at this time. *Id.* Five seconds after the uncle slammed the door, while Richards held the gun vertically, "Officer Hutchins fired on Richards five times without warning, striking and killing him." *Id.* at 1131.

The court denied qualified immunity. In doing so, it recognized that "[w]hen a warning is feasible, the failure to warn adds to the unreasonableness of the use of deadly force." *Id.* at 1133 (quotation omitted). In part, the court found that "it was clearly established that person does not pose an immediate threat of serious physical harm to another when, although the person is in possession of a gun, he does not point it at another or wield it in an otherwise menacing fashion." *Id.* at 1134. The *Cole* Court's reliance on the Sixth Circuit's decision in *Brandenburg v. Cureton* is particularly instructive, where the court held—in the context of serving a warrant—that "an officer's use of deadly force against suspect who had previously threatened to kill the officer and fired warning shots at him could be found unreasonable if it were true that the suspect was not grasping the trigger or aiming his weapon at the officer when he was shot." 882 F.2d 211, 213, 215 (6th Cir. 1989) (quotations omitted).

Similarly, in *Partridge I*, the decedent was not suspected of a crime but was armed, suicidal, and under the influence of cough medication and possibly marijuana. 929 F.3d at 565. "Taking the facts in the complaint as true, [the decedent] simply began to move the gun away from his head, was shot as he began to move the gun away from his head, per [the officer's] orders to 'drop the gun' and never pointed the gun at the

officers." *Id.* "On these facts, no reasonable officer could conclude that a compliant individual posed an immediate threat." *Id.*

On remand, the district court entered summary judgment on the Fourth Amendment deadly force claim at issue in *Partridge I.* *Partridge v. City of Benton, Arkansas*, 70 F.4th 489, 491 (8th Cir. 2023) (*Partridge II*). Once again, the district court was reversed. The Eighth Circuit held that there was "a genuine dispute of material fact whether [the decedent] pointed his gun at the officers. This precludes summary judgment." *Partridge II*, 70 F.4th at 493; *see also Wealot v. Brooks*, 865 F.3d 1119, 1125 (8th Cir. 2017) (cautioning that "[b]efore the reasonableness of the officers' conduct can be assessed, two genuine disputes of material fact must be resolved: (1) whether the officers saw Waylen throw his gun and therefore knew he was unarmed, and (2) whether Waylen was turning around to the officers with his hands raised to surrender" and reversing pretrial grant of qualified immunity).

### B.   Plaintiffs' First Amended Complaint alleges a violation of clearly established law.

Like the decedent in *Partridge I*, Amir was not suspected of a crime and merely possessed a handgun. (FAC ¶¶ 128, 141.) Amir also never refused to comply with the officers' commands and never resisted arrest or attempted to evade arrest by flight. (*Id.* ¶¶ 129-30.) Like the decedent in *Partridge I*, who "was shot as he began to move the gun away from his head, per [the officer's] orders to 'drop the gun' and never pointed the gun at the officers," Amir "was shot as he began to comply with the officers' commands, including Hanneman's command" to show the officers his hands. (*Id.* ¶ 131.)

Alternatively, Amir was shot before he was given an opportunity to comply with the officers' commands, including Hanneman's command." (*Id.* ¶ 132.) Amir attempted to comply with the commands being yelled at him. (*Id.* ¶¶ 131, 133.)

Moreover, like the decedents in *Partridge I* and *Cole*, Amir never pointed the handgun's muzzle at any officer or other person, never pointed or moved the handgun's muzzle in the direction of any officer or other person, and never pointed the handgun's muzzle in a menacing way. (*Id.* ¶¶ 134-37.) Amir also never placed his finger on the handgun's trigger. (*Id.* ¶ 133.) Amir never took any menacing action, never moved the handgun in such a way that Hanneman or any other officer would believe Amir was aiming the handgun's muzzle at any officer or other person, and never discharged the handgun. (*Id.* ¶¶ 138-40.)

Similar to the officer in *Cole*, neither Hanneman nor any officer issued Amir a warning to drop the handgun or a warning that Amir would be shot if he did not drop the handgun, despite having the opportunity. (*Id.* ¶¶ 122-23.) Hanneman also did not attempt to retreat or find cover in the apartment's kitchen, despite having the opportunity. (*Id.* ¶ 124.)

