UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Karen Wells and Andre Locke as co-trustees for the next of kin of Amir Rahkare Locke, deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>Mark Hanneman, in his individual capacity as a Minneapolis police officer, and the City of Minneapolis,<br><br>Defendants. | Case No. 23-cv-00273-WMW-DLM<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS** |

## INTRODUCTION

Defendants City of Minneapolis and Mark Hanneman respectfully submit this memorandum of law in support of their motion for judgment on the pleadings. The Amended Complaint, search warrant application, and body-worn camera (BWC) video footage indisputably establish that it was objectively reasonable for Defendant Officer Mark Hanneman to fire his weapon at Amir Locke because, under the circumstances, Officer Hanneman could have reasonably believed that Locke represented an immediate threat of death or serious physical harm to him or another officer. Consequently, Officer Hanneman is not liable for Locke's death under any legal theory and the Amended Complaint must be dismissed.

Plaintiffs' Amended Complaint fails to set forth a viable legal claim. It is indisputable that the Minneapolis Police Department (MPD) was informed that a judge had issued a no-knock, nighttime search warrant related to a murder investigation. A high-powered firearm round, capable of piercing body armor, had been used in the murder. The murder suspects were depicted in social media images with firearms, including some with extended magazines. The murder suspects had also been linked to other violent crimes. The murder suspects were associated with the Bolero Flats Apartments that were the subject of the court-approved search warrant. A suspect in the murder was seen going into the Bolero Flats Apartments with a weapon that the St. Paul Police Department (SPPD) suspected was the murder weapon. That same person had requested a key fob for apartment 701. Officer Hanneman encountered Locke in apartment 701.

The BWC recording establishes that once MPD officers entered apartment 701, announcing they were police conducting a search warrant, an unidentified person, later identified as Locke, looked over a couch at the officers and began to move around while concealed under a blanket. Locke continued to move under the blanket as officers continued to enter and give additional commands for people, including Locke, to show their hands and get on the ground. When Locke partially emerged from the blanket, he was holding a handgun that was pointed in Officer Hanneman's direction, and there were multiple other officers in the

apartment near Locke. As Locke began to raise his gun up, Officer Hanneman fired his handgun at Locke. Locke passed away from his injuries.

Under these circumstances, as a matter of law, Officer Hanneman had probable cause to believe that Locke posed a threat of death or serious physical harm to himself and other officers.  Therefore, Officer Hanneman's use of deadly force was objectively reasonable. As a matter of law, Officer Hanneman is also entitled to qualified and official immunity. Accordingly, the *Monell* and *Canton* liability claims also fail as a matter of law because they are not supported by any underlying constitutional violation by a City employee. In addition, the wrongful death claim in the Amended Complaint must be dismissed for failure to state a claim.  Defendants ask this Court to grant them judgment on the pleadings.

## FACTUAL BACKGROUND

## I.   FACTS DEPICTED IN THE SEARCH WARRANT APPLICATION AND AMENDED COMPLAINT

The St. Paul Police Department provided the following facts in support of its application for a non-knock search warrant.[1]  (Doc. 48).

---

[1] While courts generally may not consider materials outside the pleadings in deciding whether to grant a motion for judgment on the pleadings, courts may properly consider, among other things, public records, including the SPPD's application for search warrants here. *Noble Sys. Corp. v. Alorica Cent.*, LLC, 543 F.3d 978, 982 (8th Cir. 2008).

On January 10, 2022, around 9:33 p.m., SPPD responded to a report that a man was shot. (Doc. 17 at 3.)  This man, Otis Elder, ultimately died from a gunshot wound caused by a .223 caliber round, a type of ammunition that can penetrate police body armor. (*Id.* at 3, 9.)  SPPD began an extensive investigation into the murder, the details of which are described in the search warrant application. (*Id.* at 1-10.) As a result of the extensive investigation, SPPD identified multiple suspects for the murder of Otis Elder.  Those individuals were frequently depicted on social media in photographs displaying firearms, and were connected to other crimes including robberies and firearm incidents. (*Id.* at 5-7.)

