## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Karen Wells and Andre Locke as
co-trustees for the next of kin of
Amir Rahkare Locke, deceased,

                Plaintiffs,

v.

Mark Hanneman, in his individual capacity
as a Minneapolis police officer, and the
City of Minneapolis,

                Defendants.

Case No. 23-cv-273 (WMW/DLM)

**Plaintiffs' Opposition to Defendants'
Motion for Judgment on the Pleadings**

## <u>Introduction</u>

Amir Locke ("Amir") was awoken from his sleep and unreasonably and unlawfully killed in violation of his Fourth and Fourteenth Amendment rights on February 2, 2022, during the execution of a no-knock warrant by Minneapolis police officers. Officer Mark Hanneman ("Hanneman") shot and killed Amir only seconds after entry into the apartment where Amir slept, without warning, and while Amir started to comply with confusing and overlapping commands. Amir was shot and killed for merely possessing a handgun in a country that staunchly protects Second Amendment rights. Amir never put his finger on the trigger or pointed the handgun in the direction of any officer. Hanneman's shooting of Amir in this manner violated clearly established law and qualified immunity does not apply.

The unlawful conduct arising from the execution of the no-knock warrant and shooting of Amir were consistent with longstanding and widespread unconstitutional customs and practices by the Minneapolis Police Department ("MPD").  As documented by the findings of state and federal agencies, MPD has a well-documented history of violating Fourth and Fourteenth Amendment rights and failing to train, supervise, and discipline officers for violating people's rights, particularly with respect to people of color.  Shockingly (but not surprisingly), the City had ample notice and documented knowledge of the serious dangers associated with no-knock warrants, yet statistics and other evidence demonstrates that the City for all intents and purposes only conducts no-knock raids when the target is Black.  The City's indifference to this dangerous, discriminatory, and unlawful conduct made Amir's death all but a certainty.

Defendants' motion should be denied in its entirety.

## **Background**

### I.    **The unlawful killing of Amir Locke.**

In the early morning hours of February 2, 2022, Amir slept on a couch in the living room of his cousin's Minneapolis apartment.[1]  A handgun was near the couch where Amir slept.[2]  MPD officers suddenly barreled into the apartment yelling overlapping, incoherent commands.[3]  The officers failed to properly announce themselves prior to crossing the threshold of the apartment.,[4] even though MPD Policy 9-307

---

[1] ECF No. 40, First Am. Compl. ("FAC") ¶¶ 80, 92.
[2] *Id.* ¶ 95.
[3] *Id.* ¶¶ 107-08.
[4] *Id.* ¶¶ 71, 88, 92, 104-05.

mandated that officers announce themselves prior to entry: "During announced entry search warrants, MPD officers shall announce themselves as 'Police' and announce their purpose as "Search Warrant" prior to crossing the threshold of the door into the residence or building."[5]

Within seconds of entering the apartment, an MPD officer kicked the couch Amir was sleeping on.[6]  The kick startled Amir, who was still draped in the blanket he slept in, and Amir fell off the couch onto the ground.[7]  Any reasonable officer would have recognized that Amir was startled awake under hectic and terrifying circumstances.[8]   In fact, MPD Policy 9-307 required officers to be cognizant of such barriers to understanding when executing no-knock warrants: "Officers should be mindful of any known or reasonably believed barriers or obstacles to cooperation such as perception barriers, mental or emotional capacity, physical and language barriers, including whether the individual is known or believed to be deaf or hard of hearing."[9]

Following the entry in contravention of MPD policy, Amir began to stand and grabbed the nearby handgun to assess the threat that jarred him awake, like many Americans might do in our country where the right to bear arms is staunchly protected

---

[5] *Id.* ¶ 101; *see also* ECF No. 1-1 at *78 of 99, Compl. Ex. B., MPD Policy 9-307(A)(2)(b) (Nov. 30, 2020).  MPD Policy 9-307(A) reflects that unannounced entry is synonymous with no-knock entry.
[6] *Id.* ¶109.
[7] *Id.* ¶ 111-12.
[8] *Id.* ¶ 112.
[9] ECF No. 1-1 at *78 of 99, Compl. Ex. B., MPD Policy 9-307(A)(2)(d)

under the Second Amendment.[10]  Amir held the handgun momentarily in his right hand.[11]

Despite being presented with these terrifying circumstances, Amir kept his finger off the

trigger, kept the handgun pointed down, and never raised the handgun in a threatening

manner in the direction of any officer or other person.[12]  At all times, Amir exercised

proper firearm and trigger discipline as he assessed circumstances that any person would

have perceived as confusing and terrifying.[13]

    Neither Hanneman nor any officer issued Amir a warning to drop the handgun or a

warning that Amir would be shot if he did not drop the handgun despite having the

opportunity to afford such a warning.[14]  Hanneman did not attempt to retreat or find cover

in the apartment's kitchen despite having the opportunity to do so.[15]  Instead, Hanneman

simply yelled, "show me your hands," as he rapidly approached. [16]  Amir began to

comply with Hanneman's order to show his hands and lowered the gun's barrel and

muzzle further toward the ground.[17]  Amir also raised his left hand in the air to the side of

his head, but before Amir could fully comply with Hanneman's command to "show me

your hands," Hanneman fired three shots at Amir.[18] Hanneman shot Amir only eight

seconds after the MPD officers entered the apartment and without providing Amir with

---

[10] FAC ¶¶ 2, 69, 112.

[11] *Id.* ¶ 113.

[12] *Id.* ¶ 114.

[13] *Id.* ¶ 115.

[14] *Id.* ¶¶ 122-23.

[15] *Id.* ¶ 124.

[16] *Id.* ¶ 116.

[17] *Id.* ¶ 117-18.

[18] *Id.* ¶¶ 119-20.

any warning.[19]  Even though multiple officers had their weapons pointed at Amir and had

a view of Amir's firearm, only Hanneman shot Amir.[20]  Amir died from the gunshot

wounds.[21]

## II.    MPD has a well-documented history of unlawful customs and practices that were the moving force behind Amir's death.

Plaintiffs' FAC also details the MPD's notorious and widespread history of

excessive force, particularly against Black individuals and other people of color.[22]  This

history is highlighted by recent findings from the Minnesota Department of Human

Rights ("MDHR Findings") from its investigation into the MPD.[23]  Among other things,

the MDHR Findings concluded that there was probable cause to believe that the City and

MPD engaged in a pattern or practice of race discrimination in violation of state law.[24]

The MDHR Findings also stated that the City and MPD's training practices "reinforce a

culture that exacerbates a pattern of race-based policing" and "teaches a paramilitary

culture to new officer hires and reinforces these concepts with veteran officers," that

MPD's trainings continue to embed a "warrior mindset," and that veteran MPD officers

reinforce a culture of unquestioned compliance by other officers through "positioning

community members as the enemy."[25]

---

[19] *Id.* ¶¶ 121, 125.
[20] *Id.* ¶ 142.
[21] *Id.* ¶ 145.
[22] *Id.* ¶¶ 16-32.
[23] *Id.* at Ex. A (citing ECF No. 1-1 at 12).
[24] *Id.* ¶ 158.
[25] *Id.* ¶ 160 (citing MDHR Findings at 39-40).

Consistent with this race-based policing, a preliminary report issued by the Minneapolis Department of Civil Rights Office of Police Conduct Review found that between September 1, 2021 and January 31, 2022, the MPD only executed no-knock warrants on people of color and that 80% of the no-knock warrant targets were Black.[26] The City knew that the MPD was obtaining and "executing no-knock and other high-risk warrants against Black people at a disproportionate rate and that MPD had a custom and practice of intentionally seeking no-knock warrants because of race."[27] Yet, the City allowed this practice to continue despite knowing the severe dangers posed by no-knock warrants, which were being disproportionately inflicted upon people of color.[28] Exhibiting his awareness of the concerns about the dangers of no-knock warrants raised by Minneapolis residents, Minneapolis Mayor Jacob Frey, in 2021, falsely proclaimed to the general public that his administration banned no-knock warrants.[29]

The MPD's unlawful customs and practices are also the recent focus of a pattern and practice investigation by the United States Department of Justice ("DOJ").[30] On June 16, 2023, the DOJ announced its findings ("DOJ Rep.") that there was reasonable cause to believe that the City and MPD engage in a pattern or practice of conduct that deprives people of their rights under the Constitution and federal law.[31] The DOJ determined that "persistent deficiencies in MPD's accountability systems, training, supervision, and

