UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Karen Wells and Andre Locke as co-trustees for the next of kin of Amir Rahkare Locke, deceased,

Plaintiffs,

vs.

Mark Hanneman, in his individual capacity as a Minneapolis police officer, and the City of Minneapolis,

Defendants.

Case No. 23-cv-00273-WMW-DLM

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS**

---

Defendants Mark Hanneman and the City of Minneapolis respectfully submit this Reply Memorandum of Law in Support of their Motion for Judgment on the Pleadings.

## I.   PLAINTIFFS' LEGAL CONCLUSIONS AND SPECULATION ARE NOT FACTUAL ALLEGATIONS TO BE ACCEPTED BY THE COURT

Plaintiffs' opposition is chiefly based on allegations that do not relate to the legal issue before the Court. The legal standard for assessing an officer's use of deadly force is whether a reasonable officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others. *Loch v. City of Ltchfield*, 689 F.3d 961, 965 (8th Cir. 2012).

First, Plaintiffs ask the Court to err by focusing on Locke's perspective when the reasonableness of force is judged from the perspective of the reasonable officer on scene. *Saucier v. Katz*, 533 U.S. 194, 205 (2001). Plaintiffs allege Locke was asleep, startled awake, grabbed his handgun only to assess the situation, and began to comply with orders when he was shot. These allegations improperly focus on Locke's perspective and intentions. But Locke's perspective and intentions are not relevant. What is relevant is whether an objectively reasonable officer on the scene, based on the facts known to him at the time and as depicted in the video footage, would believe that Locke posed an immediate threat of death or serious physical bodily harm. Moreover, the allegations about Locke's intentions are wholly speculative, not facts that support a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When Locke is first visible on the body worn camera (BWC) video, Locke is already moving around under the blanket and he emerges with the handgun. Neither Plaintiffs nor a reasonable officer could know whether any of the intentions or perceptions attributed to Locke are true. Significantly, no discovery will support those speculative assertions as true.

Second, Plaintiffs allege that Locke was not a suspect of a crime. Again, this is not relevant because the legal standard looks to the information known to the officers at the time force was used. Here, the officers had information that a suspect

they were searching for murdered Elder with bullet piercing bullets, the suspect was connected to the apartment where Locke was encountered, and the suspect was seen in the apartment building with a gun.  And, when the officers entered the apartment, Locke raised a gun in the direction of officers.  A reasonable officer would conclude that Locke posed an immediate threat of death or great bodily harm at that moment.  It is of no relevance whether Locke – armed and positioning to fire – was the original suspect described in the search warrant.

Third, Plaintiffs allege that officers failed to announce their presence prior to entry.  This too is irrelevant to the legal standard of whether it was objectively reasonable to use deadly force at the moment Locke raised a gun in the officers' direction. Additionally, the officers were executing a lawful warrant which did not require knocking or announcing prior to entering the apartment.

Fourth, Plaintiffs allegations are contradicted by video evidence.  Plaintiffs allege that Locke never pointed the gun in the direction of any officer.  This is blatantly contradicted by the BWC video.    (Ex. 5 (Pearson BWC at 6:48:10).) Therefore, the Court need not assume it is true. Rather, the Court must accept the facts as depicted in the video.  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Ching v. City of Minneapolis*, 73 F.4th 617, 621 (8th Cir. 2023)(considering video). The video depicts Locke pointing the gun in the direction of officers.  Plaintiffs also allege

that officers "yelled overlapping and incoherent commands." (Pl. Opp. at 2.) But this too is contradicted by the BWC.

Fifth, Plaintiffs' allegations are legal conclusions which need not be accepted by the Court. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). Among the legal conclusions: Plaintiffs claim that officers failed to provide a warning to drop the gun and retreat even though they had the opportunity to do so; that Locke never raised the gun in a threatening manner in the direction of any officers or other person; that Locke began to comply with Officer Hanneman's orders to show his hands and lowered the gun's barrel and muzzle further toward the ground. These are legal conclusions, inconsistent with the perspective of a reasonable officer, contradicted by BWC video, or occurred after Hanneman made the decision to use deadly force. (Ex 5 (Pearson BWC at 6:48:9-10).)

