UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Karen Wells and Andre Locke, *as co-trustees for the next of kin of Amir Rahkare Locke, deceased*, | File No. 23-cv-273 (ECT/DLM) |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| Mark Hanneman, *in his individual capacity as a Minneapolis police officer*, and City of Minneapolis, | |
| Defendants. | |

Jeffrey S. Storms, Naomi Martin, and Ryan O. Vettleson, Storms Dworak LLC, Minneapolis, MN; Antonio R. Romanucci, Bhavani K. Raveendran, and Sam Harton, Romanucci & Blandin, LLC, Chicago, IL; Christopher M. O'Neal, Ben Crump Law PLLC, Tallahassee, FL, for Plaintiffs Karen Wells and Andre Locke.

Tracey N. Fussy, Kristin R. Sarff, Mark S. Enslin, and Rebekah Murphy, Minneapolis City Attorney's Office, Minneapolis, MN, for Defendants Mark Hanneman and City of Minneapolis.

In the early morning of February 2, 2022, Amir Locke was shot and killed by Defendant Mark Hanneman, a Minneapolis Police Department officer. The basic facts surrounding Amir's death are not disputed. Officer Hanneman was part of a Minneapolis Police Department SWAT team. The SWAT team was searching for a murder suspect. As part of its search, the team executed a no-knock search warrant on an apartment. Amir was asleep on a couch in the apartment. The officers' entry into the apartment roused Amir,

who was holding a handgun. Officer Hanneman began firing after he saw the handgun in Amir's hand.

Plaintiffs Karen Wells and Andre Locke are co-trustees for Amir's next of kin. Karen and Andre brought this case to recover damages arising from Amir's death. Through 42 U.S.C. § 1983, they claim that Officer Hanneman violated Amir's Fourth Amendment rights and that the City of Minneapolis implemented unconstitutional policies and practices that caused Amir's death. Karen and Andre also assert a wrongful-death claim under Minnesota law.

Defendants seek judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The primary issue is whether Officer Hanneman possesses qualified immunity from suit. In Defendants' view, video recorded by the SWAT team officers' body-worn cameras establishes conclusively that Officer Hanneman did not violate Amir's clearly established Fourth Amendment rights. This is so, Defendants argue, because police officers have a right to shoot an armed person who poses a threat, and the body-worn camera videos show that Amir possessed a handgun and did not comply with officers' demands to show them his hands.

The motion will be denied. Plaintiffs allege facts plausibly showing that Officer Hanneman's use of force violated Amir's clearly established Fourth Amendment rights. As presented at this stage, the body-worn-camera videos show Amir was armed, but they do not conclusively establish that Amir's actions justified the use of deadly force. The City's only argument for its separate dismissal depends on Officer Hanneman's dismissal. Regardless, Plaintiffs allege plausible claims against the City. And Plaintiffs' wrongful-

2

death claim survives because the official-immunity rules by which this claim is judged under Minnesota law are comparable to the qualified-immunity inquiry under federal law.

I

Begin with the standards governing a Rule 12(c) motion's adjudication. A motion for judgment on the pleadings is assessed under the same standards as a Rule 12(b)(6) motion. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). Under the familiar Rule 12(b)(6) standards, a court must accept a complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). A pleading's allegations must "state a claim to relief that is plausible on its face." *Id.* at 570. Considering "matters outside the pleadings" generally transforms a Rule 12(b)(6) motion—and, by extension, a Rule 12(c) motion—into one for summary judgment, but not when the documents are "necessarily embraced" by the pleadings. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (citation omitted).

As noted, Defendants' motion relies on videos recorded by SWAT team officers' body-worn cameras, and the parties dispute whether these videos may be considered at this stage. Defendants argue the videos contradict the operative Amended Complaint's allegations and instead establish Defendants' version of the dispositive facts. Plaintiffs argue the videos cannot be considered at this stage of the proceedings if they contradict the Amended Complaint's factual allegations. Alternatively, Plaintiffs argue the videos are at

3

times difficult to discern and have inconsistent time stamps, making the incident's precise facts and timeline unclear.