Defendants point to the body worn camera as being dispositive of whether Plaintiffs have sufficiently alleged a violation of Amir's clearly established constitutional rights. (Defs. Mem. at 4.) This is not so. At this stage of the proceedings, a court deciding whether an officer's use of force was objectively reasonable must accept the nonmoving party's allegations, unless they are "blatantly contradicted by the record." *See Michael v. Trevena*, 899 F.3d 528, 533 (8th Cir. 2018) (reversing and remanding

district court's grant of summary judgment "based on its finding that 'Michael's report of his sister intentionally running over his foot was clearly false.'  Neither the dash cam video nor audio recordings can sustain that conclusion.  The recordings are at best inconclusive and, in finding otherwise, the district court resolved fact disputes in the officers' favor, which is impermissible at summary judgment in any civil case, including a § 1983 suit involving the doctrine of qualified immunity."); *Burbridge v. City of St. Louis, Missouri*, 2 F.4th 774, 781 (8th Cir. 2021) ("We have carefully reviewed the videos of the incident, and we are unable to clearly see that [defendant's] involvement was limited to kneeling on [the plaintiff's] legs, nor are we able to otherwise parse the actions of individual officers. We therefore conclude that the videos do not blatantly contradict [the plaintiff's] version of events[.]").  While the body worn camera footage captures part of the botched raid, it does not conclusively disprove the FAC's allegations. *Thompson v. Monticello*, 894 F.3d 993, 999 (8th Cir. 2018) (holding qualified immunity inappropriate because video did not conclusively resolve factual disputes as "it captures only part of the incident, and . . . does not clearly show where Thompson's other hand was positioned when he turned to point at his house.").  Defendants ask this Court to impermissibly resolve fact disputes after reviewing the footage, to grant them a stay of discovery.  The Court should decline Defendants' request.

Taking the facts alleged in Plaintiffs' FAC in the light most favorable to the nonmoving party, Plaintiffs have alleged a violation of Amir's clearly established constitutional rights.  At most, the Defendants have highlighted that fact disputes exist as to whether Amir's clearly established constitutional rights were violated, which warrants

discovery. *See Lovelace*, 47 F.3d at 287 (declining to follow a bright line rule from dicta in *Harlow* and recognizing that discovery may be appropriate on qualified immunity issues) (citing *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *see also Hill v. City of Minneapolis*, No. 12-cv-738 (MJD/AJB), 2012 WL 7761496, at *6 (D. Minn. Dec. 26, 2012) ("A primary purpose of the qualified immunity defense is to protect government officials from the burdens of trial of discovery. Even though some predicate facts have been alleged in this matter, qualified immunity is typically considered on motion for summary judgment and generally involves consideration of facts elicited through at least some additional discovery." (citations omitted)) *report and recommendation adopted*, 2013 WL 1104257 (D. Minn. Mar. 18, 2013). Defendants fail to meet their heavy burden to establish the need for stay as they are not entitled to judgment on the pleadings. Thus, this Court should find no good cause exists to grant a stay, deny Defendants' request to stall the resolution of this case, and allow discovery to move forward.

**C.    Defendants' motion for judgment on the pleadings will not dispose of this entire action.**

Defendants state that their forthcoming motion for judgment on the pleadings will assert "qualified immunity and vicarious qualified immunity arguing that the BWC demonstrates it was not clearly established that Officer Hanneman could not shoot Mr. Locke under the circumstances." (Defs. Mem. at 3.) Defendants further argue that a stay is warranted because "the motion would dispose of the entire lawsuit[.]" (*Id.* at 4.) Defendants' arguments are flawed for several reasons.

18

      **1.**     **Plaintiffs alleged plausible *Monell* and *Canton* claims that do not hinge on Hanneman's qualified immunity defense.**

Just as vicarious liability does not exist in Section 1983 actions, the concept of "vicarious qualified immunity" does not exist. Attempts to assert this doctrine have been rejected in similar concepts. *See, e.g., Bacon v. Hennepin Cnty. Med. Ctr.*, No. 06-cv-2359 (PJS/RLE), 2007 WL 4373104, at *13 (D. Minn. Dec. 11, 2007) ("Further, as HCMC admits, no court in the country has ever granted *vicarious* qualified immunity to a government defendant in an FMLA suit." (Emphasis in original)). Instead, a grant of qualified immunity may sometimes result in the dismissal of a claim if the Court finds that no constitutional violation occurred. *Peirce v. Aswegan*, No. 22-cv-2664 (DWF/DJF), 2023 WL 2898595, at *5 (D. Minn. Apr. 11, 2023) ("Because Peirce has failed to allege a constitutional violation, his claim against the City of Elk River also fails.").