SPPD's investigation concluded that the suspects were associated with apartment units 701, 1402, and 1403 of the Bolero Flats Apartments at 1117 S. Marquette Avenue in Minneapolis. (*Id.* at 5-7.) One of the murder suspects was seen going into Bolero Flats Apartments with a weapon that the SPPD suspected was the murder weapon. (Doc. 17 at 6.)  That same person had requested a key fob for apartment 701.  (*Id.* at 7.)

Based on this information, on January 31, 2022, SPPD applied for and obtained search warrants for apartment units 701, 1402, and 1403 at the Bolero Flats Apartments. (Doc. 40 (Amended Complaint) at ¶¶ 70-71.) These signed warrants were daytime, knock-and-announce search warrants. (*Id.* at 70.) Plaintiffs allege that SPPD requested assistance from the MPD in executing the

warrants. (Amended Complaint at ¶ 83.)  Plaintiffs allege that MPD supervisors refused to assist with the warrants unless SPPD obtained no-knock search warrants. (*Id.* at ¶ 84.)  SPPD applied for and was granted no-knock warrants to search the apartments at Bolero Flats, including apartment 701. (*Id.* at ¶ 86.)

The search warrant was executed on apartment 701 on February 2, 2022.  (*Id.* at ¶ 90.)  Locke was asleep on the couch in apartment 701 when officers began executing the search warrant.  (*Id.* at ¶¶ 90, 92.)  Before Officer Hanneman fired his weapon, Locke was laying on a couch covered in a blanket, and, as he began to stand, Locke "grabbed" a "handgun" and held it in his right hand.  (*Id.* at ¶¶ 112-113.)

## II.   FACTS DEPICTED IN THE BWC VIDEO.

The following is a description of what is audible and visible on BWC video recordings from the MPD officers that executed the search warrant on apartment 701.[2]  (*See* Doc. 16/47.)  At 6:48:02 a.m., MPD officers unlocked the door to

---

[2] Courts from this district routinely conclude that BWC videos are "embraced by the pleadings" and proper to consider on a motion to dismiss. *See e.g.*, *Ching as Trustee for Jordan v. City of Minneapolis*, 73 F.4th 617, 621 (8th Cir. 2023) ("Videos of an incident are necessarily embraced by the pleadings, and we will consider the videos here.")  A court deciding a motion to dismiss — or motion for judgment on the pleadings — may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint or answer. *See, e.g.*, *Vernio v. Higgins*, No. CV 19-3024 (DWF/LIB), 2020 WL 3542757, at *2 (D. Minn. June 30, 2020) (citing *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)); *Sinclair Ref. Co. v. Stevens*, 123 F.2d 186, 188–89 (8th Cir. 1941)(considering exhibit attached to answer).  The facts are to be viewed

apartment 701. (Doc. 16/47 (Ex. 3 (Hanneman BWC)) at 6:48:02-04.)   Officers

shouted, "Police search warrant" and stepped into the apartment. (*Id.* at 6:48:05.)

Officers loudly repeated "police search warrant" as they moved further into the

apartment. (*Id.* at 6:48:06-08.)

As MPD Sergeant Sysaath moved into the living room, Locke was visible on

the couch lifting his head with his face turned toward Officer Hanneman, who was

in front of Sysaath. (Doc. 16/47 (Ex. 1 (Sysaath BWC)) at 06:48:12-14.) As MPD

Sergeant Carlson moved into the apartment, the top of Locke's head was visible

over the back of the couch, and Locke's face turned toward Carlson; Locke's face

was illuminated by Carlson's flashlight. (Doc. 16/17 (Ex. 2 (Carlson BWC)) at

06:47:28.)

An officer shouted, "Let me see your hands!" (*Id.* at 6:47:28.) Locke's hands

moved up and then down back under a blanket laying atop of him. (*Id.* at 6:47:29-

30.) Locke moved around on the couch going up and down and side to side, and

the blanket went back over his head. (*Id.* at 6:47:28-6:47:32.)   An officer yelled,

"Hands! Hands!" (*Id.*)  An officer yelled, "Police search warrant." (Doc. 16/17 (Ex.