---

[26] *Id.* ¶¶ 152-54.
[27] *Id.* ¶ 156.
[28] *Id.* ¶¶ 37-46.
[29] *Id.* ¶¶ 57-60.
[30] *Id.* ¶ 164.
[31] *Id.* ¶ 165; Ex. E, DOJ Rep.

officer wellness programs, which contribute to the violations of the Constitution and federal law. . . . For years, MPD used dangerous techniques and weapons against people who committed at most a petty offense and sometimes no offense at all."[32]

The DOJ found, as relevant here, that "MPD uses excessive force, including unjustified deadly force and excessive less-lethal force" and that "MPD unlawfully discriminates against Black and Native American people when enforcing the law."[33] When discussing MPD's pattern or practice of violating the Fourth Amendment by using excessive force, the DOJ found that "MPD officers routinely use excessive force, often when no force is necessary."[34]  The DOJ also found "that MPD officers often use unreasonable force (including deadly force) to obtain immediate compliance with orders, often forgoing meaningful de-escalation tactics and instead using force to subdue people."[35]  Finally, the DOJ found "that MPD officers discharged firearms in situations where there was no immediate threat . . . [, without warning, and] without assessing whether the person presents any threat, let alone a threat that would justify deadly force."[36]

---

[32] *Id.* ¶ 166 (citing DOJ Rep. at 1).
[33] *Id.* ¶ 167 (citing DOJ Rep. at 9).
[34] *Id.* ¶ 168 (citing DOJ Rep. at 10).
[35] *Id.* ¶ 169 (citing DOJ Rep. at 169).
[36] (*Id.* ¶¶ 170-72 (citing DOJ Rep. at 11-12).  Plaintiffs allege and incorporate in their pleadings each of the Department of Justice's findings.  (FAC ¶ 185.)

### III.    The City's failure to train, supervise, and discipline its officers, including Hanneman, were moving forces behind Amir's death.

As an MPD officer, Hanneman had four citizen complaints brought against him.[37] In July 2021, a Minnesota district court concluded Hanneman violated an individual's constitutional right to be free from an unreasonable search and seizure, based on Hanneman's conduct during an MPD SWAT team warrant execution.[38]  Hanneman had searched and seized an individual who, like Amir, was not the subject of the search warrant being executed.[39]  The court's opinion dismissing the case reflected that Hanneman did not understand written MPD policy or the Fourth Amendment and that MPD SWAT had a custom and practice of engaging in unconstitutionally excessive searches and seizures of non-subjects of warrants when conducting SWAT team raids.[40] Despite MPD superior officers knowing about Hanneman's unconstitutional conduct, Hanneman was not disciplined.[41]  Neither Hanneman nor MPD SWAT received any training to ensure they understood MPD policy or the constitutional rights of people to be free from unconstitutional searches and seizures, including the right to be free from unreasonable, excessive, and deadly force and from discriminatory policing.[42]

---

[37] *Id.* ¶ 49.
[38] *Id.* ¶ 50-51.
[39] *Id.* ¶ 51.
[40] *Id.* ¶¶ 52-53.
[41] *Id.* ¶ 54.
[42] *Id.* ¶ 55.

The MDHR and DOJ's findings reflect the City's failures.[43]  For example, the DOJ concluded there were "systemic deficiencies in MPD's training programs that contribute to the pattern or practice of [constitutional] violations[.]"[44]  The DOJ also found that "MPD's training revealed an overreliance on using force during encounters[,]" and MPD "supervisors are inadequately trained and in turn struggle to understand policy and effectively communicate changes to officers[.]"[45]

## IV.    Procedural Posture and Causes of Action

Plaintiffs initiated this action on February 2, 2023.[46]  By agreement, Plaintiffs amended their complaint on July 7, 2023.[47]  Defendants answered on August 25, 2023,[48] and subsequently filed this motion.  Discovery against Defendants has been stayed while Plaintiffs are permitted to engage in third-party discovery.[49]

Plaintiffs allege that (I) Hanneman violated Amir's Fourth and Fourteenth Amendment rights to be free from unreasonable, excessive, and deadly force; (II) the City is liable for Amir's killing under *Monell* because it knew of and was deliberately indifferent in failing to correct persistent and widespread unconstitutional practices and customs that violated citizens' rights to Equal Protection and to be free from unreasonable force under the Fourth and Fourteenth Amendments; (III) the City is liable

---

[43] *Id.* ¶¶ 160 (citing MDHR Findings at 39-40), 166 (citing DOJ Rep. at 1), 182-84 (citing DOJ Rep. at 79-81).
[44] *Id.* ¶182 (citing DOJ Rep. at 79).
[45] *Id.* ¶¶ 183-84 (quotations omitted) (citing DOJ Rep. at 80-81).
[46] ECF No. 1.
[47] ECF No. 40, FAC.
[48] ECF No. 45, Answer to FAC.
[49] ECF No. 58, Order.

for Amir's killing under *Canton* because it knew that training was necessary to avoid violating citizens' Fourth and Fourteenth Amendment rights and with deliberate indifference failed to train, supervise, and discipline its officers to prevent violations of citizens' rights, including for violations of their Equal Protection rights; and (IV) Hanneman and the City are liable under Minnesota state law for the wrongful death of Amir because MPD officers, including Hanneman, engaged in wrongful acts and omissions that caused Amir's death.

## The Record on Defendants' Motion

**A.      Standard of review: motion to dismiss standards apply absent further notice and a conversion of this motion to one for summary judgment.**

A motion for judgment of the pleadings under Rule 12(c) is analyzed in accordance with Rule 12(b)(6) motion to dismiss standards. *Jenkins v. Univ. of Minn.*, 50 F. Supp. 3d 1084, 1102 n.9 (D. Minn. Sep. 25, 2014) (citing *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990)).  When deciding whether to grant a motion for judgment on the pleadings, the Court must accept as true the facts in the complaint and draw all reasonable inferences in favor of the nonmoving party.  *Partridge v. City of Benton, Ark.*, 929 F.3d 562, 564 (8th Cir. 2019) (*Partridge I*).  Additionally, a reviewing court must ask itself if the claim is merely "plausible on its face."  *Haney v. Portfolio Recovery Assocs.*, 895 F.3d 974, 981 (8th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A court "assesses plausibility by drawing on [its] own judicial experience and common sense."  *Id*. (quotations omitted).  A court examines "the plausibility of the

plaintiff's claim as a whole, not the plausibility of each individual allegation." *Id.* (quotation omitted). "Judgment on the pleadings should be granted only if the moving party has clearly demonstrated that no material issue of fact remains and the moving party is entitled to judgment as a matter of law." *Patridge*, 929 F.2d at 564-65 (quotation omitted). At the motion to dismiss stage, "[t]here is no requirement for direct evidence; the factual allegations may be circumstantial[.]" *McDonough v. Anoka Cnty.*, 799 F.3d 931, 945 (8th Cir. 2015). A court's decision under Rule 12(c) is reviewed *de novo*. *Patridge*, 929 F.2d at 564.

Defendants ask this Court to find that there "is no dispute as to any material facts" and grant them judgment on the pleadings.[50]

> As with Rule 12(b)(6) motions, courts are not strictly limited to the four corners of the complaints, when deciding Rule 12(c) motions but may consider other matters, including matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned[] without converting the motion into one for summary judgment.

*Fiecke-Stifter v. MidCountry Bank*, No. 22-cv-3056, 2023 WL 5844758, at *3 (D. Minn. Sept. 11, 2023) (quoting *Dittmer Props., L.P. v. F.D.I.C.*, 708 F.3d 1011, 1021 (8th Cir. 2013) (quotations omitted)). Such evidence may not, however, be viewed for the truth of the matters asserted. *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831-32 (8th Cir. 2003). And all reasonable inferences must still be made in Plaintiffs' favor on all evidence considered at this stage of the case. *Partridge*, 929 F.3d at 564; *see also Tolan*

---

[50] Def. Mem. at 8 (citing *Ashley Cty, Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

*v. Cotton*, 572 U.S. 650, 659 (2014) (criticizing the Fifth Circuit for noncompliance with the summary judgment and qualified immunity standards).

Finally, when a party seeks consideration of materials on a 12(c) motion that may not properly be considered under a motion to dismiss standard, the Court is required to convert the motion into one for summary judgment. *McAuley v. Fed. Ins. Co.*, 500 F.3d 784, 787 (8th Cir. 2007) ("when matters outside the pleadings are presented and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided by Rule 56"). If such a motion is converted to one for summary judgment, resisting party is entitled to notice of the conversion so that the party may appropriately respond. *Country Club Estates, L.L.C. v. Town of Loma Linda*, 213 F.3d 1001, 1005 (8th Cir. 2000).