The allegations delineated above are not factual allegations, and courts do not assume the truth of such conclusions. *See, e.g., Ashcroft,* 556 U.S. at 681. Viewed from the perspective of a reasonable officer on the scene, Officer Hanneman's use of deadly force was objectively reasonable.

II.     **THE COURT SHOULD CONSIDER EXHIBITS EMBRACED BY THE PLEADINGS**

A.     **Body Worn Camera Video**

The Court should consider the BWC video in deciding this motion. Plaintiffs argue that this Court should use discretion to not consider the depictions in the BWC that are harmful for Plaintiffs' case.  However, the BWC videos are embraced by the pleadings and must be considered by the Court.

This issue was recently decided by the Eighth Circuit in *Ching v. Walsh*.  73 F.4th  617, 620-21 (8th Cir. 2023). There, the Eighth Circuit concluded that BWC videos were necessarily embraced by the pleadings and are to be considered on a motion for judgment on the pleadings. *Id*. at 621 (citing *LeMay v. Mays*, 18 F.4th 283, 289 (8th Cir. 2021).  The Eighth Circuit also held that:

> The jurisdictional limitation on our authority to review a district court's factual findings does not obligate us to accept a version of events that is "blatantly contradicted by the record."

*Id*. (citing *Wallace v. City of Alexander*, 843 F.3d 763,767 (8th Cir. 2016) and *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1010 (8th Cir. 2017)). Thus, the facts of the case are governed by a review of the BWC depictions.

Defendants filed and cited to the BWC videos with their answers and they are, therefore, embraced by the pleadings. Moreover, Plaintiffs undoubtedly relied upon the BWC to draft the Complaint and Amended Complaint.  They describe the actions of specifically named people, reference when actions happened in

comparison to other actions, and reference the times that particular events occurred, which could have come only from the recordings. (*See* Doc. 40 at ¶¶107, 109, 110 (containing exact quotes and time sequences). For example, Officer Pearson's BWC shows Sergeant Troy Carlson kick the couch Locke is on at the same time Sergeant Sysaath yells, "get on the ground." (Doc. 40 at ¶110.) Pearson's BWC also shows Hanneman walk from the kitchen toward Locke and stop in front of Locke. Audio depicts Hanneman's voice say, "show me your hands." (*Id.* at ¶116.) Plaintiffs have embraced the videos. Indeed, still images from Officer Pearson's BWC are pasted into Plaintiffs' Opposition. (Doc. 68 at 29, 31-32.)

Significantly, the authenticity of the BWC is not questioned. Plaintiffs do not claim that the BWC has been altered, or that what is depicted in the recorded video is inauthentic in some manner. Instead, they argue that the BWC should not be considered by the Court because it does not depict the entirety of the raid. The BWC video from Sergeants Sysaath and Carlson and Officer Pearson accurately capture what was recoded, and the depicted facts are more than sufficient to show that Officer Hanneman's use of deadly force was objectively reasonable. The micro-second not shown does not alter the analysis. The video depicts the following: Sergeant Sysaath moved into the living room, and Locke was visible on the couch lifting his head with his face turned toward Officer Hanneman, who was in front of Sysaath. (Docs. 16, 47 (Ex. 1 (Sysaath BWC)) at 06:48:12-14.) As Sergeant