Our Eighth Circuit Court of Appeals has provided clear guidance governing the consideration of videos recorded by police officers' body-worn cameras in the Rule 12(c) context: "Videos of an incident are necessarily embraced by the pleadings" and therefore may be considered in adjudicating a motion for judgment on the pleadings. *Ching v. City of Minneapolis*, 73 F.4th 617, 621 (8th Cir. 2023). A complaint's allegations should not be accepted "if they are blatantly contradicted by video evidence." *Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019) (cleaned up). On the other hand, "[i]nconclusive video evidence must be construed in the plaintiff's favor." *Abdullah v. Lepinski*, No. 23-cv-121 (ECT/DTS), 2023 WL 5515895, at *2 (D. Minn. Aug. 25, 2023); *see Evans v. Krook*, --- F.4th ---, No. 23-2753, 2024 WL 3283787, at *2 (8th Cir. July 3, 2024); *see also Raines v. Counseling Assocs., Inc.*, 883 F.3d 1071, 1075 (8th Cir. 2018); *Maser v. City of Coralville*, No. 23-cv-028, 2023 WL 8526724, at *2 (S.D. Iowa Nov. 2, 2023) ("The Court . . . will rely on the video to override a party's denial of a fact only when the video footage is definitive; if the footage is unclear, the factual dispute will be resolved in [the plaintiff's] favor as the non-moving party.").

The SWAT team officers' body-worn camera videos are therefore appropriately considered in adjudicating Defendants' motion. The dispositive question is whether the videos negate any plausible allegations or inferences that Defendants violated Amir's clearly established Fourth Amendment rights. The Amended Complaint's factual

4

allegations and the videos' content—or what the parties contend the videos show—will be discussed in tandem.

II

Turn to the facts alleged in the Amended Complaint and as shown by the body-worn-camera videos. In late January 2022, a homicide was committed in St. Paul involving the use of armor-piercing bullets. Based on surveillance videos from the area near the homicide, the St. Paul Police Department focused on a person named Mehki Speed as the prime suspect. Am. Compl. [ECF No. 40] ¶ 72. Mehki lived in apartment 1402 of the Bolero Flats apartment building on South Marquette Avenue in Minneapolis. *Id.* ¶¶ 71, 73. Mehki's brother, Marlon, lived in the same building, in apartment 701. *Id.* ¶¶ 78–79. Amir was Mehki and Marlon's cousin. *Id.* ¶ 80.

The St. Paul Police Department secured warrants to search both apartments 1402 and 701, telling the issuing judge that Mehki was "associated with" apartment 701, had requested a key fob for that apartment in the past, and that Minneapolis Fire Department medics had transported Mehki from apartment 701 two weeks earlier. *Id.* ¶ 76; *see also* Answer Ex. 11 [ECF No. 17] at 7. The St. Paul Police Department asked the Minneapolis Police Department to execute the warrants. Am. Compl. ¶ 83. The Minneapolis Police Department agreed to do so only if the warrants were re-issued as "no-knock" warrants rather than "knock and announce" warrants.[1] *Id.* ¶ 84. St. Paul Police then applied for and received no-knock warrants for the apartments. *Id.* ¶ 86.

---

[1] The Fourth Amendment generally requires that a government official executing a search warrant knock and announce the official's presence before entering a residence. *See*

5

Minneapolis SWAT Team 1280 executed the warrants in the early morning of February 2, 2022. *Id.* ¶¶ 90, 98. Amir was sleeping under a blanket on a couch in apartment 701. *Id.* ¶¶ 92, 94. The couch faced away from the apartment's entrance and sat in a living room that was "straight ahead after entering the door to the apartment." *Id.* Defendant Mark Hanneman is a Minneapolis Police Officer who served on SWAT Team 1280; he was the third member of the team to enter apartment 701 on February 2, after Sergeant John Sysaath and Sergeant Troy Carlson. *Id.* ¶¶ 99, 107; *see also* ECF No. 16 Ex. 3 (Hanneman BWC)[2] at 6:48:05.