However, even if qualified immunity is granted, Plaintiffs' *Monell* claims can survive. *See Speer v. City of Wynne, Arkansas*, 276 F.3d 980, 985-87 (8th Cir. 2002) (confirming that a public entity or supervisory official may be liable under § 1983, even though government individuals were not personally liable) (citations omitted). If an individual defendant violates a plaintiff's fourth amendment rights but is entitled to qualified immunity, the plaintiff can still proceed in a claim that the official city policy led directly to the constitutional violation. *See Bulfin v. Rainwater*, No. 4:20 CV 689 JMB, 2022 WL 17092332, at *13 (E.D. Mo. Nov. 21, 2022), *motion for relief from judgment denied,* No. 4:20 CV 689 JMB, 2023 WL 3452231 (E.D. Mo. May 15, 2023)

19

(citing *Kuha v. City of Minnetonka,* 365 F.3d 590 (8th Cir. 2003), *abrogated on other grounds*, *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 395-96 (8th Cir. 2007)). Specifically, "'[t]his is true even if the arresting officers are not held responsible because of some good faith belief, meriting qualified immunity.'"  *Id.* (quoting *Kuha,* 365 F.3d 590).  Where officers are granted qualified immunity "based on a lack of clearly established law," it is not determinative of whether *Monell* claims would be foreclosed. *Est. of Walker v. Wallace*, 881 F.3d 1056, 1062 (8th Cir. 2018) (Kelly, J., concurring) (citing *Owen*, 445 U.S. at 657-58).

As set forth in the FAC and above, Plaintiffs have alleged a host of customs, practices, and a failure to train that plausibly allege violations under *Monell* and *Canton.* These theories do not all hinge on whether Hanneman is granted qualified immunity, such as the MPD, through its individual officers, only obtaining and executing no-knock warrants against Black individuals.  (FAC ¶¶ 194-207); *see also Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) ("[A]lthough there must be an unconstitutional act before a municipality can be held liable, there need not be a finding that a municipal employee is liable in his or her individual capacity." (quotations omitted)).  Defendants do not address the plausibility of Plaintiffs' *Monell* claims, other than to state that they are subject to vicarious qualified immunity, which again, does not exist.  Accordingly, the Defendants have not carried their burden to demonstrate that a stay is warranted as to *Monell* claims that the City has not and cannot show will rise and fall on a qualified immunity finding as to Hanneman.  *See also Webb*, 889 F.3d at 487

(noting that the denial of dismissal of *Monell* claim is only subject to interlocutory review if "inextricably intertwined" with the question of immunity).

> ## 2.   Hanneman's defense of qualified immunity will not dispose of Plaintiffs' state law wrongful death claims.

In addition to Plaintiffs' Section 1983 claims, Plaintiffs have alleged a supplemental Minnesota state law claim for wrongful death.  (FAC ¶¶ 208-15.)  Qualified immunity is not a defense to this claim, as the potential defense to a state law claim is "official immunity."  *Johnson v. Morris*, 453 N.W.2d 31, 42 (Minn. 1990) (citations omitted) (distinguishing qualified and official immunities).[3]  The common law doctrine of official immunity "protects from personal liability a public official charged by law with duties that call for the exercise of judgment or discretion unless the official is guilty of a willful or malicious wrong."  *Watson by Hanson v. Metro. Transit Comm'n*, 553 N.W.2d 406, 414 (Minn. 1996) (quotation omitted).  Defendants cite no case standing for the proposition that a stay of discovery is warranted pending a motion to dismiss on official immunity, nor would the jurisprudence involving official immunity compel such a result.