5 (Pearson BWC at 6:48:07; Carlson BWC at 6:47:32; Hanneman BWC at 6:48:09-

---

"in the light depicted by the videotape." *Scott v.* Harris, 550 U.S. 372, 380-381
(2007).

10.))[3] Hanneman shouted, "Hands. Hands. Hands." (Hanneman BWC at 6:48:9-10.)  An officer yelled, "Get on the fucking ground." (*Id*.) Locke continued to move around under the blanket in a crouched position. (Pearson BWC at 6:48:09.) Locke's hair and part of the side of his face were visible from Pearson's position. (Pearson BWC at 06:48:09-10.)  Hanneman was positioned at the couch and Locke can be seen on the couch leaning forward onto the ottoman holding a handgun. (Pearson BWC at 6:48:09-10.)

As the officers continued to approach, a handgun was visible under Locke's blanket. (Pearson BWC at 06:48:10.) Locke was holding the firearm in his right hand. (*Id*.) The firearm was pointed in Hanneman's direction, and just to the right of Officer Aaron Pearson position. (*Id*.) Hanneman ordered, "Show me your hands." (Hanneman BWC at 6:48:12-13.) Locke began to raise his gun. (Pearson BWC at 6:48:09-6:48:10.)  At this moment, Hanneman fired his handgun at Locke. (*Id*. at 06:48:11; Sysaath BWC at 6:48:13.) After Locke was shot, Locke dropped the gun; he then crawled toward where the gun had landed and attempted to get up. (Pearson BWC at 6:48:12-6:48:15.) Hanneman laid his body down on top of Locke. (*Id*. at 6:48:15.) An officer asked Hanneman if the gun laying on the ground was

---

[3] The timestamps for each officers' BWC are inconsistent with each other. Accordingly, citations to specific BWC footage include the timestamp of the referenced event from the individual officers' BWC footage. However, to establish an overall timeline, the timing of events listed in the factual narrative of Defendants' Memorandum is based on the timestamps from Officer Hanneman's BWC.

his, and Hanneman stated, "No. That's his. He had that and pointed it at me." (*Id.* at 6:48:27-33.) Another officer responded: "Yep. I saw it. I saw it. I saw it." (*Id.* at 6:48:27-33.)

## STANDARD OF REVIEW

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is appropriate only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law." *Ashley Cty, Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009) (quotations and citations omitted). A motion for judgment on the pleadings under Rule 12(c) is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009). The distinction between a Rule 12(c) motion and a Rule 12(b)(6) motion is "purely formal." *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). "A Rule 12(c) motion may assert the defense of failure to state a claim upon which relief can be granted." *Id.*

A plaintiff's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotations and citations omitted). "A claim has facial plausibility when the [party] pleads factual content that allows the court to draw the reasonable

8

inference that the [alleged party] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556–67). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664. In reviewing a motion for judgment on the pleadings, the Court considers all facts alleged in the complaint as true to determine if the complaint states a claim for "relief that is plausible on its face." *Branden v. Wal-Mart Store, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court construes the complaint in the light most favorable to the non-movant, drawing all inferences in his favor. *Saterdalen v. Spencer*, 725 F.3d 838, 841 (8th Cir. 2013).  "When considering a motion for judgment on the pleadings a court must generally ignore all materials outside the pleadings unless they are matters of public record, attached to the pleadings, or part of the record of the case." *Montgomery v. Indep. Sch. Dist. No. 709*, 109 F. Supp. 2d 1081, 1087 (D. Minn. 2000) (citing *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir.1999)). However, a document attached to a pleading "is part of the pleading for all purposes." Fed. R. Civ. P. 10(c). The document attached to the pleading may properly be considered even if it contradicts the allegations in the complaint. *Zean v. Fairview Health Services*, 858 F.3d 520, 527 (8th Cir. 2017) (questionnaire and consent form were embraced by the complaint even though they contradicted consent allegation in claim arising out of a contractual

relationship). When reviewing a motion to dismiss on the pleadings, the Court

may consider exhibits attached to the answer which are not disputed. *Sinclair Ref.*

*Co. v. Stevens*, 123 F.2d 186, 188–89 (8th Cir. 1941).