**B.    This Court should not consider all materials submitted by Defendants.**

Plaintiffs agree that a court may consider the following materials submitted by the parties without turning this motion into one for summary judgment: Plaintiffs' Exhibits A through E, which are attached to the FAC.[51] The Court may also consider the search

---

[51] ECF No. 1-1, Exhibit A, Minnesota Department of Human Rights, *Investigation into the City of Minneapolis and the Minneapolis Police Department: Findings from the Minnesota Department of Human Rights*; Exhibit B, MPD Policy & Procedure Manual Vol. 9 (Nov. 30, 2020); Exhibit C, Minneapolis Email Correspondence (Oct. 11-12, 2021); Exhibit D, Minneapolis Department of Civil Rights, Office of Police Conduct Review, "Preliminary Report: High Risk Warrants"; and Exhibit E, United States Department of Justice Civil Rights Division & United States Attorney's Office D. Minn Civil Division, *Investigation of the City of Minneapolis and the Minneapolis Police Department*.

warrant and application for the search warrant in a limited manner.[52]   The Court should

not consider the following materials in accordance with a motion to dismiss standard:

Defendants' Joint Report of the Hennepin County Attorney's Office and Minnesota

Attorney General's Office Regarding the Death of Amir Locke "Joint Report")[53] or the

ten body-worn camera ("BWC") recordings filed under seal.[54]

 First, this Court should not consider the Joint Report because the Joint Report is

irrelevant and may not be viewed for the truth of the matters asserted.  *Kushner*, 317 F.3d

at 831-32.  The Joint Report itself recognizes that its authors' roles "are limited to

considering **only** whether criminal charges are warranted against any of the police

officers involved in Mr. Locke's death."[55]  Defendants do not state an express purpose for

their submission of this report into the record, but it can be assumed it is submitted to be

used as favorable evidence or to encourage the Court to adopt its reasoning.  Either

purpose is improper, and the Joint Report should not be considered.

 Defendants contend that this Court "may properly" consider the Joint Report as a

document "attached to the pleading . . . even if it contradicts the allegations in the

---

[52]  ECF No. 48.  The warrant and application may not be accepted for the truth of the
matters asserted.  *Whitten v. City of Omaha*, 199 F. Supp. 3d 1224, 1231 (citing *Kushner*,
317 F.3d at 831-32); *see also Fredin v. Clysdale*, No. 18-cv-0510 (SRN/HB), 2018 WL
7020186, at *7 (D. Minn. Dec. 20, 2018) (recommending conversion to motion for
summary judgment to review warrant), report and recommendation adopted 2019 WL
802048 (D. Minn. Feb. 21, 2019); *Pierce v. Little Rock Drug Task Force*, 84 Fed. Appx.
722, 723 (8th Cir. Jan. 5, 2004) (reversing entry of summary judgment and finding that
warrant and application must be viewed on summary judgment in light most favorable to
nonmoving party).
[53]  ECF No. 45-1.
[54]  *See* ECF No. 47 (Placeholder for Sealed Exhibits).
[55]  Joint Report at 44.

complaint."[56]  But the cases Defendants cite to support this proposition are cases in which

the courts analyzed contract disputes by considering the contracts at issue.[57]  Here, unlike

in Defendants' contract cases, whether Hanneman's use of deadly force was reasonable is

a "fact-intensive inquiry."  *McDaniel v. Neal*, 44 F.4th 1085, 1091 (8th Cir. 2022).

Second, the Court should decline to consider the BWC footage.  Hanneman also

urges this Court to consider the BWC footage to decide the motion.  District courts have

discretion when deciding whether to consider information not physically attached to a

complaint.  *Kushner*, 317 F.3d at 832.  In *Yang v. City of Minneapolis*, the defendants

urged the district court to consider BWC footage from the incident at issue, arguing the

BWC recordings were public records, embraced by the pleadings, and documented in real

time the sequence of events of the incident.  607 F. Supp. 3d 880, 890 n.4 (D. Minn.

2022).  The plaintiff objected, asserting the recordings were "incomprehensible, fail[ed]

to identify the individuals depicted visually or audibly, and use[d] inconsistent

timestamps."  *Id.*  The district court declined to rely on the BWC footage.  I*d.*

Here, like in *Yang*, the footage is not inconsistent with Plaintiffs' allegations, does

not clearly identify all individuals depicted visually or audibly, and—as Defendants

acknowledge—uses inconsistent timestamps.[58]  Additionally, Hanneman's BWC footage

does not capture the entirety of the botched raid.  At this stage in the proceedings, it

---

[56] Def. Mem. at 9.
[57] *Id.* at 9-10 (citing *Zean v. Fairview Health Servs.*, 858 F.3d 520, 527 (8th Cir. 2017);
*Sinclair Ref. Co. v. Stevens*, 123 F.2d 186, 188-89 (8th Cir. 1941) (considering contracts
and receipts to determine whether defendants had legal duty to repair and maintain
equipment).
[58] Def. Mem. at 7 n.3.

would be improper for the Court to rely upon video that does not authentically identify key events, such as who said what, or who did what, and when.  A precise understanding of timing and action will be critical to this matter's ultimate resolution.  Thus, the Court should decline to consider the BWC footage to decide Hanneman's motion.

For the reasons discussed, the Court should not consider the Joint Report or the BWC footage to decide Defendants' motion.  Defendants, who control the evidence, effectively seek to have this Court make a ruling on summary judgment, while shielding the full body of evidence from Plaintiffs through a stay of discovery.  Worse yet, Defendants improperly argue that all of their submitted materials should be accepted for the truth of the matter asserted, stating that these materials "indisputably establish that it was objectively reasonable" for Hanneman to shoot Amir.[59]  *See Kushner*, 317 F.3d at 831-32.  If the Court considers those materials, Plaintiffs should be provided with notice of the motion's conversion to one for summary judgment and given an opportunity to appropriately respond after appropriate discovery has been conducted.

## **Qualified Immunity**

Plaintiffs pleaded Fourth Amendment unreasonable use of deadly force against Hanneman in violation of 42 U.S.C. § 1983.  "The essential elements of a § 1983 claim are (1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) (citation omitted).

---

[59] Def. Mem. at 1.

Hanneman argues his conduct did not violate Amir's constitutional rights and that, even if his conduct did, he is entitled to qualified immunity because he contends the violation was not clearly established.[73]

Only an individual defendant may assert a defense of qualified immunity. *See Owen v. City of Independence, Mo.*, 445 U.S. 622, 650-57 (1980) (stating defense of qualified immunity not available to municipalities). "The defendant bears the burden of proof on this affirmative defense." *Herts v. Smith*, 345 F.3d 581, 585 (8th Cir. 2003) (citing *Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002) (recognizing that plaintiff must still show rights were clearly established)); *see also White v McKinley*, 519 F.3d 806, 813 (8th Cir. 2008) ("The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences.").

The defense of "[q]ualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Montoya v. City of Flandreau*, 669 F.3d 867, 872 (8th Cir. 2012) (reversing trial court's grant of qualified immunity on excessive force claim). A reviewing court must ask: "(1) whether the facts alleged, construed in the light most favorable to the nonmoving party, establish a violation of a constitutional right, and (2) whether such right was clearly established so that a reasonable officer would have known her actions were unlawful."

---

[73] Def. Mem. 10-23.

*El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 456 (8th Cir. 2011) (citation omitted).  This Court has discretion to address these issues in either order; however, the sequence set forth above "is often appropriate . . . ."  *Shannon v. Koehler*, 616 F.3d 855, 862 (8th Cir. 2010) (citing *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009) (additional citations omitted)).