6

Carlson moved into the apartment, the top of Locke's head was visible over the back of the couch, and, as Locke's face turned toward Carlson, Locke's face was illuminated by Carlson's flashlight. (Doc. 16, 17 (Ex. 2 (Carlson BWC)) at 06:47:28.) An officer shouted, "Let me see your hands!" (*Id.* at 6:47:28.) Locke's hands moved up and then down back under a blanket laying atop of him. (*Id.* at 6:47:29-30.) Locke moved around on the couch going up and down and side to side, and the blanket went back over his head. (*Id.* at 6:47:28-6:47:32.) Pearson's BWC footage shows Locke holding a gun in his hand and pointing forward with the muzzle angled, at times, slightly downward, and then Locke's whole body rising up and shift forward, including the gun, as Locke begins to stand up. It shows the gun pointed in Hanneman's direction and Hanneman within a foot of Locke. (Ex. 5 (Pearson BWC at 6:48:09-10)). In contrast, the video does not depict Locke showing his hands, dropping the gun, or moving his arms to the side as if to throw the gun away from himself. It does not show Locke holding the gun gingerly as if to drop it or demonstrate that he is about to drop it. The video depicts Locke holding the handle of the gun in a manner in which it could be fired. It shows that Locke never wavers from that tight grip. Pearson 's BWC video depicts Pearson moving his handgun up and into position to shoot at this time. *Id.* Within 1 second of Pearson moving his gun up, Hanneman shoots Locke.

This milli-second is all that the incident does not show and it is not dispositive because no matter what Locke was doing during that milli-second, it was not enough time for Hanneman to deduce that Locke was no longer a threat and to act on the new calculus. "While mere seconds can be sufficient time for an officer to reassess a threat," a "single second in a less than two-second encounter" is not sufficient time to "reassess the threat." *Ching*, 73 F.4th at 621.  In *Ching*, the officer shot the decedent when he was coming at the officer with a knife. *Id*. at 619. The officer shot him and decedent fell to the ground and the knife rolled away from him.  *Id*. at 620. The officer shot him four times while he was on the ground.  *Id*. The shooting lasted two seconds.  *Id*. The district court ruled that the four shots while the decedent was on the ground was unreasonable because the officer had sufficient time to reassess the threat posed by the decedent after he fell to the ground and dropped the knife.  *Id*. at 620.  The Eighth Circuit reversed, ruling that "given the swift and continuous progression of the incident and [the officer's] limited time to observe and process the circumstances, a jury could not find [the officer] had sufficient time to reassess the threat [the suspect] presented before he stopped firing." *Id*. at 621.  The audio and visual depictions in the BWC are properly before the Court for consideration at this stage of the proceedings and are easily decipherable as to the salient moments of the incident.

B.     **The Joint Report**

Plaintiffs' Opposition, and their pleadings, make repeated references to a DOJ Report.   (Opp. at 6-9 (citing to paragraphs in complaints.)   Plaintiffs argue that the DOJ investigation report supports Plaintiffs' claims. The DOJ makes no mention of the Locke incident or any assertion that the execution of the warrant or Locke's death violated any law, even though the criminal matter was closed. While Defendants do not submit the Joint Report for proof that Hanneman's shooting was lawful, the Joint Report makes the closure, and it does confirm that the DOJ report itself could have discussed the Locke incident.

III.   <u>**THE FORCE WAS OBJECTIVELY REASONABLE**</u>

Eighth Circuit precedent establishes that Officer Hanneman's decision to use deadly force in the light of what the officers knew from the warrant and what they encountered in the apartment was objectively reasonable. The use of deadly force here was objectively reasonable based on the totality of the circumstances because Locke posed an immediate threat of death or great bodily harm to the officers.   The facts that should be compared to the relevant case law are as follows:

- As officers entered apartment 701, they repeatedly announced "Police. Search warrant"

- Locke's face was illuminated by Carlson's flashlight and he looks at Carlson. (Doc. 16, 17 (Ex. 2 (Carlson BWC)) at 06:47:28.)

- An officer shouted, "Let me see your hands!"  (*Id.* at 6:47:28.) Locke's hands moved up and then down back under a blanket laying atop of him.  (*Id.* at 6:47:29-30.)

- Officers yelled "let me see your hands," "hands," and "get on the ground."  (Ex. 2 (Carlson BWC)) at 06:47:28.)