"Approximately six seconds after Team 1280 crossed the threshold into Apartment 701, Sgt. Carlson encountered Amir on the couch." Am. Compl. ¶ 109; ECF No. 16 Ex. 2 (Carlson BWC) at 6:47:30. Sergeant Carlson kicked the couch, and Amir fell to the floor. Am. Compl. ¶¶ 110–11; ECF No. 16 Ex. 5 (Pearson BWC) at 6:48:08. Amir, still draped in the blanket, "began to stand and grabbed [his] handgun . . . ." *Id.* ¶ 112. Officer Hanneman came around the couch at approximately the same time, telling Amir to "[s]how me your hands." *Id.* ¶ 116; ECF No. 16 Ex. 3 at 6:48:09–13. Officer Hanneman then fired three shots at Amir, approximately eight seconds after the SWAT team entered the

---

*Wilson v. Arkansas*, 514 U.S. 927, 934–36 (1995) (holding that knock-and-announce requirement is part of Fourth Amendment's reasonableness inquiry, with exceptions such as when the "circumstances present[] a threat of physical violence"). "In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).

[2] Exhibit 16 consists of the body-worn camera (or "BWC") videos from nine officers involved in the incident.

6

apartment and two seconds after Sergeant Carlson kicked the couch.  Am. Compl. ¶¶ 120–21; ECF No. 16 Ex. 5 at 6:48:11; ECF No. 16 Ex. 1 (Sysaath BWC) at 6:48:13.

The Amended Complaint alleges that Amir did not have his finger on the handgun's trigger at any time, kept the gun pointed down, and "never raised the handgun in a threatening manner in the direction of any officer or other person."  Am. Compl. ¶ 114. The Amended Complaint also alleges that, when Officer Hanneman told Amir to "show me your hands," Amir lowered the gun's barrel and muzzle further toward the ground and raised his left hand to the side of his head.  *Id.* ¶¶ 118–19.  Before Amir "could fully comply with [Officer] Hanneman's command," the Amended Complaint alleges, Officer Hanneman fired his weapon.  *Id.* ¶ 120.

According to Defendants, the body-worn-camera videos reveal a different account of these events.  Defendants say the videos show that Amir looked up as police entered the apartment, went back under the blanket, moved around under the blanket, and held the gun by its grip.  Defs.' Mem. in Supp. [ECF No. 65] at 6–7; ECF No. 16 Ex. 5 at 6:48:10.  These actions, in Defendants' view, contradict the Amended Complaint's allegations that Amir was complying with Officer Hanneman's commands.

This description of the body-worn camera videos is not persuasive at this Rule 12(c) stage.  In the form they have been presented with this motion, the body-worn-camera videos provide dim, unclear images of the incident's critical moments.  Plaintiffs proffer screenshots from the videos that reasonably may be construed to support the finding that Amir was attempting to put the gun down and was raising his other hand immediately before Officer Hanneman fired.  *See* Pls.' Mem. in Opp'n [ECF No. 68] at 29–32.  A careful

7

review of the videos shows that Amir's actions are obscured by darkness or the officers themselves, making it difficult to determine how Amir responded to the officers' commands.[3]  Accepting Defendants' characterization of the video evidence would therefore not be faithful to Rule 12(c)'s requirement that allegations and materials embraced by the complaint—including body-worn-camera video—be construed in a light most favorable to the plaintiff.  In view of the Amended Complaint's allegations and the body-worn-camera video, it remains plausible that Amir was attempting to comply with officers' directions to drop the handgun and surrender before he was shot.

III

Defendants seek judgment on the pleadings as to Officer Hanneman based on qualified immunity.  In determining whether Officer Hanneman has qualified immunity, two questions are answered: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional . . . right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009); *see also Watson v. Boyd*, 2 F.4th 1106, 1109 (8th Cir. 2021).  Courts may consider the questions in either order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  A § 1983 plaintiff can defeat a claim of qualified immunity only if the answer to both questions is yes.  *Id.*  "Qualified immunity 'protects all but the plainly incompetent or

---

[3]     To be clear, I reviewed and re-reviewed each of the body-worn-camera videos, frequently pausing some videos in an attempt to discern specific events.  The videos cannot reasonably be construed to establish any fact that might contradict the Amended Complaint's core allegations.  Perhaps the videos are capable of enhancements.  Regardless, that kind of evidence has not been provided with this motion.