"The law concerning a motion to dismiss for failure to state a claim is not hospitable to the doctrine of official immunity." *Stresemann v. Jesson*, A13-1967, 2015 WL 7693339, at *2 (Minn. App. Nov. 30, 2015). "In Minnesota, a defendant who seeks the protection of official immunity usually seeks to satisfy the burden of proof by

---

[3] It appears from the "Introduction" to Defendants' memorandum that they are invoking this defense as well, but there is no further mention of it throughout the memorandum.

asserting official immunity in a motion for summary judgment." *Id*. (citing *Vassallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn. 2014); *Thompson v. City of Minneapolis*, 707 N.W.2d 669, 673 (Minn. 2006); *Mumm v. Mornson*, 708 N.W.2d 475, 480-81 (Minn. 2006); *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 655 (Minn. 2004); *Briggs v. Rasicot*, 867 N.W.2d 217, 220 (Minn. App. 2015); *Shariss v. City of Bloomington*, 852 N.W.2d 278, 280 (Minn. App. 2014)). "Indeed, we are unaware of any precedential opinion of a Minnesota appellate court in a case in which a defendant asserted official immunity in a motion to dismiss pursuant to rule 12.02(e)." *Id*.

The need for discovery is critical in cases involving ministerial duties because Minnesota courts have recognized that both unwritten policies and training can create ministerial duties. *See, e.g., Bond by and through Bond v. ISD #191*, No. A21-0688, 2022 WL 92961, at *4-5 (Minn. App. Jan. 10, 2022) (collecting cases); *see also Ellis v. City of Minneapolis*, No. A20-0443, 2021 WL 668084, at *3 (Minn. App. Feb. 22, 2021) ("A ministerial duty need not be 'imposed by law' and may arise from an 'unwritten policy' or 'protocol' that dictates a particular course of conduct.") (quoting *Anderson*, 678 N.W.2d at 655).

Accordingly, qualified immunity cannot dispose of Plaintiffs' state law claim, nor should the doctrine of official immunity at these early stages of the proceedings.

## II. The practicalities of this case weigh against a stay.

Since this Court has inherent discretion over its docket, it is appropriate to consider the practicalities of a motion to stay in this specific case. As detailed throughout

this memorandum, Defendants fail to carry their burden on showing that they are likely to succeed on the merits of their forthcoming motion for judgment on the pleadings. Defendants make generalized statements about hardship and inequity but fail to cite any specific or actual hardships that will occur.  On the other hand, Plaintiffs' state law wrongful death claims are subject to a three-year statute of limitations period, which expires on February 2, 2025.  If the motion for judgment on the pleadings is argued in November 2023, it is not outside the realm of possibility that it could take the Court nearly a year to rule on the motion., i.e., the end of 2024.  Regardless of whether the case proceeds at the district court or an interlocutory appeal, Plaintiffs' time to conduct discovery to amend their complaint to potentially add other parties on the wrongful death claim will be minimal, if not nonexistent.

Defendants have shown no factual or legal basis for the dismissal of the state law wrongful death claim; thus, discovery for that claim should proceed to discovery regardless of the qualified immunity decision.  Similarly, Defendants fail to meet their burden of demonstrating how the *Monell* and *Canton* claims will necessarily be dismissed.  Minneapolis and MPD officials, including Hanneman, will all still be subject to discovery should any one of those claims proceed as they should.  Thus, Defendants fail to show that there will be a conservation of resources by staying the entirety of discovery now.

## Conclusion

For the foregoing reasons, Defendants' motion to stay discovery should be denied in its entirety.

**NEWMARK STORMS DWORAK LLC**

**Dated:** September 15, 2023

/s/ Jeffrey S. Storms
Jeffrey Storms #0387240
Ryan O. Vettleson, #0312915
Naomi E. H. Martin, #0402332
222 South 9th Street, Suite 470
Minneapolis, MN 55402
Telephone:  (612) 455-7050
Facsimile:  (612) 455-7051
E-mail: jeff@newmarkstorms.com
             ryan@newmarkstorms.com
             naomi@newmarkstorms.com

- and -

**ROMANUCCI & BLANDIN**

/s/ Bhavani Raveendran
Antonio M. Romanucci (Admitted pro hac vice)
(Illinois ARDC No, 6190290)
Bhavani Raveendran (Admitted pro hac vice)
(Illinois ARDC No, 6309968)
Sam Harton (Admitted pro hac vice)
(Illinois ARDC No. 6342112)
321 North Clark St., Suite 900
Chicago, Illinois 60654
Phone: 312-458-1000
Fax: 312-458-1004
Email: aromanucci@rblaw.net
braveendran@rblaw.net
sharton@rblaw.net

- and -

**BEN CRUMP LAW**
Christopher M. O'Neal (*pro hac vice*)
(Florida Bar No. 0910201)
717 D Street N.W., Suite 310
Washington, D.C. 20004
E-mail: chris@bencrump.com