## ARGUMENT

I.   **THE EXCESSIVE FORCE CLAIM AGAINST OFFICER HANNEMAN FAILS AS A MATTER OF LAW.**

Plaintiffs' Section 1983 excessive force claim against Officer Hanneman fails

as a matter of law because his use of deadly force on Locke was objectively

reasonable under the circumstances. In addition, as of February 2022, the date of

the incident, the law had not clearly established that Hanneman's use of force was

unlawful under the circumstances and he is entitled to qualified immunity.

### A.   **Officer Hanneman's Use of Force was Objectively Reasonable.**

Section 1983 prohibits a person acting under color of state law from

depriving another person of their "rights, privileges, or immunities secured by the

Constitution and laws." 42 U.S.C. § 1983. Plaintiffs contend that Hanneman's

actions violated Locke's Fourth Amendment right to be free from unreasonable

seizures. To establish a Fourth Amendment seizure claim, a plaintiff must prove

that the amount of force used was objectively unreasonable under the particular

circumstances. *Henderson v. Munn*, 439 F.3d 497, 501 (8th Cir. 2006). The

reasonableness of the officer's conduct is judged under the totality of the

circumstances confronting the officer. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

In assessing an officer's use of force, the Eighth Circuit has made clear that an officer need not elect the most prudent course of action to have acted within the confines of the Fourth Amendment:

> The Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within a range of conduct which is objectively "reasonable" under the Fourth Amendment. Alternative measures which 20/20 hindsight reveal to be less intrusive (or more prudent)… are simply not relevant to the reasonableness inquiry.

*Schultz v. Long*, 44 F.3d 643, 649 (8th Cir. 1995). This is particularly true because officers are often required to make use of force decisions in a split-second and under difficult, unpredictable circumstances. The U.S. Supreme Court explains:

> Because police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective. We set out a test that cautioned against the '20/20 vision hindsight' in favor of deference to the judgment of reasonable officers on the scene.

*Saucier v. Katz*, 533 U.S. 194, 205 (2001).

"The use of deadly force is reasonable where an officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

Here, the force used by Officer Hanneman was reasonable under the totality of the circumstances because Hanneman had probable cause to believe that Locke posed a threat of death or serious physical harm to himself or other officers. Officers are allowed to reasonably rely on information provided to them by other officers. *Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005) (*citing United States v. Hensley*, 469 U.S. 221, 232 (1985)). Here, the search warrant application prepared by SPPD and issued by the court revealed a murder had been committed with a .223 caliber firearm, a type of ammunition capable of piercing police body armor, and the murder suspects were associated with other violent crimes and had been photographed with guns. SPPD connected the murder suspects to three apartments at the Bolero Flats Apartments. One of the murder suspects was seen going into Bolero Flats Apartments with a weapon that the SPPD suspected was the murder weapon. That same person had requested a key fob for apartment 701.

Officers entered apartment 701 and announced "police, search warrant" repeatedly. Locke was moving around, partially concealed under a blanket. Officers yelled out additional commands, such as "let me see your hands," "hands," and "get on the ground." Locke moved to the ground, but remained partially concealed under the blanket, and what was visible of Locke showed Locke holding a gun in his right hand. Locke raised the gun and pointed the gun

in Hanneman's direction and near the direction of other police officers in the apartment.

Under those circumstances, a well-trained officer would have probable cause to believe that Locke posed a threat of death or serious physical harm to Hanneman or the other officers in the apartment. Locke was in an apartment believed to house one of the murder suspects. The gun was visible, raised and in Locke's hand, and pointed in Hanneman's direction. Combined with Locke's unusual movement and failure to comply with police commands, it was objectively reasonable for Hanneman to believe that Locke intended to use the firearm against the officers and make a split-second decision to use deadly force.