The issue of "clearly established" is "a legal question for the court to decide." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009).  The court asks "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *El-Ghazzawy*, 636 F.3d at 459 (citation omitted).  "A plaintiff need not identify 'a case directly on point,' but controlling authority or a robust consensus of persuasive authority must put the constitutional question 'beyond debate.'" *Glover v. Paul*, 78 F.4th 1019, 1021 (8th Cir. 2023) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011)); *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1212 (8th Cir. 2013) (no requirement that a court "previously confronted a situation identical to this case . . . there is no requirement that the very action in question be previously held unlawful")  (internal quotes omitted).  As a result, "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  The question is whether the officer had "fair warning" that her conduct was unconstitutional.  *Id.*

<u>**Argument**</u>

**I.     Plaintiffs plausibly allege that Hanneman violated Amir's clearly established constitutional rights to be free from unreasonable and deadly force.**

      **A.     Eighth Circuit precedent clearly establishes that mere possession of a firearm does not warrant the use of deadly force.**

An officer's use of force violates the Fourth Amendment when it is unreasonable. *Cole v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020) (citations omitted).  In assessing objective reasonableness, courts generally weigh the *Graham* factors, *i.e.*, (1) severity of crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is attempting to actively resist or flee.  *Partridge*, 929 F.3d at 565 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (additional citation omitted).  When deadly force is used, such force is reasonable only if the officer "has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others."  *Id.* (quotation omitted). "But where a person poses no immediate threat to the officer and no threat to others, deadly force is not justified." *Id.* (quotations omitted); *see Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

In the United States, we recognize a "fundamental" right to bear arms.  *United States v. Sitladeen*, 64 F.4th 978, 988 (8th Cir. 2023) (citation omitted).  The Eighth Circuit has held that, "[g]enerally, an individual's mere possession of a firearm is *not* enough for an officer to have probable cause to believe that individual poses an immediate threat of death or serious bodily injury; the suspect must also point the firearm at another individual or take similar 'menacing action.'"  *Cole*, 959 F.3d at 1132 (emphasis added) (citations omitted).  Circuits throughout the country agree with the

Eighth Circuit and have made clear that mere possession of a firearm does not provide immediate justification for police to shoot an individual. *See, e.g.*, *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016) ("[T]he mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit. . . . [T]he ultimate determination depends on the risk presented, evaluating the totality of the circumstances surrounding the weapon."); *George v. Morris*, 736 F.3d 829, 838-39 (9th Cir. 2013); *King v. Taylor*, 694 F.3d 650, 653, 662-63 (6th Cir. 2012).

In the Eighth Circuit's *Cole* decision, an intoxicated man was in a dispute with his uncle. 959 F.3d at 1130. The uncle headed into his home while the man retrieved a long gun, which turned out to be a pellet gun, from his vehicle. *Id.* The man emerged with the "gun vertically facing either the sky or the ground but never pointed at" the uncle. *Id.* (alteration and quotation omitted). An officer arrived on the scene right at this time. *Id.* The uncle went into the home and slammed the door shut. *Id.* at 1131. Seconds later, the officer fired at the man "five times without warning, striking and killing him." *Id.*

The Eighth Circuit affirmed the district court's denial of the officer's motion for summary judgment based on qualified immunity. *Id.* In doing so, it recognized that "[w]hen a warning is feasible, the failure to warn adds to the unreasonableness of the use of deadly force." *Id.* at 1133 (quotation omitted). In part, the court found that "it was clearly established that person does not pose an immediate threat of serious physical harm to another when, although the person is in possession of a gun, he does not point it at another or wield it in an otherwise menacing fashion." *Id.* at 1134.

19

The *Cole* Court's reliance on the Sixth Circuit's decision in *Brandenburg v. Cureton* is particularly instructive here.  882 F.2d 211, 213, 215 (6th Cir. 1989).  In *Brandenburg*, the court held—in the context of serving a warrant—that "an officer's use of deadly force against a suspect who had previously threatened to kill the officer and fired warning shots at him could be found *unreasonable* if it were true that the suspect was not grasping the trigger or aiming his weapon at the officer when he was shot."  *Id.* (emphasis added) (quotations omitted).

In the Eighth Circuit's *Partridge I* decision, the decedent was not suspected of a crime but was armed, suicidal, and under the influence of cough medication and possibly marijuana.  929 F.3d at 565.  "Taking the facts in the complaint as true, [the decedent] simply began to move the gun away from his head, was shot as he began to move the gun away from his head, per [the officer's] orders to 'drop the gun' and never pointed the gun at the officers."  *Id.*  "On these facts, no reasonable officer could conclude that a compliant individual posed an immediate threat."  *Id.*  The Eighth Circuit reversed the district court's granting of the motion to dismiss and remanded the case for the parties to engage in discovery.  *Id.* at 567.

On remand and after discovery, the district court entered summary judgment on the Fourth Amendment deadly force claim at issue in *Partridge I*.  *Partridge v. City of Benton, Ark.*, 70 F.4th 489, 491 (8th Cir. 2023) (*Partridge II*).  Once again, the district court was reversed.  The Eighth Circuit held that there was "a genuine dispute of material fact whether [the decedent] pointed his gun at the officers."  *Id.* at 493; *see also Wealot v. Brooks*, 865 F.3d 1119, 1125 (8th Cir. 2017) (cautioning "[b]efore the reasonableness of

20

the officers' conduct can be assessed, two genuine disputes of material fact must be

resolved: (1) whether the officers saw Waylen throw his gun and therefore knew he was

unarmed, and (2) whether Waylen was turning around to the officers with his hands

raised to surrender" and reversing pretrial grant of qualified immunity).  The *Partridge II*

defendants sought rehearing by the panel and rehearing *en banc*.  *Partridge v. City of

Benton, Ark.*, No. 21-3001, 2023 WL 6053542, at *1 (8th Cir. Sep. 18, 2023) (*Partridge

III*).  The Eighth Circuit denied both requests.  *Id.*

> ### B.    Hanneman was on notice through clearly established law that it was unreasonable and in violation of the Fourth Amendment to shoot Amir without warning for Amir merely possessing a gun, as Amir complied with commands and never took menacing action with the gun.

Amir was not suspected of a crime.[74]  Despite Amir never being a suspect in the

St. Paul investigation leading to the no-knock warrant, and not being named or identified

in any way in the warrant application, Defendants continue their attempts to tarnish

Amir's name by framing their arguments to imply Amir was suspected of being

associated with the St. Paul investigation.[75]  Proper application of the motion to dismiss

standard requires a finding that Amir was not a suspect of any crime for purposes of a

*Graham* analysis.[76]

---

[74] FAC ¶ 128.

[75] Def. Answer to FAC ¶¶ 75, 81, 89, 128; Def. Mem. at 2, 4, 11-14, 16 (stating officers are not required "to pause as a suspect wields a deadly weapon in their direction"), 17, 25 (stating Hanneman was not required "to retreat or find cover in the murder suspect's apartment).

[76] FAC ¶ 128.

Amir never refused to comply with the officers' commands, never resisted arrest, and never attempted to evade arrest by flight.[77]  Like in *Partridge*, Amir's movements of lowering the handgun and raising his opposite hand were an effort to comply with officer commands, and Amir was shot as he was in the process of complying with those commands (*i.e.*, showing his hands).[78]  As in *Cole* and *Partridge*, Amir never placed his finger on the handgun's trigger, never pointed the handgun's muzzle at any officer or other person, never pointed or moved the handgun's muzzle in the direction of any officer or other person, never pointed the handgun's muzzle in a menacing way, never took any menacing action, never moved the handgun in such a way that Hanneman or any other officer would believe Amir was aiming the handgun's muzzle at any officer or other person, and never discharged the handgun.[79]  Like in *Cole*, despite having the opportunity, neither Hanneman nor any officer had issued Amir a warning to drop the handgun or a warning that Amir would be shot if he did not drop the handgun.[80]  Finally, as in *Cole,* despite having the opportunity, Hanneman did not attempt to retreat or find cover in the apartment's kitchen before shooting Amir.[81]

Plaintiffs allege in Paragraph 141 of their FAC that "Amir merely possessed the handgun."[82]  Without qualification, Defendants admitted that fact.[83]  This admission is

---

[77] *Id.* ¶¶ 128-30.
[78] *Id.* ¶¶ 131-33.
[79] *Id.* ¶¶ 134-40.
[80] *Id.* ¶¶ 122-24.
[81] *Id.*
[82] *Id.* ¶ 141.
[83] Answer to FAC ¶ 141.

consistent with Plaintiffs allegations that Amir complied with commands, never resisted or attempted to flee, and never took a menacing action with the handgun.  Years before Amir was killed on February 2, 2022, *Partridge* addressed conduct that occurred on October 17, 2016, and *Cole* addressed conduct that occurred on October 25, 2016.  *See Partridge I*, 929 F.3d at 567 (it was "objectively unreasonable to shoot an individual who does not pose an immediate threat to the officers or others."); *see also Cole*, 959 F.3d at 1134 (clearly established that "a person does not pose an immediate threat of serious physical harm to another when, although the person is in possession of a gun, he does not point it at another or wield it in an otherwise menacing fashion.").  When the allegations here are viewed in light of the precedent established by *Cole* and *Partridge*, Hanneman had fair warning that he violated Amir's clearly established right to be free from unreasonable and deadly force in violation of the Fourth Amendment.