- Rather than show his hands, Locke grabbed the gun. (First Amended Complaint at ¶¶112-13.)

- Locke moved to the ground leaning forward on the ottoman but remained partially concealed under the blanket. (Ex. 5 (Pearson BWC at 6:48:09).)  Locke peaked out from under the blanket holding a gun in his right hand directed forward.  (*Id.* at 6:48:10.)

- Hanneman came around the couch to Locke. *Id.*

- Locke **raised** his whole body, including **the gun, pointing the gun in Hanneman's direction**.  *Id.*

- Hanneman and others continue to order Locke to show his hands.  *Id.*

- Locke did not give any indication that he was submitting to their authority and was not ready to shoot.  *Id.*

It was objectively reasonable for Officer Hanneman to use deadly force on Locke.  Any objectively reasonable officer would believe that furtive movements under the couch to grab the gun, peaking out from a concealed position, and pointing the gun out in the officer's direction created an immediate threat of death or great bodily harm. This is particularly true given how close Hanneman was to Locke, and Hanneman's inability to secure cover from gunfire, and that the officers

were effecting a search warrant connected to a murder involving gunshots. *Id.* Further, in response to officers identifying who they were and their purpose, Locke responded by grabbing a gun, remaining silent, not showing his hands, not tossing the gun or making any motion indicative that he was dropping the gun.

Under the totality of the circumstances, Locke did not merely possess a gun, he made menacing and threatening actions. There was no indication that he was not a threat. In those circumstances, officers do not need to wait to shoot. *Sinclair v. City of Des Moines*, 268 F.3d 594, 596 (8th Cir. 2001) ("no constitutional or statutory right exists that would prohibit a police officer from using deadly force when faced with an apparently loaded weapon"); *Loch v. City of Litchfield*, 689 F.3d 965, 966-67 (8th Cir. 2012) (deadly force was objectively reasonable when the officer reasonably believed the suspect had a gun, even though in fact the suspect had discarded his weapon before walking toward the officer, and a witness had allegedly informed the officer of this fact). This is so even if the barrel of Locke's gun was pointed down. When an officer reasonably believes that there is an imminent threat of serious harm, the officer may be justified in using deadly force even before the person actually points a weapon at him. *Liggins v. Cohen*, 971 F.3d 798 (8th Cir. 2020) (citing *Malone v. Hinman*, 847 F.3d 949, 954-55 (8th Cir. 2017)); *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001). Once the barrel is pointed at the officer it will likely be too late. *See Nelson v. City of Battle Creek,*

*Michigan*, 802 F. App'x 983, 984-88 (6th Cir. 2020) (over two-second period in 2013, minor reached for and grabbed realistic-looking BB gun from his waistband, gripped and raised it, and then dropped gun and raised his hands, before officer shot him; court held that "Rivera reasonably perceived threat of serious physical harm when he saw N.K. reach for and grab what looked like real gun. It was not objectively unreasonable for Rivera to decide to shoot N.K. as he saw N.K. grip and raise his gun, even if the bullet ultimately struck N.K. after he had dropped the gun."); *Untalan v. City of Lorain*, 430 F.3d 312, 315–16 (6th Cir. 2005) (deadly force was objectively reasonable even a few seconds after subject dropped knife: "[a]ssuming that Ronnie lost control of the butcher knife just before being shot, by all accounts the amount of time between the loss of such control and the shooting could not have been more than a few seconds and could have been as little as a split-second….Within a few seconds of reasonably perceiving a sufficient danger, officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed.")