8

those who knowingly violate the law.'" *Sok Kong Tr. for Map Kong v. City of Burnsville*, 960 F.3d 985, 991 (8th Cir. 2020) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). If the material facts are not genuinely disputed, then the constitutionality of an officer's conduct is a question of law. *Thompson v. Reuting*, 968 F.2d 756, 759 (8th Cir. 1992); *see also Pollreis v. Marzolf*, 66 F.4th 726, 732 n.2 (8th Cir. 2023); *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003). "[Q]ualified immunity questions should be resolved at the earliest possible stage of a litigation." *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987).

Plaintiffs allege that Officer Hanneman violated Amir's clearly established Fourth Amendment right to be free from unreasonable seizures. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.").[4] Several general principles guide the qualified-immunity analysis in this context. Determining whether a police officer's use of force violates this right "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Sok Kong Tr. for*

---

[4] The Amended Complaint also invokes the Fourteenth Amendment. *See* Am. Compl. at 36. The Fourteenth Amendment does not apply. Its substantive-due-process protections apply to an excessive-force claim when there has been no seizure. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843–44 (1998). Here, because Amir was shot and killed, there was a "seizure." *See Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[A]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach.").

9

*Map Kong*, 960 F.3d at 991 (quoting *Kisela*, 584 U.S. at 103). "Reasonableness 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,'" and must "embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quoting *Kisela*, 584 U.S. at 103).

More specific considerations govern the qualified-immunity analysis in the use-of-deadly-force context. "'[A]bsent probable cause' for an officer to believe the suspect poses 'an immediate threat of death or serious bodily injury' to others, 'use of deadly force is not objectively reasonable.'" *Cole v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020) (quoting *Billingsley v. City of Omaha*, 277 F.3d 990, 993 (8th Cir. 2002)). "Generally, an individual's mere possession of a firearm is not enough for an officer to have probable cause to believe that individual poses an immediate threat of death or serious bodily injury; the suspect must also point the firearm at another individual or take similar 'menacing action.'" *Id.* Well before February 2, 2022, it was clearly established that an officer violates the Fourth Amendment when he uses deadly force on an armed individual who is moving his gun in compliance with officers' commands. *Partridge v. City of Benton*, 70 F.4th 489, 492 (8th Cir. 2023); *see Craighead v. Lee*, 399 F.3d 954, 961 (8th Cir. 2005) (holding that the use of deadly force against an individual holding a gun over his head, pointed upward, is unreasonable).

Applying these rules here shows that Officer Hanneman is not entitled to qualified immunity at the Rule 12(c) stage. According to the Amended Complaint, Amir possessed

a handgun, but "never raised the handgun in a threatening manner in the direction of any officer or other person." Am. Compl. ¶ 114. And, the Amended Complaint alleges, after Officer Hanneman ordered Amir to show his hands, Amir lowered the firearm's barrel and muzzle further toward the ground and began raising his left hand. *Id.* ¶¶ 118–19. These allegations plausibly show that Amir did not point the firearm at officers or use the weapon in a menacing way and that Amir was attempting to comply with officers' commands. As explained above, in the form they have been presented on this motion, the body-worn-camera videos do not contradict these allegations. Under *Cole* and *Partridge*, among other Eighth Circuit cases, the Amended Complaint's uncontradicted allegations plausibly show the violation of a clearly established right.