It is settled law that an officer facing an armed suspect may use deadly force where the officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others. *See, e.g., Aipperspach v. McInerney*, 766 F.3d 803, 807 (8th Cir. 2014) (deadly force objectively reasonable where decedent refused repeated demands to drop the gun he was holding and waved the gun in the direction of many officers after losing his balance); *Sinclair v. City of Des Moines*, 268 F.3d 594, 596 (8th Cir. 2001) ("no constitutional or statutory right exists that would prohibit a police officer from using deadly force when faced with an apparently loaded weapon"); *Loch v. City of Litchfield*, 689 F.3d 965, 966-67 (8th Cir. 2012) (deadly force was objectively reasonable when the officer reasonably

13

believed the suspect had a gun, even though in fact the suspect had discarded his weapon before walking toward the officer, and a witness had allegedly informed the officer of this fact); *Thompson v. Hubbard*, 257 F.3d 896, 898–900 (8th Cir. 2001) (affirming summary judgment in favor of an officer who shot and killed an unarmed fleeing suspect based on the officer's credible testimony that the suspect "looked over his shoulder ... and moved his arms as though reaching for a weapon").

Based on this settled law, Hanneman's use of deadly force was objectively reasonable. Officers are not required to wait to be shot before they may use deadly force. "Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm — the Constitution does not require that certitude precede the act of self protection." *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996).

The Amended Complaint alleges the use of deadly force was unreasonable because officers should not have used a no-knock warrant and should have given Locke more time to realize what was happening. (Amended Compl. at ¶¶ 1-4.) According to the Amended Complaint, Locke was startled and behaved innocently when he grabbed his gun to assess the threat, and that he did not put his finger on the trigger. (Amended Compl. at ¶¶ 111-12, 114.) These arguments are irrelevant to the legal inquiry of reasonableness.

14

First, the type of warrant used to search for a murder suspect is immaterial to the reasonableness determination. Officer Hanneman was assisting in the execution of a lawful search warrant. That the warrant was a no-knock warrant is immaterial to the independent legal inquiry into the reasonableness of Officer Hanneman's force. The events leading up to an officer's decision to use deadly force are irrelevant to a Fourth Amendment seizure analysis. *Yang v. City of Minneapolis*, 607 F.Supp.3d 880, 893 (D. Minn. 2022).[4] Instead, the Court's analysis must focus on the reasonableness of the seizure itself, that is, the shooting, and not on the events leading up to it. *Id.* at 893 (citing *Schulz v. Long*, 44 F.3d 643, 648 (8th Cir. 1995)); *see also Gardner v. Bueger*, 82 F.3d 248, 252 (8th Cir. 1996). As the Eighth Circuit has explained, "The Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general. Consequently, we scrutinize

---

[4] The *Yang* decision is consistent with the caselaw in other circuits. *See, e.g., Bella v. Chamberlain*, 24 F.3d 1251, 1255 (10th Cir. [1994]) (quoting *Cole* in stating that "'we scrutinize only the seizure itself, not the events leading to the seizure'"); *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992) ("pre-seizure conduct is not subject to Fourth Amendment scrutiny"); *Fraire v. City of Arlington*, 957 F.2d 1268, 1275–76 (5th Cir. 1992) (rejecting as irrelevant evidence that police officer manufactured the circumstances which gave rise to the seizure), *cert. denied*, 506 U.S. 973 (1992); *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991) ("the officer's liability [is to] be determined exclusively upon an examination and weighing of the information [the officers] possessed immediately prior to and at the very moment [they] fired the fatal shot[s]").

only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment." *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) (citations omitted).

Here, the seizure occurred when Locke was shot. Thus, the use of deadly force analysis starts at that moment, not at the time when a decision was made to use a no-knock warrant. Further, the Amended Complaint does not allege that it was Hanneman's decision to request a no-knock warrant and, in fact, attributes that decision to others. (Amended Compl. at ¶ 84.) Liability for a federal constitutional tort is personal, and Hanneman's conduct must be assessed independently. *Heartland Academy Community Church v. Waddle*, 595 F.3d 798, 806 (8th Cir. 2010).