Hanneman contends that *Partlow*, *Liggins*, and *Schulz* establish that his use of deadly force was reasonable.[84]  In *Partlow*, the officers saw a suicidal suspect "in the dark of night" forcefully push open an apartment-building door "with a shotgun in his hand," and only "seconds passed" until they opened fire.  774 F.3d at 502.  Before shooting, the officers ordered the suspect to drop the gun, and "they observed [him] move the shotgun in such a way that the officers believed that [he] was aiming the barrel of the shotgun at them."  *Id.*  Based on the facts in the summary judgment record, the court

---

[84] Def. Mem. at 17-18 (citing *Partlow v. Stadler*, 774 F.3d 497, 499 (8th Cir. 2014)).

concluded the officers had a reasonable belief, even if mistaken, that the suspect was aiming at them.  *Id.* at 503.

In *Schulz*, a police officer shot a man who suffered from paranoid schizophrenia and who had barricaded himself in his parents' basement.  44 F.3d at 646.  At the moment he was shot, the man was armed and ready with a double-bladed axe and was approaching an officer who was entangled in a barricade.  *Id.*  Based on the facts presented at trial, a jury concluded the officer did not violate the man's constitutional rights.  *Id.*

In *Liggins*, the minor suspect was armed with stolen firearm, was fleeing from police with a gun in his hand, and "was running in [the officer's] general direction."  971 F.3d 798, 801 (8th Cir. 2020).

Here, unlike *Partlow*, the FAC does not allege that Amir moved to aim his gun at Hanneman or any other officer.[85]  Nor is there an allegation that Hanneman believed Amir to be moving to aim at him.[86]  Plaintiffs specifically allege that "Amir never moved the handgun in such a way that Hanneman or any other officer would believe Amir was aiming the handgun's muzzle at any officer or other person."[87]  Moreover, Hanneman never ordered Amir to drop the gun.[88]  Unlike in *Schulz* and *Liggins*, the FAC does not

---

[85] *See* FAC ¶ 114, 135-39.
[86] *Id.* at ¶139.
[87] *Id.*
[88] *Id.* at ¶122.

allege that Amir was approaching or running in the direction of Hanneman or any of the officers.[89]

Hanneman's motion and application for qualified immunity must be denied.

**C.    Neither the video nor other evidence submitted by Hanneman blatantly contradicts Plaintiffs' allegations.**

Even if this Court chooses to consider the BWC footage to decide Hanneman's motion, Plaintiffs' allegations are supported by the footage, especially that of Officer Aaron Pearson's body worn camera. Without basis in the BWC footage, Hanneman argues that the footage is dispositive of whether Plaintiffs have sufficiently alleged a violation of Amir's clearly established constitutional rights.[90] Additionally, Hanneman contends that "[t]he facts are to be viewed 'in the light depicted by the videotape.'"[91] This is not the standard.

At this stage of the proceedings, a court deciding whether an officer's use of force was objectively reasonable must accept the nonmoving party's allegations, unless they are "blatantly contradicted by the record." *Michael v. Trevena*, 899 F.3d 528, 533 (8th Cir. 2018); *see also Burbridge v. City of St. Louis, Missouri*, 2 F.4th 774, 781 (8th Cir. 2021) (affirming denial of summary judgment based on qualified immunity); *Thompson v. Monticello*, 894 F.3d 993, 999 (8th Cir. 2018) (same); *Westwater v. Church*, 60 F.4th 1124, 1129 (8th Cir. 2023) (reversing and remanding summary judgment on qualified immunity and holding the video did not "blatantly contradict" plaintiff's version); *LeMay*

---

[89] *See* FAC ¶ 114, 135-39.
[90] Def. Mem. at 5-8, 12-19.
[91] *Id.* at 6 (citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)).

*v. Mays*, 18 F.4th 283, 288-89 (8th Cir. 2021) (affirming denial of motion to dismiss based on qualified immunity).  Moreover, Plaintiffs are entitled to all reasonable inferences in interpreting that footage and the Court should not resolve factual disputes. *See Partridge*, 929 F.3d at 564.

In *Michael*, the Eighth Circuit reversed summary judgment based on qualified immunity for an excessive force claim, reasoning that neither party's version of events was "blatantly contradicted by the record" because video did not show key events.  899 F.3d at 532.  The district court had granted summary judgment "based on its finding that 'Michael's report of his sister intentionally running over his foot was clearly false.'" *Id.* at 533.  The Eighth Circuit rejected the district court's factual finding, reasoning that "[n]either the dash cam video nor audio recordings can sustain that conclusion [because the] recordings are at best inconclusive." *Id.*  It continued, "in finding otherwise, the district court resolved fact disputes in the officers' favor, which is impermissible at summary judgment in any civil case, including a § 1983 suit involving the doctrine of qualified immunity." *Id.*

In *Burbridge*, the Eighth Circuit affirmed the district court's denial of summary judgment based on qualified immunity for excessive force claims because the video evidence did not "blatantly contradict" plaintiff's version of events.  2 F.4th at 781.  In its reasoning, the court stated, "[w]e have carefully reviewed the videos of the incident, and we are unable to clearly see that [defendant's] involvement was limited to kneeling on [the plaintiff's] legs, nor are we able to otherwise parse the actions of individual officers." *Id.*

Similarly, in *Thompson*, the Eighth Circuit affirmed the district court's denial of summary judgment based on qualified immunity for excessive force claims because the video did not conclusively resolve factual disputes as "it captures only part of the incident, and . . . does not clearly show where [plaintiff's] other hand was positioned when he turned to point at his house."  894 F.3d at 999.  The court reasoned that "the video does not conclusively disprove [plaintiff's] view of the incident."  *Id.*

Defendants' memorandum contains repeated allegations based on Defendants' own interpretation of the BWC, labeled as "facts."  Those allegations directly contradict Plaintiffs' pleadings regarding the direction of the handgun's barrel and movements of Amir.[92]  While the BWC footage captures part of the botched raid, it does not "conclusively disprove" or "blatantly contradict" Plaintiffs' allegations.  A viewing in light of the motion to dismiss standard reflects that a proper announcement was not issued prior to the officers crossing the threshold of the apartment;[93] no warning was

---

[92] *Compare* Def. Mem. at 2 (alleging Amir "was holding a handgun that was pointed in Officer Hanneman's direction"), at 3 (alleging Amir "began to raise his gun up"), at 5 (labeling section "Facts Depicted in the BWC Video"), 7 (alleging the "firearm was pointed in Hanneman's direction"), at 12 (alleging Amir "raised the gun and pointed the gun in Hanneman's direction and near the direction of other police officers"), at 13 (alleging the gun was "pointed in Hanneman's direction" and that Amir "fail[ed] to comply with police commands"), at 17 (alleging "Hanneman shot only when he was feet away from a man who raised and pointed a gun in his direction [and] ignored repeated orders to show his hands"), at 18 (alleging Amir was "raising and pointing the gun in Hanneman's direction"), at 19 (alleging Amir "had already raised and pointed the gun at Officer Hanneman"), at 25 (alleging Amir was "raising and pointing a gun in his direction, with [his] hand on the grip, and while Hanneman was in close proximity with no ability to retreat or find cover"), *with* FAC ¶¶ 129-39.
[93] BWC of Sgt. Sysaath, at 06:48:04; BWC of Officer Pearson, at 06:48:02; BWC of Sgt. Carlson, at 06:47:25; BWC of Officer Hanneman, at 06:48:05.

issued for Amir to drop the gun before Amir was shot;[94] and Amir pointed the gun down, never pointed it towards any officer, and never took any menacing or threatening action with the gun.[95]

Hanneman does not explicitly argue that Amir was a suspect, nor should he be permitted to do so under the Rule 12 standard. Nor does he argue that Amir attempted to resist or evade by flight. Hanneman seemingly relies on the allegations made by a law enforcement officer in the Application to implicitly argue that Hanneman was aware of all allegations set forth in the Application and that awareness caused him to believe Amir was dangerous.[96] Defendants argue "[i]t is indisputable that the [MPD] was informed that a judge had issued a no-knock, nighttime search warrant related to a murder investigation."[97] Hanneman takes this statement one step further, relying on the proposition that "[o]fficers are allowed to reasonably rely on information provided to them by other officers," and implicitly argues Hanneman had knowledge of every allegation included in the Application.[98] The FAC includes no allegation that Hanneman had knowledge of the substance of the Application, and Hanneman cannot ask this Court to improperly make that leap.