In *Liggins,* officers were investigating the report of a stolen gun by the plaintiff's brother, as well as a carjacking.  971 F.3d at 799. Officers knew the apartment complex had a history of "violent activity." *Id*. When officers arrived, the plaintiff had a gun. *Id*. at 800. The plaintiff stated he was holding the gun by the barrel pointed down. *Id*. He stated the gun was moving slightly because he

12

was running. *Id*. The officer was to the left of the sidewalk in the parking lot, in front of the plaintiff at an acute angle to the left, so the plaintiff was running in the officer's general direction, even if not directly at him. *Id*. When the officer saw the plaintiff had a gun in his hand, the officer took cover behind his vehicle and two seconds later he shot at the plaintiff four times with no warning. *Id*. Plaintiffs argue *Liggins* is distinguishable because the gun was stolen, he was fleeing police and he was running in the officer's general direction. None of these factors are distinguishable in a way that make Hanneman's actions unreasonable, rather they make them more reasonable. The Eighth Circuit explains:

> With only a second or two to react as he rounded the parked truck, Cohen had reasonable grounds to believe that the fleeing subject who was running toward the back of the property could raise the gun and shoot. It would take only an instant to do so if the person were ready to fire. …This was a split-second decision for the officer. It was not practical in that moment for Cohen to discern whether B.C. was carrying the gun in an unusual manner or to shout a warning and wait for him to react. There was simply no time. "When the hesitation involved in giving a warning could readily cause such a warning to be the officer's last, then a warning is not feasible."

*Id*. at 801. Here, as in *Liggins*, a reasonable officer would conclude that Locke's movements presented an immediate threat of death or serious bodily injury to the officers. To raise the muzzle and shoot would have taken less time than Hanneman could react. *Id*. at 801.

The Eighth Circuit has stated that when a person has a weapon, "[w]here the weapon was, what type of weapon it was, and what was happening with the

weapon are all inquiries crucial to the reasonableness determination." *Yang v. City of Minneapolis*, 607 F.Supp.3d 880, 892 (D. Minn. 2022)(*citing Partridge*, 929 F.3d at 566–67).   In *Yang*, the court concluded that it was sufficient to know that the decedent had a gun, was on his porch, and had retrieved the gun after he saw police with their guns pointed at him.   607 F.Supp.3d at 892. The court concluded with that information that it was reasonable for an officer to shoot the decedent. *Id*. Here, Officer Hanneman had all that information too.   Locke had a gun in his hand held by the handgrip, it was pointing forward in Hanneman's direction, and Locke grabbed it and continued to hold it after he saw officers pointing their guns at him and ordering him to show his hands.

Plaintiffs attempt to diminish the import of *Schultz v. Long*, 44 F.3d 643 (8th Cir. 1995), arguing it is not relevant because the facts are distinguishable.   They miss the point. Defendants raised *Schultz* because it shows that the use of a no-knock warrant is not relevant to show whether deadly force was reasonable because it is too far removed from the proximate cause, which was Locke grabbing the gun, holding it firmly in his hands, aiming it in Hanneman's direction, raising his whole body up with the gun, and failing to drop the gun.

Finally, Plaintiffs fail to distinguish *Partlow v. Stadler*, 774 F.3d 497 (8th Cir. 2014)(holding that even if the plaintiff's actions were innocent as he moved his gun, the officers' use of deadly force was reasonable because they had no way of

knowing what the plaintiff planned to do) in a meaningful way. Plaintiffs argue *Partlow* is distinguishable because there was no allegation that Hanneman believed Locke was aiming the gun at him or that Locke was intending to aim his gun at Hanneman. (Pl. Opp. at 34.) This is immaterial to the relevant standard. The standard is what an objectively reasonable officer would believe Locke was doing in light of the totality of the circumstances. *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).) *Liggins* demonstrates this point perfectly.