Defendants rely on *Liggins v. Cohen*, 971 F.3d 798 (8th Cir. 2020), for their argument that Officer Hanneman's conduct was objectively reasonable. Defs.' Mem. in Supp. at 18–19. In *Liggins*, an officer shot an armed individual. *Liggins*, 971 F.3d at 800. The individual was running toward the officer, holding a gun by its barrel and pointed down. *Id.* The district court denied summary judgment to the officer on qualified immunity grounds, finding disputed questions of fact as to whether the officer acted reasonably. *Id.* The Eighth Circuit reversed, finding that undisputed facts established that the officer's actions were objectively reasonable: a person carrying a gun was running in the direction of the police officer, the gun was moving as he ran, and the officers were investigating a report of a stolen firearm. *Id.* at 801. Because the officer had only one or two seconds to react, he had "reasonable grounds to believe that the fleeing subject who was running . . . could raise the gun and shoot." *Id. Liggins* teaches that "i[n] dangerous

11

situations where an officer has reasonable grounds to believe that there is an imminent threat of serious harm, the officer may be justified in using a firearm before a subject actually points a weapon at the officer or others." *Id.*

Defendants argue that the entry of summary judgment in *Liggins* shows that judgment on the pleadings should be entered here, but this argument is not persuasive. Defendants are correct that, like the officer in *Liggins*, Officer Hanneman faced a "split-second decision." *Id.* And it is true, as Defendants note, that the Supreme Court has found an officer's conduct reasonable when the officer "had mere seconds to assess the potential danger." *Kinsela*, 584 U.S. at 105. *Liggins* is nonetheless distinguishable for its procedural posture. Here, as noted, the Amended Complaint allows the plausible inference that Officer Hanneman either saw or should have seen that Amir was not using the handgun in a threatening manner and was attempting to comply with officers' commands. Am. Compl. ¶¶ 114, 118–19. Discovery may ultimately reveal that "[i]t was not practical in that moment for [Officer Hanneman] to discern whether [Amir] was carrying the gun in an unusual manner . . . ." *Liggins*, 971 F.3d at 801. At this stage, "[t]aking the facts in the complaint as true and drawing all reasonable inferences in [Plaintiffs'] favor, [the officer] shot a non-resisting, non-fleeing [individual] as he moved his gun in compliance with [officer's] commands . . . ." *Partridge*, 929 F.3d at 567.

Plaintiffs raise three alternative contentions that deserve comment. (1) The Amended Complaint includes several allegations regarding Amir's state of mind. *See, e.g.*, Am. Compl. ¶ 112 (alleging that Amir "grabbed the handgun to assess the threat that jarred him awake"). The qualified immunity "analysis must consider only what a reasonable

12

officer on the scene would have perceived." *Liggins*, 971 F.3d at 801; *see Morgan-Tyra v. City of St. Louis*, 89 F.4th 1082, 1090 (8th Cir. 2024) (Kelly, J., dissenting). (2) Plaintiffs argue that Officer Hanneman's failure to command that Amir drop the handgun establishes that the use of deadly force was not reasonable. Not so. "When the hesitation involved in giving a warning could readily cause such a warning to be the officer's last, then a warning is not feasible." *Liggins*, 971 F.3d at 801 (quoting *Hicks v. Scott*, 958 F.3d 421, 437 (6th Cir. 2020)). (3) Plaintiffs argue that the underlying search warrant was invalid because it was not supported by probable cause. This lack of probable cause, Plaintiffs contend, establishes the unreasonableness of Officer Hanneman's conduct. Again, this is not correct. The Fourth Amendment analysis considers only the circumstances at the time of the seizure—here, the use of deadly force—not the events leading up to it. *Cole*, 993 F.2d at 1333 ("[W]e scrutinize only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment."). "[T]he . . . standard of reasonableness *at the moment* applies" to claims of excessive force. *Graham*, 490 U.S. at 396 (emphasis added).

## IV

Plaintiffs raise two § 1983 claims against the City of Minneapolis. In Count Two, they claim the City maintained unconstitutional practices and customs that violated its citizens' equal protection rights and their right to be free from the unreasonable use of force. Am. Compl. ¶¶ 194–200. In Count Three, they claim the City failed to adequately train its officers to avoid violating citizens' rights under the Fourth and Fourteenth Amendments. *Id.* ¶¶ 201–07.