Second, the reasonableness of an officer's use of force is assessed from the perspective of the officer on the scene and in the moment, and with the recognition that officers are often required to make split-second decisions. That framework does not require an officer to pause as a suspect wields a deadly weapon in their direction or to assume an innocent intent. The case of *Schulz v. Long*, 44. F.3d 643 (8th Cir. 1995) is informative. In that case, deputies engaged with a barricaded mentally ill man. *Id*. at 645. When the man advanced on them with a double-bladed ax, deputies shot and killed him. *Id*. at 645. The plaintiff argued the force was unreasonable because the officers, by their actions, created the need to use

force and they instead should have waited for a supervisor or a SWAT team. *Id*. at 648. The Eighth Circuit determined those arguments were irrelevant to the issue as to whether the officers' use of deadly force was reasonable in effectuating the seizure. *Id*. at 648-49.

Hanneman shot only when he was feet away from a man who raised and pointed a gun in his direction, ignored repeated orders to show his hands, inside an apartment connected to a murder that had been committed with armor-piercing ammunition, and by suspects associated with other violent crimes who were pictured with guns. As stated above, the law does not require Hanneman to wait for Locke to shoot at him before reasonably using deadly force.

Moreover, Plaintiffs' allegations that Locke was merely startled and unaware of the implication of his raising and pointing a gun at an officer are pure speculation, not warranting consideration. But even if true, they do not render the use of deadly force unreasonable. In *Partlow v. Stadler*, 774 F.3d 497, 499 (8th Cir. 2014), a suicidal man left his apartment building with a shot gun. An officer yelled, "Gun! He's got a gun." *Id*. at 500. Others yelled "drop the gun" or "put down the gun!" *Id*. The officers shot the plaintiff. *Id*. It was alleged that the plaintiff did not know of the officers' presence. *Id*. at 502. The plaintiff claimed that although his gun moved, the movements were innocent, claiming he was turning to put the gun down. *Id*. at 500. The Eighth Circuit held that even if the plaintiff intended no harm

17

as he moved his gun, the officers' use of deadly force was reasonable because they had no way of knowing what the plaintiff planned to do. *Id*. at 502-03.

The Amended Complaint makes assertions about Locke's unknown state of mind, but the appropriate inquiry here focuses on how a reasonable officer would have perceived Locke's actions. *See id*. at 502. Whether Locke was surprised or assessing the situation with no intent to shoot is not relevant. A reasonable officer would perceive Locke's actions of coming up from the couch, remaining partially concealed by a blanket while holding a gun, hand on the grip, and raising and pointing the gun in Hanneman's direction as an immediate threat of death or serious physical harm.

Similarly, even if the barrel of Locke's gun was pointed down, the use of force was objectively reasonable. When an officer reasonably believes that there is an imminent threat of serious harm, the officer may be justified in using deadly force even before the person actually points a weapon at him. *Liggins v. Cohen*, 971 F.3d 798 (8th Cir. 2020) (citing *Malone v. Hinman*, 847 F.3d 949, 954-55 (8th Cir. 2017)); *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001). In *Liggins*, officers were investigating the report of a stolen gun by the plaintiff's brother, as well as a carjacking. 971 F.3d at 799. Officers knew the apartment complex had a history of "violent activity." *Id*. When officers arrived, the plaintiff had a gun. *Id*. at 800. The plaintiff stated he was holding the gun by the barrel pointed down. *Id*. He stated

the gun was moving slightly because he was running. *Id*. When the officer saw the plaintiff had a gun in his hand, the officer took cover behind his vehicle and two seconds later he shot at the plaintiff four times with no warning. *Id*. The Eighth Circuit concluded that:

> With only a second or two to react as he rounded the parked truck, Cohen had reasonable grounds to believe that the fleeing subject who was running toward the back of the property could raise the gun and shoot. It would take only an instant to do so if the person were ready to fire. …This was a split-second decision for the officer. It was not practical in that moment for Cohen to discern whether B.C. was carrying the gun in an unusual manner or to shout a warning and wait for him to react. There was simply no time. "When the hesitation involved in giving a warning could readily cause such a warning to be the officer's last, then a warning is not feasible."

*Id*. at 801.