---

[94] BWC of Sgt. Pearson, at 06:48:02-06:48:11.
[95] BWC of Sgt. Pearson, at 06:48:02-06:48:11; BWC of Officer Hanneman, at 06:48:05 – 06:48:13.
[96] *Id.* at 2-5, 12-13 (contending that the allegations made in the Application are "facts").
[97] *Id.* at 2.
[98] *Id.* at 12 (citing *Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005) (analyzing summary judgment record) (citation omitted)).

Hanneman does not even expressly argue that Amir posed an imminent threat warranting the use of deadly force.  Instead, Hanneman asks this Court to impermissibly resolve fact disputes after reviewing the footage, to grant them judgment on the pleadings. Still images from the body cameras further support Plaintiffs' claim.  For example, the following image from Officer Pearson BWC reflects that Amir had the gun pointed down, with his finger off the trigger:



*BWC of Sgt. Pearson, at 06:48:10*

Amir's holding of the gun reflects textbook trigger discipline:



*See* "What is Trigger Discipline," <u>U.S. Concealed Carry Association</u> *available at https://www.usconcealedcarry.com/resources/terminology/general-terms/trigger-discipline/* (last accessed Nov. 7, 2023) (countless other similar content and images are publicly available online).

   The still images from the video further reflect that Amir was raising his left hand in compliance with the officers' orders:



*BWC of Sgt. Pearson, at 06:48:10*



*BWC of Officer Hanneman, at 06:48:13*



**BWC of Sgt. Pearson, at 06:48:11**

At most, Hanneman highlights that fact disputes exist as to whether Amir's clearly established constitutional rights were violated, which warrants discovery.  *See Lovelace v. Delo*, 47 F.3d 286, 287 (8th Cir. 1995) (declining to follow a bright line rule from dicta in *Harlow* and recognizing that discovery may be appropriate on qualified immunity issues) (citing *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *see also Hill v. City of Minneapolis*, No. 12-cv-738 (MJD/AJB), 2012 WL 7761496, at *6 (D. Minn. Dec. 26, 2012) ("A primary purpose of the qualified immunity defense is to protect government officials from the burdens of trial of discovery.  Even though some predicate facts have been alleged in this matter, qualified immunity is typically considered on motion for summary judgment and generally involves consideration of facts elicited through at least some additional discovery." (citations omitted)) *report and recommendation adopted*, 2013 WL 1104257

(D. Minn. Mar. 18, 2013).  Because the BWC footage does not "conclusively disprove" or "blatantly contradict" Plaintiffs' allegations, this Court should decline to resolve the factual disputes and should grant Plaintiffs all reasonable inferences in interpreting that footage.

## II.   Plaintiffs plausibly allege that the City is liable because it maintained unconstitutional practices and customs and because it failed to train its officers to avoid violating citizens' constitutional rights.

The City asserts it is not liable under *Monell* and *Canton* based solely on its contention that Hanneman's use of deadly force was not an underlying constitutional violation.[99]  The City does not address Plaintiffs' allegations that Amir's right to equal protection under the Fourteenth Amendment and right to be free from unreasonable application of a no-knock warrant under the Fourth amendment were also violated,[100] which can serve as the underlying constitution violation for *Monell.*[101]  *See, e.g., Parada v. Anoka County*, 332 F. Supp. 3d 1229, 1245 (D. Minn. 2018) (violation of equal protection rights can serve as basis for *Monell* claim).

Additionally, the City does not contend that Plaintiffs have failed to sufficiently allege practices and customs of excessive force or the City's deliberate indifference to its failure to train, supervise, and discipline officers to avoid excessive force, therefore this Court need only to analyze whether an underlying constitutional injury occurred.  *See*

---

[99] Def. Mem. 3, 22-23.
[100] *Id.*
[101] *See Fahra v. Weyker*, No. 16-cv-1146, 2017 WL 3421387, at *7 (D. Minn. Aug. 9, 2017) (discussing that combined actions of multiple officials giving rise to a Constitutional violation may serve as the underlying violation for *Monell).*

Local R. 7.1(c)(3)(B) ("A reply memorandum must not raise new grounds for relief or present matters that do not relate to the opposing party's response."). The Court can therefore assume that Plaintiffs sufficiently pleaded all other aspects of Counts II and III.

"[V]icarious liability is inapplicable to . . . § 1983 suits." *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (quotation omitted). Thus, to hold a municipality liable under Section 1983, a plaintiff must demonstrate that an unconstitutional policy or custom was the cause of the plaintiff's constitutional injury. *Berry v. Hennepin Cnty.*, No. 20-cv-2189 (WMW/JFD), 2022 WL 3579747, at *3 (D. Minn. Aug. 19, 2022) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). A plaintiff may also establish a claim directly against a municipality for failing to train its employees if that failure was the cause of plaintiff's constitutional injury. *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Just as vicarious liability does not exist in Section 1983 actions, the concept of "vicarious qualified immunity" does not exist. Attempts to assert this doctrine have been rejected in similar concepts. *See, e.g.*, *Bacon v. Hennepin Cnty. Med. Ctr.*, No. 06-cv-2359 (PJS/RLE), 2007 WL 4373104, at *13 (D. Minn. Dec. 11, 2007) ("Further, as HCMC admits, no court in the country has ever granted *vicarious* qualified immunity to a government defendant in an FMLA suit."). Instead, a grant of qualified immunity may sometimes result in the dismissal of a claim if the Court finds that no constitutional violation occurred. *Peirce v. Aswegan*, No. 22-cv-2664 (DWF/DJF), 2023 WL 2898595, at *5 (D. Minn. Apr. 11, 2023) ("Because Peirce has failed to allege a constitutional violation, his claim against the City of Elk River also fails.").

34

> **A.**     **Plaintiffs plausibly allege that the City is liable under *Monell* and *Canton* because Hanneman violated Amir's constitutional rights.**

As discussed in Section I *supra*, this Court should conclude that Hanneman's conduct violated Amir's constitutional rights and therefore, the *Monell* and *Canton* claims are based on an underlying constitutional injury.  But even if qualified immunity is granted, Plaintiffs' Counts II and III can survive.  *See Speer v. City of Wynne, Ark.,* 276 F.3d 980, 985-87 (8th Cir. 2002) (confirming that a public entity or supervisory official may be liable under § 1983, even though government individuals were not personally liable) (citations omitted).  "Municipal liability does not hinge on a municipal employee being held personally liable, rather, that employee simply needs to have committed an unconstitutional act."  *Furlow v. Belmar*, 52 F.4th 393, 406 (8th Cir. 2022).

If an individual defendant violates a plaintiff's fourth amendment rights but is entitled to qualified immunity, the plaintiff can still proceed in a claim that the official city policy led directly to the constitutional violation.  *See Bulfin v. Rainwater*, No. 4:20 CV 689 JMB, 2022 WL 17092332, at *13 (E.D. Mo. Nov. 21, 2022), *motion for relief from judgment denied,* No. 4:20 CV 689 JMB, 2023 WL 3452231 (E.D. Mo. May 15, 2023) (citing *Kuha v. City of Minnetonka,* 365 F.3d 590 (8th Cir. 2003), *abrogated on other grounds*, *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 395-96 (8th Cir. 2007)).  Specifically, "[t]his is true even if the arresting officers are not held responsible because of some good faith belief, meriting qualified immunity."  *Id.* (quotation).  Where officers are granted qualified immunity "based on a lack of clearly established law," it is not determinative of whether *Monell* and *Canton* claims would be foreclosed.  *Est. of Walker*

*v. Wallace*, 881 F.3d 1056, 1062 (8th Cir. 2018) (Kelly, J., concurring) (citing *Owen*, 445 U.S. at 657-58).

Here, if the Court determines that Hanneman's conduct violated Amir's constitutional right to be free from unreasonable force, but that Hanneman escapes liability because the constitutional rights were not clearly established, the Court should still deny the City's motion for judgment on the pleadings.

> **B.      Regardless of this Court's ruling on Hanneman, Plaintiffs plausibly allege that the City is liable because the combined actions of multiple officials were the moving force behind Amir's constitutional injury.**

Municipal liability issues "require[] entirely different analysis from the question of qualified immunity . . . because it would require examination of [the department's] supervision and training policies rather than the actions of individual officers". *S.L. ex rel. Lendeman v. St. Louis Metro. Police Dep't. Bd. of Police Com'rs*, 725 F.3d 843, 855 (8th Cir. 2013). Thus, even if the Court determines Hanneman's use of deadly force was not unconstitutional, Plaintiffs have sufficiently alleged underlying constitutional violations of Amir's Fourth and Fourteenth Amendment rights.