The cases Plaintiffs cite for support that the shooting was unreasonable are inapposite. Plaintiffs argue the force was unreasonable because Locke merely possessed the handgun without wielding it in an otherwise menacing or threatening fashion. (Doc. 68 at 22-23.)[1] Plaintiffs cites to *Partridge* and *Cole* for support that mere possession of a gun is not sufficient to use deadly force and

---

[1] Plaintiffs claim Defendants admitted that Locke merely possessed the gun. Reviewing the answer in its entirety, it was clearly a clerical error to admit Paragraph 140 of the Amended Complaint. The preceding paragraphs of the answer specifically deny Paragraphs 130-139, which all involve Plaintiffs' claims that Locke did not act threatening or menacing or point the gun at officers. Defendants admit that Locke possessed the gun at the time he was shot. "Merely" is a legal conclusion and to admit that Locke only "merely" possessed the gun is obviously a clerical error. Defendants have good cause to amend their answer. Though an amendment is not necessary prior to this motion because, again, the facts of this case are depicted in the video – which shows Locke gripping, raising, and pointing the gun in the direction of officers.

attempt to argue Locke's actions were not menacing or threatening. *Partridge* and *Cole* are inapposite.

In *Partridge v. City of Benton*, a mother called the police because she believed her son was suicidal and he went into the woods with a gun. 929 N.W.2d 562, 564 (8th Cir. 2019). When the officer found her son, the son raised the gun to his own temple, which is consistent with someone who is suicidal. *Partridge*, 952 N.lW.2d at 564. The officer yelled at the son to drop the weapon, and as he moved the gun away from his own temple, the officer shot him. *Id*. No BWC footage of the incident existed. The complaint gave no information regarding the direction the gun moved, the speed or the timing. *Id*. at 566. No BWC laid out those facts, thus simply saying the gun moved was not enough information because, in the abstract, the movement of the gun from away from his own temple was consistent with him dropping the weapon and complying with the officers' orders. *Id*. Here, the purpose of the interaction was entirely different. Officers were executing a high-risk search warrant to arrest a cold-blooded murder, rather than being dispatched to prevent the decedent from self-harm. There was no movement of the gun suggesting Locke was dropping the weapon. He kept it forward, held tightly in his hand. He did not follow commands. Locke's actions garner more suspicion than someone who is only threatening to hurt themselves and for which officers are there to prevent such harm. The officers here were not at the apartment on a

16

welfare check.  They were there to execute a high-risk warrant relating to a murder over drugs.  Moreover, in *Partridge*, the teenager already had the gun when officers encountered them.  Here, Locke chose to arm himself upon hearing officers state, "Police. Search warrant" and looked at Sergeant Carlson in the face.   Locke continued to hold the gun in a threatening manner until he was shot.

*Cole v. Hutchins*, 959 F.3d 1127 (8th Cir. 2020) is also readily distinguishable. In *Cole*, officers were dispatched to a domestic fight in progress.  *Id*. at 1130. They arrived at the scene and saw two men fighting for ten seconds when one man walked toward his front porch. *Id*. They saw the decedent walk to his vehicle and retrieve a long gun from it and walk back up to house of the man he is fighting with while holding the gun vertically. *Id*. at 1130-31. When the decedent started up the front steps, the other man went inside and slammed his door shut.  *Id*. at 1131. The decedent then backed down the steps and turned away from the door toward his vehicle.  *Id*. At this point, five seconds after the man was inside of his house and the decedent left the house, the officer shot the decedent without any warning.  *Id*. In that moment, when the decedent had retreated down the front steps turned away from the house, with the other man inside of the house, the decedent was no longer a threat.  *Id*. at 1133. Moreover, the officer stood "silent" when he saw the decedent retrieve his gun, go back to the fight, and when he retreated. *Id*. at 1134.  He issued no warning or commands.  *Id*.

Here, there was no clear indication that the threat was over when Hanneman decided to use deadly force. Locke did not obey commands, drop the gun or in any manner indicate that he was not "ready to shoot." When officers yelled, "Police. Search warrant" Locke grabbed the gun. When an officer kicked the couch and told him to get on the ground, Locke did not. Nor did Locke drop the gun. Instead, Locke emerged from under the covers holding a handgun in his hand "ready to shoot" leaning forward on the ottoman. That he did not have his finger on the trigger is of no consequence because the time it would take to bring the finger to the trigger from the side of the gun was negligible. Whether that was his intent is unknowable and irrelevant. To an objectively reasonable officer, Locke looked ready to shoot. A person who appears ready to shoot is an immediate threat.