A municipality is a "person" to whom the prohibitions of § 1983 apply. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). But a municipality is not liable "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691. "[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* While a municipality may be liable only for its own illegal acts, *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986), if the "execution of a government's policy or custom . . . inflicts the injury [] the government as an entity [may be held] responsible under § 1983. *Monell*, 436 U.S. at 694. As the Supreme Court explained, municipal liability under § 1983 lies when "official policy [is] the moving force of the constitutional violation." *Id.* "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

In addition to liability for unconstitutional policies, practices, and customs, a municipality may be liable for failing to properly train its public servants, including police officers. Inadequate training "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). A municipality "may be deemed deliberately indifferent if the policymakers choose to retain" a training program when they "are on actual or constructive notice that a particular

omission in [that] training program causes city employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 61–62.

### A

The City's only argument against Count Two is that Officer Hanneman's qualified immunity precludes the claim. The determination that Officer Hanneman is not entitled to qualified immunity defeats this contention. Regardless, whether Officer Hanneman has qualified immunity for Plaintiffs' Fourth Amendment claim is not dispositive of the claim that City practices and customs violate the Equal Protection Clause.

"[A] municipality may be held liable for its unconstitutional policy or custom even when no official has been found personally liable for his conduct under the policy or custom." *Webb v. City of Maplewood*, 889 F.3d 483, 486 (8th Cir. 2018). In *Webb*, the plaintiffs challenged a city policy of issuing arrest warrants for failure to pay traffic fines, alleging the policy violated their equal-protection and due-process rights. *Webb*, 889 F.3d at 484–85. While each plaintiff had been subjected to this practice, they did not sue the individual police officers who arrested them; they sued the city that promulgated the allegedly unconstitutional policy. *Webb v. City of Maplewood*, No. 16-cv-1703, 2017 WL 2418011, at *1 (E.D. Mo. June 5, 2017), *aff'd*, 889 F.3d 483 (8th Cir. 2018). The city argued it was immune because "all of the individuals the complaint identifies as participating in the contested practices are personally immune from suit." *Webb*, 889 F.3d at 486. The Eighth Circuit rejected this contention: "even if . . . [City] officials all enjoy personal immunity from suit, it hardly follows that they did not engage in any unlawful acts or that the City is thereby immune as well." *Id.*

The Eighth Circuit has explained that "situations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation." *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002) (citing, *inter alia*, *Garcia v. Salt Lake Cnty.*, 768 F.2d 303 (10th Cir. 1985)).

> *Monell* does not require that a jury find an individual defendant liable before it can find a local governmental body liable.  The language of § 1983 "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." *Monell,* 436 U.S. at 692.  Although the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.

*Garcia*, 768 F.2d at 310.

The theory underlying Count Two is consistent with these cases.  Plaintiffs allege the City had a policy or custom of executing no-knock warrants and of using excessive force against people of color, and that these policies violate the Equal Protection Clause.  Am. Compl. ¶ 196.  Plaintiffs describe statistics showing that, in 2021 and 2022, eighty percent of no-knock warrants executed by Minneapolis police targeted Black subjects.  *Id.* ¶ 154.  The Amended Complaint alleges that no warrants of this type were executed against a non-Hispanic white subject.  *Id.*  Plaintiffs allege that the police officers may have been acting reasonably according to official policy, but that the policy in question—executing no-knock warrants exclusively on people of color—was unconstitutional.  The bottom line, then, is that the City's exclusive reliance on Officer Hanneman's entitlement to qualified

immunity as the ground to challenge Count Two is not persuasive. The officer is not entitled to qualified immunity, and even if he were, that fact alone would not undermine the plausibility of Count Two's policy or custom claim.

B

As with Count Two, Defendants seek dismissal of Plaintiffs' failure-to-train claim in Count Three solely on the basis that Officer Hanneman is entitled to qualified immunity. "It is the law in this circuit . . . that a municipality may not be held liable on a failure to train theory unless an underlying Constitutional violation is located." *Schulz v. Long*, 44 F.3d 643, 650 (8th Cir. 1995). Because Plaintiffs have plausibly alleged that Officer Hanneman is not entitled to qualified immunity, however, the failure-to-train cannot be dismissed on this basis.