Officer Hanneman's use of deadly force was objectively reasonable. As in *Partlow*, Locke's subjective state of mind is irrelevant.  And,  as in *Liggins*, Hanneman had no obligation to wait to use deadly force when doing so could have been deadly for the officer, particularly since, here, Locke had already raised and pointed the gun at Officer Hanneman.  A reasonable officer would have reasonably perceived a deadly threat or imminent significant physical threat under these circumstances.

## B.   Officer Hanneman is Entitled to Qualified Immunity.

Even if the use of force could be found to be constitutionally unreasonable, Plaintiffs' excessive force claim still fails because there was no clearly established

law that would have put a reasonable officer on notice that using deadly force in these circumstances was unlawful and Officer Hanneman is entitled to qualified immunity.

Qualified immunity protects government agents who perform discretionary functions from civil liability, so long as the challenged actions are objectively reasonable in light of clearly established legal principles. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Qualified immunity is a question of law that the court determines as early as possible to shield appropriate officials from suit. *See Gainor v. Rogers*, 973 F.2d 1379, 1382–83 (8th Cir. 1992). In evaluating a claim of qualified immunity, the court inquires: (1) whether the facts alleged show the officer's conduct violated a constitutional right, and (2) whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Craighead v. Lee,* 399 F.3d 954, 961 (8th Cir. 2005). In *Pearson v. Callahan*, the Supreme Court clarified that a court may decide which of the two qualified immunity prongs should be addressed first based on the circumstances of each case. 555 U.S. 223, 236 (2009).

For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful;

but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)(quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

A court may deny a request for qualified immunity only if it is obvious that no reasonably competent officer would have concluded that the conduct was legal. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). If rational officers could possibly disagree on the legality of the actions, qualified immunity applies. *Id.* "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004). An officer does not lose qualified immunity because of a mistaken, yet reasonable belief as to the legality of his actions. *Saucier*, 533 U.S. at 205-06.

For the reasons stated above and consistent with the caselaw cited *supra*, no constitutional right was violated because Officer Hanneman's use of force was objectively reasonable. Additionally, in February 2022, there was no clearly established law that would have placed an officer on notice that the use of deadly force, when faced with an armed person, who is raising a gun in the direction of an officer, and who the officer had reason to believe may be a violent murderer with bullet piercing ammunition, and who refuses to show his hands, drop the weapon, or show any indication of submitting to lawful authority, would be deemed unconstitutional. To the contrary, a reasonable officer would have

21

correctly believed that deadly force was authorized under established caselaw, as set forth above.  Accordingly, Hanneman is entitled to qualified immunity.

## II.    PLAINTIFFS' *MONELL* CLAIM AGAINST THE CITY FAILS.

Plaintiffs' Amended Complaint asserts a *Monell* claim against the City based on an alleged practice and custom of unreasonable force and Equal Protection violations.  (Amended Compl. at ¶¶ 194-200.)  To maintain a *Monell* claim, a plaintiff must first show that a government employee deprived the plaintiff of their constitutional rights. *Golberg v. Hennepin Cnty.*, 417 F.3d 808, 813 (8th Cir. 2005). "[F]or municipal liability to attach, individual liability must first be found on an underlying substantive claim." *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007); *Sanders v. City of Minneapolis, Minn.*, 474 F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* …municipal liability.") Plaintiffs' *Monell* claim against the City fails because Plaintiffs' underlying Section 1983 claim, or alleged violation of Locke's constitutional rights, is premised on Officer Hanneman's use of force. However, as discussed above, Officer Hanneman's use of force was objectively reasonable and, accordingly, it cannot serve as the basis for a valid *Monell* claim. Because that claim fails as a matter of law, the *Monell* claim likewise must be dismissed.