To state a claim for Section 1983 liability based on a municipal custom under *Monell* and *Canton*, a plaintiff must plead facts that establish an underlying violation of the plaintiff's constitutional rights. *Corwin v. City of Independence*, 829 F.3d 695, 700 (8th Cir. 2016) (analyzing *Monell*); *Roach v. City of Fredericktown, Mo.*, 882 F.2d 294, 298 (8th Cir. 1989) (analyzing *Canton*). Importantly, "[e]ven if no individual employee is found liable, a municipality might be liable, but only where 'the combined actions of

36

multiple officials may give rise to a constitutional violation.'" *Fahra v. Weyker*, No. 16-cv-1146, 2017 WL 3421387, at *7 (D. Minn. Aug. 9, 2017) (citing *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002)).  The Eighth Circuit, "has previously rejected the argument that [there is] a rule that there must be a finding that a municipal employee is liable in his individual capacity as a predicate to municipal liability."  *Speer*, 276 F.3d at 985.  A plaintiff does not need to "show more than that a governmental policy or custom was the 'moving force' that led to the deprivation of his constitutional rights, the foundation for municipal liability recognized by the Court in *Monell*[.]"  *Id.* at 986.

Whether a municipal entity can be held liable without an individual employee being liable "depends on the nature of the constitutional violation alleged, the theory of municipal liability asserted by the plaintiff, and the defenses set forth by the individual actors."  *Id.*  "[S]ituations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation."  *Id.*  "The question, then, is whether there is evidence showing [MPD] created policy which caused at least one constitutional violation—enough for the [City] to be liable for damages[.]"  *Dean v. Searcey*, 893 F.3d 504, 512 (8th Cir. 2018).

Here, Plaintiffs have pleaded constitutional violations that include, but are not limited to, Fourth Amendment violations based on the execution of a no-knock warrant without probable cause, the long history of the City's officers' use of excessive force, the history of excessive force during no-knock warrant raids, and Equal Protection violations based on the disproportionate use of excessive force on Black individuals, selective

enforcement of no-knock warrants against Black individuals, and the history of excessive force use against Black individuals during no-knock warrant raids.

### 1.    Fourth Amendment violations

Whether a search and seizure violate the Fourth Amendment depends upon whether it is reasonable under the circumstances.  *State v. Fay*, 488 N.W.2d 322, 324 (Minn. App. 1992).[102]  Reasonableness depends upon a balance between public interest, and the individual's right to personal security free from arbitrary interference by law officers. *Id.*  The reasonableness of the officers' conduct is determined by the totality of the circumstances.  *Id.*  When a court determines that officers' conduct under the totality of the circumstances violates the Fourth Amendment, a court need not reach the question of whether the warrant was valid in the first instance.  *Id.*

"Whether probable cause exists is a 'common-sense decision' the weighs the totality of the circumstances that are detailed in a warrant application."  *United States v. Mayweather*, No. 17-cr-0229, 2018 WL 1370532, at *2 (D. Minn. Mar. 16, 2018) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  "Probable cause does not exist absent a nexus between the targeted contraband and the location to be searched."  *Id.*  (citing *Unites States v. Tellez*, 217 F.3d 547, 549 (8th Cir. 2000)).

Inquiry into the need for an unannounced entry is included in the reasonableness inquiry into the warranted search under the Fourth Amendment.  *Garza v. State*, 632 N.W.2d 633, 638 (Minn. 2001) (citing *Wilson v. Arkansas,* 514 U.S. 927, 934 (1995)).

---

[102] The no-knock warrant in this case was issued by a Minnesota state court, therefore Minnesota caselaw is applicable.

"[P]olice must have a *reasonable suspicion* that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence."  *State v. Botelho*, 638 N.W.2d 770, 778 (Minn. App. 2002).  "Therefore, police must have reasonable suspicion of a threat to officer safety or the likelihood of destruction of evidence, and this reasonable suspicion must be supported by a *particularized* showing of dangerousness, futility, or likelihood of destruction of evidence."  *Id.*

Plaintiffs plausibly allege the Application did not provide probable cause to execute a no-knock warrant on Apartment 701.[103]  Plaintiffs allege that the initial warrants were to be served on four apartments as "knock and announce," but were specifically requested to be changed by the City's agents to no-knock warrants.[104] Despite available information that the suspects in connection to the homicide did not reside at 701 and that residents were not believed to be involved, a no-knock warrant was requested for 701 by unreasonably applying the same rationale as the apartments known to be the suspects' homes.[105]

The Application failed to put forth a sufficient nexus between apartment 701 and the homicide suspects to establish probable cause for the no-knock search warrant in this case. ████████████████████████████████

---

[103] FAC ¶ 77.
[104] *Id.* ¶ 84.
[105] *Id.* ¶¶ 73-75.

███████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

████████████████   The Application provided the issuing judge with no information to

believe that there was any illegal activity at apartment 701 and no evidence to show that

anyone residing at 701 had been involved in the homicide (or any crime for that matter)

or would have any evidence of the homicide in their possession[106].

The affidavit provides no information that makes it even probable that the firearm

or any of the items listed in the Application would be found in apartment 701.

Defendants highlight the lack of information in the Application for apartment 701:

> The murder suspects were associated with the Bolero Flats Apartments that
> were the subject of the court-approved search warrant. ████████████████
> ██████████████████████████████████████████████
> ██████████████████████████████[107].

Importantly, the Application never identified a weapon and did not provide facts that

would make it probable that a weapon would be found in apartment 701. *See United

States v. Herron*, 215 F.3d 812, 814 n.2 (8th Cir. 2000) (finding "no evidence that there

was any illegal activity at the . . . residence" and stating the warrant affidavit made "only

two passing references to the [searched] residence (to note [the suspect's] presence there

and to request a search warrant for the residence) and only three total references to [the

suspect] (to note his criminal background, to note his familial relation to the [home's

---

[106] *Id.* ¶ 81.
[107] Def. Mem. at 2.

owner], and to describe him as an occupant of the property to be searched)"); *United States v. Lussier*, No. 18-CR-281, 2019 WL 1987235 (D. Minn. May 6, 2019) (finding no probable cause existed for the warrant "[b]ecause the affidavit does not allege, much less demonstrate, that the assault occurred at the searched residence, or that any evidence relating to the assault would be found there"). Plaintiffs' allegations indicate that the application for a no-knock warrant to 701 was tantamount to securing a no-knock warrant for any location visited by a suspect of a crime, without a reasonable connection to the crime itself.

Further, although the warrant affidavit discusses ███████████████████ ████████████████████████████████████████████████████████ ██████████████████████████ are the same sets of people, if they were different people, and whether they were reliable sources of information. *See United States v. Nelson*, No. 04-cr-4651, 2005 WL 1355025, at *1-2 (D. Minn. Jun. 2, 2005) ("There is no information set forth in the affidavit upon which to evaluate the 'veracity' or 'basis of the knowledge' of the person supplying the information to the officer[.]"). There is nothing in the Application that would allow a reasonable person to believe, based on the totality of the circumstances laid out in the affidavit, that there was a "fair probability that contraband or evidence of a crime will be found in a particular place" — in this case, apartment 701. *Gates*, 462 U.S. at 238.

Finally, the City's officers, including Hanneman, did not have reasonable suspicion at the time the no-knock warrant was executed of a threat to officer safety or the likelihood of destruction of evidence, and this reasonable suspicion must be supported

by a *particularized* showing of dangerousness, futility, or likelihood of destruction of evidence. *Botelho*, 638 N.W.2d at 778. Therefore, the execution of the no-knock warrant violated Amir's constitutional rights.

## 2.    Equal Protection violations

Plaintiffs also sufficiently pleaded that Amir's equal-protection rights were violated by the City's selective use of no-knock raids based on race. "[T]he Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). A selective-enforcement claim does not require proof that the plaintiff was arrested without probable cause or reasonable suspicion to believe that the plaintiff committed a criminal offense. *Johnson v. Crooks*, 326 F.3d 995, 999-1000 (8th Cir. 2003). Rather, the plaintiff must prove that the officer exercised his or her discretion to enforce the laws on account of the plaintiff's race, nationality, or other characteristics. *See id.* at 1000. Plaintiff must normally "Prove similarly situated individuals were not stopped or arrested in order to show the requisite discriminatory effect and purpose." *See id.* (discussing selective enforcement of traffic laws or racially-motivated arrests).