Plaintiffs allege Hanneman had the opportunity to issue a warning but provides no caselaw to support that a warning was feasible under the circumstances. The circumstances here were far more dire than in *Liggins*, where no warning was issued but the force remained reasonable. "When the hesitation involved in giving a warning could readily cause such a warning to be the officer's last, then a warning is not feasible." *Liggins*, 971 F.3d at 801.

*Cole* and *Partridge* demonstrate that some level of immediate threat of serious physical harm must be apparent at the time an officer decides to use deadly

force.  Here, there are no factual allegations or reasonable inferences suggesting that Locke was no longer a threat at the time Hanneman decided to use deadly force.  There are however ample facts to demonstrate Locke posed an objective and immediate threat to the officers when Hanneman shot him.

Plaintiffs did not allege sufficient facts to support a conclusion that the shooting was objectively unreasonable under the specific circumstances – which is required under *Graham*.

## IV.   <u>HANNEMAN IS ENTITLED TO QUALIFIED IMMUNITY</u>

For the reasons stated above and consistent with the caselaw cited *supra*, no constitutional right was violated because Officer Hanneman's use of force was objectively reasonable.  Additionally, in February 2022, there was no clearly established law that would have placed an officer on notice that the use of deadly force here would violate the constitution. To the contrary, a reasonable officer would have correctly believed that deadly force was authorized under established caselaw, as set forth above.  Accordingly, Hanneman is entitled to qualified immunity.

## V.   <u>PLAINTIFFS' MONELL AND CANTON CLAIMS FAIL</u>

 Plaintiffs make three unavailing arguments that their *Monell* and *Canton* claims survive the Defendants' motion:  that the search warrant did not sufficiently delineate that the search warrant would be dangerous or that the murder suspect

19

or the weapon used could be in Apartment 701; that the City uses no knock warrants disproportionately on black persons; and, officers use excessive force on black persons, generally. All of Plaintiffs' arguments fail because there is a lack of causation between those allegations and Locke's cause of death. Locke's death was not caused by the alleged customs asserted by Plaintiffs. His death was caused by use of force, not those alleged customs Plaintiffs assert. Municipalities actions must be the moving force behind the injury. *Bd. Cnty Commrs. v. Brown*, 520 U.S. 397, 4040 (1997). Because Hanneman's force was not unconstitutional, there is no "moving force" that caused Locke's death. Without that moving force, the *Monell* claims fail.

*Monell* liability requires the alleged custom to be the moving force behind the particular unconstitutional force in the present matter and not merely the "but for" cause. *Harris v. Pagedale,* 821 F.2d 499, 507 (8th Cir. 1987)(citing *Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986)). Plaintiffs must establish a direct causal link between the custom and the constitutional violation here. *City of Canton v. Harris*, 489 U.S. 378,385 (1989). It is a "rigorous standard[ ] of causation" in order to prevent opening the flood gates to liability to every actions in which something could have been done to prevent it from occurring. *Brown*, 520 U.S. at 404-05; *see also Connick v. Thompson*, 563 U.S. 51, 75 (2011); *City of Oklahoma v. Tuttle,* 471 U.S. 808, 823 (1985). To establish *Monell* liability, Plaintiffs must demonstrate that:

> [T]hrough its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bd. Cnty Com'rs of Brian Co., v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

Here, Count II of the First Amended Complaint alleges constitutional violations of the First Amendment, Fourteenth Amendment, and Equal Protection Clause were the moving force behind Locke's death. (Doc. 68 at ¶¶195, 197.) The complaint does not plausibly plead a causal link between any allegedly unconstitutional practice or custom and Locke's death, including under a theory of Equal Protection. To the contrary, Locke's death was caused by his raising and pointing of a gun in the direction of officers during the execution of a high-risk search warrant related to a murder investigation.