Regardless, Plaintiffs' allegations are sufficient. The elements of a § 1983 failure-to-train claim are: (1) that training was inadequate; (2) that the failure to train "reflects a deliberate and conscious choice" by the municipal entity; and (3) the deficiencies in training actually caused the injury at issue. *Ambrose v. Young*, 474 F.3d 1070, 1079 (8th Cir. 2007) (citation omitted).

The Amended Complaint alleges that Minneapolis Police Department training regarding the use of force and the use of no-knock warrants was inadequate, that policymakers knew it was inadequate and knew that the inadequate training allowed Minneapolis police officers to violate citizens' rights, and that the failure to adequately train Minneapolis police officers resulted in Amir's death. Am. Compl. ¶¶ 202–03. Were these Plaintiffs' only allegations in support of the failure-to-train claim, Defendants would

17

likely be entitled to judgment on this claim. *See B.A.B., Jr. v. Bd. of Educ.*, 698 F.3d 1037, 1040 (8th Cir. 2012) (affirming failure-to-train claim's dismissal because the plaintiff did not allege facts plausibly showing the claim's elements). Unlike the plaintiffs in *B.A.B.*, however, Plaintiffs here outline the City's knowledge of the Minneapolis Police Department's use of no-knock warrants, including four specific instances where police officers' use of no-knock warrants resulted in injuries and consequent civil lawsuits against the City. Am. Compl. ¶¶ 41–44. Plaintiffs also plead that the City had notice that Officer Hanneman specifically had violated other individuals' rights during the execution of search warrants, but that the City did not offer Officer Hanneman, or any other officer, additional training in the constitutional execution of search warrants. *Id.* ¶¶ 50–55. And Plaintiffs allege that independent investigators, including the United States Department of Justice, found Minneapolis Police Department training regarding the use of force to be constitutionally insufficient. *E.g.*, *id.* ¶ 166.

V

Defendants seek dismissal of Plaintiffs' Minnesota-law wrongful death claim, arguing they are entitled to official immunity. "[U]nder Minnesota law a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion. Generally, police officers are classified as discretionary officers entitled to that immunity." *Johnson v. Morris*, 453 N.W.2d 31, 41–42 (Minn. 1990) (en banc) (citations omitted). Discretionary conduct on the part of a police officer is entitled to official immunity unless "the official committed a willful or malicious wrong." *Elwood v. Rice Cnty.*, 423 N.W.2d 671, 679 (Minn. 1988)

18

(en banc). The official-immunity determination "contemplates less of a subjective inquiry into malice, which was traditionally favored at common law, and more of an objective inquiry into the legal reasonableness of an official's actions." *Hassan v. City of Minneapolis*, 489 F.3d 914, 920 (8th Cir. 2007) (quoting *State ex rel. Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994) (en banc)). Malice in this context is usually a question for the jury, although "Minnesota courts rule in favor of a defendant when 'no reasonable jury could find the [officers] acted with bad faith or malicious intent.'" *Smith v. City of Minneapolis*, 754 F.3d 541, 549 (8th Cir. 2014) (alteration in original) (quoting *Elwood*, 423 N.W.2d at 679); *but cf. Stresemann v. Jesson*, No. A13-1967, 2015 WL 7693339, at *2 (Minn. Ct. App. Nov. 30, 2015) ("The law concerning a motion to dismiss for failure to state a claim is not hospitable to the doctrine of official immunity.").

The same reasoning that led to the denial of qualified immunity leads here to the denial of official immunity. *See Craighead*, 399 F.3d at 963. Plaintiffs allege facts plausibly showing that Officer Hanneman's use of deadly force violated Amir's clearly established Fourth Amendment rights. In other words, Officer Hanneman's use of deadly force was not legally reasonable. That is enough to defeat official immunity on this record.

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendants' Motion for Judgment on the Pleadings [ECF No. 63] is **DENIED**.

Dated: July 8, 2024

s/ Eric C. Tostrud
Eric C. Tostrud
United States District Court