## III.   PLAINTIFFS' *CANTON* CLAIM FAILS.

Plaintiffs' Amended Complaint asserts a *Canton* liability claim against the City for allegedly failing to train, discipline or supervise its officers with respect to Fourth and Fourteenth amendment rights.  (Amended Complaint at ¶¶ 201-207.)  As with a *Monell* claim, a *Canton* theory of liability may only be sustained if a municipal employee committed an underlying constitutional violation.  *See Roach v. City of Fredericktown, Mo.*, 882 F.2d 294, 297-98 (8th Cir. 1989) (affirming the district court's denial of municipal liability under *Canton* where the plaintiffs alleged inadequate police training but "had not proven that specific constitutional rights were violated" by the municipal employee); *see also Jones v. Ramsey Cnty. Sheriff's Dept.*, 2014 WL 4659434, at *10 (D. Minn. 2014) ("In order to prevail on a municipal liability claim, 'there must first be an underlying violation of the plaintiff's constitutional right by a municipal employee'").  As explained above, Plaintiffs do not have a viable claim against Officer Hanneman with respect to his use of force, and as such, the City cannot be liable under a *Canton* theory for alleged failure to train, supervise, or discipline.

## IV.   PLAINTIFFS' STATE LAW WRONGFUL DEATH CLAIM FAILS.

Officer Hanneman is entitled to official immunity for Plaintiffs' wrongful death claim. Official immunity rests on the same rationale as federal qualified

immunity: courts must ensure that the threat of suit does not inhibit public officials' exercise of discretion in discharging their duties. *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991); *Holmquist v. State*, 425 N.W.2d 230, 233 n.1 (Minn. 1988). "[A] public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion. Generally, police officers are classified as discretionary officers entitled to that immunity." *Johnson v. Morris*, 453 N.W.2d 31, 41-42 (Minn. 1990). When a public official's duties require the exercise of discretion or personal judgment, personal liability for damages will attach only when the harmful action is done willfully or maliciously. *Pletan v. Gaines*, 494 N.W.2d 38, 40 (Minn. 1992). Official immunity is broadest when officers act in emergency situations and circumstances that are high-risk to the officer or bystanders. *Id. at* 40. The Minnesota Supreme Court explained that in such circumstances, "questions must be resolved under emergency conditions with little time for reflection and often on the basis of incomplete and confusing information. It is difficult to think of a situation where the exercise of significant, independent judgment and discretion would be more required." *Id.* at 41.

To overcome Officer Hanneman's right to official immunity, Plaintiffs must establish that he acted with malice. To prove malice, Plaintiff must show "intentional doing of a wrongful act without legal justification or excuse." *Rico*,

472 N.W.2d at 107.   The question of malice is an objective inquiry into the legal reasonableness of an official's actions. *Miskovich v. Indep. Sch. Dist.*, 226 F. Supp. 2d 990, 1021 (D. Minn. 2002).   The willful or malicious wrong exception to official immunity "does not impose liability merely because an official *intentionally* commits an act that a court or jury subsequently determines is a wrong. Instead, the exception anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is prohibited."  *Rico*, 472 N.W.2d at 107 (emphasis in original).

Here, Officer Hanneman made a discretionary decision when responding to Locke raising and pointing a gun in his direction, with Locke's hand on the grip, and while Hanneman was in close proximity with no ability to retreat or find cover in the murder suspect's apartment. The indisputable video evidence demonstrates these facts, and confirms the reasonableness of his discretionary response. Accordingly, Hanneman is entitled to official immunity. This immunity extends vicariously to the City. *Schroeder v. St. Louis Cty*, 708 N.W.2d 497, 508 (Minn. 2006).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court to grant their motion to for judgment on the pleadings in its entirety.

Dated:  October 17, 2023

KRISTYN ANDERSON
City Attorney
By
___/s/ Tracey N. Fussy_
TRACEY N. FUSSY (#3117807)
KRISTIN R. SARFF (#388003)
MARK ENSLIN (#338813)
REBEKAH MURPHY (#392912)
Assistant City Attorneys
Minneapolis City Attorney's Office
350 South Fifth Street, Room 210
Minneapolis, MN 55415
(612) 673-2254
(612) 673-3919
(612) 673-5132
(612) 430-8897
tracey.fussy@minneapolismn.gov
kristin.sarff@minneapolismn.gov
mark.enslin@minneapolismn.gov
rebekah.murphy@minneapolismn.gov

*Attorneys for Defendants*