Plaintiffs allege that "[b]etween September 1, 2021 and January 31, 2022, the City only executed no-knock warrants on people of color, with 80% of no-knock warrant targets being Black."[108] They also allege the City "did not execute a single no-knock warrant on Non-Hispanic Whites[.]" *Id.* As discussed, Plaintiffs clearly allege that the

---

[108] FAC ¶154.

application of the no-knock warrant involved an insufficient nexus to Apartment 701; that the City's officers knew that the residents of 701 were Black; and that the City's officers knew none of the residents were suspected of involvement with the underlying crimes.[109] Despite this, a no-knock warrant was requested, in line with the City's ongoing custom and practice of violating the equal protection rights of its Black citizens. Plaintiffs sufficiently allege that the combined action of the City's officials to obtain a no-knock warrant on account of the target's race pursuant to its practice and custom of engaging in selective enforcement was the moving force behind Amir's death. Plaintiffs' allegations support a reasonable inference that the City's officers—as a matter of policy—only execute no-knock warrants against Black individuals.

As set forth in the FAC and above, Plaintiffs plausibly allege a host of customs, practices, and a failure to train, supervise, and discipline that plausibly allege violations under *Monell* and *Canton.* These theories do not all hinge on whether Hanneman is granted qualified immunity, such as the MPD, through its individual officers, only obtaining and executing no-knock warrants against Black individuals.[110] *See Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) ("[A]lthough there must be an unconstitutional act before a municipality can be held liable, there need not be a finding that a municipal employee is liable in his or her individual capacity." (quotations omitted)). Accordingly, the City has not carried its burden to demonstrate that it is entitled to judgment on the pleadings on Counts II and III because the City has not and

---

[109] *Id*. ¶¶ 81-82.
[110] *Id*. ¶¶ 194-207.

cannot show they rise and fall on a qualified immunity finding as to Hanneman. Because Plaintiffs have sufficiently alleged a constitutional injury, the Court should allow them to proceed to discovery.

**III.    Plaintiffs plausibly allege that the City's officers, including Hanneman, engaged in wrongful acts and omissions that were malicious and/or in violation of ministerial duties.**

In addition to Plaintiffs' Section 1983 claims, Plaintiffs state a plausibly supplemental Minnesota state law claim for wrongful death against Hanneman and the City.[111] Defendants argue Plaintiffs' state law claim for wrongful death should be dismissed because, they assert, Hanneman is entitled to official immunity.[112] Defendants' motion to dismiss Plaintiffs' state law claims on official immunity should be denied for three reasons: (1) the Court should not exercise jurisdiction over the state law claims should it dismiss the federal claims; (2) official immunity is not suitable for a motion to dismiss; and (3) Plaintiffs sufficiently pleaded a malicious wrong and/or violation of ministerial duties.

First, a district court can refuse to exercise supplemental jurisdiction when the related original jurisdiction federal claims are dismissed. 28 U.S.C. § 1367(c)(3); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009). While Plaintiffs maintain that both their federal and state claims should survive this motion, case law

---

[111] *Id.* ¶¶ 208-15.

[112] Def. Mem. at 3, 23-25. Qualified immunity is not a defense to this claim, as the potential defense to a state law claim is "official immunity." *Johnson v. Morris*, 453 N.W.2d 31, 42 (Minn. 1990) (citations omitted) (distinguishing qualified and official immunities).

counsels in favor of this court declining jurisdiction over the state law claims if Plaintiffs'
federal claims are dismissed.  Federal courts typically decline to exercise supplemental
jurisdiction when only state law claims remain in the early stage of a lawsuit.  *See
Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also Marshall v. Green
Giant Co.*, 942 F.2d 539, 549 (8th Cir. 1991).

Second, "[t]he law concerning a motion to dismiss for failure to state a claim is not
hospitable to the doctrine of official immunity."  *Stresemann v. Jesson*, A13-1967, 2015
WL 7693339, at *2 (Minn. App. Nov. 30, 2015).  The common law doctrine of official
immunity "protects from personal liability a public official charged by law with duties
that call for the exercise of judgment or discretion unless the official is guilty of a willful
or malicious wrong."  *Watson by Hanson v. Metro. Transit Comm'n*, 553 N.W.2d 406,
414 (Minn. 1996) (quotation omitted).  "Discretionary conduct is clearly *not* protected if
the official committed a willful or malicious wrong," but "[t]he doctrine protects honest
law enforcement efforts."  *Elwood v. Rice Cnty.*, 423 N.W.2d 671, 679 (Minn. 1988).  "In
determining whether an official has committed a malicious wrong, we consider whether
the official has intentionally committed an act that he or she had reason to believe is
prohibited."  *Hassan v. City of Minneapolis, Minn.*, 489 F.3d 914, 920 (8th Cir. 2007)
(quotation omitted).  "This determination contemplates less of a subjective inquiry into
malice, which was traditionally favored at common law, and more of an objective inquiry
into the legal reasonableness of an official's actions."  *Smith v. City of Minneapolis*, 754
F.3d 541, 549 (8th Cir. 2014) (quotation omitted).

"In Minnesota, a defendant who seeks the protection of official immunity usually seeks to satisfy the burden of proof by asserting official immunity in a motion for summary judgment." *Id.* (citing *Vassallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn. 2014); *Thompson v. City of Minneapolis*, 707 N.W.2d 669, 673 (Minn. 2006); *Mumm v. Mornson*, 708 N.W.2d 475, 480-81 (Minn. 2006); *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 655 (Minn. 2004); *Briggs v. Rasicot*, 867 N.W.2d 217, 220 (Minn. App. 2015); *Shariss v. City of Bloomington*, 852 N.W.2d 278, 280 (Minn. App. 2014)). "Indeed, we are unaware of any precedential decision of a Minnesota appellate court in a case in which a defendant asserted official immunity in a motion to dismiss pursuant to rule 12.02(e)." *Id.*

The need for discovery is critical in cases involving ministerial duties because Minnesota courts have recognized that both unwritten policies and training can create ministerial duties. *See, e.g.*, *Bond by and through Bond v. ISD #191*, No. A21-0688, 2022 WL 92961, at *4-5 (Minn. App. Jan. 10, 2022) (collecting cases); *see also Ellis v. City of Minneapolis*, No. A20-0443, 2021 WL 668084, at *3 (Minn. App. Feb. 22, 2021) ("A ministerial duty need not be 'imposed by law' and may arise from an 'unwritten policy' or 'protocol' that dictates a particular course of conduct.") (quoting *Anderson*, 678 N.W.2d at 655).

Finally, Plaintiffs have also properly alleged violation of ministerial duties at this stage in the litigation, including the officers' failure to properly announce their presence

prior to crossing the threshold of the apartment.[113]  *See* MPD Policy 9-307(A)(2)(b). Given that training and customs can create ministerial duties, it is also critical that further discovery be conducted related to the officers' failures on crossing the threshold but also regarding how the officers were supposed to account Amir's barriers to understanding during the execution of the warrant *i.e.*, being woken from sleep.  *See* MPD Policy 9-307(A)(2)(d).  Additionally, Plaintiffs alleged the intentional tort of battery, and further discovery is necessary to address the malicious nature of that battery.  Accordingly, Defendants' motion for official immunity should be denied.

## Conclusion

For the foregoing reasons, Defendants' motion for judgment on the pleadings should be denied in its entirety.

**NEWMARK STORMS DWORAK LLC**

Dated: November 7, 2023          /s/ Jeffrey Storms
                                 Jeffrey Storms #0387240
                                 Ryan O. Vettleson, #0312915
                                 Naomi E. H. Martin, #0402332
                                 222 South 9th Street, Suite 470
                                 Minneapolis, MN 55402
                                 Telephone:  (612) 455-7050
                                 Facsimile:  (612) 455-7051
                                 E-mail: jeff@newmarkstorms.com
                                         ryan@newmarkstorms.com
                                         naomi@newmarkstorms.com

                                 - and -

---

[113] FAC ¶ 104.

**ROMANUCCI & BLANDIN**

/s/ Bhavani Raveendran
Antonio M. Romanucci (Admitted pro hac vice)
(Illinois ARDC No, 6190290)
Bhavani Raveendran (Admitted pro hac vice)
(Illinois ARDC No, 6309968)
Sam Harton (Admitted pro hac vice)
(Illinois ARDC No. 6342112)
321 North Clark St., Suite 900
Chicago, Illinois 60654
Phone: 312-458-1000
Fax: 312-458-1004
Email: aromanucci@rblaw.net
braveendran@rblaw.net
sharton@rblaw.net

- and -

**BEN CRUMP LAW**
Christopher M. O'Neal (*pro hac vice*)
(Florida Bar No. 0910201)
717 D Street N.W., Suite 310
Washington, D.C. 20004
E-mail: chris@bencrump.com