Contrary to Plaintiffs' assertions, the use of a no knock warrant here has no bearing on the reasonableness analysis for a deadly force analysis. The Fourth Amendment seizure analysis does not consider the events leading up to the force. *Yang v. City of Minneapolis*, 607 F.Supp.3d 880, 893 (D. Minn. 2022)("whether an officer's actions may have created the need to use deadly force is not relevant to whether the officer's use of force was reasonable.") The Court's analysis must focus on the reasonableness of the seizure itself, that is, the shooting, and not on

the events leading up to it. *Id.* at 893 (citing *Schulz v. Long*, 44 F.3d 643, 648 (8th Cir. 1995)); *see also Gardner v. Bueger*, 82 F.3d 248, 252 (8th Cir. 1996).[2]  As the Eighth Circuit has explained, "The Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general. Consequently, we scrutinize only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment." *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) (citations omitted). Because Hanneman's actions were constitutional, and because Locke was the moving force behind his death, the *Monell* claim fails for any of the asserted reasons.  *Watkins v. City of St. Paul*, 2016 WL 6398287, at *1 (D. Minn. 2016)(citing to <u>*Monell*</u>, 436 U.S. at 691); *Reynolds v. City of Little Rock*, 893 F.2d 1004, 1007 (8th Cir. 1990) ("The necessary predicate for liability of the City and individual supervisors, however, is a finding that the LRPD officers who shot Reeves used excessive force under the circumstances."). And because any alleged

---

[2] See also *Bella v. Chamberlain,* 24 F.3d 1251, 1255 (10th Cir. [1994]) ("'we scrutinize only the seizure itself, not the events leading to the seizure'"); *Carter v. Buscher,* 973 F.2d 1328, 1332 (7th Cir. 1992) ("pre-seizure conduct is not subject to Fourth Amendment scrutiny"); *Fraire v. City of Arlington,* 957 F.2d 1268, 1275–76 (5th Cir. 1992) (rejecting as irrelevant evidence that police officer manufactured the circumstances which gave rise to the seizure); *Greenidge v. Ruffin,* 927 F.2d 789, 792 (4th Cir. 1991) ("the officer's liability [is to] be determined exclusively upon an examination and weighing of the information [the officers] possessed immediately prior to and at the very moment [they] fired the fatal shot[s]").

causal connection between the alleged customs and Locke's death is broken by Locke's own actions.

Count III alleges a *City of Canton* claim of failure to train officers regarding the same practices alleged above. This argument fails for the same reason the *Monell* claim fails.

## VI.  <u>IF THE COURT DISMISSES THE FEDERAL CLAIMS, IT SHOULD ALSO DISMISS THE STATE CLAIM</u>

Plaintiffs ask this Court to remand the Wrongful Death claim to state court if it dismisses the federal claims.  This Court should not do so. Plaintiffs chose to bring this action in federal court and to remand now smacks of forum shopping. Also, the Court will have decided the federal claims based on the same nucleus of facts. If the Court deems the shooting lawful, the case should be dismissed in its entirety. If Hanneman's conduct was lawful, Locke's death was not wrongful. And Hanneman should not be forced to defend himself again in another forum.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court

to grant their motion for judgment on the pleadings in its entirety.

Dated:  November 14, 2023

KRISTYN ANDERSON
City Attorney
By
*/s/ Tracey N. Fussy*
TRACEY N. FUSSY (#3117807)
KRISTIN R. SARFF (#388003)
MARK ENSLIN (#338813)
Assistant City Attorneys
Minneapolis City Attorney's Office
350 South Fifth Street, Room 210
Minneapolis, MN 55415
(612) 673-2254
(612) 673-3919
(612) 673-5132
tracey.fussy@minneapolismn.gov
kristin.sarff@minneapolismn.gov
mark.enslin@minneapolismn.gov

*Attorneys for Defendants*